**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SOROOF TRADING DEVELOPMENT COMPANY, LTD., Plaintiff, | ) | No. 10 Civ. 1391 (LTS) (JCF) |
| v. | ) | |
| GE FUEL CELL SYSTEMS, LLC GE MICROGEN, INC., and PLUG POWER INC. Defendants. | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF SOROOF TRADING DEVELOPMENT COMPANY, LTD.'S MOTION FOR PARTIAL SUMMARY JUDGEMENT

# TABLE OF CONTENTS


Table of Authorities .......... 3

Preliminary Statement .......... 4

Procedural History .......... 5

Statement of Facts .......... 7

Argument

I. STANDARD OF REVIEW UNDER RULE 56 .......... 12

II. APPLICATION OF DELAWARE LAW .......... 13

III. GE FUEL CELL WAS IMPROPERLY DISSOLVED IN CONTRAVENTION OF TITLE 6, SECTION 18-804(B)(3) OF THE DELAWARE CODE .......... 13

IV. THE CORPORATE VEILS OF BOTH GE MICROGEN AND GE FUEL CELL SHOULD BE PIERCED TO HOLD GE AND PLUG POWER LIABLE FOR THE ACTIONS OF GE FUEL CELL .......... 17

A. GE Fuel Cell was the alter ego of GE Microgen and GE .......... 18

B. GE at all times acted through its shell, GE Microgen .......... 20

Conclusion .......... 22

# TABLE OF AUTHORITIES

## COURT CASES

Woodford v. Community Action of Greene County, Inc., 268 F.3d 51, 54 (2d Cir. 2001) ..... 12

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ..... 12

Fax Telecommunicaciones Inc. v. AT & T, 138 F.3d 479, 485 (2d Cir. 1998) ..... 12

Gottlieb v. County of Orange, 84 F.3d 511, 519 (2d Cir. 1996) ..... 12, 13

Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) ..... 13

Ritchie Capital Management, LLC v. Coventry First LLC, No. 07 Civ. 3494, 2007 WL 2044656, (S.D.N.Y. July 17, 2007) ..... 13, 17

Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d. Cir. 1995) ..... 13

Metro Commun. Corp. BVI. v. Adv. Mobilecomm Tech., Inc., 54 A.2d 121, 139 (Del. Ch. 2004) ..... 14

Thor Merrit Square, LLC v. Bayview Malls LLC, No. 4480-VCP, 2010 WL 972776 (Del. Ch. Ct. Dec. 16, 2010) ..... 14

Hallmark Cards, Inc. v. Matthews, Inc., No. Civ.A. 99-2129, 1999 WL 1212196, (E.D.Pa. Dec. 16, 1999) ..... 17

Blair v. Infineon Technologies AG, 720 F. Supp. 2d 462, 470-471 (D.Del. 2010) ..... 18

United States v. Golden Acres, Inc., 702 F. Supp. 1097 1104 (D. Del. 1988) ..... 18

UBS Securities, Inc., v. Tsoukanelis, 852 F. Supp. 244 (S.D.N.Y. 1994) ..... 19

Northern Tankers (Cyprus) Ltd. v. Backstrom, 967 F. Supp. 1391, 1401-1402 (D.Conn. 1997) ..... 20

Directors Guild America, Inc. v. Garrison Productions, Inc., 733 F. Supp. 755, 762 (S.D.N.Y. 1990) ..... 22

## FEDERAL RULES

Fed. R. Civ. Pro. 56 ..... 12

## STATE STATUTES

6 Del. Code § 18-1804 ..... 14

## PRELIMINARY STATEMENT

Plaintiff Soroof Trading Development Company, Ltd. ("Soroof"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment ("Motion"). Partial Summary Judgment is warranted in this case against Defendants, GE Fuel Cell, LLC ("GE Fuel Cell"),[1] GE Microgen, Inc. ("GE Microgen") and Plug Power, Inc. ("Plug Power"), because the undisputed evidence proves that GE Fuel Cell was improperly dissolved and that it was the alter ego of its immediate parent companies, GE Microgen and Plug Power (as well as GE Microgen's parent,, General Electric Company, Inc. ("GE"), which exercised ultimate control over the GE Fuel Cell venture).

Phase I discovery is now complete. It has revealed that, despite knowing of their financial exposure to legal claims by Soroof, Defendants deliberately and improperly caused the dissolution of GE Fuel Cell without making <u>any</u> provisions for these claims, reasonable or otherwise, in direct contravention of Delaware law. Specifically, Title 6, Section 18-804(b)(3) of the Delaware Code requires that a dissolving LLC make reasonable provision to compensate all known claims against a dissolved LLC, or claims that, based on facts known to the LLC, are likely to arise or become known to the LLC within 10 years after the date of dissolution. Here, Defendants were fully aware of Soroof's claims, and rather than address those claims, they

