UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOROOF TRADING DEVELOPMENT COMPANY, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>GE FUEL CELL SYSTEMS, LLC, GE MICROGEN, INC., and PLUG POWER INC.,<br><br>Defendants. | Civil Action No. 10 CIV 1391 |

**DEFENDANTS PLUG POWER INC. AND GE MICROGEN, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants Plug Power Inc. ("Plug Power") and GE Microgen, Inc. ("GE Microgen") hereby submit their Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

*Formation of GE Fuel Cell Systems, LLC*

1. In February 1999, Plug Power and GE Microgen entered into an agreement to form a limited liability company, GE Fuel Cell Systems, LLC ("GEFCS"), organized under the laws of the State of Delaware. Declaration of Dahlia S. Fetouh ("Fetouh Decl."), Exhibit 1, Deposition of Gerard L. Conway, Jr. ("Conway Dep."), at 17:11-17:17 ("It was organized, it was set up as a Delaware limited liability company. Originally there were two members. One was GE Microgen. They had 75 percent interest in the LLC. And Plug Power had a 25 percent interest. They were the managing member, GE

Microgen."); Fetouh Decl., Exhibit 2, PPI000031-75, Amended and Restated Limited Liability Company Agreement of GE Fuel Cell Systems, L.L.C. ("GEFCS LLC Agreement"). GE Microgen and Plug Power were the sole members of GEFCS. *Id.*

2. Plug Power and GE Microgen formed GEFCS to sell and market fuel cell products that Plug Power was developing. Fetouh Decl., Exhibit 1, Conway Dep., at 17:18-17:20 ("The agreement was set up to sell and market the fuel cell products that Plug Power would produce."); *id.* at 19:20-19:25 ("[T]he limited liability company was set up expressly in the actual formation documents to sell and market the fuel cell products that were anticipated would be produced by Plug Power."); Fetouh Decl., Exhibit 3, Deposition of Frank Scovello ("Scovello Dep."), at 26:11-26:14 ("Q. What was exactly the purpose of setting up GEFCS? A. To become a distributor for the Plug Power Fuel Cell product."); Fetouh Decl., Exhibit 2, GEFCS LLC Agreement ¶ 3.1.

3. The product that Plug Power was developing, and GEFCS was planning to distribute, was a Proton Exchange Membrane ("PEM") fuel cell (the "Product"). The Product was a "prime power fuel cell system . . . its intended application was to replace the generator, the power generation at a residence or small commercial facility." Fetouh Decl., Exhibit 1, Conway Dep., at 87:7-87:16; *id.* at 89:19-90:7 ("Q. What is a proton exchange membrane fuel cell product, in layman's terms? A. That is the fuel cell. That is the – it's an assembly of plates, membranes and catalysts that are stacked together, which is really the heart of the fuel cell product. It is the part of the overall product which you provide the hydrogen fuel to and in which the electrochemical reaction occurs. So when people talk about fuel cells, that's what they are talking about.").

4. The Product – a complex interconnection of three components that included a fuel cell – was intended to be a continuous power product that would produce power twenty-four hours a day, seven days a week. Fetouh Decl., Exhibit 1, Conway Dep. at 87:16-87:19 ("Basically, it consists of three parts, a reformer, a fuel cell stack, and an inverter, that are coupled together."); Fetouh Decl., Exhibit 3, Scovello Dep., at 38:13-38:15 ("When we originally formed GE Fuel Cell Systems, GE's interest was in a Fuel Cell product that would produce power 24/7.").

5. The purpose of GEFCS was to market and sell the resulting PEM fuel cell product to various subdistributors around the world. Fetouh Decl., Exhibit 3, Scovello Dep., at 33:9-33:13 ("GEFCS was set up as the master distributor, worldwide distributor, and then we would in turn sign up other distributors within certain territories to distribute the products that Plug Power would provide to GEFCS."); Fetouh Decl., Exhibit 1, Conway Dep., at 31:11-31:19 ("So in connection with all of this, there were existing agreements that GE had gone out and entered into or GE Fuel Cell Systems had entered into in connection with they basically were subdistributor agreements under this master agreement that GE had with Plug Power or GE Fuel Cell Systems and Plug Power were a party to.").

