UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOROOF TRADING DEVELOPMENT COMPANY, LTD.,

Plaintiff,

v.

GE FUEL CELL SYSTEMS, LLC, GE MICROGEN, INC., and PLUG POWER INC.,

Defendants.

Civil Action No. 10 CIV 1391

**DEFENDANTS PLUG POWER INC.'S AND GE MICROGEN, INC.'S RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, Defendants Plug Power Inc. ("Plug Power") and GE Microgen, Inc. ("GE Microgen") (collectively, "Defendants") hereby submit their Response to Plaintiff Soroof Trading Development Company, Ltd.'s ("Soroof's") Local Rule 56.1 Statement of Material Facts ("Soroof's Statement of Facts"). This response is divided into two sections. Section I repeats Plaintiff's Local Rule 56.1 Statement in corresponding numbered paragraphs and then lists Defendants' responses to each statement. Section II lists additional numbered paragraphs containing a separate, short, and concise statement of additional material facts. Defendants Plug Power Inc. and GE Microgen, Inc's Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Defendants' SOF") (Docket No. 93) and the Declaration of Dahlia S. Fetouh ("First Fetouh Decl.") and the exhibits attached thereto (Docket No. 94) are incorporated here by reference as if fully set forth herein.

## I. DEFENDANTS' RESPONSES TO SOROOF'S STATEMENT OF FACTS

1. This litigation originally commenced on July 1, 2008, when Soroof initiated AAA arbitration proceedings against GE Fuel Cell. GE Fuel Cell filed a Motion to Dismiss and asserted, among other things, that GE Fuel Cell was a dissolved entity, and, consequently, it claimed that Soroof could maintain no actions against it.

**Defendants' Response to Paragraph 1:**

Defendants admit that Soroof initiated arbitration proceedings against GE Fuel Cell Systems, LLC ("GEFCS") on July 1, 2008, but deny Soroof's characterization of that filing as "commenc[ing]" the instant federal court proceeding. Defendants admit the remainder of Paragraph 1.

2. Soroof opposed GE Fuel Cell's Motion to dismiss, arguing, *inter alia*, that GE Fuel Cell, as a Delaware limited liability company, was required by the Delaware Code to "make such provision as will be reasonably likely to be sufficient to provide compensation" for claims that are either known or reasonably should have been known to GE Fuel Cell. See DEL. CODE ANN. Tit. 6, § 18-804(b)(3). GEFCS made no such provisions and failed to notify Soroof of its dissolution. See Complaint at ¶ ¶ 27-29.

**Defendants' Response to Paragraph 2:**

Defendants admit that Soroof opposed GEFCS's Motion to Dismiss. Defendants deny that GEFCS failed to make provision as required by § 18-804(b)(3). Further, Defendants were not required to notify Soroof of the dissolution of GEFCS because the Distributor Agreement between GEFCS and Soroof ("Agreement") had already expired at that time. First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1. The dissolution of GEFCS was reported publicly by Plug Power.

Defendants' SOF ¶ 43; First Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149.

3. The Arbitration Panel, chaired by the Hon. Kathleen Roberts, a retired federal judge from this Honorable Court, addressing the same arguments now before this Court, denied GE Fuel Cell's Motion to Dismiss without prejudice to GE Fuel Cell filing a motion for summary judgment after discovery. See Ex. A, Prehearing Order No. 2.

**Defendants' Response to Paragraph 3:**

Defendants deny that the Arbitration Panel "address[ed] the same arguments now before this Court," but admit the remaining facts set forth in Paragraph 3.

4. In or about February 1999, GE, acting through GE Microgen, and Plug Power established GE Fuel Cell; GE Microgen owned sixty percent and and [*sic*] Plug Power owned forty percent of GE Fuel Cell. See Ex. B, Plug Power 8-K at PP1000149.

**Defendants' Response to Paragraph 4:**

Defendants deny Soroof's characterization that GE "act(ed) through GE Microgen." Defendants clarify that the LLC Agreement for GEFCS was by and between GE Microgen and Plug Power. First Fetouh Decl., Exhibit 2, PPI000031-75, Amended and Restated Limited Liability Company Agreement of GE Fuel Cell Systems, L.L.C. ("GEFCS LLC Agreement"). Defendants further clarify that in February 1999, GE Microgen owned seventy-five percent and Plug Power owned twenty-five percent of GEFCS. Id. at PPI000033; First Fetouh Decl., Exhibit 1, Deposition of Gerard L. Conway, Jr. ("Conway Dep."), at 17:11-16. Defendants admit that the agreement was later amended, such that GE Microgen owned sixty percent and Plug Power owned forty percent of GEFCS. First Fetouh Decl., Exhibit 2, GEFCS LLC Agreement at

PPI000033; First Fetouh Decl., Exhibit 3, Deposition of Frank Scovello ("Scovello Dep."), at 28:12-17.

5. GE Fuel Cell was established to act as the worldwide distributor of Plug Power's Proton Exchange Membrane Fuel Cell (the "Product"). See Ex. C, Scovello Dep. Tr. at 33:4-13.

**Defendants' Response to Paragraph 5:**

Defendants admit the facts set forth in Paragraph 5.

6. Both GE Fuel Cell and its immediate parent GE Microgen were undercapitalized. The funding for GE Fuel Cell came directly from GE itself. See Ex. D, Scovello Dep. Tr. at 44:23-25.

**Defendants' Response to Paragraph 6:**

Defendants deny that GEFCS and GE Microgen were undercapitalized. Defendants further deny that GE Microgen was the parent company of GEFCS. GEFCS was a Delaware limited liability company. GE Microgen and Plug Power were the members of GEFCS. Defendants' SOF ¶ 1. Article V of the Amended and Restated LLC Agreement – entitled "Capital Contributions" – provides that GE Microgen previously contributed $10,000 to the capital of GEFCS. First Fetouh Decl., Exhibit 2, GEFCS LLC Agreement, ¶ 5.1. The GEFCS LLC Agreement also provides that GE Microgen would arrange for "its Affiliate, GE" to provide capital to GEFCS in the form of up to $8,000,000 in loans, and that GEFCS could borrow additional capital "from any Person, including any Member of any Affiliate of a Member" if needed. Id. at ¶ 5.5. Further, on February 3, 1999, General Electric Company loaned GEFCS $18,250,000. First Fetouh Decl., Exhibit 8, Declaration of Frank Scovello, at 7. GEFCS also utilized Soroof's nonrefundable distributor fee to support the activities of GEFCS. Declaration of Dahlia S. Fetouh submitted in support of Defendants' Opposition to Soroof's Motion for

Partial Summary Judgment ("Second Fetouh Decl."), Exhibit A, Scovello Dep., at 121:15-20 ("Q. And that $1 million had gone to GE Fuel Cell? A. That $1 million went to offset the cost, my salary, the salaries of Barry Glickman and all the other people that were involved in supporting the activities of GEFCS, yes."). Additionally, other companies with which GEFCS established Distributor Agreements paid distributor fees to GEFCS in addition to Soroof. See Second Fetouh Decl., Exhibit B, GE000198, GE Fuel Cell Systems LLC Summary; Second Fetouh Decl., Exhibit A, Scovello Dep., at 60:2-7 ("And there is a summary of all of the third party agreements that were entered into with distributors for GEFCS. In addition to that, over on the right, far right, you will see the fees that were paid over to GEFCS, and those were the distribution fees.").

