**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOROOF TRADING DEVELOPMENT COMPANY, LTD., Plaintiff, v. GE FUEL CELL SYSTEMS, LLC GE MICROGEN, INC., and PLUG POWER INC. Defendants. | No. 10 Civ. 1391 (LTS) (JCF) **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS GE MICROGEN, INC. AND PLUG POWER INC.'S MOTION FOR SUMMARY JUDGMENT** |

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS GE MICROGEN, INC. AND PLUG POWER INC.'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**


Table of Authorities ........................................................................................ 3

Preliminary Statement ........................................................................................ 4

Procedural History ........................................................................................ 5

Statement of Facts ........................................................................................ 7

Argument

I. STANDARD OF REVIEW UNDER RULE 56 .................................................. 12

II. DEFENDANTS FAILED TO COMPLY WITH THE REQUIREMENTS OF TITLE 6, SECTION 18-804(b)(3) OF THE DELAWARE CODE

A. Delaware law does not preclude claims against a dissolved LLC ................. 13

B. Section 18-804(b)(3) does not require formal notice of a claim .................... 14

C. Defendants were aware of likely claims by Soroof prior to dissolving GE Fuel Cell ........................................................................................ 15

D. Defendants did not establish a reasonable provision under Section 18-1804(b)(3) ........................................................................................ 17

III. DEFENDANTS CONCEDE THAT GE FUEL CELL WAS THE ALTER EGO OF ITS PARENT COMPANIES

A. Fraud is not required to pierce the corporate veil ........................................ 20

B. The undisputed evidence and Defendants admissions demonstrate that GE Fuel Cell was the alter ego of its parent companies ...................................... 21

Conclusion ........................................................................................ 24

Certificate of Service ........................................................................................ 26

## TABLE OF AUTHORITIES

### COURT CASES


D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. ) .......... 12

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 (1986) .......... 12

L.B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) .......... 12

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) .......... 12

Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995) .......... 12,13

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) .......... 12

Metro Commun. Corp. BVI. V. Adv. Mobilecomm Tech., Inc., 54 A.2d 121, 139 (Del. Ch. 2004) .......... 13

Disabled in Action of Metropolitan New York v. Hammons, 202 F.3d 110, 119 (2d. Cir. 2000) .. 15

Robinson v. Shell Oil Co., 519 U.S. 337 (1997) .......... 15

Aslandis v. United States Lines, Inc., 7 F.3d 1067, 1072-1073 .......... 15

Thor Merrit Square, LLC v. Bayview Malls LLC, No. 4480-VCP, 2010 WL 972776 (Del. Ch. Ct. Dec. 16, 2010) .......... 17

People v. Hyland, No. 61-08, 2008 WL 918284, *2 (N.Y. Dist. Ct. April 2, 2008) .......... 19, 22

Ritchie Capital Management, LLC v. Coventry First LLC, No. 07 Civ. 3494, 2007 WL 2044656, (S.D.N.Y. July 17, 2007) .......... 20

Hallmark Cards, Inc. v. Matthews, Inc., No. Civ.A. 99-2129, 1999 WL 1212196, (E.D.Pa. Dec. 16, 1999) .......... 20

Blair v. Infineon Technologies AG, 720 F. Supp. 2d 462, 470-471 (D.Del. 2010) .......... 20, 21

United States v. Golden Acres, Inc., 702 F. Supp. 1097 1104 (D. Del. 1988) .......... 15, 20

Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d. Cir. 1995) .......... 21

UBS Securities, Inc., v. Tsoukanelis, 852 F. Supp. 244 (S.D.N.Y. 1994) .......... 23

Directors Guild America, Inc. v. Garrison Productions, Inc., 733 F. Supp. 755, 762 (S.D.N.Y. 1990) .......... 24


### FEDERAL RULES


Fed. R. Civ. Pro. 56 .......... 4


### STATE STATUTES


6 Del. Code § 18-1804 .......... 13

## PRELIMINARY STATEMENT

Plaintiff, Soroof Trading Development Company, Ltd. ("Soroof"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submits this Memorandum of Law in Support of its Opposition to Defendants, GE Microgen, Inc.'s and Plug Power, Inc.'s, Motion for Partial Summary Judgment ("Defendants' Motion"). Defendants' Motion should be denied in all respects because the undisputed evidence demonstrates that GE Fuel Cell, LLC ("GE Fuel Cell"), was improperly dissolved, that Defendants failed to comply with the requirements of Delaware law, and that it was the alter ego of its immediate parent companies, GE Microgen, Inc. ("GE Microgen") and Plug Power, Inc. ("Plug Power").[1]

Despite not having complied with their contractual duties or the requirements of Delaware law, Defendants claim that they are immune from all liability because GE Fuel Cell is a dissolved entity and that GE Fuel Cell's hollow shell of a corporate existence insulates its two parent entities from any liability. In addition, Defendants argue that if any obligations were required under Delaware law, these were either (a) discharged by Soroof's failure to give formal notice of any claim or (b) satisfied by Defendants' proposed alternative contract.