[1] As will be addressed more fully below, evidence obtained through Phase I discovery revealed that General Electric Company, Inc. ("GE") at all times maintained complete dominion and control over the GEFCS venture, including the actions of GEFCS's two members, GE Microgen and GE Fuel Cell. Soroof filed a motion to amend the Complaint to add GE as a party to this action, which motion has been fully briefed. <u>See</u> Plaintiff's Motion and Memorandum of Law for Leave to Amend the Complaint and Modify the Scheduling Order filed on October 29, 2010 ("Motion for Leave") at Dkt. # 56-58. In light of GE MicroGen's Motion for Judgment, which is *sub judice* before your Honor, Magistrate Judge Francis declined to rule on the Motion for Leave at this stage of the proceedings. Instead, he denied the Motion for Leave *without prejudice* to Soroof re-filing it after this Court rules on the pending Motion for Judgment.

brazenly dissolved GE Fuel Cell without making any provisions to shield themselves from liability. Thus, this Court should find as a matter of law that Defendants failed to properly dissolve GE Fuel Cell in accordance with Delaware law.

In addition, discovery has revealed that GE Fuel Cell was nothing more than an empty shell that its members failed to adequately capitalize. In fact, GE Fuel Cell lacked even the most basic elements constituting an independent existence from its members and GE. Despite, having never adhered to corporate formalities while GE Fuel Cell was in existence, Defendants now seek to rely on those very same formalities as a shield from liability. As such, the undisputed evidence requires that the corporate veils of GE Fuel Cell and GE Microgen be pierced to hold the real parties in interest, GE and Plug Power liable for the wrongdoing GE Fuel committed at these Defendants' direction.

## PROCEDURAL HISTORY

This litigation originally commenced on July 1, 2008, when Soroof initiated AAA arbitration proceedings against GE Fuel Cell. GE Fuel Cell filed a Motion to Dismiss and asserted, among other things, that GE Fuel Cell was a dissolved entity, and, consequently, it claimed that Soroof could maintain no actions against it. Soroof opposed GE Fuel Cell's Motion to dismiss, arguing, *inter alia*, that GE Fuel Cell, as a Delaware limited liability company, was required by the Delaware Code to "make such provision as will be reasonably likely to be sufficient to provide compensation" for claims that are either known or reasonably should have been known to GE Fuel Cell. See DEL. CODE ANN. Tit. 6, § 18-804(b)(3). GEFCS made no such provisions and failed to notify Soroof of its dissolution. See Complaint at ¶ ¶ 27-29. The latter fact is not disputed. Consequently, GE Fuel Cell's dissolution was ineffective and improper and its members – Defendants Plug Power and GE Microgen – and any other affiliate who

participated in or caused the dissolution are liable to Soroof for the actions of GE Fuel Cell giving rise to this litigation and the transfer of the $1 million deposit paid by Soroof. The Arbitration Panel, chaired by the Hon. Kathleen Roberts, a retired federal judge from this Honorable Court, addressing the same arguments now before this Court, denied GE Fuel Cell's Motion to Dismiss without prejudice to GE Fuel Cell filing a motion for summary judgment after discovery. See Ex. A, Prehearing Order No. 2. Unfortunately for Defendants, the discovery conducted on this issue has only weakened their position since the Arbitration Panel denied the Motion to Dismiss.

After the motion to dismiss was denied, Soroof notified GE Fuel Cell of its intention to move to compel GE MicroGen and Plug Power to join the arbitration. Subsequently, Defendants requested and Soroof agreed, *inter alia*, to enter into the Agreement on Venue ("Venue Agreement"), whereby the parties agreed to dismiss the arbitration proceedings and move the litigation to the United States District Court for the Southern District of New York. In accordance with the Venue Agreement, on February 22, 2010, Soroof filed its complaint against GE Fuel Cell and its two parent and principal shareholders GE Microgen and Plug Power in this action. The Defendants maintained that GE Fuel Cell had been properly dissolved, thereby rendering GE Microgen and Plug Power immune from liability. As such, the parties agreed to a phased discovery plan, with Phase I discovery limited to circumstances surrounding the dissolution and/or winding up of GE Fuel Cell with Phase II discovery to follow and to address Soroof's substantive claims. Phase I discovery is now complete and whether (a) GE Fuel Cell was dissolved properly and (b) the corporate veils of GE Fuel Cell should be pierced to hold GE Microgen and Plug Power accountable are now ripe for consideration.