6. Plug Power and GEFCS entered into a Master Distributor Agreement setting forth GEFCS's obligations to market, sell, and provide services for the Product. *See* Fetouh Decl., Exhibit 4, PPI000001-30, Amended and Restated Distributor Agreement.

7. GEFCS was the vehicle for distributing the product. GE Microgen's role in GEFCS was to manage sales and marketing, and Plug Power's role was to develop and manufacture the product. Fetouh Decl., Exhibit 1, Conway Dep., at 19:25-20:18 ("So our role, Plug

Power's role was to make that product. And that's what we were focused on . . . there was a fair amount of work to be done to actually take this technology and try to commercialize it into a product . . . Q. So it's fair to say that Plug Power's role was to develop the technology and the product. And then GE's role was to market and sell the product. Is that a fair synopsis of how things worked? A. Correct. Correct."); Fetouh Decl., Exhibit 3, Scovello Dep., at 33:9-33:13 ("GEFCS was set up as the master distributor, worldwide distributor, and then we would in turn sign up other distributors within certain territories to distribute the products that Plug Power would provide to GEFCS.").

8. During the operation of GEFCS, employees of both GE Microgen and Plug Power supported the activities of GEFCS. Fetouh Decl., Exhibit 3, Scovello Dep., at 33:1-33:3 ("It's a joint venture. And GE provided people to support the joint venture as did Plug Power.").

9. Plug Power devoted over 300 employees toward the effort of developing the Product to specifications, while GE Microgen engaged in efforts to market the product nationwide and around the world through its network of subdistributors. Fetouh Decl., Exhibit 3, Scovello Dep., at 48:18-48:20 ("It had over 300 people working on the development. They did significant research and development.").

10. GE Microgen and Plug Power communicated regularly regarding Plug Power's efforts in developing the fuel cell product. Fetouh Decl., Exhibit 1, Conway Dep., at 19:4-19:7 ("So there was regular – I would say there was daily conversation between GE and Plug Power about the development of our products.").

11. GE Microgen leased office space at Plug Power's facility. GE Microgen had office space for more than twenty employees in Plug Power's facility, and each company's office was identified by a separate sign and each company was unable to access the other's space. Fetouh Decl., Exhibit 1, Conway Dep., at 23:8-23:11 ("There were keycards that they could – we had to be invited, if you will, into their space. It wasn't as if we could just walk into their space."); Fetouh Decl., Exhibit 3, Scovello Dep., at 36:9-36:16 ("Q. Why was there a need to relocate to the Plug Power facility? A. Just for convenience and integrating and working with Plug Power. They were our partner in the LLC, and it was just most convenient to locate at their facility. We had separate offices. We were co-located with him [sic]. We had a separate office area. But that was the most convenient.").

12. GE Microgen and Plug Power each had their own employees. Fetouh Decl., Exhibit 3, Scovello Dep., at 32:20-32:21 ("I think we grew to over 20 people that were responsible for supporting the activities of GEFCS."); *id.* at 33:1-33:3 ("And GE provided people to support the joint venture as did Plug Power.").

*Distributor Agreement Between GEFCS and Soroof*

13. On June 6, 2000, GEFCS and Soroof Trading Development Company, Ltd. ("Soroof") entered into a Distributor Agreement (the "Agreement") that would allow Soroof to be the exclusive distributor for the PEM Fuel Cell products within the Kingdom of Saudi Arabia. Fetouh Decl., Exhibit 5, Agreement.

14. At the time that Agreement was negotiated and executed, the PEM Fuel Cell products were still in development. Fetouh Decl., Exhibit 3, Scovello Dep., at 27:20-27:25 ("Plug had demonstrated the Fuel Cell technology, the core technology. They had not produced

the product. The expectation was that Plug would be able to produce a product and that GE would become the master distributor for that product within certain fields of use.”).