7. Likewise, GE Fuel Cell did not have any employees. See Ex. C, Scovello Dep. Tr. at 32:14-33:3; See Ex. D, Conway Dep. Tr. at 20:23-21:3. Instead, all of the individuals tasked to the GE Fuel Cell project were actually employed by GE. Ex. C, Scovello Dep. Tr. at 32:22-25; Ex. D, Conway Dep. Tr. at 6:25-7:3 and 20:23-21:3.

**Defendants' Response to Paragraph 7:**

Defendants admit that GEFCS did not have any employees. Defendants deny that all of the individuals tasked to the GEFCS venture "were actually employed by GE." GE Microgen and Plug Power each provided individuals to support the joint venture. See Defendants' SOF ¶¶ 8-9; First Fetouh Decl., Exhibit 3, Scovello Dep. at 33:1-3. Plug Power devoted over 300 employees toward the effort of developing the Product to specifications, while GE Microgen engaged in efforts to market the product nationwide and around the world through its network of subdistributors. See Defendants' SOF ¶¶ 8-9; First Fetouh Decl., Exhibit 3, Scovello Dep. at 32:19-21; id. at 48:18-20.

8. Frank Scovello, a GE employee, served as the president of both GE Microgen and GE Fuel Cell, although he was really employed by GE. See Ex. F, Termination Agreement at GE 000061; See also Ex. D, Scovello Dep Tr. at 12:18-20; 24:4-5; and 32:22-33:3.

**Defendants' Response to Paragraph 8:**

Defendants admit the facts set forth in Paragraph 8.

9. Richard Stewart, a GE employee, served as director of GE Microgen, on the Management Committee of GE Fuel Cell and on the Board of Plug Power. See Ex. E; Action by Written Consent of Directors; Plug Power 8-K at PP1000151.

**Defendants' Response to Paragraph 9:**

Defendants admit the facts set forth in Paragraph 9.

10. The Management Committee of GE Fuel Cell was composed entirely of GE and Plug Power representatives. See Ex. E, Action by Written Consent of Members of GE Fuel Cell Systems, LLC; See also Ex. C, Scovello Dep. Tr. at 33:1-2.

**Defendants' Response to Paragraph 10:**

Defendants admit the facts set forth in Paragraph 10.

11. GE Fuel Cell did not maintain its own office. Instead, the only offices maintained were marked by a GE Microgen sign at Plug Power's headquarters with no indication of any GE Fuel Cell presence. See Ex. D, Conway Dep. Tr. at 18:24-19:4, 22:13-22.

**Defendants' Response to Paragraph 11:**

Defendants admit that GEFCS did not maintain its own office. Defendants clarify that GE Microgen had office space for more than twenty employees in Plug Power's facility, and each company's office was identified by a separate sign. Each company was unable to access

the other's space. Defendants' SOF ¶ 11; see First Fetouh Decl., Exhibit 1, Conway Dep., at 23:8-11; First Fetouh Decl., Exhibit 3, Scovello Dep., at 36:9-16.

12. GE Fuel Cell was never capitalized or owned anything other than nominally-valued assets. GE agreed to fund the initial expenses of GE Fuel Cell Systems, LLC. Ex. C, Scovello Dep. Tr. at 44:23-25. At the time of GE Fuel Cell's dissolution, it had "no cash on hand," "was not really a going concern," and its only assets were "a server," "a telephone switch," and a "small amount of furniture." Id. at 48:22-24, 49:1-9.

**Defendants' Response to Paragraph 12:**

Defendants deny that GEFCS was never capitalized. See Defendants' Response to Paragraph 6, supra. Defendants further state that at the time of dissolution, GEFCS's only assets were a computer server, a phone switch, a small amount of furniture, and distribution rights for Plug Power's technology. See Defendants' SOF ¶ 26; First Fetouh Decl., Exhibit 3, Scovello Dep., at 49:3-7; id. at 75:12-18; Second Fetouh Decl., Exhibit C, Conway Dep., at 80:4-19.

13. On June 6, 2000 GE Fuel Cell entered into the "Distributor Agreement Between GE Fuel Cell Systems, LLC, and Soroof Trading Development Company Ltd." on or about June 6, 2000. See Ex. G, Agreement.

**Defendants' Response to Paragraph 13:**

Defendants admit the facts set forth in Paragraph 13.

14. Specifically, GE warranted in the Agreement that "[i]t has full authority and capability to enter into and perform its obligations under this Agreement." See Ex. G, Agreement at ¶ 10.1.2.

**Defendants' Response to Paragraph 14:**

Defendants clarify that Paragraph 10.1.2 of the Agreement states that "[GEFCS] has full authority and capability to enter into and perform its obligations under this Agreement (having obtained all requisite third party, corporate and governmental approvals)." Defendants further state that this provision of the Agreement is outside the scope of the dissolution issue and Phase I discovery and thus is immaterial to Soroof's Motion for Partial Summary Judgment. Defendants further state that the Agreement speaks for itself.

15. GE further warranted that it had "full legal right, power and authority to enter into and perform this Agreement." See Ex. G, Agreement at ¶ 10.1.4.

**Defendants' Response to Paragraph 15:**

Defendants admit that Paragraph 15 accurately states a portion of Paragraph 10.1.4 of the Agreement between GEFCS and Soroof. The Agreement speaks for itself. Defendants further state that this provision of the Agreement is outside the scope of the dissolution issue and Phase I discovery and thus is immaterial to Soroof's Motion for Partial Summary Judgment.

16. Pursuant to the Agreement, Soroof paid GE a "distributor fee" of $1 million. See Ex. G, Agreement at ¶ 6.4.

**Defendants' Response to Paragraph 16:**

Defendants clarify that Paragraph 6.4 of the Agreement states that the fee is "a one-time non-refundable distributor fee" of $1 million. Defendants deny that the fee was paid to "GE." The fee was paid to GEFCS. Defendants admit that in exchange for the right to be the sole and exclusive distributor of the PEM Fuel Cell products in Saudi Arabia, Soroof paid a $1,000,000 distributor fee to GEFCS that was specified as "non-refundable" under the terms of the Agreement. Defendants' SOF ¶ 15.