Both the law and the facts belie Defendants' arguments. First, Delaware law does not preclude claims against a dissolved LLC because Soroof is seeking nullification of the certificate of cancellation. Second, Title 6, Section 18-804(b)(3) of the Delaware Code imposes specific requirements on a dissolving LLC to make "reasonable provision" for known claims prior to

---

[1] As the issue of piercing the corporate veil of GE Microgen to hold the General Electric Company ("GE") liable was not raised in Defendants' Motion, Soroof does not address that issue here. However, Soroof maintains, as stated in its own Motion for Partial Summary Judgment, that the corporate veils of both GE Fuel Cell and GE Microgen should be pierced to hold the real party in interest, GE, liable. See Soroof Trading Development Company, Inc.'s Motion for Partial Summary Judgment at Docket # 87-90.

dissolution. In fact, here the undisputed evidence demonstrates that Defendants had full knowledge of possible claims by Soroof and even bargained over an indemnity to apportion the risks of those claims between themselves, although they failed to make provisions to pay Soroof for any liability assessed. Third, Defendants' own admissions as well as the undisputed evidence establish that GE Fuel Cell was nothing but a shell company, thus necessitating piercing the corporate veil to hold its parent entities liable.

## PROCEDURAL HISTORY

This litigation originally commenced on July 1, 2008, when Soroof initiated AAA arbitration proceedings against GE Fuel Cell. GE Fuel Cell filed a Motion to Dismiss and asserted, among other things, that GE Fuel Cell was a dissolved entity, and consequently, it claimed that Soroof could maintain no actions against it. Soroof opposed GE Fuel Cell's Motion to dismiss, arguing, inter alia, that GE Fuel Cell, as a Delaware limited liability company was required by the Delaware Code to "make such provision as will be reasonably likely to be sufficient to provide compensation" for claims that are either known or reasonably should have been known to GE Fuel Cell. See DEL. CODE ANN. TIT. 6, § 18-1804(b)(3). GE Fuel Cell made no such provisions and failed to notify Soroof of its dissolution. See Complaint at ¶ ¶ 27-29. The latter fact is not disputed. Consequently, GE Fuel Cell's dissolution was ineffective and improper and its members – Defendants Plug Power and GE Microgen – and any other affiliates who participated in or caused the dissolution are liable to Soroof for the actions of GE Fuel Cell giving rise to this litigation and the transfer of the $1 million deposit paid by Soroof. The Arbitration Panel, chaired by the Hon. Kathleen Roberts, a retired federal judge from this Honorable Court, addressing the same arguments now before this Court, denied GE Fuel Cell's Motion to Dismiss without prejudice to GE Fuel Cell filing a motion for summary judgment after discovery. See. Ex. 14, Prehearing Order No. 2. Unfortunately for Defendants, the discovery

conducted on this issue has only weakened their position since the Arbitration Panel denied the Motion to Dismiss.

After the Motion to Dismiss was denied, Soroof notified GE Fuel Cell of its intension to move to compel GE Microgen and Plug Power to join the arbitration. Subsequently, Defendants requested and Soroof agreed to enter into the Agreement on Venue ("Venue Agreement"), whereby the parties agreed to dismiss the arbitration proceedings and move the litigation to the United States District Court for the Southern District of New York. In accordance with the Venue Agreement, on February 22, 2010, Soroof filed its complaint against GE Fuel Cell and its two parent and principal shareholders, GE Microgen and Plug Power in this action. The Defendants maintained that GE Fuel Cell had been properly dissolved, thereby rendering GE Microgen and Plug Power immune from liability. As such, the parties agreed to a phased discovery plan, with Phase I discovery limited to circumstances surrounding the dissolution and/or winding up of GE Fuel Cell and Phase II discovery to be conducted afterward to address Soroof's substantive claims. During Phase I discovery, evidence revealed that in fact GE Fuel Cell was nothing more than a shell entity of its two parent companies, GE Microgen and Plug Power.[2] Phase I discovery is now complete and the issues of whether GE Fuel Cell was dissolved properly and whether the corporate veil of GE Fuel Cell should be pierced to hold GE Microgen and Plug Power accountable are now ripe for consideration.

---

[2] Phase I discovery also revealed that GE Microgen was also a shell entity of the real party in interest, GE, and Soroof filed a seeking GE's joinder as a defendant in this action. See, Soroof's Motion to Leave to File Complaint, at Dkt. #56-58. The Court has not yet reached the merits of this Motion, and Soroof consented to its denial without prejudice in light of the pending Motion for Judgment and anticipated summary judgment motions on the issue of dissolution. See Dkt. #78.

## STATEMENT OF FACTS

In or about February 1999, GE, acting through GE Microgen, and Plug Power established GE Fuel Cell established a joint venture, GE Fuel Cell. See Ex. 1, Plug Power 8-K at PP1000149. GE Fuel Cell was established to act as the world wide distributor for Plug Power's Proton Exchange Membrane Fuel Cell (the "Product"). See Ex. 2, Scovello Dep. Tr. at 33:4-13. While GE Fuel Cell was established as a separate entity, from its inception it remained wholly dependant on its parent companies. First, it lacked any independent funding of its own.[3] Second, the parent entities provided all of the manpower for GE Fuel Cell. In fact, GE Fuel Cell did not have a single employee of its own. See Scovello Dep. Tr. at 12:9-20, 32:14-33:3; see Ex. 12, Conway Dep. Tr. at 20:23-21:3. Instead, all of the individuals tasked to the GE Fuel Cell project were actually employed by GE. Ex. 2, Scovello Dep. Tr. at 32:22-25; Ex. 12, Conway Dep. Tr. at 6:25-7:3 and 20:23-21:3. Third, Plug Power in turn provided the physical space, within its own offices for GE Fuel Cell's operations. See Ex. 2, Scovello Dep. Tr. at 62:10-16. Yet, there was no evidence of any GE Fuel Cell presence at Plug Power's facilities. Instead, the so-called GE Fuel Cell offices were marked by a GE Microgen sign. See Ex. 12, Conway Dep. at 18:24-19:4, 22:13-22. Fourth, the Management Committee of GE Fuel Cell was composed entirely of GE Microgen and Plug Power representatives. See Ex. 4, Action by Written Consent