## STATEMENT OF FACTS

In or about February 1999, GE acting through its subsidiary, GE Microgen, and Plug Power established a joint venture, GE Fuel Cell. See Ex. B, Plug Power 8-K at PP1000149. GE Fuel Cell was established to act as the worldwide distributor for Plug Power's Proton Exchange Membrane Fuel Cell (the "Product"). See Ex. C, Scovello Dep. Tr. at 33:4-13. While GE Fuel Cell was established as a separate entity, from its inception it remained wholly dependant on GE Microgen, GE and Plug Power. In fact, although, GE Microgen was the joint venture partner, it was GE that at all times controlled the actions of GE Microgen and by extension GE Fuel Cell. First, GE provided all of the financing for GE Fuel Cell.[2] Second, GE provided all of the manpower for GE Fuel Cell; that is, GE Fuel Cell did not have a single employee of its own but instead all of the individuals tasked to GE Fuel Cell were employees of GE. See Ex. C, Scovello Dep. Tr. at 32:22-33:3; Ex. D, Deposition of Gerard L. Conway, Plug Power General Counsel ("Conway Dep." at 6:25-7:3; 20:23-21:3. Third, Plug Power provided physical space within it own offices to house GE Fuel Cell's operations.[3] Yet, there was no evidence of any GE Fuel Cell presence at Plug Power's facilities. Instead, the so-called GE Fuel Cell offices were marked by a GE Microgen sign. See Ex. D, Conway Dep. at 22:13-22. Fourth, the Management Committee of GE Fuel Cell was composed entirely of GE and Plug Power representatives. See Ex. E, Action by Written Consent of Members of GE Fuel Cell Systems, LLC. Fifth, GE employee, Frank Scovello, acted as the president of both GE Fuel Cell and GE Microgen, although he was really employed by GE through its energy division. See Ex. F, Termination

---

[2] Mr. Scovello testified: "I can tell you that the original funding of the LLC, GE agreed to fund the expenses of the LLC initially." See Ex. C, Scovello Dep. Tr. at 44:23-25.

[3] See Ex. D, Conway Dep. Tr. at 18:24-19:4 ("GE leased a part of Plug Power's facility. They had maybe two dozen business development and engineering folks that basically worked out of that space.")

Agreement at GE 000061; Scovello Dep. at 32:22-33:3. Finally, GE Fuel Cell was never capitalized. That is, GE Fuel Cell never had any assets. In fact, at the time of its dissolution, GE Fuel Cell had "[n]o cash on hand" and "was not really a going concern." Ex. C, Scovello Dep. Tr. at 48:22-24; 49:1-9. In fact, according to Mr. Scovello, "[t]he only thing we had were things related to our physical presence within the Plug Power building. We had a server that we used for our computer connections, and a telephone switch, and a small amount of furniture. And that was it." Id.

As the global distributor for the Product, GE Fuel Cell entered into territorial distribution agreements with third-party distributors. One such territorial distribution agreement was with Soroof. On or about June 6, 2000 Soroof and GE Fuel Cell signed the "Distributor Agreement Between GE Fuel Cell Systems, LLC, and Soroof Trading Development Company Ltd." (the "Agreement"). See Ex. G, the Agreement. The Agreement established Soroof as the exclusive distributor for Product in the Kingdom of Saudi Arabia. Id. at ¶ 3.1. Pursuant to the Agreement, Soroof paid GE Fuel Cell a "distributor fee" of $1 million. Id. at ¶ 6.4. Soroof paid this fee on the premise that GE Fuel Cell actually had saleable Product to deliver. See Ex. H, Declaration of James Jackson ("Jackson Decl.") at ¶ 7. Although, this money was paid to GE Fuel Cell, the funds were diverted to defer the costs of other GE employees who were "supporting" the activities of GE Fuel Cell. See Ex. C, Scovello Dep. Tr. at 121:15-20.

In conjunction with the Agreement, Defendants required Soroof to ready itself for distributing the Product, including, *inter alia*, by hiring staff and outfitting offices. See Ex. H, Jackson Decl. at ¶ 6. Specifically, to undertake its obligations under the Agreement, Soroof expended in excess of $1 million, which expenditures were contemplated and, in fact, required by GE Fuel Cell. Id.

Soroof undertook these additional expenditures under the belief that GE Fuel Cell was fully capable of performing its obligations; i.e., that it had saleable Product for delivery to Soroof, as warranted in the Agreement. Specifically, GE Fuel Cell warranted that "[i]t has full authority and capacity to enter into **and perform its obligations** under this Agreement." See Ex. G., Agreement at ¶ 10.1.2 (emphasis added). GE Fuel Cell further warranted that it had "full legal right, power and authority to enter into **and perform** this Agreement." Id. at ¶ 10.1.4 (emphasis added). Moreover, should circumstances surrounding GE Fuel Cell's ability to deliver Product change at any time, GE Fuel Cell had a continuing obligation "to share promptly relevant information, including but not limited to product performance, failure and liability issues...." Id. at ¶ 7.4. As it turned out, GE Fuel Cell's warranties were false when made.

In or around November of 2000, Defendants notified Soroof that the Product would not be ready for distribution as promised. See Ex. H, Jackson Decl. at ¶ 8. According to Defendants, the Product was functional, but it did not yet meet quality standards. Id. Although, Defendants claimed quality standards prevented delivery of the Product, in reality there was no Product to be delivered at all.[4] The fuel cell contracted for was supposed to produce power continuously, twenty-four hours a day, seven days a week. See Ex. C, Scovello Dep. Tr. at 38:8-21. However, as early as 2001, it became apparent that Plug Power could not develop a fuel cell that could actually meet these specifications. Id.. at 102:11-19. The best Plug Power could develop was a back-up generator. Id. at 74:22-75:6. Despite knowing as early as 2001 that Plug Power was unlikely to develop the contracted for Product, Defendants continued to assure Soroof

[4] Frank Scovello testified that, "[b]asically, that Plug was unable to produce the product to our specifications. They were producing technology, but it was considered pre-commercial by GE. So there was no commercial product that we could provide Soroof." See Ex. C, Scovello Dep. Tr. at 101:21-25.

that Product was forthcoming. Defendants made these assurances knowing that there actually was no Product and that one was unlikely to ever be developed at all.[5] Despite Soroof having raised concerns regarding the failure to deliver Product from as early as 2002, Defendants' never honestly conveyed to Soroof relevant information regarding the Product, as required under section 7.4 of the Agreement. Id. at 101:1-11.