15. In exchange for the right to be the sole and exclusive distributor of the PEM Fuel Cell products in Saudi Arabia, Soroof paid a $1,000,000 distributor fee that was specified as “non-refundable” under the terms of the Agreement. Fetouh Decl., Exhibit 5, Agreement ¶ 6.4.

16. The Agreement specifically prohibited consequential damages. Fetouh Decl., Exhibit 5, Agreement ¶¶ 12.2, 15.4.

17. The Distributor Agreement expired on its own terms on December 31, 2005. Fetouh Decl., Exhibit 5, Agreement ¶ 4.1.

18. At the time the Agreement expired, GEFCS had been unable to produce the PEM Fuel Cell products to commercial specifications and no products were available for distribution. Fetouh Decl., Exhibit 3, Scovello Dep. at 93:24-94:1 (“because at time the Prince was aware that we were unable to deliver the original product that we had contemplated in our agreement.”); *id.* at 101:21-101:25 (“Plug was unable to produce the product to our specifications. They were producing technology, but it was considered pre-commercial by GE. So, there was no commercial product that we could provide to Soroof.”).

<u>*Dissolution of GEFCS*</u>

19. Ultimately, the GEFCS business venture was unsuccessful in developing the specified PEM fuel cell product for distribution. Despite the investment of substantial effort and expense, technological challenges in the development of the Product could not be overcome. Plug Power was unable to produce the product as originally envisioned by the

two companies due to these technical challenges, and the LLC was subsequently dissolved for this reason. Fetouh Decl., Exhibit 3, Scovello Dep., at 47:21-48:1 ("GE's original intention was to distribute a certain kind of product that became very clear to us after an amount of time that Plug could not produce that product. When that became evident, that's when we started talking about terminating that agreement because basically we had nothing to sell."); Fetouh Decl., Exhibit 6, PPI000104, Action by Written Consent of the Members of GE Fuel Cell Systems, L.L.C., at PPI000104 ("WHEREAS, the Company has experienced little financial activity over the past several years and is not likely to experience an increase in financial activity before the term of the Agreement expires."); Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149 (explaining that decision to dissolve GEFCS).

20. Since Plug Power went public in 1999, it spent over a half a billion dollars trying to bring the PEM fuel cell products to the marketplace. Fetouh Decl., Exhibit 1, Conway Dep. , at 101:12-102:3 ("Q. Did it ultimately come about that Plug Power would up losing money in connection with the efforts to produce the product that was specified in the GE Fuel Cell contracts? A. Yes. That's why we turned our focus to the GenCore product. Q. Is it something that you know, that you are able to tell us even in a ballpark sense as to how much money Plug Power itself would up losing on these transactions? A. Well, I can tell you that since we have gone public in 1999, we have spent north of half a billion dollars trying to bring these products to the marketplace."). This involved the efforts of over 300 employees in research and development of the fuel cell products. Fetouh Decl., Exhibit 3, Scovello Dep., at 48:17-48:21 ("It was not for lack of trying. It had over 300 people

working on the development. They did significant research and development. It was just a very difficult challenge at the time.").

21. Further, GE Microgen and other General Electric Company affiliates contributed to this investment through the payment of $42.5 million for Plug Power stock during the existence of GEFCS. Fetouh Decl., Exhibit 8, Declaration of Frank Scovello, at p. 9.

22. All parties involved were disappointed that technical challenges prevented the production and distribution of Plug Power's product, as both GE Microgen and Plug Power expended substantial amounts of time and money trying to create and market the product for distribution. Fetouh Decl., Exhibit 1, Conway Dep., at 33:3-33:12 ("I think that obviously all of the subdistributors had anticipated a relationship that didn't materialize. We certainly weren't happy. The idea was that we would be able to commercialize these products earlier on than we ultimately did. So I think there was an awareness that these subdistributors were not necessarily pleased."); *id.* at 41:24-42:3 ("So I don't think anybody was happy with the progress that the fuel cell industry generally was making."); Fetouh Decl., Exhibit 3, Scovello Dep., at 48:16-48:21 ("A. It was a technical challenge. It was a significant technical challenge. It was not for lack of trying. It had over 300 people working on the development. They did significant research and development. It was just a very difficult challenge at the time.").