17. The $1 million paid by Soroof was used to pay the salaries of GE Energy employees working at GE Fuel Cell. See Ex. C, Scovello Dep. Tr. at 121:15-20.

**Defendants' Response to Paragraph 17:**

Defendants deny paragraph 17 and state that GEFCS utilized Soroof's nonrefundable distributor fee to support the activities of GEFCS. Second Fetouh Decl., Exhibit A, Scovello Dep., at 121:15-20 ("Q. And that $1 million had gone to GE Fuel Cell? A. That $1 million went to offset the cost, my salary, the salaries of Barry Glickman and all the other people that were involved in supporting the activities of GEFCS, yes.").

18. Soroof hired staff, outfitted offices and in total incurred additional costs of over $1 million in expenditures, which were required by GE, as part of its efforts to be prepared to distribute Product. See Ex. H, Jackson Decl. at ¶ 6.

**Defendants' Response to Paragraph 18:**

Defendants lack knowledge as to the facts as set forth regarding Soroof's conduct in Paragraph 18 and therefore deny them. Defendants deny that the actions were required by GE. Defendants further state that the facts set forth in Paragraph 18 are outside the scope of the dissolution issue and Phase I discovery, and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

19. Soroof undertook all of these expenses under the belief that GE Fuel Cell actually had saleable Product to deliver. See Ex. H, Jackson Decl. at ¶ 7.

**Defendants' Response to Paragraph 19:**

Defendants lack knowledge as to the facts set forth regarding the reasons for Soroof's conduct in Paragraph 19 and therefore deny them. Defendants deny that Soroof reasonably believed that GEFCS had saleable product to deliver at the time of the Agreement. See First

Fetouh Decl., Exhibit 11, Jackson Decl. at ¶¶ 5, 7 (Distributor Agreement between GEFCS and Soroof was entered into on or about June 6, 2000, and product was not expected until end of the year 2000). Defendants further state that the facts set forth in Paragraph 19 are outside the scope of the dissolution issue and Phase I discovery, and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

20. Under the Agreement, GE Fuel Cell maintained a continuing obligation to make available for Soroof "a sufficient quantity" of Product for Soroof to distribute throughout Saudi Arabia, and to use "reasonable efforts to supply" this Product. See Ex. G, Agreement at ¶ ¶ 5.1 and 5.2.

**Defendants' Response to Paragraph 20:**

Defendants deny that the Agreement required delivery of Product. There was no obligation under the Agreement that a Product be delivered absent an accepted purchase order. See First Fetouh Decl., Exhibit 5, Agreement at ¶ 5.1; p. 25 at § 7.3; see also Docket No. 46, Memorandum of Law in Support of Defendant GE Microgen, Inc.'s Motion for Judgment on the Pleadings Pursuant to F.R.C.P. 12(c) ("12(c) Memo."), at 10-11; Docket No. 70, Defendant GE Microgen Inc.'s Reply Memorandum of Law in Support of Its Motion for Judgment on the Pleadings Pursuant to F.R.C.P. 12(c) ("12(c) Reply Memo."), at 7-8. Defendants further state that the facts set forth in Paragraph 20 are outside the scope of the dissolution issue and Phase I discovery, and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

21. In the event that there was any change in the ability to deliver Product, GE Fuel Cell had a continuing obligation "to share promptly relevant information, including but not limited to product performance, failure and liability issues...." See Ex. G, Agreement at ¶ 7.4.

**Defendants' Response to Paragraph 21:**

Defendants deny Soroof's interpretation of GEFCS's obligations under the Agreement. The Agreement speaks for itself. Defendants further state that the facts set forth in Paragraph 21 are outside the scope of the dissolution issue and Phase I discovery and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

22. The first scheduled delivery of Product was to occur in 2001. See Ex. G, Agreement at ¶ 6.6.

**Defendants' Response to Paragraph 22:**

Defendants deny that the contract required delivery of Product. There was no obligation under the Agreement that a Product be delivered absent an accepted purchase order. See First Fetouh Decl., Exhibit 5, Agreement at ¶ 5.1; p. 25 at § 7.3; 12(c) Memo. at 10-11; 12(c) Reply Memo. at 7-8. Defendants further state that the facts set forth in Paragraph 22 are outside the scope of the dissolution issue and Phase I discovery and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

23. GE assured Soroof that Product would be ready for distribution by the middle of 2001 and encouraged Soroof to continue expanding its infrastructure in preparation for eventual delivery and distribution. See Ex. H, Jackson Decl. at ¶ 8.

**Defendants' Response to Paragraph 23:**

Defendants deny the facts in Paragraph 23. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 9-10. Defendants further

state that the facts set forth in Paragraph 23 are outside the scope of the dissolution issue and Phase I discovery, and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

24. GE missed the 2001 deadline and every subsequent deadline regarding when Product would be available for delivery. See Ex. H, Jackson Decl. at ¶ 9.

**Defendants' Response to Paragraph 24:**

Defendants deny the facts in Paragraph 24. There were no "deadlines" nor any obligation under the Agreement that a Product be delivered absent an accepted purchase order. See First Fetouh Decl., Exhibit 5, Agreement at ¶ 5.1; p. 25 at § 7.3; 12(c) Memo. at 10-11. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 7-10. Defendants further state that the facts set forth in Paragraph 24 are outside the scope of the dissolution issue and Phase I discovery, and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

25. In light of its continued failure to meet its delivery deadline, GE Fuel Cell agreed to expand Soroof's distribution territory to include Lebanon. See Ex. H, Jackson Decl. at ¶ 9.

**Defendants' Response to Paragraph 25:**

Defendants deny the facts in Paragraph 25. There were no "deadlines" nor any obligation under the Agreement that a Product be delivered absent an accepted purchase order. See First Fetouh Decl., Exhibit 5, Agreement at ¶ 5.1; p. 25 at § 7.3. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be

considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 7-10. Defendants further state that the facts set forth in Paragraph 25 are outside the scope of the dissolution issue and Phase I discovery and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

26. In light of GE Fuel Cell's continued assurances, Soroof entered into negotiations with third-parties whereby Soroof would deliver potentially thousands of units of Product throughout Saudi Arabia and Lebanon. See Ex. H, Jackson Decl. at ¶ 11.