---

[3] Mr. Scovello, GE Fuel Cell's President, testified: "I can tell you the original funding of the LLC, GE agreed to fund the expenses of the LLC initially." See Ex. 2, Scovello Dep. Tr. at 44:23-25. In a March 24, 2006 e-mail, in conjunction with GE Fuel Cell's dissolution, Sabrena Ponds, a GE Energy employee wrote: "the LLC was not generating revenue. The GE owner (Microgen) funded expenses incurred by [GE Fuel Cell]." See Ex. 3, March 24, 2006 S. Ponds E-mail.

of Members of GE Fuel Cell Systems, LLC; Ex. 12, Conway Dep. Tr. at 18:24-19:4, 22:13-22; see also Ex. 2, Scovello Dep. Tr. at 33:1-3.

Finally, although Mr. Scovello was purportedly the president of GE Microgen and GE Fuel Cell, he testified that he was at all relevant times employed by the parent company GE, not GE Microgen or GE Fuel Cell. See Ex. 5, Termination Agreement at GE 000061; see Ex. 2, Scovello Dep. Tr. at 32:14-33:3; Ex. 12, Conway Dep. Tr. at 6:25-7:3 and 20:23-21:3. According to Mr. Scovello, “I was never employed by GE Microgen. My employer was GE Energy at the time I was involved with this activity with Soroof.” Ex. 2, Scovello Dep. Tr. at 12:9-20;

As the global distributor for the Product, GE Fuel Cell entered into territorial distribution agreements with third-party distributors. One such territorial distribution agreement was with Soroof. On or about June 6, 2000 Soroof and GE Fuel Cell signed the "Distributor Agreement Between GE Fuel Cell Systems, LLC, and Soroof Trading Development Company Ltd." (the "Agreement"). See Ex. 6, the Agreement. The Agreement established Soroof as the exclusive distributor for Product in the Kingdom of Saudi Arabia. Id. at ¶ 3.1. Pursuant to the Agreement, Soroof paid GE Fuel Cell a "distributor fee" of $1 million. Id. at ¶ 6.4. Soroof paid this fee on the premise that GE Fuel Cell actually had saleable Product to deliver. See Ex. 7, Jackson Decl. at ¶ 7. Although, this money was paid to GE Fuel Cell, the funds were diverted to defer the costs of other GE employees who were "supporting" the activities of GE Fuel Cell. See Ex. 2, Scovello Dep. Tr. at 121:15-20.

In conjunction with the Agreement, Defendants required Soroof to ready itself for distributing the Product, including, *inter alia,* by hiring staff and outfitting offices. See Ex. 7, Jackson Decl. at ¶ 6. Specifically, to undertake its obligations under the Agreement, Soroof

expended in excess of $1 million, which expenditures were contemplated and, in fact, required by GE Fuel Cell. Id.

Soroof undertook these additional expenditures under the belief that GE Fuel Cell was fully capable of performing its obligations; i.e., that it had saleable Product for delivery to Soroof, as warranted in the Agreement. See Ex. 7, Jackson Decl. at ¶ 7. Specifically, GE Fuel Cell warranted that "[i]t has full authority and capacity to enter into **and perform its obligations** under this Agreement." See Ex. 6, Agreement at ¶ 10.1.2 (emphasis added). GE Fuel Cell further warranted that it had "full legal right, power and authority to enter into **and perform** this Agreement." Id. at ¶ 10.1.4 (emphasis added). Moreover, should circumstances surrounding GE Fuel Cell's ability to deliver Product change at any time, GE Fuel Cell had a continuing obligation "to share promptly relevant information, including but not limited to product performance, failure and liability issues...." See Id. at ¶ 7.4. As it turned out, GE Fuel Cell's warranties were false when made.

In or around November of 2000, Defendants notified Soroof that the Product would not be ready for distribution as promised. See Jackson Decl. at ¶ 8. According to Defendants, the Product was functional, but it did not yet meet quality standards. Id. Although, Defendants claimed quality standards prevented delivery of the product, in actuality there was no product to be delivered at all.[4] The Product contracted for was supposed to produce power continuously, twenty-four hours a day, seven days a week. See Ex. 2, Scovello Dep. Tr. at 38:8-21. However, as early as 2001, it became apparent that Plug Power could not develop a fuel cell that could

[4] Frank Scovello admitted in his deposition: "Basically, that Plug was unable to produce the product to our specifications. They were producing technology, but it was considered pre-commercial by GE. So there was no commercial product that we could provide Soroof." See Ex. 2, Scovello Dep. Tr. at 101:21-25.

actually meet these specifications. Id. at 102:11-19. The best Plug Power could develop was a back-up generator. Id. at 74:22-75:6. Despite knowing as early as 2001 that Plug Power was unlikely to develop the contracted for Product, Defendants continued to assure Soroof that Product was forthcoming. See Ex. 2, Scovello Dep. Tr. at 102:11-19. Defendants gave these assurances knowing that there actually was no Product available and that, in fact, the Product was unlikely to ever be developed at all.[5] Despite Soroof having raised concerns regarding the failure to deliver Product from as early as 2002, Defendants never honestly conveyed to Soroof relevant information regarding the Product, including their inability to develop the Product, as required under section 7.4 of the Agreement. See Ex. 2, Scovello Dep. Tr. at 101:1-11.