Rather, Defendants continued to falsely assure and dupe Soroof that the Product would eventually be delivered. See Ex. H, Jackson Decl. at ¶ 9. During this time, Defendants encouraged Soroof to expand its infrastructure in preparation to distribute the Product. Id. at ¶ 8. The Defendants fell into a pattern, whereby they repeatedly contacted Soroof and claimed that the Product was not yet ready due to various problems, while at the same time assuring Soroof that Product was forthcoming. Id. at ¶ 9. To placate Soroof for its patience, Defendants agreed to expand Soroof's territory to encompass Lebanon. Id. In light of Defendants' repeated assurances, Soroof entered negotiations with various third-parties whereby Soroof would deliver potentially thousands of units of Product throughout Saudi Arabia and Lebanon. Id. at ¶ 11. Defendants' false assurances also had the added consequence of causing Soroof to maintain its offices and workforce at great expense. Id. It was not until the early months of 2005 that Defendants finally informed Soroof that they could not overcome the apparent problems in bringing the Product to market (and to Soroof). Id. at ¶ 12.

It cannot be disputed and the evidence is overwhelming that GE, GE Fuel Cell, GE Microgen and Plug Power were fully aware of Soroof's potential claims against GE Fuel Cell. In late 2005 and early 2006, Soroof expressed its dissatisfaction with Defendants complete lack

[5] See Ex. C, Scovello Dep. Tr. at 103:1-3 (Mr. Scovello explained that "it became clearer and clearer to us the challenge that was involved and that the product would **never** be developed.") (emphasis added).

of performance under the Agreement. See, e.g., Ex. H, Jackson Decl. at ¶ 13; Ex. C Scovello Dep. at 37:2-38:7. Based on the concerns raised by Soroof, Defendants were aware that they could face potential legal liability for their failure to perform under the Agreement.[6] As such, when the decision was made to dissolve GE Fuel Cell, GE sought a very broad indemnity from Plug Power to cover any possible claims raised by Soroof.[7] However, in light of Plug Power's unwillingness to grant such a broad indemnity, the Defendants capped it at $1 million. [8]

In 2006, Soroof again raised the issue of the Agreement's termination and possible financial implications resulting therefrom.[9] However, neither during these conversations nor after did Defendants ever inform Soroof of the impending dissolution of GE Fuel Cell. Despite knowledge of Soroof's possible legal claims, and that it might seek to hold Defendants

---

[6] See, e.g., Ex. I, January 5, 2006 E-mail from A. Bucknam, Plug Power's Vice President of Business Development, to Mark Sperry, Plug Power's former Chief Marketing Officer ("GE took a $1MM payment from [Soroof], and now is concerned about **legal problems** given that the distributors feel that they didn't get value for their $'s.") (emphasis added); Ex. D, Conway Dep. Tr. at 34:14-19 and 13:23-25; see also Ex. J, January 26, 2006 E-mail from R. Menon, a Plug Power employee charged with sales and development, to Frank Scovello ("During our conversation this morning, [Soroof] did bring up the financial issues surrounding the expired GE agreement...[m]y fear is that...they may circle back to the investment they made to secure the [GE Fuel Cell] distributorship and somehow hold Plug Power accountable."); Ex. D, Conway Dep. Tr. at 45:11-13

[7] See Ex. C, Scovello Dep. Tr. at 125:21-126:9; see also Ex. D; Conway Dep. Tr. at 66:11-68:22.

[8] See Ex. K, February 28, 2006 E-mail from Greg Silvestri, former Chief Operating Officer of Plug Power, to Sergey Polikarpov ("Essentially, GE is looking for Plug Power to broadly and fully indemnify GE for any possible actions taken at any future date by the distributors...Plug Power's position is that we will not sign such a broad and open ended agreement...."); Ex. D, Conway Dep. Tr. at 61:14-15; see also Ex. C, Scovello Dep. Tr. at 125:21-126:9; Ex. D, Conway Dep. Tr. at 71:17-72:25.

[9] See Ex. C, Scovello Dep. Tr. at 90:19-91:21; see also Ex. J, January 26, 2006 E-mail from R. Menon, *supra* footnote 6.

accountable, GE, GE Microgen, and Plug Power quietly and without notice dissolved GE Fuel Cell.[10] GE Fuel Cell's dissolution became effective on December 31, 2006. See Ex. M; Executed Certificate of Cancellation of GE Fuel Cell.