23. The members of GEFCS entered into a Termination Agreement on March 24, 2006 in which they approved the dissolution, termination, and winding up of GEFCS. Fetouh Decl., Exhibit 9, PPI000107-09, Termination Agreement.

24. A certificate of cancellation for GEFCS was filed on December 29, 2006 and took effect on December 31, 2006. Fetouh Decl., Exhibit 10, GEFCS Certificate of Cancellation, GE000111.

25. At the time of dissolution, GEFCS did not have any cash assets. Fetouh Decl., Exhibit 3, Scovello Dep., at 49:8-49:9 ("Q. Was there cash on hand? A. No cash on hand."); 75:11-75:12 ("GEFCS really had no cash assets."); Fetouh Decl., Exhibit 1, Conway Dep., at 80:12-80:14 ("Q. Did GE Fuel Cell have any cash assets? A. I don't believe so.").

26. GEFCS's only assets at the time of dissolution were a computer server, a phone switch, a small amount of furniture, and distribution rights for Plug Power's technology. Fetouh Decl., Exhibit 3, Scovello Dep., at 49:3-49:7 ("The only thing we had were things related to our physical presence within the Plug Power building. We had a server that we used for our computer connections, and a telephone switch, a small amount of furniture. And that was it."); *id.* at 75:12-75:18 ("The only items that existed within the physical plant were the server that was used to connect our computers to the GE server . . . and a phone switch which was a connection to a GE communication network."); Fetouh Decl., Exhibit 1, Conway Dep., at 80:4-80:19 ("Q. The second bullet says 'The only non cash assets are a server, phone switch and distribution rights to the fuel cell business.' . . . Is that an accurate statement? A. Yes, I believe that is an accurate statement . . . Q. It says 'The distribution rights have been transferred to Plug Power, the entity which originally owned the rights.' Is that an accurate statement? A. That is an accurate statement.").

27. In connection with the termination and dissolution, GEFCS terminated existing distribution agreements with subdistributors who had agreements that were still in

operation by their terms. *See* Fetouh Decl., Exhibit 3, Scovello Dep., at 64:3-64:8 ("This was to notify them that we were terminating our agreement with Plug Power. Those were existing distributor agreements, so we were obligated under the agreement to notify them. I believe in the letter that we sent them, we also did mention that GEFCS would be dissolved.").

28. At the time the decision to terminate the GEFCS LLC Agreement and dissolve GEFCS was made, the Distributor Agreement had already expired. Fetouh Decl., Exhibit 5, Agreement ¶ 4.1.

29. GEFCS had no ongoing obligations to Soroof under that expired contract. Fetouh Decl., Exhibit 5, Agreement.

30. Soroof had only expressed dissatisfaction "with GE's total lack of performance of the Agreement." Docket No. 1, Complaint ¶ 21; Fetouh Decl., Exhibit 11, Declaration of James Jackson ¶ 13 ("I spoke with Frank Scovello of GE and informed him that Soroof was dissatisfied with GE's total lack of performance of the Agreement.").