**Defendants' Response to Paragraph 26:**

Defendants lack knowledge as to the facts set forth regarding the reasons for Soroof's conduct in Paragraph 26 and therefore deny them. Defendants further state that the facts set forth in Paragraph 26 are outside the scope of the dissolution issue and Phase I discovery, and thus are immaterial to Soroof's Motion for Partial Summary Judgment.

27. The fuel cell contracted for was supposed to produce power continuously, twenty-four hours a day, seven days a week. See Ex. C, Scovello Dep. Tr. at 38:8-21. Throughout the term of the Agreement, Plug Power, which was overseeing the development of the Product could never produce a fuel cell to meet the specifications or the design functions required. Id. at 101:21-25. The best Plug Power could develop was a backup generator. Id. at 74:22-75:6.

**Defendants' Response to Paragraph 27:**

Defendants admit that the Product was intended to be a continuous power product that would produce power twenty-four hours a day, seven days a week. Defendants admit that Plug

Power was unable to produce the product as originally envisioned due to technical challenges. See Defendants' SOF ¶ 19; First Fetouh Decl., Exhibit 3, Scovello Dep., at 47:21-48:1. Defendants deny Plaintiff's characterization that the "best Plug Power could develop was a backup generator." Plug Power had a product similar to the Product envisioned by GEFCS called GenCore. The GenCore product was also a PEM fuel cell, but the GenCore product had been successfully developed for application as a back-up power source. See Defendants' SOF ¶ 35; First Fetouh Decl., Exhibit 3, Scovello Dep., at 38:13-21; First Fetouh Decl., Exhibit 1, Conway Dep., at 43:6-44:11.

28. Defendants knew as early as 2001 that Plug Power was unlikely to ever successfully develop commercially marketable Product. See Exhibit C, Scovello Dep. Tr. at 102:11-19. Mr. Scovello explained that "it became clearer and clearer to us the challenge that was involved and that the product would never be developed." Id. at 103:1-3.

**Defendants' Response to Paragraph 28:**

Defendants deny Soroof's characterization of the facts set forth in Paragraph 28. Defendants further state that around 2001, Defendants realized there would be a delay in production of the Product. Nevertheless, GEFCS continued to work on the development of the Product. See First Fetouh Decl., Exhibit 3, Scovello Dep., at 48:4-8 ("Well, it became evident to us – to me, it became evident maybe in the 2003, 2004 time frame where it looked like Plug was having a lot of problems trying to produce the product that we needed."); Second Fetouh Decl., Exhibit A, Scovello Dep., at 102:13-103:4 ("It was really a gradual realization that they could not build product even close to what we had originally contemplated . . . That was the realization that there would be a delay. And then gradually as Plug continued to work on the development

of the product, it became clearer and clearer to us the challenge that was involved and that the product would never be developed that would, you know, meet our original specifications.").

29. In or about early 2005, Defendants finally conceded that problems with the Product could not be resolved and that they would not be able to make delivery. See Exhibit H; Jackson Decl. at ¶ 12. As Mr. Scovello testified, "we had no product to give them as GE." See Ex. C, Scovello Dep. Tr. at 91:5-6 (emphasis added).

**Defendants' Response to Paragraph 29:**

Defendants deny Soroof's characterization of the facts set forth in Paragraph 29. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 9-10. But even that declaration shows that Soroof was well aware before 2005 that GEFCS was having difficulty producing the Product. See First Fetouh Decl., Exhibit 11, Jackson Decl. at ¶ 9 ("Over the course of several years . . . GE repeatedly contacted Soroof and claimed that the Product was not yet ready due to various problems it had developing the Product . . ."). Defendants further state that in 2005, the parties were engaged in ongoing discussions concerning the Product. See First Fetouh Decl., Exhibit 3, Scovello Dep., at 94:5-12 ("A. There was dialogue that went on between various entities at Soroof and there was a lot of different people. They had a lot of change of personnel. But, there was a lot of e-mail exchanged about not having product. So just in general, they were aware. Whether Prince Bander himself was aware, it is possible he wasn't, but his people certainly were.").

30. The Agreement by its terms was to expire on December 31, 2005. See Ex. G, Agreement at ¶ 2.1.

**Defendants' Response to Paragraph 30:**

Defendants admit the facts set forth in Paragraph 30.

31. Prior to dissolving GE Fuel Cell, Defendants were aware that Soroof had potential legal claims against Defendants. See Exhibit I, January 5, 2006 E-mail from A.Bucknam, Plug Power's Vice President of Business Development, to Mark Sperry, Plug Power's former Chief Marketing Officer; Ex. D, Conway Dep. Tr. at 34:14-19 and 13:23-25; Ex. J, January 26, 2006 E-mail from R. Menon, a Plug Power employee charged with sales and development, to Frank Scovello; Ex. D, Conway Dep. Tr. 45:11-13; Ex. K, February 28, 2006 E-mail from Greg Silvestri, former Chief Operating Officer of Plug Power, to Sergey Polikarpov; Ex. D., Conway Dep. Tr. at 61:14-15; See also Exhibit C, Scovello Dep. Tr. at 37:2-38:7; 90:19-91:21; and 120:16-121:1.

**Defendants' Response to Paragraph 31:**

Defendants deny Soroof's characterization of the facts set forth in Paragraph 31. At the time of the termination of the GEFCS LLC Agreement and the dissolution of GEFCS, the Distributor Agreement had already expired. Defendants' SOF ¶ 28; First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1. GEFCS had no ongoing obligations to Soroof under that expired contract. Defendants' SOF ¶ 29; First Fetouh Decl., Exhibit 5, Agreement. Soroof had only expressed "dissatisf[action] with GE's total lack of performance of the Agreement." Defendants' SOF ¶ 30; Docket No. 1, Complaint ¶ 21; First Fetouh Decl., Exhibit 11, Declaration of James Jackson ¶ 13 ("I spoke with Frank Scovello of GE and informed him that Soroof was dissatisfied with GE's total lack of performance of the Agreement."). Because the Agreement with Soroof had

expired by its terms, and because Soroof had articulated no viable claim against GEFCS under the Agreement in any event, GE Microgen and Plug Power viewed the expiration of the Agreement as the end of the contractual relationship between GEFCS and Soroof; and did not believe there was any possible or viable claim by Soroof. Defendants' SOF ¶ 31; First Fetouh Decl., Exhibit 3, Scovello Dep., at 89:15-16 ("We had felt it expired under its own term in December of 2005."); id. at 113:19-24 ("A. We did not have a concern at the time we were terminating that Soroof was asking for the return of their million dollar distribution fee. We wanted to support both Soroof and Flint in setting up an alternative to what they originally started with GE. That was our biggest concern."); First Fetouh Decl., Exhibit 1, Conway Dep., at 48:5-15 ("A. They, as you said, appeared to be unhappy. So perhaps that is what he is referring to. I would also say that none of these people are lawyers. So when they are referring to contractual standpoint, I think that's their opinion. If there was a formal claim that had been made by Soroof to Plug Power, it would have been brought to my attention. And that did not happen."); id. at 49:13-50:4 ("A. To my knowledge, it was clear. The contract terminated on December 31, 2005. In that contract, which we did not have at the time but which we subsequently were provided by GE, it also is clear that there was a nonrefundable distribution fee. As I said before, we were looking to engage with and develop an ongoing relationship with Soroof. So trying to understand were they happy, what were their issues would have been part of Ravi's job, with the goal of coming to an agreement with Soroof to do a go-forward business relationship related to Plug Power.").