Instead, Defendants continued to falsely assure Soroof that the Product would eventually be delivered. See Ex. 7, Jackson Decl. at ¶ 9. During this time, Defendants encouraged Soroof to expand its infrastructure in preparation to distribute the Product. See Id. at ¶ 8. The Defendants fell into a pattern whereby they repeatedly contacted Soroof and claimed that the Product was not yet ready due to various problems, while at the same time assuring Soroof that Product was forthcoming. Id. at ¶ 9. To placate Soroof for its patience, GE agreed to expand Soroof's territory to encompass Lebanon. Id. In light of Defendants' repeated assurances, Soroof entered negotiations with various third-parties whereby Soroof would deliver potentially thousands of units of Product throughout Saudi Arabia and Lebanon. Id. at ¶ 11. Defendants' false assurances also had the added consequence of causing Soroof to maintain its offices and workforce at great expense. Id. It was not until the early months of 2005 that Defendants finally

[5] See Ex. 2, Scovello Dep. Tr. at 103:1-3 (Mr. Scovello stating that "it became clearer and clearer to us the challenge that was involved and that the product would **never** be developed.") (emphasis added).

informed Soroof that they could not overcome the apparent problems in bringing the Product to market (and to Soroof). Id. at ¶ 12.

In late 2005, Soroof expressed its dissatisfaction with Defendants complete lack of performance under the Agreement. See Ex. 7, Jackson Decl. at ¶ 13. Based on the concerns raised by Soroof, Defendants were aware that they could face potential legal liability for their failure to perform under the Agreement.[6] As such, when the decision was made to dissolve GE Fuel Cell, GE Microgen sought a very broad indemnity from Plug Power to cover any possible claims raised by Soroof. See Ex. 2, Scovello Dep. Tr. at 125:21-126:9. However, in light of Plug Power's unwillingness to grant such a broad indemnity, the Defendants capped it at $1 million. [7]

In 2006, Soroof again raised the issue of the Agreement's termination and possible financial implications resulting therefrom.[8] However, neither during these conversations nor after did Defendants ever tell Soroof of the impending dissolution of GE Fuel Cell.[9] Despite

---

[6] See Ex. 8, January 5, 2006 E-mail from A. Bucknam ("GE took a $1MM payment from [Soroof], and now is concerned about **legal problems** given that the distributors feel that they didn't get value for their $'s.") (emphasis added); see also Ex. 9, January 26, 2006 E-mail from R. Menon (During our conversation this morning, [Soroof] did bring up the financial issues surrounding the expired GE agreement...[m]y fear is that...they may circle back to the investment they made to secure the [GE Fuel Cell] distributorship and somehow hold Plug Power accountable.)

[7] See Ex. 10, February 28, 2006 G. Silvestri E-mail ("Essentially, GE is looking for Plug Power to broadly and fully indemnify GE for any possible actions taken at any future date by the distributors...Plug Power's position is that we will not sign such a broad and open ended agreement...."); see also Ex. 2, Scovello Dep. Tr. at 125:21-126:9.

[8] See Ex. 2, Scovello Tr. at 90:19-91:21; see also Ex. 9, January 26, 2006 E-mail from R. Menon, *supra* footnote 6.

[9] See Ex. 2, Scovello Tr. at 92:22-93:4; see also Jackson Decl. at ¶ 14.

knowledge of Soroof's possible legal claims, and that it might seek to hold Defendants accountable, GE Microgen and Plug Power quietly and without notice dissolved GE Fuel Cell. See Ex. 2, Scovello Dep. Tr. at 92:22-25; Ex. 12, Conway Dep. Tr. at 27:7-10. GE Fuel Cell's dissolution became effective on December 31, 2006, although a decision was reached to dissolve GE Fuel Cell early in 2006. See Ex. 11, Executed Certificate of Cancellation of GE Fuel Cell. At the time of GE Fuel Cell's dissolution, it had "no cash on hand," "was not really a going concern," and its only assets were "a server," "a telephone switch," and a "small amount of furniture." Ex. 2, Scovello Dep. Tr. at 48:22-24, 49:1-9.

## ARGUMENT

### I) STANDARD OF REVIEW UNDER RULE 56

"Summary judgment is appropriate only where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). The party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." L.B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The court has a duty to examine all factual assertions in materials such as affidavits and exhibits in the light most favorable to the non-moving party. See Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about material facts "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). Finally, when deciding a motion for summary judgment, the court must not weigh evidence, consider the credibility of a witness, or attempt to resolve issues of fact. Rodriguez, 72 F.3d at 1061. Application of these established standards to the facts of this case requires that Defendants' Motion be denied in its entirety.

## II) DEFENDANTS FAILED TO COMPLY WITH THE REQUIREMENTS OF TITLE 6, SECTION 18-804(b)(3) OF THE DELAWARE CODE

In seeking to avoid their obligations under Delaware law, Defendants advance a number of arguments. First, Defendants argue that a dissolved LLC is immune from all claims. Second, Defendants argue that Section 18-804(b)(3) does not apply in the context of this case because they had no knowledge of any possible claims by Soroof, either because Soroof never made a formal claim or because there were no facts to alert them to a possible claim. And, finally Defendants argue that if Section 18-804(b)(3) does apply, than their efforts to conclude a new contract with Soroof satisfied its requirements. However, both the plain language of the statute and the undisputed evidence contradicts all of Defendants' contentions.