## ARGUMENT

### I) STANDARD OF REVIEW UNDER RULE 56.

Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. Pro. 56(a). Not every "dispute" requires the denial of summary judgment, however, as "[a] factual dispute does not present a genuine issue precluding summary judgment unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Woodford v. Community Action of Greene County, Inc., 268 F.3d 51, 54 (2d Cir. 2001) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Thus, "[t]he mere existence of *some* alleged factual dispute...will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Fax Telecommunicaciones Inc. v. AT & T, 138 F.3d 479, 485 (2d Cir. 1998) (emphasis in original) (internal citation omitted). Moreover, "[i]f the undisputed facts reveal that there is an absence of sufficient proof as to any essential element on which the opponent of summary judgment has the burden of proof, any factual dispute with respect to other elements becomes immaterial and cannot defeat the motion." Gottlieb v. County of Orange, 84 F.3d 511, 519 (2d Cir. 1996).

Although the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought, the opposing party must come

[10] See Ex. C, Scovello Dep. Tr. at 92:22-25; see also Ex. D, Conway Dep. Tr. at 27:7-10.

forward with materials setting forth specific facts showing that there is a genuine issue of material fact to be tried; a party "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." Gottlieb, 84 F.3d at 518; see also Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) ("mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.").

## II) APPLICATION OF DELAWARE LAW.

Under New York law, "[q]uestions relating to the internal affairs of corporations…are generally decided in accordance with the law of the place of incorporation." See Ritchie Capital Management, LLC v. Coventry First LLC, No. 07 Civ. 3494, 2007 WL 2044656, *4 (S.D.N.Y. July 17, 2007). Here the two issues to be decided, whether GE Fuel Cell was dissolved properly and whether its corporate veil should be pierced, implicate the internal affairs of GE Fuel Cell, a Delaware limited liability company. As such, both of these issues warrant the application of Delaware law. See Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d. Cir. 1995) (finding that "Delaware law determines whether the corporate veil should be pierced" because "the state of incorporation determines when the corporate form will be disregarded and liability will be imposed"); see also Ritchie Capital Management, LLC, 2007 WL 2044656 at *4 (finding that Delaware law on piercing the corporate veil should be applied to a Delaware LLC).

## III) GE FUEL CELL WAS IMPROPERLY DISSOLVED IN CONTRAVENTION OF TITLE 6, SECTION 18-804(B)(3) OF THE DELAWARE CODE.

Defendants presume that GE Fuel Cell's dissolution renders them immune to any and all claims. To accept Defendants' proposition would mean that any limited liability company, to avoid litigation, could simply dissolve and then hide its members behind the corporate veil.

However, Delaware law imposes strict requirements on a dissolving LLC, and failure to adhere to those requirements will necessitate the nullification of the certificate of dissolution.

Section 18-804(b)(3) of the Delaware Code, provides as follows:

> (b) A limited liability company which has dissolved:
>
> (3) Shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been known to the limited liability company or that have not arisen **but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within 10 years after the date of dissolution.**

6 Del. Code § 18-1804 (emphasis added). The import of section 18-804(b)(3) is crystal clear. GE Fuel Cell was required, by law, to make provisions so that it could provide compensation for claims brought within 10 years of its dissolution. And its failure to do so here is in direct contravention of Delaware law. See Metro Commun. Corp. BVI. v. Adv. Mobilecomm Tech., Inc., 854 A.2d 121, 139 (Del. Ch. 2004) (finding that plaintiffs had sufficiently pled facts that could nullify the dissolution of a limited liability company on the grounds that the dissolved company had failed to make any provision for known likely legal claims).

Here, there is no dispute that Defendants did not make any provision whatsoever to address any known claims against GE Fuel Cell. Rather, GE Fuel Cell dissolved the way it began its existence: with nothing. GE Fuel Cell's improper dissolution directly implicates section 18-804(b)(3) because, as demonstrated below, Defendants had knowledge of Soroof's claims, but rather than make reasonable provision to compensate Soroof, they chose to simply disregard their obligations.

Recently, the Delaware Court of Chancery in Thor Merrit Square, LLC v. Bayview Malls LLC, No. 4480-VCP, 2010 WL 972776 (Del. Ch. Ct. Dec. 16, 2010), explicated what constitutes a reasonable provision under section 18-804(b)(3). In Thor Merrit the defendants were obligated

to undertake repairs in conjunction with the sale of their property. Thor Merrit, 2010 WL 972776, *1. The defendants put aside money in an escrow account to cover the costs of these repairs. Id. The defendants claimed that the money in the escrow account satisfied their obligations under section 18-804(b)(3). Id. at *4. The Court rejected this argument. Id. at *5. The Court found that despite knowing the total cost of repairs, the defendants had put aside only at best a quarter of their financial exposure. Id. As such, the Court found that defendant's failure to put aside sufficient funds indicated that Defendants failed to make reasonable provision for unmatured claims...before they filed the Dissolved Defendants' certificates of cancellation." Id. Thus, in Thor Merrit, the Court found that where a party dissolved by making some provision to address future claims but not enough to address all known claims this was insufficient to meet the "reasonable provision" requirement of section 18-804(b)(3).