31. Because the Agreement with Soroof had expired by its terms, and because Soroof had articulated no viable claim against GEFCS under the Agreement in any event, GE Microgen and Plug Power viewed the expiration of the Agreement as the end of the contractual relationship between GEFCS and Soroof; and did not believe there was any possible or viable claim by Soroof. Fetouh Decl., Exhibit 3, Scovello Dep., at 89:15-89:16 ("We had felt it expired under its own term in December of 2005."); *id.* at 113:19-113:24 ("A. We did not have a concern at the time we were terminating that Soroof was asking for the return of their million dollar distribution fee. We wanted to support both Soroof and Flint in setting up an alternative to what they originally started with GE. That

was our biggest concern."); Fetouh Decl., Exhibit 1, Conway Dep., at 49:13-49:15 ("To my knowledge, it was clear. The contract terminated on December 31, 2005."); *id.* at 48:5-48:15 ("A. They, as you said, appeared to be unhappy. So perhaps that is what he is referring to. I would also say that none of these people are lawyers. So when they are referring to contractual standpoint, I think that's their opinion. If there was a formal claim that had been made by Soroof to Plug Power, it would have been brought to my attention. And that did not happen."); *id.* at 49:13-50:4 ("A. To my knowledge, it was clear. The contract terminated on December 31, 2005. In that contract, which we did not have at the time but which we subsequently were provided by GE, it also is clear that there was a nonrefundable distribution fee. As I said before, we were looking to engage with and develop an ongoing relationship with Soroof. So trying to understand were they happy, what were their issues would have been part of Ravi's job, with the goal of coming to an agreement with Soroof to do a go-forward business relationship related to Plug Power.").

32. Because Plug Power had an interest in continuing to develop its business relationship with Soroof, Plug Power entered into discussions with Soroof about a potential new distributor agreement between Plug Power and Soroof. Fetouh Decl., Exhibit 1, Conway Dep., at 37:5-37:21 ("[W]e were in the business of continuing to try to develop these fuel cell products. If GE was not going to distribute them, we would have to distribute them. We were essentially going to be targeting the same customers. So if GE didn't want to target them, we would. GE was, on the business level, was helpful to us in introducing us to a lot of their customers. Basically, the idea there was we are not in fuel cells anymore, but Plug Power is. You might want to talk to them. As with any relationship, business

relationship, there are issues that can be addressed as you move forward."); *id.* at 44:12-45:4 ("So there were different customers, potential customers and users, distributors. But there were some of the same. Soroof fell into that category that they may be interested, we felt, in this GenCore product. We were also continuing to work on the prime power product. So we contemplated if we began to distribute this product through various entities around the world, when the prime power product was commercialized, we would have a channel to the marketplace. This was all being done independent of GE. We needed to move forward. We needed to survive. We had new investors. We were working on new investors."); *id.* at 49:20-50:4 ("As I said before, we were looking to engage with and develop an ongoing relationship with Soroof. So trying to understand were they happy, what were their issues would have been part of Ravi's job, with the goal of coming to an agreement with Soroof to do a go-forward business relationship related to Plug Power.").

33. Likewise, GE Microgen encouraged these discussions. Fetouh Decl., Exhibit 3, Scovello Dep., at 113:19-113:24 ("We did not have a concern at the time we were terminating that Soroof was asking for the return of their million dollar distribution fee. We wanted to support both Soroof and Flint in setting up an alternative to what they originally started with GE. That was our biggest concern.").

34. In the Termination Agreement, Plug Power agreed to "make commercially reasonable efforts to enter into separate nonexclusive distributor agreements for Plug Power's GenCore product with Soroof" and one other subdistributor. Fetouh Decl., Exhibit 9, PPI000107-09, Termination Agreement ¶ 2(b).

35. Like the fuel cell product targeted for development by GEFCS, the GenCore product was also a PEM fuel cell, but the GenCore product had been successfully developed for application as a back-up power source (as opposed to continuous power). Fetouh Decl., Exhibit 3, Scovello Dep., at 38:13-38:21 ("When we originally formed GE Fuel Cell Systems, GE's interest was in a Fuel Cell product that would produce power 24/7. The products that Plug Power wound up building were products used for backup power, specifically for telecommunication application. The discussions that Plug was having with Soroof was to begin selling those products to Soroof, so that they could distribute in Saudi Arabia."); Fetouh Decl., Exhibit 1, Conway Dep., at 43:6-44:11 ("The product that we were selling and marketing at this time was a different product than had originally been contemplated by GE and Plug. Essentially, it was a subset of that product . . . What we were attempting to do in this time frame is basically take . . . the fuel cell, which we were proficient at and had commercialized, and sell that product into a different market. Many of the same customers would be interested in it, but it was essentially a backup power system, not a prime power system. So think of a generator that's at your house versus a battery pack. That will give you a good analogy.").