32. It was GE that decided to terminate the venture and dissolve GE Fuel Cell. See Ex. C, Scovello Dep. Tr. at 115:12-116:1 GE sought a broad indemnity from Plug Power as part of the dissolution of GE Fuel Cell because it was concerned about legal claims by Soroof.

See Ex. C, Scovello Dep. Tr. at 125:21-126:9; See also Ex. D, Conway Dep. Tr. at 66:11-68:22 and 71:17-72:25.

**Defendants' Response to Paragraph 32:**

Defendants deny Soroof's characterization of the facts set forth in Paragraph 32. Defendants further state that the decision to terminate was primarily taken by the senior management of GE. See Second Fetouh Decl., Exhibit A, Scovello Dep. 115:25-116:1. Defendants deny that the reason for the indemnity was because of concerns about legal claims by Soroof. In connection with the negotiations between Soroof and Plug Power for the GenCore product, GE Microgen asked Plug Power to obtain a release from Soroof for any liability under the Agreement. GE Microgen's president, Frank Scovello, testified that GE Microgen sought that release because, following execution of the Termination Agreement, GE Microgen would have no role in any future communications with Soroof. Defendants' SOF ¶ 39; First Fetouh Decl., Exhibit 3, Scovello Dep., at 100:19-22. In the Termination Agreement, GE Microgen asked Plug Power to agree to indemnify GEFCS and GE Microgen up to $1,000,000 if Plug Power did not obtain a release from Soroof releasing GEFCS from all liability relating to Soroof's payment of the $1,000,000 nonrefundable distributor fee under the Agreement. Defendants' SOF ¶ 40; First Fetouh Decl., Exhibit 9, Termination Agreement ¶ 2(b). GE Microgen requested the indemnification provision because it did not produce fuel cell products and therefore had no means of addressing any issue Soroof might have in the future. Defendants' SOF ¶ 42; First Fetouh Decl., Exhibit 3, Scovello Dep., at 123:18-124:2 ("[O]nce we had dissolved our agreement with Plug Power, we had no way of resolving any kind of issues with any distributors that could come up after that time . . . There were no claims that were made at the time, but we just had no means to address them going forward.").

33. Plug Power refused to grant GE an unlimited indemnity. See Ex. K, February 28, 2006 G. Silvestri E-mail; See also Ex. C, Scovello Dep. Tr. at 125:21-126:9; Ex. D, Conway Dep. Tr. at 71:17-72:25.

**Defendants' Response to Paragraph 33:**

Defendants deny Soroof's characterization of the facts set forth in Paragraph 33. The final indemnity agreement was the product of a month of negotiations between Plug Power and GE Microgen. See Second Fetouh Decl., Exhibit C, Conway Dep., at 72:4-10. Plug Power agreed to the indemnification provision because it saw minimal to no risk to Plug Power by agreeing to it, as the Agreement had already expired on its own terms at the time of the dissolution of GEFCS and no viable claims existed under the Agreement. Defendants' SOF ¶ 41; First Fetouh Decl., Exhibit 1, Conway Dep., at 85:8-12 ("I felt that there was no claim, that the risk was minimal, and that because GE had asked for it and I saw no risk to Plug Power that we could agree to that request.").

34. As part of the GE Fuel Cell termination agreement, Plug Power agreed to indemnify GE Microgen from, "any losses, liabilities, damages, causes of action, claims, costs and expenses (including reasonable attorneys fees), related to or associated with the failure of [Plug Power] to obtain adequate releases from Soroof and Flint, respectively; provided, however, that such indemnification shall not exceed...$1,000,000 as to Soroof." See Ex. F, Termination Agreement; Ex. B, Plug Power 8-K at GE 000060.

**Defendants' Response to Paragraph 34:**

Defendants admit that Paragraph 34 accurately quotes a portion of the Termination Agreement. The Termination Agreement speaks for itself.

35. In its 8-K filed in 2006 Plug Power stated that “[Plug Power] and GE are terminating their joint venture, GE Fuel Cell Systems (“GEFCS”), and the associated distributor and other agreements. [Plug Power] and GE agreed that GEFCS was not an effective entity for marketing [Plug Power's] products” See Ex. B, Plug Power 8-K at PP1000149.

**Defendants’ Response to Paragraph 35:**

Defendants admit that Paragraph 35 accurately quotes an excerpt of Plug Power’s Form 8-K filing. The Form 8-K filing speaks for itself.

36. The Certificate of Cancellation dissolving GE Fuel Cell became effective on December 29, 2006. See Ex. M, Filed Certificate of Cancellation of GE Fuel Cell.

**Defendants’ Response to Paragraph 36:**

Defendants clarify that the Certificate of Cancellation was executed on December 29, 2006, but became effective on December 31, 2006. Defendants admit the remaining facts set forth in Paragraph 36.

37. Defendants never informed Soroof about the dissolution of GE Fuel Cell. See Ex. C, Scovello Dep. Tr. at 92:22-25; Ex. D, Conway Dep. Tr. at 27:7-10.

**Defendants’ Response to Paragraph 37:**

Defendants admit that they are not aware of formal notice directly to Soroof about the dissolution of GEFCS. First Fetouh Decl., Exhibit 3, Scovello Dep., at 93:1-4. Defendants were not required to notify Soroof of the dissolution of GEFCS because the Distributor Agreement between GEFCS and Soroof had already expired at that time. First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1. The dissolution of GEFCS was reported publicly by Plug Power. Defendants’ SOF ¶ 43; First Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149.

38. It was not until 2007 that James Jackson, president of Soroof, discovered that GE Fuel Cell had been dissolved through a chance reading of a partial SEC filing. See Ex. H, Jackson Decl. at ¶ 14.

**Defendants' Response to Paragraph 38:**

Defendants lack knowledge as to the facts set forth in Paragraph 38 and therefore deny them. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 9-10.