### A) Delaware law does not preclude claims against a dissolved LLC.

Defendants' argument that Delaware law bars claims against a dissolved LLC is a red herring. Delaware law does not bar claims against a dissolved LLC if the party asserting the claims is seeking to have the certificate of cancellation nullified on the grounds that the LLC dissolved in contravention of the LLC Act. Soroof is seeking that here. See Metro Commun. Corp. BVI. v. Adv. Mobilecomm Tech., Inc., 854 A.2d 121, 138-139 (Del. Ch. 2004).

Further, Delaware law does not require Soroof to specifically allege or seek nullification of the certificate of cancellation in its Complaint. Rather, where as here, a complaint pleads facts that support the inference GE Fuel Cell was wound up in contravention of the LLC Act it also "pleads facts that support an application to nullify the certificate of cancellation." Id. at 139. In

the case at bar, Soroof has specifically pled that: Defendants were aware that Soroof had incurred substantial costs in preparation to take delivery and distribute the Product, that it had conveyed its dissatisfaction to Defendants, and that Defendants were aware of possible claims before they dissolved GE Fuel Cell without any notice to Soroof in violation of Delaware law.[10] Accordingly, Soroof has not just pled an inference that GE Fuel Cell was wound up in contravention of the LLC Act but it has specifically pled so.

B) <u>Section 18-804(b)(3) does not require formal notice of a claim</u>.

Defendants mislead the Court by positing that they had no obligation to make any provision, reasonable or otherwise, because Soroof failed to provide formal notice of its claim. Under Defendants' nonsensical theory, their obligations were only triggered had Soroof provided a formal notice of a claim and in the absence of such notice, they had no obligations to Soroof. However, the plain language of Section 18-1804-(b)(3) belies Defendants' interpretation.

Section 18-804(b)(3) of the Delaware Code, provides as follows:

> (b) A limited liability company which has dissolved:
>
> (3) Shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within 10 years after the date of dissolution.

6 Del. Code § 18-1804. Nowhere in the language of Section 18-1804(b)(3) is there a condition precedent requirement of tendering a formal notice. On the contrary, Section 18-1804(b)(3) simply states that a dissolving LLC must make "such provision as will be reasonably likely to be sufficient to provide compensation...based on facts known to the limited liability company."

---

[10] <u>See</u> Complaint at e.g. ¶¶ 11, 13, 21 & 26-29.

Thus, the plain language of Section 18-1804(b)(3) is crystal clear, and the burden of compliance falls solely on Defendants. And where as here the language of a statute is unambiguous it must be given effect. See Disabled in Action of Metropolitan New York v. Hammons, 202 F.3d 110, 119 (2d. Cir. 2000) (the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case") (citing Robinson v. Shell Oil Co., 519 U.S. 337 (1997)); see also Aslandis v. United States Lines, Inc., 7 F.3d 1067, 1072-1073 (2d. Cir. 1993) ("[A] court should presume that the statute says what it means. If the words of a statute are unambiguous, judicial inquiry should end, and the law interpreted according to the plain meaning of its words.").

C) Defendants were aware of likely claims by Soroof prior to dissolving GE Fuel Cell.

In any case, Defendants allege that even if no formal notice was required, they had no knowledge of any possible claims by Soroof. Once again, the overwhelming and undisputed evidence refutes this intentionally misleading statement. Defendants were aware that Soroof had paid a $1 million distribution fee for what turned out to be a right to distribute a fuel cell product that did not even exist and was never likely to exist. Defendants were also aware that Soroof had incurred additional costs and expenses at Defendants' behest in order to ready itself to take delivery and distribute Product. Soroof's costs were further compounded by the need to maintain office space and employees based on Defendants' repeated assurances over a five-year period that Product would eventually arrive. Finally, Soroof had expressed its concerns about the failure to deliver Product as early as 2002, in late 2005 and again in early 2006.[11] Thus, there was more than a sole expression of "displeasure" on the part of Soroof.

---

[11] See Ex. 2, Scovello Dep. Tr. at 90:19-91:13, 101:1-11; see also Ex. 7, Jackson Decl. at ¶ 13.

Given the fact that Soroof had expressed its concern and "displeasure" on numerous occasions, Defendants were rightly concerned about a possible lawsuit. In January of 2006, within days of the termination of the Agreement, Al Bucknam of Plug Power, explained that the main impetus for Defendants to pursue an alternative agreement with Soroof was due to concern about "legal problems given that the distributors feel they didn't get value for their $'s."[12] Likewise, in January 2006, after a meeting with Soroof, Ravi Menon, a Plug Power employee, was concerned that Soroof, "may circle back to the investment they made to secure the GEFC distributorship and somehow hold Plug Power accountable."[13] As such, there is no basis for Defendants to argue that they had no knowledge of possible claims by Soroof when their own internal communications reveal otherwise.

It is precisely because Defendants were aware of possible claims by Soroof that they negotiated over the scope of the indemnity. As Greg Silvestri of Plug Power explained in an e-mail: “Essentially, GE is looking for Plug Power to broadly and fully indemnify GE for any possible actions taken at any future date by the distributors."[14] That is, not only were Defendants aware of possible claims by Soroof, they were negotiating over how to apportion the costs of those claims. Defendants cannot be heard to deny that they negotiated the indemnity because they were aware that Soroof had claims and that these claims were likely to survive termination of the Agreement. As such, if Defendants actually believed that there was no likelihood of claims by Soroof there would have been no reason to even enter into an indemnity, let alone negotiate over its breadth.