Accordingly, under the standard of Thor Merrit, any provision that fails to make full recompense will not meet the requirements of section 18-804(b)(3). Here, there is no evidence whatsoever, that Defendants undertook any effort to satisfy any, let alone all, of Soroof's claims. First, section 18-804(b)(3) requires that any provision be structured to provide compensation for claim holders of the dissolved LLC. Here, it is undisputed that no compensation provision of any kind was ever established. Second, the only measure Defendants arguably made was to pursue an unsuccessful effort to enter into an alternative distribution agreement with Soroof for a new power generator. See Ex. F, Termination Agreement at §2(b). However, an unsuccessful effort to enter into a contract for a generator that did not come close to meeting the specifications

of the original contracted for Product cannot be regarded as a "reasonable provision" under the standards of section 18-804(b)(3).[11]

Further, Soroof anticipates that Defendants may argue that no reasonable provision was required because they had no formal notice of Soroof's claims. This hollow argument is belied by both the plain meaning of the statute and the undisputed facts. However, nothing in the statute's language requires the tendering of a formal notice to trigger this duty. Instead, the statute plainly imposes the duty on the "limited liability company which has dissolved," in this case GE Fuel Cell, to make reasonable provision to address likely future claims "based on facts known" to it. Here, it is undisputed that GE Fuel Cell knew of possible claims by Soroof.

Defendants were aware that Soroof had paid a $1 million distribution fee for what turned out to be a right to distribute a fuel cell that did not even exist. Defendants were also aware that Soroof had incurred additional costs and expenses at Defendants' behest in order to take delivery and distribute Product. Soroof's costs were further compounded by the need to maintain office space and employees based on Defendants' repeated assurances over a five-year period that Product would arrive. Further, Soroof had expressed its concerns about the failure to deliver Product as early as 2002, in late 2005 and again in early 2006.[12] Knowing all this, GE was correctly "concerned about legal problems" by Soroof.[13] Thus, Defendants cannot credibly argue that they had no notice of possible claims by Soroof.

---

[11] As Mr. Scovello testified, the new generator developed by Plug Power "was **totally different** than what GE had totally envisioned when we entered into the agreement with Plug" and that "[i]t was a backup power rather than a 24/7 continuous power." See Ex. C, Scovello Dep. Tr. at 74:22-75:6 (emphasis added).

[12] See Ex. C, Scovello Dep. Tr. at 90:19-91:13; see also Ex. H, Jackson Decl. at ¶ 13.

[13] See Ex. I, January 5, 2006 E-mail from A. Bucknam, *supra* footnote 6.

In fact, the indemnity negotiations between Defendants reveal knowledge of possible claims after the Agreement's termination. Discussions of the breadth of the indemnity only occurred after the Agreement ended. As such, if Defendants actually believed that the Agreement's termination would also end any possible liability there would have been no need for the indemnity. It is precisely because they were aware of their liability exposure post termination that they negotiated the indemnity. Thus, there is no basis for Defendants to argue that their exposure would end when the Agreement expired. In fact, Defendants' efforts to craft an indemnity clearly demonstrate that they did not believe this to be the case.

## IV) THE CORPORATE VEILS OF GE FUEL CELL SHOULD BE PIERCED TO HOLD GE MICROGEN AND PLUG POWER LIABLE FOR THE ACTIONS OF GE FUEL CELL.

In addition to finding that GE Fuel Cell's dissolution was contrary to Delaware law, this Court should also pierce the corporate veils of GE Fuel Cell to hold its parents, GE Microgen and Plug Power, liable for the actions of GE Fuel Cell. Because, as shown below, GE Fuel Cell at all times acted as the alter ego of Plug Power and the GE entities. Under Delaware law, "to prevail on an alter ego theory of liability, a plaintiff must show that the two corporations operated as a single economic entity such that it would be inequitable...to uphold a legal distinction between them." See Ritchie Capital Management, LLC, 2007 WL 2044656, at *5 (internal citation omitted) (applying Delaware law on veil piercing). Further, "an alter ego analysis commences with an examination of factors which exposes how the corporation operates and the particular defendant's relationship to that operation." Hallmark Cards, Inc. v. Matthews, Inc., No. Civ.A. 99-2129, 1999 WL 1212196, *4 (E.D.Pa. Dec. 16, 1999) (applying Delaware law).

Among the factors Delaware Courts consider to determine if a company is acting as the alter ego of another are: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporation; (5) siphoning off of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) whether the corporation is merely a facade. See Blair v. Infineon Technologies AG, 720 F. Supp. 2d 462, 470-471 (D.Del. 2010). While no single factor would justify a decision to disregard the corporate entity, some combination is required as well as an overall element of injustice or unfairness. See United States v. Golden Acres, Inc., 702 F. Supp. 1097 1104 (D.Del. 1988).

A) GE Fuel Cell was the alter ego of GE Microgen and Plug Power.