36. Plug Power was offering to make Soroof the exclusive distributor of GenCore, an existing product, in Saudi Arabia without payment of any distributor fee. Fetouh Decl., Exhibit 1, Conway Dep., at 44:12-44:17 ("So there were different customers, potential customers and users, distributors. But there were some of the same. Soroof fell into that category that they may be interested, we felt, in this GenCore product."); Fetouh Decl., Exhibit 12, PPI000383, March 10, 2006 email from Plug Power to Soroof (attaching proposed Plug Power/Soroof International Distributor Agreement); Fetouh Decl., Exhibit

13, PPI000403, Proposed Plug Power/Soroof International Distributor Agreement; Fetouh Decl., Exhibit 3, Scovello Dep., at 122:4-122:9 ("What we had told Plug Power directly is that we would expect that you would sign a distribution agreement which was similar in terms of the GEFCS agreement and there would be no distribution fee associated with that. That's what we told them.").

37. Plug Power and Soroof engaged in extensive negotiations in an attempt to enter into a new distributor agreement for the GenCore product. Fetouh Decl., Exhibit 1, Conway Dep., at 92:13-94:10 ("Q. And still talking about the negotiations that had been happening up to the point of the signing of the termination agreement, how long had they been going on up to that date, which is March 2006? A. I believe they had been going on for some time, for a number of months at least. . . . They involved a discussion of the product and its capabilities. They involved a discussion with Soroof related to the third-party fueling provider . . . So there were discussions, visits, meetings with the hydrogen provider. And there were a lot of discussions around different concepts for how the hydrogen would – the best method to have the hydrogen available for the GenCore products.").

38. These negotiations included communications between Soroof, Plug Power, and third parties for Soroof's distribution of Plug Power's GenCore product in Saudi Arabia, the identification of Soroof as Plug Power's distributor in Saudi Arabia, and protocol for Soroof's transmittal of proposals to potential customers for the sale of Plug Power's fuel cell products. Fetouh Decl., Exhibit 12, PPI000383, March 10, 2006 email from Plug Power to Soroof (attaching proposed Plug Power/Soroof International Distributor Agreement); Fetouh Decl., Exhibit 13, PPI000403, Proposed Plug Power/Soroof

International Distributor Agreement; Fetouh Decl., Exhibit 14, PPI000379, March 8, 2006 through March 14, 2006 email correspondence between Plug Power and a third party (identifying Soroof as "our distributor"), at PPI000379; Fetouh Decl., Exhibit 15, PPI000456-465, December 25, 2005 through February 27, 2006 email exchange between Soroof and Plug Power (concerning protocol for transmittal of product proposals to customers); Fetouh Decl., Exhibit 16, PPI000372-375, March 9, 2006 through March 15, 2006 email exchange between Plug Power and Soroof (regarding proposals to third parties for product sales); Fetouh Decl., Exhibit 17, PPI000356, March 29, 2006 through March 31, 2006 internal Plug Power email (reporting that Plug Power was "presently in the process of formalizing the Distributor Agreement with Soroof…"), at PPI000356; Fetouh Decl., Exhibit 18, PPI000370, March 9, 2009 through April 3, 2006 email exchange between Plug Power and a third party (characterizing Soroof as company which "represents Plug Power in Saudi Arabia"), at PPI000371.