## II. DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

1. In February 1999, Plug Power and GE Microgen entered into an agreement to form a limited liability company, GE Fuel Cell Systems, LLC ("GEFCS"), organized under the laws of the State of Delaware. First Fetouh Decl., Exhibit 1, Conway Dep., at 17:11-17 ("It was organized, it was set up as a Delaware limited liability company. Originally there were two members. One was GE Microgen. They had 75 percent interest in the LLC. And Plug Power had a 25 percent interest. They were the managing member, GE Microgen."); First Fetouh Decl., Exhibit 2, PPI000031-75, Amended and Restated Limited Liability Company Agreement of GE Fuel Cell Systems, L.L.C. ("GEFCS LLC Agreement"). GE Microgen and Plug Power were the sole members of GEFCS. Id.

2. Plug Power's ownership interest in GEFCS later increased to 40%. First Fetouh Decl., Exhibit 2, Amended LLC Agreement; First Fetouh Decl., Exhibit 3, Scovello Dep., at 28:12-18.

3. Plug Power and GE Microgen formed GEFCS to sell and market fuel cell products that Plug Power was developing. First Fetouh Decl., Exhibit 1, Conway Dep., at 17:18-20 ("The agreement was set up to sell and market the fuel cell products that Plug Power would produce."); id. at 19:20-25 ("[T]he limited liability company was set up expressly in the actual formation documents to sell and market the fuel cell products that were anticipated would be produced by Plug Power."); First Fetouh Decl., Exhibit 3, Scovello Dep., at 26:11-14 ("Q. What was exactly the purpose of setting up GEFCS? A. To become a distributor for the Plug Power Fuel Cell product."); First Fetouh Decl., Exhibit 2, GEFCS LLC Agreement ¶ 3.1.

4. The product that Plug Power was developing, and GEFCS was planning to distribute, was a Proton Exchange Membrane ("PEM") fuel cell (the "Product"). The Product was a "prime power fuel cell system . . . its intended application was to replace the generator, the power generation at a residence or small commercial facility." First Fetouh Decl., Exhibit 1, Conway Dep., at 87:7-16; id. at 89:19-90:7 ("Q. What is a proton exchange membrane fuel cell product, in layman's terms? A. That is the fuel cell. That is the – it's an assembly of plates, membranes and catalysts that are stacked together, which is really the heart of the fuel cell product. It is the part of the overall product which you provide the hydrogen fuel to and in which the electrochemical reaction occurs. So when people talk about fuel cells, that's what they are talking about.").

5. The Product – a complex interconnection of three components that included a fuel cell – was intended to be a continuous power product that would produce power twenty-four hours a day, seven days a week. First Fetouh Decl., Exhibit 1, Conway Dep. at 87:16-19 ("Basically, it consists of three parts, a reformer, a fuel cell stack, and an inverter, that are

coupled together."); First Fetouh Decl., Exhibit 3, Scovello Dep., at 38:13-15 ("When we originally formed GE Fuel Cell Systems, GE's interest was in a Fuel Cell product that would produce power 24/7.").

6. The purpose of GEFCS was to market and sell the resulting PEM fuel cell product to various subdistributors around the world. First Fetouh Decl., Exhibit 3, Scovello Dep., at 33:9-13 ("GEFCS was set up as the master distributor, worldwide distributor, and then we would in turn sign up other distributors within certain territories to distribute the products that Plug Power would provide to GEFCS."); First Fetouh Decl., Exhibit 1, Conway Dep., at 31:11-19 ("So in connection with all of this, there were existing agreements that GE had gone out and entered into or GE Fuel Cell Systems had entered into in connection with they basically were subdistributor agreements under this master agreement that GE had with Plug Power or GE Fuel Cell Systems and Plug Power were a party to.").

7. Plug Power and GEFCS entered into a Master Distributor Agreement setting forth GEFCS's obligations to market, sell, and provide services for the Product. <u>See</u> First Fetouh Decl., Exhibit 4, PPI000001-30, Amended and Restated Distributor Agreement.

8. GEFCS was the vehicle for distributing the product. GE Microgen's role in GEFCS was to manage sales and marketing, and Plug Power's role was to develop and manufacture the product. First Fetouh Decl., Exhibit 1, Conway Dep., at 19:25-20:18 ("So our role, Plug Power's role was to make that product. And that's what we were focused on . . . there was a fair amount of work to be done to actually take this technology and try to commercialize it into a product . . . Q. So it's fair to say that Plug Power's role was to develop the technology and the product. And then GE's role was to market and sell the

product. Is that a fair synopsis of how things worked? A. Correct. Correct."); First Fetouh Decl., Exhibit 3, Scovello Dep., at 33:9-13 ("GEFCS was set up as the master distributor, worldwide distributor, and then we would in turn sign up other distributors within certain territories to distribute the products that Plug Power would provide to GEFCS.").

9. GE Microgen and Plug Power communicated regularly regarding Plug Power's efforts in developing the fuel cell product. First Fetouh Decl., Exhibit 1, Conway Dep., at 19:4-7 ("So there was regular – I would say there was daily conversation between GE and Plug Power about the development of our products.").

<u>*Distributor Agreement Between GEFCS and Soroof*</u>

10. On June 6, 2000, GEFCS and Soroof Trading Development Company, Ltd. ("Soroof") entered into a Distributor Agreement (the "Agreement") that would allow Soroof to be the exclusive distributor for the PEM Fuel Cell products within the Kingdom of Saudi Arabia. First Fetouh Decl., Exhibit 5, Agreement.

11. At the time that Agreement was negotiated and executed, the PEM Fuel Cell products were still in development. First Fetouh Decl., Exhibit 3, Scovello Dep., at 27:20-25 ("Plug had demonstrated the Fuel Cell technology, the core technology. They had not produced the product. The expectation was that Plug would be able to produce a product and that GE would become the master distributor for that product within certain fields of use.").

12. In exchange for the right to be the sole and exclusive distributor of the PEM Fuel Cell products in Saudi Arabia, Soroof paid a $1,000,000 distributor fee that was specified as

"non-refundable" under the terms of the Agreement. First Fetouh Decl., Exhibit 5, Agreement ¶ 6.4.

13. The Agreement specifically prohibited consequential damages. First Fetouh Decl., Exhibit 5, Agreement ¶¶ 12.2, 15.4.

14. The Distributor Agreement expired on its own terms on December 31, 2005. First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1.