---

[12] See Ex. 8, January 5, 2006 E-mail from A. Bucknam.

[13] See Ex. 9, January 26, 2006 E-mail from R. Menon.

[14] See Ex. 10, February 28, 2006 G. Silvestri E-mail.

D) Defendants did not establish a reasonable provision under Section 18-1804(b)(3).

Finally, Defendants' argument that Plug Power's effort to enter into an alternative distributor agreement with Soroof constituted a "reasonable provision" also fails when examined against the requirements of Section 18-1804(b)(3). Recently, the Delaware Court of Chancery in Thor Merrit Square, LLC v. Bayview Malls LLC, No. 4480-VCP, 2010 WL 972776 (Del. Ch. Ct. Dec. 16, 2010), explicated what constitutes a reasonable provision under Section 18-804(b)(3).

In Thor Merrit the defendants were obligated to undertake repairs in conjunction with the sale of their property. Thor Merrit, 2010 WL 972776, *1. The defendants set aside money in an escrow account to cover the costs of these repairs. Id. The defendants claimed that the money in the escrow account satisfied their obligations under Section 18-804(b)(3). Id. at *4. The Court rejected this argument. Id. at *5. The Court found that despite knowing the total cost of repairs, the defendants had put aside, only at best, a quarter of their financial exposure. Id. As such, the Court found that the failure to put aside sufficient funds indicated that defendants failed "to make reasonable provision for unmatured claims...before they filed the Dissolved Defendants' certificates of cancellation." Id. Thus in Thor Merrit, the Court found that where a party dissolved by making some provision to address future claims but not enough to address all known claims this was insufficient to meet the "reasonable provision" requirement of section 18-804(b)(3).

Accordingly, under the standard articulated in Thor Merrit, any provision that fails to make full recompense will not meet the requirements of section 18-804(b)(3). Here, there is no evidence whatsoever that Defendants undertook any effort to satisfy any -- let alone all -- of Soroof's claims. First, the plain language of section 18-804(b)(3) requires that any provision be structured to provide "compensation" for claim holders of the dissolved LLC. Here, it is

undisputed that no funds to provide compensation of any kind was ever set aside for Soroof's benefit.

Rather, Defendants desperately argue that their efforts to enter into an alternative distribution agreement satisfied the "reasonable provision" requirement of Section 18-1804(b)(3). However, Defendants' proposed alternative agreement was for a completely different fuel cell than the one originally contracted for. As Mr. Scovello admitted under oath the new generator developed by Plug Power "was **totally different** than what GE had totally envisioned when we entered into the agreement with Plug" and that "[i]t was a backup power rather than a 24/7 continuous power."[15] Defendants also admit that the new generator was nothing more than a back-up generator.[16] In fact, that Plug Power failed to develop the Product is, according to Mr. Scovello, precisely why the decision to dissolve GE Fuel Cell was made. See Ex. 2, Scovello Dep. Tr. at 47:17-48:1. That is, Defendants were offering to replace an agreement for a fuel cell that generated power continuously twenty-four hours, seven days a week for a back-up generator akin to a battery pack.[17] Therefore, an unsuccessful effort to enter into a contract for a generator that did not come close to meeting the specifications of the

---

[15] See Ex. 2, Scovello Dep. Tr. at 74:22-75:6 (emphasis added).

[16] See Defendants' Motion at 7 ("the GenGore product was also a PEM fuel cell, but the GenCore product had been successfully developed for application as a back-up power source").

[17] See Defendants Statement of Undisputed Material Facts at ¶ 35 ("The product that we were selling and marketing at this time was a different product than had originally been contemplated by GE and Plug...it was essentially a backup power system, not a prime power system. So think of a generator that's at your house versus a battery pack. That will give you a good analogy.")

original contracted for Product cannot be regarded as a "reasonable provision" or "compensation"[18] under the standards of Section 18-804(b)(3).

Further, the disingenuousness of Defendants' argument is evidenced by their own admission. On the one hand, Defendants argue that the alternative generator contract was an effort to meet the requirements of Section 18-804(b)(3), however, they also admit that the only reason they pursued the alternative contract was for business development purposes. Defendants judiciously admit that: "Because Plug Power had an interest in continuing to develop its business relationship with Soroof, Plug Power entered into discussions with Soroof about a potential new distributor agreement between Plug Power and Soroof."[19] Thus, by Defendants' own admission, the proposed alternative agreement was nothing more than a business development effort and not as they now claim, an effort to satisfy the "reasonable provision" requirement of Section 18-804(b)(3).

## III) DEFENDANTS CONCEDE THAT GE FUEL CELL WAS THE ALTER EGO OF ITS PARENT COMPANIES

In seeking to hide behind a corporate form that they themselves never adhered to, Defendants advance two arguments against piercing the corporate veil of GE Fuel Cell, one legal and the other factual. Defendants first claim that fraud is required in order to pierce the corporate veil. Second, Defendants claim that having a separate office in the name of GE

---

[18] See People v. Hyland, No. 61-08, 2008 WL 918284, *2 (N.Y. Dist. Ct. April 2, 2008) ("compensation is the giving back in value of an equivalent in either money… or in actual value otherwise conferred") (citing Black's Law Dictionary (4th ed. 1968)).