Throughout its existence, GE Fuel Cell was nothing more than a shell within a shell of the ultimate controlling entity, GE. Among all the factors considered by courts in piercing the corporate veil, “the one that all authorities consider significant in the inquiry...is inadequate capitalization.” See Golden Acres, Inc., 702 F. Supp. at 1104 (internal citation omitted). Here, there is no dispute that GE Fuel Cell was grossly undercapitalized. First, GE Fuel Cell had no cash assets. See Ex. C, Scovello Dep. Tr. at 48:22-49:9. In fact, all of its operational funds came from GE. Id. at 44:15-25. Further, given that Plug Power never managed to develop any Product that could be sold, GE Fuel Cell had no means to generate any revenue. Id. at 48:22-49:9. Thus in the absence of any actual product to distribute, the only method for GE Fuel Cell to generate revenue was through the sale of distribution rights. However, any revenue actually generated through these rights was siphoned off to pay the expenses of other GE employees. As Mr. Scovello explained under oath: “That $1 million [distribution fee paid to GE Fuel Cell by Soroof] went to offset the cost, my salary, the salaries of Barry Glickman and all the other people that were involved in supporting the activities of [GE Fuel Cell], yes.” Id. at 121:15-20. Thus,

given that GE Fuel Cell could generate no revenue whatsoever and had used the funds paid to it by Soroof to offset GE salaries, the only assets it could claim as its own were a computer server, a telephone switch and some furniture. Id. at 49:5-7.

In addition to undercapitalization, GE Fuel Cell lacked even the most basic elements of an independent existence. First, as Mr. Scovello succinctly stated "[GE Fuel Cell] had no employees." Id. at 32:25-33:1. All of the personnel assigned to "support" GE Fuel Cell were actually employees of GE.[14] Further, the whole Management Committee of GE Fuel Cell was composed entirely of Plug Power and GE representatives. Also, Mr. Scovello acted as the president of GE Fuel Cell, although he was at all times an employee of GE.[15]

It is precisely in circumstances such as these that courts have found it both necessary and equitable to pierce the corporate veil. This reasoning is exemplified by the Southern District's decision in UBS Securities, Inc., v. Tsoukanelis, 852 F. Supp. 244 (S.D.N.Y. 1994). In Tsoukanelis, the Court, applying Delaware law, found that piercing the corporate veil was warranted where: "there was a general absence of the formalities and paraphernalia that are part and parcel of corporate existence. For example...[defendant] had no employees, offices or bank account, kept no financial statements, never filed a tax return and never held any meetings of any sort after it was incorporated." See Tsoukanelis, 852 F. Supp. at 248. Here there was not a general but a complete "absence of the formalities" of a separate corporate existence.

---

[14] Mr. Scovello explained in his deposition that: "GE provided people to support the joint venture as did Plug Power." See Ex. C, Scovello Dep. Tr. at 33:1-2.

[15] See Ex. C, Scovello Dep. Tr. at 24:4-5 ("I was for a brief time president of [GE Fuel Cell]. But I never was employed by GE Fuel Cell."). Id. at 32:14-33:1 (the people responsible for supporting GE Fuel Cell activities "were GE Energy employees. GEFCS had no employees.")

B) GE at all times acted through its shell, GE Microgen.

Although this issue is not yet pending before the Court, it is worth noting that the undisputed evidence demonstrates that GE Microgen's corporate veil should also be pierced to hold the ultimate parent company of both, GE, liable. See Northern Tankers (Cyprus) Ltd. v. Backstrom, 967 F. Supp. 1391, 1401-1402 (D.Conn. 1997) (piercing multiple corporate veils to hold the ultimate owners liable where defendants "set up corporations that own corporations that own corporations that allegedly conduct business"). The undisputed evidence demonstrates that both GE Microgen and GE Fuel Cell were nothing more than shell corporations controlled and financed by GE. First, just as with GE Fuel Cell, GE Microgen was undercapitalized and had no assets of its own. The initial funds provided to finance GE Fuel Cell were not provided by GE Microgen but by GE itself.[16] Further, if additional financing were required, this money again would not be provided by GE Microgen but would be obtained from GE itself.[17]

In addition to lacking any funding to finance its or the operations of GE Fuel Cell, GE Microgen also did not have any employees. First, Frank Scovello, the President of GE Fuel Cell and GE Microgen was actually an employee of GE Energy, a division of GE.[18] In addition, all of the other employees assigned to assist with GE Microgen and GE Fuel Cell were also GE employees employees. See Ex. C, Scovello Dep. Tr. at 32:22-25. Finally, perhaps best

---

[16] See Ex. C, Scovello Dep. Tr. at 44:23-25, *supra* footnote 2.

[17] Section 5.5(a) of the Amended and Restated Limited Liability Company Agreement states: "[GE Microgen] shall arrange for its Affiliate, GE, to provide, during the period ending 12/31/2005, in the form of loans to [GE Fuel Cell], capital as required to fund [GE Fuel Cell's] operations...." See Ex. L, Amended and Restated Limited Liability Company Agreement of GE Fuel Cell at ¶ 5.5(a).