39. In connection with these negotiations, GE Microgen asked Plug Power to obtain a release from Soroof for any liability under the Agreement. GE Microgen's president, Frank Scovello, testified that GE Microgen sought that release because, following execution of the Termination Agreement, GE Microgen would have no role in any communications with Soroof. Fetouh Decl., Exhibit 3, Scovello Dep., at 100:19-100:22 ("Once we signed this termination agreement with Plug Power, we had no way of resolving any type of an issue with Plug, or with Soroof or Flint."); *id.* at 123:18-123:21 ("A. As I stated earlier, once we had dissolved our agreement with Plug Power, we had no way of resolving any kind of issues with any distributors that could come up after that time.").

40. In the Termination Agreement, GE Microgen asked Plug Power to agree to indemnify GEFCS and GE Microgen up to $1,000,000 if Plug Power did not obtain a release from Soroof releasing GEFCS from all liability relating to Soroof's payment of the $1,000,000 nonrefundable distributor fee under the Agreement. Fetouh Decl., Exhibit 9, PPI000107-09, Termination Agreement ¶ 2(b).

41. Plug Power agreed to the indemnification provision because it saw minimal to no risk to Plug Power by agreeing to it, as the Agreement had already expired on its own terms at the time of the dissolution of GEFCS and no viable claims existed under the Agreement. Fetouh Decl., Exhibit 1, Conway Dep., at 85:8-85:12 ("I felt that there was no claim, that the risk was minimal, and that because GE had asked for it and I saw no risk to Plug Power that we could agree to that request.").

42. GE Microgen requested the indemnification provision because it did not produce fuel cell products and therefore had no means of addressing any issue Soroof might have in the future. Fetouh Decl., Exhibit 3, Scovello Dep., at 123:18-124:2 ("[O]nce we had dissolved our agreement with Plug Power, we had no way of resolving any kind of issues with any distributors that could come up after that time . . . There were no claims that were made at the time, but we just had no means to address them going forward.").

43. The dissolution of GEFCS was reported publicly by Plug Power. Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149.

44. By the spring of 2006, discussions between Plug Power and Soroof slowed and, ultimately, Soroof chose not to enter into a new distributor agreement for the GenCore product. Fetouh Decl., Exhibit 1, Conway Dep., at 116:12-116:22 ("Q. It looks like when we looked at the documents that the dialogue between Plug Power and Soroof for the

distribution of the GenCore product just stopped. And that's my impression from looking at it. But what I'd like to ask you is what happened? Why didn't it go any further than it apparently did? . . . A. I do not know why it just stopped. I don't know.").

## II. PROCEDURAL BACKGROUND

45. On July 1, 2008, Soroof filed an arbitration demand against GEFCS seeking to recover damages under the theory that GEFCS had improperly failed to deliver products pursuant to the Agreement. Docket No. 13, Preliminary Pre-Trial Statement, at 1-6.

46. On January 22, 2010, the parties entered into a Venue Agreement, whereby the parties agreed to suspend the arbitration and litigate Soroof's claims in this Court. Docket No. 63-3, Venue Agreement.

47. On February 22, 2010, Soroof filed a complaint against GEFCS, GE Microgen, and Plug Power asserting claims originally stated in the arbitration as well as various claims allegedly arising out of the Agreement, including claims for breach of contract, misrepresentation, conversion, and unjust enrichment. Docket No. 1, Complaint, at pp. 7-14.

48. Soroof admits that it never made a formal written claim to GEFCS or its former members before the filing of the arbitration demand or the current lawsuit. Fetouh Decl., Exhibit 19, Docket No. 78, Order, at 1 ("Plaintiff has represented . . . that it made no formal claim against defendants prior to commencement of the arbitration."); Fetouh Decl., Exhibit 20, December 1, 2010 Hearing Tr., at 14:12-25 ("The Court: Are you relying on any notice prior to the – any formal notice prior to the commencement of the arbitration, either oral or written? Mr. Kalbian: No formal written notice. But I'm . . . reminded that – no formal written notice, but I'm reminded that Mr. Scovello, the 30(b)(6) designees,

testified that he had a conversation with Jim Jackson where Jackson told him about the – Soroof's displeasure, if you will, with the situation and that this conversation took place before the dissolution, so – The Court: All right. Is that the extent of the notice that you're relying on? Mr. Kalbian: Yes."); *see also* Fetouh Decl., Exhibit 1, Conway Dep., at 48:11-48:15 ("If there was a formal claim that had been made by Soroof to Plug Power, it would have been brought to my attention. And that did not happen.").