15. At the time the Agreement expired, GEFCS had been unable to produce the PEM Fuel Cell products to commercial specifications and no products were available for distribution. First Fetouh Decl., Exhibit 3, Scovello Dep. at 93:24-94:1 ("because at time the Prince was aware that we were unable to deliver the original product that we had contemplated in our agreement."); id. at 101:21-25 ("Plug was unable to produce the product to our specifications. They were producing technology, but it was considered pre-commercial by GE. So, there was no commercial product that we could provide to Soroof.").

*Dissolution of GEFCS*

16. Ultimately, the GEFCS business venture was unsuccessful in developing the specified PEM fuel cell product for distribution. Despite the investment of substantial effort and expense, technological challenges in the development of the Product could not be overcome. Plug Power was unable to produce the product as originally envisioned by the two companies due to these technical challenges, and the LLC was subsequently dissolved for this reason. First Fetouh Decl., Exhibit 3, Scovello Dep., at 47:21-48:1 ("GE's original intention was to distribute a certain kind of product that became very clear to us after an amount of time that Plug could not produce that product. When that

became evident, that's when we started talking about terminating that agreement because basically we had nothing to sell."); First Fetouh Decl., Exhibit 6, PPI000104, Action by Written Consent of the Members of GE Fuel Cell Systems, L.L.C., at PPI000104 ("WHEREAS, the Company has experienced little financial activity over the past several years and is not likely to experience an increase in financial activity before the term of the Agreement expires."); First Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149 (explaining that decision to dissolve GEFCS).

17. Since Plug Power went public in 1999, it spent over a half a billion dollars trying to bring the PEM fuel cell products to the marketplace. First Fetouh Decl., Exhibit 1, Conway Dep. , at 101:12-102:3 ("Q. Did it ultimately come about that Plug Power would up losing money in connection with the efforts to produce the product that was specified in the GE Fuel Cell contracts? A. Yes. That's why we turned our focus to the GenCore product. Q. Is it something that you know, that you are able to tell us even in a ballpark sense as to how much money Plug Power itself would up losing on these transactions? A. Well, I can tell you that since we have gone public in 1999, we have spent north of half a billion dollars trying to bring these products to the marketplace."). This involved the efforts of over 300 employees in research and development of the fuel cell products. First Fetouh Decl., Exhibit 3, Scovello Dep., at 48:17-21 ("It was not for lack of trying. It had over 300 people working on the development. They did significant research and development. It was just a very difficult challenge at the time.").

18. Further, GE Microgen and other General Electric Company affiliates contributed to this investment through the payment of $42.5 million for Plug Power stock during the

existence of GEFCS. First Fetouh Decl., Exhibit 8, Declaration of Frank Scovello, at p. 9.

19. All parties involved were disappointed that technical challenges prevented the production and distribution of Plug Power's product, as both GE Microgen and Plug Power expended substantial amounts of time and money trying to create and market the product for distribution. First Fetouh Decl., Exhibit 1, Conway Dep., at 33:3-12 ("I think that obviously all of the subdistributors had anticipated a relationship that didn't materialize. We certainly weren't happy. The idea was that we would be able to commercialize these products earlier on than we ultimately did. So I think there was an awareness that these subdistributors were not necessarily pleased."); id. at 41:24-42:3 ("So I don't think anybody was happy with the progress that the fuel cell industry generally was making."); First Fetouh Decl., Exhibit 3, Scovello Dep., at 48:16-21 ("A. It was a technical challenge. It was a significant technical challenge. It was not for lack of trying. It had over 300 people working on the development. They did significant research and development. It was just a very difficult challenge at the time.").

20. Because Plug Power had an interest in continuing to develop its business relationship with Soroof, Plug Power entered into discussions with Soroof about a potential new distributor agreement between Plug Power and Soroof. First Fetouh Decl., Exhibit 1, Conway Dep., at 37:5-21 ("[W]e were in the business of continuing to try to develop these fuel cell products. If GE was not going to distribute them, we would have to distribute them. We were essentially going to be targeting the same customers. So if GE didn't want to target them, we would. GE was, on the business level, was helpful to us in introducing us to a lot of their customers. Basically, the idea there was we are not in fuel

cells anymore, but Plug Power is. You might want to talk to them. As with any relationship, business relationship, there are issues that can be addressed as you move forward."); id. at 44:12-45:4 ("So there were different customers, potential customers and users, distributors. But there were some of the same. Soroof fell into that category that they may be interested, we felt, in this GenCore product. We were also continuing to work on the prime power product. So we contemplated if we began to distribute this product through various entities around the world, when the prime power product was commercialized, we would have a channel to the marketplace. This was all being done independent of GE. We needed to move forward. We needed to survive. We had new investors. We were working on new investors."); id. at 49:20-50:4 ("As I said before, we were looking to engage with and develop an ongoing relationship with Soroof. So trying to understand were they happy, what were their issues would have been part of Ravi's job, with the goal of coming to an agreement with Soroof to do a go-forward business relationship related to Plug Power.").

21. Likewise, GE Microgen encouraged these discussions. First Fetouh Decl., Exhibit 3, Scovello Dep., at 113:19-24 ("We did not have a concern at the time we were terminating that Soroof was asking for the return of their million dollar distribution fee. We wanted to support both Soroof and Flint in setting up an alternative to what they originally started with GE. That was our biggest concern.").

22. In the Termination Agreement, Plug Power agreed to "make commercially reasonable efforts to enter into separate nonexclusive distributor agreements for Plug Power's GenCore product with Soroof" and one other subdistributor. First Fetouh Decl., Exhibit 9, PPI000107-09, Termination Agreement ¶ 2(b).

23. Plug Power was offering to make Soroof the exclusive distributor of GenCore, an existing product, in Saudi Arabia without payment of any distributor fee. First Fetouh Decl., Exhibit 1, Conway Dep., at 44:12-17 ("So there were different customers, potential customers and users, distributors. But there were some of the same. Soroof fell into that category that they may be interested, we felt, in this GenCore product."); First Fetouh Decl., Exhibit 12, PPI000383, March 10, 2006 email from Plug Power to Soroof (attaching proposed Plug Power/Soroof International Distributor Agreement); First Fetouh Decl., Exhibit 13, PPI000403, Proposed Plug Power/Soroof International Distributor Agreement; First Fetouh Decl., Exhibit 3, Scovello Dep., at 122:4-9 ("What we had told Plug Power directly is that we would expect that you would sign a distribution agreement which was similar in terms of the GEFCS agreement and there would be no distribution fee associated with that. That's what we told them.").