[19] See Defendants Plug Power Inc. and GE Microgen, Inc.'s Statement of Undisputed Material Facts In Support of Their Motion for Summary Judgment (Defendants' "Statement of Material Facts") at ¶ 32.

Microgen, with nothing more, somehow evidences the separate legal existence of GE Fuel Cell. Both arguments are fatally flawed.

A) Fraud is not required to pierce the corporate veil.

Defendants first claim that in order to pierce the corporate veil, Soroof must prove fraud. This argument is intellectually dishonest because there simply is no such requirement under Delaware law. Under Delaware law, "to prevail on an alter ego theory of liability, a plaintiff must show that the two corporations operated as a single economic entity such that it would be inequitable...to uphold a legal distinction between them." See Ritchie Capital Management, LLC v. Coventry First LLC, No. 07 Civ. 3494, 2007 WL 2044656, *5 (S.D.N.Y. July 17, 2007), (internal citation omitted) (applying Delaware law on veil piercing). Further, "an alter ego analysis commences with an examination of factors which exposes how the corporation operates and the particular defendant's relationship to that operation." Hallmark Cards, Inc. v. Matthews, Inc., No. Civ.A. 99-2129, 1999 WL 1212196, *4 (E.D.Pa. Dec. 16, 1999) (applying Delaware law).

Among the factors Delaware Courts consider to determine if a company is acting as the alter ego of another are: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporation; (5) siphoning off of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) whether the corporation is merely a facade. See Blair v. Infineon Technologies AG, 720 F. Supp. 2d 462, 470-471 (D.Del. 2010). While no single factor would justify a decision to disregard the corporate entity, some combination is required as well as an overall element of injustice or unfairness. See United States v. Golden Acres, Inc., 702 F. Supp. 1097 1104 (D.Del. 1988).

As stated above, it is an overall element of injustice and unfairness that is required -- not fraud -- to pierce the corporate veil. See Fletcher v. Atex, Inc., 68 F.3d 1451, 1457 (2d. Cir. 1995) ("under Delaware law, the alter ego theory of liability does not require any showing of fraud"); see also Golden Acres, Inc., 702 F. Supp. at 1104 ("proof of plain fraud **is not** a necessary element in a finding to disregard the corporate entity") (emphasis added and internal citations omitted); Blair, 720 F. Supp. 2d at 470-471 ("Under Delaware law, the requisite injustice or unfairness is not that the parent corporation committed an actual fraud or sham but just 'something that is similar in nature to fraud or a sham.'") (internal citation omitted). And as explained more fully below, Soroof has not only satisfied all of the elements but also demonstrated the requisite level of injustice and unfairness to warrant piercing the corporate veil.

B) The undisputed evidence and Defendants' admissions demonstrate that GE Fuel Cell was the alter ego of its parent companies.

Defendants marshal only a single fact in support of their argument that GE Fuel Cell, GE Microgen and Plug Power were separate legal entities. Defendants argue that GE Microgen leasing separate office space at Plug Power's facility somehow evidences GE Fuel Cell's separate corporate existence. On the contrary, the fact that GE Microgen obtained the lease and not GE Fuel Cell merely reinforces that GE Fuel Cell was nothing more than a shell entity. Moreover, Defendants admit that all business functions of GE Fuel Cell were handled by the two parent companies, further confirming GE Fuel Cell's shell status. In Defendants' Motion, they admit that Plug Power was tasked with developing the Product and GE Microgen performed the sales and marketing.[20] As such, Defendants' judicial admissions further establish that there was no operational or physical distinction between GE Fuel Cell and its two members.

---

[20] See Defendants' Motion at pgs. 4, 22.

Defendants brazenly claim that GE Fuel Cell's undercapitalization renders it immune from all claims.[21] However, it is precisely in these situations that courts have deemed it appropriate, and why Soroof is seeking, to pierce the corporate veil. See Golden Acres, Inc., 702 F. Supp. at 1104 (internal citation omitted) (Among all the factors considered by courts in piercing the corporate veil, "the one that all authorities consider significant in the inquiry...is inadequate capitalization.").

In addition to Defendants' judicial admissions, the undisputed facts also establish that GE Fuel Cell was grossly undercapitalized. First, GE Fuel Cell had no cash assets. See Ex. 2, Scovello Dep. Tr. at 48:22-49:9. In fact, all of its operational funds came from its parent entities. Id. at 44:15-25. Further, given that Plug Power never managed to develop any Product that could be sold, GE Fuel Cell had no means to generate any revenue. Id. 48:22-49:9. Thus in the absence of any actual product to distribute, the only method for GE Fuel Cell to generate revenue was through the sale of distribution rights. However, any revenue actually generated through these rights was siphoned off to pay the expenses of other GE employees. As Mr. Scovello testified: "That $1 million went to offset the cost, my salary, the salaries of Barry Glickman and all the other people that were involved in supporting the activities of [GE Fuel Cell], yes." Id. at 121:15-20. Given that GE Fuel Cell could generate no revenue whatsoever, the only assets it could claim as its own were a computer server, a telephone switch and some furniture. See Ex. 2, Scovello Dep. Tr. at 49:5-7.

In addition to undercapitalization, GE Fuel Cell lacked even the most basic elements of an independent existence. First, as Mr. Scovello succinctly stated "[GE Fuel Cell] had no employees." See Ex. 2, Scovello Dep. Tr. at 32:25-33:1. All of the personnel assigned to

[21] See Defendants' Motion at 21.