[18] Mr. Scovello stated: "No I was never employed by GE Microgen. My employer was GE Energy at the time I was involved with this activity with Soroof." See Ex. C, Scovello Dep. Tr. at 12:18-20.

illustrating the direct role GE played in the whole GE Fuel Cell venture, Richard Stewart, a GE employee, served as director of GE Microgen, on the Management Committee of GE Fuel Cell and on the Board of Plug Power.[19]

Moreover, it was GE that ultimately decided to dissolve GE Fuel Cell and directed GE Microgen and Plug Power to effectuate GE Fuel Cell's dissolution. See Ex. D, Conway Dep. Tr. at 27:7-10; Ex. C, Scovello Dep. Tr. at 115:12-116:1 ("senior management of GE" decided to terminate the LLC Agreement and dissolve GEFCS). First, although its joint venture agreement was with GE Microgen, Plug Power stated in its 8-K that: "[Plug Power] and GE are terminating their joint venture GE Fuel Cell Systems."[20] Second, in negotiating the breadth of the indemnity, Plug Power did not negotiate with its joint venture partner, GE Microgen, but with GE directly. As Mr. Gerald Conway, Plug Power's general counsel, explained in his deposition, it was GE's legal team that was insisting on an unlimited indemnification to cover all claims by any distributors.[21] As such, the undisputed evidence demonstrates that GE, GE Microgen and GE Fuel Cell perceived themselves as and at all times acted as a single economic entity.[22]

---

[19] See Ex. E, Action by Written Consent of Directors Without a Meeting of GE Microgen, Inc; see also Ex. B, Plug Power 8-K at PP1000151.

[20] See Ex. B, Plug Power 8-K at PP1000149.

[21] See Ex. D, Conway Dep. Tr. at 66:16-20 ("I think that their legal team and this was typical in how GE addressed these things, certainly the legal folks at GE, if there was an opportunity to protect GE, they were interested in doing that.")

[22] In fact, throughout his deposition, Mr. Scovello only refers to "GE" and never makes any distinction as to GE Fuel Cell, GE Microgen and GE itself. For example, with regard to failure to deliver the product, Mr. Scovello stated: "**we** had no product to give them as **GE**." See Ex. C, Scovello Dep. Tr. at 91:5-6 (emphasis added).

Finally, GE's control of GE Microgen and by extension GE Fuel Cell exhibits the requisite level of injustice and unfairness needed to pierce the corporate veils of both GE Fuel Cell and GE Microgen. First, Defendants took a $1 million distributor fee in exchange for distribution rights to a Product that did not even exist. Second, rather than reveal the truth of the Product's unavailability, Defendants continued to assure Soroof that the Product would eventually be delivered. Defendants failure to timely inform Soroof of the Product's non-existence was not only contrary to obligations under the Agreement but also aggravated Soroof's expenses in maintaining its office and employees over a five year period. Finally, despite knowing that Soroof was unhappy with their performance under the Agreement and that they were likely to face legal claims for their failures, Defendants dissolved GE Fuel Cell as a shield from any liability. Thus, piercing the corporate veils of GE Fuel Cell and GE Microgen is warranted because maintaining the legal distinction between the Defendants would not only be inequitable but also validate their abuse of the corporate form. See Directors Guild of America, Inc. v. Garrison Productions, Inc., 733 F. Supp. 755, 762 (S.D.N.Y. 1990) (finding piercing the corporate veil warranted where defendant “controlled every asset, made all major decisions with respect to funding of the corporation, and treated the corporation as his own instrumentality, while at the same time hiding behind the corporate form when creditors...demanded their rightful payments pursuant to the contract.”).

**CONCLUSION**

Here there is no dispute on the key material facts. GE Fuel Cell and its controlling entities, GE, GE Microgen and Plug Power, were fully aware of possible legal claims by Soroof. However, rather than making provisions to compensate Soroof, Defendants simply dissolved GE Fuel Cell in order to avoid their obligations and escape their liabilities. This violated Delaware law. Moreover, the undisputed evidence establishes that there was no legal distinction between

GE Fuel Cell and its controlling entities, GE, GE Microgen and Plug Power. As such, the corporate veils of GE Fuel Cell should be pierced to hold both GE Microgen and Plug Power liable for its actions.

For these reasons, Soroof's Motion for Partial Summary Judgment should be granted, and this Court should find (1) that GE Fuel Cell was dissolved in a manner contrary to Delaware law and (2) the corporate veil of GE Fuel Cell should be pierced to hold GE Microgen and Plug Power responsible for its conduct.

Dated: February 28, 2011

Respectfully submitted,

KALBIAN HAGERTY LLP

By: /s/ Haig V. Kalbian

Haig V. Kalbian (*pro hac vice*)
Mary M. Baker (*pro hac vice*)
Aaron W. Knights (*pro hac vice*)
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
T: (202) 223-5600
F. (202) 223-6625
hkalbian@kalbianhagerty.com
mmb@kalbianhagerty.com
aknights@kalbianhagerty.com

James R. Lynch (JL-2778)
Jason Kaufman
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York, New York 10018
T: (212) 302-2400
F: (212) 302-2210
lynch@lawlynch.com
kaufman@lawlynch.com

*Counsel for Plaintiff Soroof Trading Development Company, Ltd.*