49. The parties agreed to divide discovery in this case into two phases with the first phase limited to the threshold issue of the dissolution of GEFCS. Docket No. 13, Joint Pretrial Statement, Exhibit A. The parties have completed "Phase I" discovery as to the dissolution issue.

50. Soroof did not produce any documents in response to Defendants' requests for production of documents. Fetouh Decl., Exhibit 21, Plaintiff's Responses to Defendants' First Request for Production of Documents, Response to Request No. 1 (listing documents and responding that "[e]ach of these documents is possessed by the Defendants").

51. Soroof produced no document purporting to be a claim made to GEFCS prior to its dissolution.

52. The only document that Soroof referenced in its responses to Defendants' document requests was a Declaration of James Jackson, Executive Director of the Power Division at Soroof, that was generated for the arbitration proceeding. Fetouh Decl., Exhibit 11, Declaration of James Jackson.

53. In response to an Interrogatory asking Soroof to identify all documents in which it gave notice to GEFCS of the claims stated in the Complaint, Soroof merely objected to the

request and did not provide any substantive answer. Fetouh Decl., Exhibit 22, Plaintiff's Answers to Defendants' First Set of Interrogatories, Response to Interrogatory No. 7.

54. A Motion for Judgment on the Pleadings has been fully briefed and is currently pending before this Court seeking to dismiss the complaint as both time-barred and barred by the unambiguous terms of the Soroof Distributor Agreement. Docket Nos. 45-49, 70-72.

Dated: February 28, 2011

Respectfully submitted,

/s/ Dahlia S. Fetouh
Dahlia S. Fetouh (*pro hac vice*)
Natalie F. Langlois (*pro hac vice*)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.: 617.570.1000
Fax: 617.523.1231
E-Mail: dfetouh@goodwinprocter.com
E-Mail: nlanglois@goodwinprocter.com

Abigail K. Hemani (AH 2071)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 813-8800
ahemani@goodwinprocter.com

Attorneys for Defendant PLUG POWER INC.

/s/ Michael D. Fisse
Michael D. Fisse, Esq.
Jan Van Steenis, Esq.
DAIGLE FISSE & KESSENICH, PLC
P.O. Box 5350
Covington, LA 70434-5350
(985) 871-0800
Fax: (985) 871-0899
Email: mfisse@daiglefisse.com
Email: jbradford@daiglefisse.com

Thomas Edward Healy, Esq.
PINO & ASSOCIATES, LLP
50 Main Street
White Plains, NY 10606
(914) 946-0600
Fax: (914) 946-0650
Email: thealy@pinolaw.com

Attorneys for Defendant GE MICROGEN, INC.

**CERTIFICATE OF SERVICE**

I, Dahlia S. Fetouh, hereby certify that true copies of the foregoing DEFENDANTS PLUG POWER INC. AND GE MICROGEN, INC.'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT were caused to be served by ECF on this 28th day of February, 2011 on the following counsel:

James R. Lynch, Esq.
Jason Kaufman, Esq.
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York , NY 10018
(212) 302-2400
Fax: (212) 302-2210
Email: lynch@lawlynch.com
Attorneys for Plaintiff SOROOF TRADING DEVELOPMENT COMPANY, LTD.

Haig V. Kalbian, Esq.
Mary M. Baker, Esq.
Aaron W. Knights, Esq.
KALBIAN HAGERTY LLP
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Email: hkalbian@kalbianhagerty.com
Attorneys for Plaintiff SOROOF TRADING DEVELOPMENT COMPANY, LTD.

Dated: February 28, 2011 /s/ Dahlia S. Fetouh