24. Plug Power and Soroof engaged in extensive negotiations in an attempt to enter into a new distributor agreement for the GenCore product. First Fetouh Decl., Exhibit 1, Conway Dep., at 92:13-94:10 ("Q. And still talking about the negotiations that had been happening up to the point of the signing of the termination agreement, how long had they been going on up to that date, which is March 2006? A. I believe they had been going on for some time, for a number of months at least. . . . They involved a discussion of the product and its capabilities. They involved a discussion with Soroof related to the third-party fueling provider . . . So there were discussions, visits, meetings with the hydrogen provider. And there were a lot of discussions around different concepts for how the hydrogen would – the best method to have the hydrogen available for the GenCore products.").

25. These negotiations included communications between Soroof, Plug Power, and third parties for Soroof's distribution of Plug Power's GenCore product in Saudi Arabia, the identification of Soroof as Plug Power's distributor in Saudi Arabia, and protocol for Soroof's transmittal of proposals to potential customers for the sale of Plug Power's fuel cell products. First Fetouh Decl., Exhibit 12, PPI000383, March 10, 2006 email from Plug Power to Soroof (attaching proposed Plug Power/Soroof International Distributor Agreement); First Fetouh Decl., Exhibit 13, PPI000403, Proposed Plug Power/Soroof International Distributor Agreement; First Fetouh Decl., Exhibit 14, PPI000379, March 8, 2006 through March 14, 2006 email correspondence between Plug Power and a third party (identifying Soroof as "our distributor"), at PPI000379; First Fetouh Decl., Exhibit 15, PPI000456-465, December 25, 2005 through February 27, 2006 email exchange between Soroof and Plug Power (concerning protocol for transmittal of product proposals to customers); First Fetouh Decl., Exhibit 16, PPI000372-375, March 9, 2006 through March 15, 2006 email exchange between Plug Power and Soroof (regarding proposals to third parties for product sales); First Fetouh Decl., Exhibit 17, PPI000356, March 29, 2006 through March 31, 2006 internal Plug Power email (reporting that Plug Power was "presently in the process of formalizing the Distributor Agreement with Soroof…"), at PPI000356; First Fetouh Decl., Exhibit 18, PPI000370, March 9, 2009 through April 3, 2006 email exchange between Plug Power and a third party (characterizing Soroof as company which "represents Plug Power in Saudi Arabia"), at PPI000371.

26. By the spring of 2006, discussions between Plug Power and Soroof slowed and, ultimately, Soroof chose not to enter into a new distributor agreement for the GenCore product. First Fetouh Decl., Exhibit 1, Conway Dep., at 116:12-22 ("Q. It looks like

when we looked at the documents that the dialogue between Plug Power and Soroof for the distribution of the GenCore product just stopped. And that's my impression from looking at it. But what I'd like to ask you is what happened? Why didn't it go any further than it apparently did? . . . A. I do not know why it just stopped. I don't know.").

27. On July 1, 2008, Soroof filed an arbitration demand against GEFCS seeking to recover damages under the theory that GEFCS had improperly failed to deliver products pursuant to the Agreement. Docket No. 13, Preliminary Pre-Trial Statement, at 1-6.

28. On January 22, 2010, the parties entered into a Venue Agreement, whereby the parties agreed to close the arbitration and litigate Soroof's claims in this Court. Docket No. 63-3, Venue Agreement.

29. On February 22, 2010, Soroof filed a complaint against GEFCS, GE Microgen, and Plug Power asserting claims originally stated in the arbitration as well as various claims allegedly arising out of the Agreement, including claims for breach of contract, misrepresentation, conversion, and unjust enrichment. Docket No. 1, Complaint, at pp. 7-14.

30. Soroof admits that it never made a formal claim to GEFCS or its former members before the filing of the arbitration demand or the current lawsuit. First Fetouh Decl., Exhibit 19, Docket No. 78, Order, at 1 ("Plaintiff has represented . . . that it made no formal claim against defendants prior to commencement of the arbitration."); First Fetouh Decl., Exhibit 20, December 1, 2010 Hearing Tr., at 14:12-25 ("The Court: Are you relying on any notice prior to the – any formal notice prior to the commencement of the arbitration, either oral or written? Mr. Kalbian: No formal written notice. But I'm . . . reminded that – no formal written notice, but I'm reminded that Mr. Scovello, the 30(b)(6) designees,

testified that he had a conversation with Jim Jackson where Jackson told him about the – Soroof's displeasure, if you will, with the situation and that this conversation took place before the dissolution, so – The Court: All right. Is that the extent of the notice that you're relying on? Mr. Kalbian: Yes."); see also First Fetouh Decl., Exhibit 1, Conway Dep., at 48:11-15 ("If there was a formal claim that had been made by Soroof to Plug Power, it would have been brought to my attention. And that did not happen.").

Dated: March 31, 2011

Respectfully submitted,

/s/ Dahlia S. Fetouh
Dahlia S. Fetouh (*pro hac vice*)
Natalie F. Langlois (*pro hac vice*)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.: 617.570.1000
Fax: 617.523.1231
E-Mail: dfetouh@goodwinprocter.com
E-Mail: nlanglois@goodwinprocter.com

Abigail K. Hemani (AH 2071)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 813-8800
ahemani@goodwinprocter.com

Attorneys for Defendant PLUG POWER INC.

/s/ Michael D. Fisse
Michael D. Fisse, Esq.
Jan Van Steenis, Esq.
DAIGLE FISSE & KESSENICH, PLC
P.O. Box 5350
Covington, LA 70434-5350
(985) 871-0800
Fax: (985) 871-0899
Email: mfisse@daiglefisse.com
Email: jbradford@daiglefisse.com

Thomas Edward Healy, Esq.
PINO & ASSOCIATES, LLP
50 Main Street
White Plains, NY 10606
(914) 946-0600
Fax: (914) 946-0650
Email: thealy@pinolaw.com

Attorneys for Defendant GE MICROGEN, INC.

## CERTIFICATE OF SERVICE

I, Dahlia S. Fetouh, hereby certify that true copies of the foregoing DEFENDANTS PLUG POWER INC. AND GE MICROGEN, INC.'S RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS were caused to be served by ECF on this 31st day of March, 2011 on the following counsel:

James R. Lynch, Esq.
Jason Kaufman, Esq.
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York , NY 10018
(212) 302-2400
Fax: (212) 302-2210
Email: lynch@lawlynch.com
Attorneys for Plaintiff SOROOF TRADING DEVELOPMENT COMPANY, LTD.

Haig V. Kalbian, Esq.
Mary M. Baker, Esq.
Aaron W. Knights, Esq.
KALBIAN HAGERTY LLP
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Email: hkalbian@kalbianhagerty.com
Attorneys for Plaintiff SOROOF TRADING DEVELOPMENT COMPANY, LTD.

Dated: March 31, 2011 /s/ Dahlia S. Fetouh