"support" GE Fuel Cell were actually employees of its parent corporations.[22] Further, the whole Management Committee of GE Fuel Cell was composed entirely of Plug Power and GE representatives. Also, Mr. Scovello, a GE employee, acted as the president of both GE Fuel Cell and GE Microgen. And perhaps most telling, despite being GE Fuel Cell's president, Mr. Scovello claimed that he was never actually an employee of GE Fuel Cell.[23]

It is precisely in these types of situations that courts have found it both necessary and equitable to pierce the corporate veil, as exemplified by the Southern District's reasoning in UBS Securities, Inc., v. Tsoukanelis, 852 F. Supp. 244 (S.D.N.Y. 1994). In Tsoukanelis, the Court, applying Delaware law, found that piercing the corporate veil was warranted where: "there was a general absence of the formalities and paraphernalia that are part and parcel of corporate existence. For example...[defendant] had no employees, offices or bank account, kept no financial statements, never filed a tax return and never held any meetings of any sort after it was incorporated." See Tsoukanelis, 852 F. Supp. at 248. In the case at bar, there was not a general but a complete "absence of the formalities" of a separate corporate existence.

Finally, Defendants' domination and control of GE Fuel Cell exhibits the requisite level of injustice and unfairness needed to pierce the corporate veil of GE Fuel Cell. First, Defendants took a $1 million distributor fee in exchange for distribution rights to a Product that did not even exist. Second, rather than disclose the truth of the Product's unavailability, Defendants continued to assure Soroof that the Product would eventually be delivered. Defendants' failure to timely inform Soroof of the Product's non-existence was not only contrary to obligations under the

[22] Mr. Scovello explained in his deposition that: "GE provided people to support the joint venture as did Plug Power." Ex 2, Scovello Dep. Tr. at 33:1-2.

[23] Ex. 2, Scovello Dep. Tr. at 24:4-5 ("I was for a brief time president of [GE Fuel Cell]. But I never was employed by GE Fuel Cell.").

Agreement but also aggravated Soroof's expenses in maintaining its office and employees over a five year period. Finally, despite knowing that Soroof was unhappy with their performance under the Agreement and that they were likely to face legal claims for their failures, Defendants dissolved GE Fuel Cell as a shield from any liability. Thus, piercing the corporate veil of GE Fuel Cell is warranted because maintaining the legal distinction between the Defendants would not only be inequitable but also validate their abuse of the corporate form. See Directors Guild of America, Inc. v. Garrison Productions, Inc., 733 F. Supp. 755, 762 (S.D.N.Y. 1990) (finding piercing the corporate veil warranted where defendant "controlled every asset, made all major decisions with respect to funding of the corporation, and treated the corporation as his own instrumentality, while at the same time hiding behind the corporate form when creditors...demanded their rightful payments pursuant to the contract.").

## CONCLUSION

Defendants' arguments that they had no obligation to Soroof under Delaware law and that GE Microgen and Plug Power are insulated from liability simply do not survive when examined against the requirements of Section 18-1804(b)(3) and Delaware's veil piercing standard. The undisputed facts prove that Defendants were aware of possible claims by Soroof but still dissolved GE Fuel Cell without making any provision to address those claims, in direct contravention to Section 18-1804(b)(3). Further, piercing the corporate veil and holding GE Microgen and Plug Power liable is warranted in light of the evidence and Defendants' admissions proving that GE Fuel Cell was nothing but a shell entity. For all the foregoing reasons Defendants' Motion must be denied.

Respectfully submitted,

KALBIAN HAGERTY LLP

By: /s/ Haig V. Kalbian
Haig V. Kalbian (*pro hac vice*)
Mary M. Baker (*pro hac vice*)
Aaron W. Knights (*pro hac vice*)
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
T: (202) 223-5600
F. (202) 223-6625
hkalbian@kalbianhagerty.com
mmb@kalbianhagerty.com
aknights@kalbianhagerty.com

James R. Lynch (JL-2778)
Jason Kaufman
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York, New York 10018
T: (212) 302-2400
F: (212) 302-2210
lynch@lawlynch.com
kaufman@lawlynch.com

*Counsel for Plaintiff Soroof Trading Development Company, Ltd.*

CERTIFICATE OF SERVICE

I hereby certify that, this 31st day of March, I have electronically filed the foregoing Memorandum of Law in Opposition to Defendants GE Microgen, Inc and Plug Power, Inc.'s Motion for Summary Judgment, Local Rule 56.1 Statement, Declaration of Aaron W. Knights, and exhibits with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following::

Abigail K. Hemani, Esq.
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
E-mail: ahemani@goodwinprocter.com

Dahlia S. Fetouh, Esq.
Natalie Langlois, Esq.
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
E-mail: dfetouh@goodwinprocter.com
E-mail: nlanglois@goodwinprocter.com

*Counsel for PLUG POWER, INC.*

Thomas Edward Healy
Pino & Associates, LLP
50 Main Street
White Plains, NY 10606
E-mail: thealy@pinolaw.com

Michael D. Fisse
Jon A. Van Steenis
DAIGLE FISSE & KESSENICH
PO Box 5350
Covington, LA 70434-5350
E-mail: mfiss@daiglefisse.com
E-mail: lvansteenis@daiglefisse.com

*Counsel for GE Microgen, Inc. and GE FUEL SYSTEMS, LLC*

/S/ Haig V. Kalbian

Haig V. Kalbian