UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOROOF TRADING DEVELOPMENT COMPANY, LTD.,

Plaintiff,

v.

GE FUEL CELL SYSTEMS, LLC, GE MICROGEN, INC., and PLUG POWER INC.,

Defendants.

Civil Action No. 10 CIV 1391

**DEFENDANTS PLUG POWER INC.'S AND GE MICROGEN, INC.'S RESPONSE TO PLAINTIFF'S ADDITIONAL MATERIAL FACTS IN PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS**

Defendants Plug Power Inc. ("Plug Power") and GE Microgen, Inc. ("GE Microgen") (collectively, "Defendants") hereby submit their Response to Plaintiff Soroof Trading Development Company, Ltd.'s ("Soroof's") Additional Material Facts in Soroof's Counterstatement of Material Facts (Docket No. 100). Defendants Plug Power Inc.'s and GE Microgen, Inc.'s Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Defendants' SOF") (Docket No. 93) and the Declaration of Dahlia S. Fetouh ("First Fetouh Decl.") and the exhibits attached thereto (Docket No. 94) are incorporated here by reference as if fully set forth herein. Defendants Plug Power Inc.'s and GE Microgen, Inc.'s Response to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts and Statement of Additional Undisputed Material Facts ("Defendants' Response") (Docket No. 97), and the Declaration of Dahlia S. Fetouh ("Second Fetouh Decl.") and exhibits attached thereto (Docket No. 98) are also incorporated here by reference as if fully set forth herein.

## I. DEFENDANTS' RESPONSES TO SOROOF'S ADDITIONAL MATERIAL FACTS

55. This litigation originally commenced on July 1, 2008, when Soroof initiated AAA arbitration proceedings against GE Fuel Cell. GE Fuel Cell filed a Motion to Dismiss and asserted, among other things, that GE Fuel Cell was a dissolved entity, and, consequently, it claimed that Soroof could maintain no actions against it.

**Defendants' Response to Paragraph 55:**

Defendants admit that Soroof initiated arbitration proceedings against GE Fuel Cell Systems, LLC ("GEFCS") on July 1, 2008, but deny Soroof's characterization of that filing as "commenc[ing]" the instant federal court proceeding. Defendants admit the remainder of Paragraph 55.

56. Soroof opposed GE Fuel Cell's Motion to dismiss, arguing, *inter alia*, that GE Fuel Cell, as a Delaware limited liability company, was required by the Delaware Code to "make such provision as will be reasonably likely to be sufficient to provide compensation" for claims that are either known or reasonably should have been known to GE Fuel Cell. See DEL. CODE ANN. Tit. 6, § 18-804(b)(3). GEFCS made no such provisions and failed to notify Soroof of its dissolution. See Complaint at ¶ ¶ 27-29.

**Defendants' Response to Paragraph 56:**

Defendants admit that Soroof opposed GEFCS's Motion to Dismiss. Defendants deny that GEFCS failed to make provision as required by § 18-804(b)(3). Further, Defendants were not required to notify Soroof of the dissolution of GEFCS because the Distributor Agreement between GEFCS and Soroof ("Agreement") had already expired at that time. First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1. The dissolution of GEFCS was reported publicly by Plug Power.

Defendants' SOF ¶ 43; First Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149.

57. The Arbitration Panel, chaired by the Hon. Kathleen Roberts, a retired federal judge from this Honorable Court, addressing the same arguments now before this Court, denied GE Fuel Cell's Motion to Dismiss without prejudice to GE Fuel Cell filing a motion for summary judgment after discovery. See Ex. 14, Prehearing Order No. 2.

**Defendants' Response to Paragraph 57:**

Defendants deny that the Arbitration Panel "address[ed] the same arguments now before this Court," but admit the remaining facts set forth in Paragraph 57.

58. Both GE Fuel Cell and its immediate parent GE Microgen were undercapitalized. The funding for GE Fuel Cell came directly from GE itself. See Ex. D, Scovello Dep. Tr. at 44:23-25. In fact, GE Fuel Cell was never capitalized or owned anything other than nominally-valued assets. Id. at 48:22-49:9. All of its operational funds came from its parent entities. Id. at 44:15-25. At the time of GE Fuel Cell's dissolution, it had "no cash on hand," "was not really a going concern," and its only assets were "a server," "a telephone switch," and a "small amount of furniture." Id. at 48:22-49:9. In a March 24, 2006 e-mail, in conjunction with GE Fuel Cell's dissolution, Sabrena Ponds, a GE Energy employee wrote: "the LLC was not generating revenue. The GE owner (Microgen) funded expenses incurred by [GE Fuel Cell]." See Ex. 3, March 24, 2006 S. Ponds E-mail.

**Defendants' Response to Paragraph 58:**

Defendants deny that GEFCS and GE Microgen were undercapitalized. Defendants further deny that GE Microgen was the parent company of GEFCS. GEFCS was a Delaware

limited liability company. GE Microgen and Plug Power were the members of GEFCS. Defendants' SOF ¶ 1. Article V of the Amended and Restated LLC Agreement – entitled "Capital Contributions" – provides that GE Microgen previously contributed $10,000 to the capital of GEFCS. First Fetouh Decl., Exhibit 2, GEFCS LLC Agreement, ¶ 5.1. The GEFCS LLC Agreement also provides that GE Microgen would arrange for "its Affiliate, GE" to provide capital to GEFCS in the form of up to $8,000,000 in loans, and that GEFCS could borrow additional capital "from any Person, including any Member of any Affiliate of a Member" if needed. Id. at ¶ 5.5. Further, on February 3, 1999, General Electric Company loaned GEFCS $18,250,000. First Fetouh Decl., Exhibit 8, Declaration of Frank Scovello, at 7. GEFCS also utilized Soroof's nonrefundable distributor fee to support the activities of GEFCS. Second Fetouh Decl., Exhibit A, Scovello Dep., at 121:15-20 ("Q. And that $1 million had gone to GE Fuel Cell? A. That $1 million went to offset the cost, my salary, the salaries of Barry Glickman and all the other people that were involved in supporting the activities of GEFCS, yes."). Additionally, other companies with which GEFCS established Distributor Agreements paid distributor fees to GEFCS in addition to Soroof. See Second Fetouh Decl., Exhibit B, GE000198, GE Fuel Cell Systems LLC Summary; Second Fetouh Decl., Exhibit A, Scovello Dep., at 60:2-7 ("And there is a summary of all of the third party agreements that were entered into with distributors for GEFCS. In addition to that, over on the right, far right, you will see the fees that were paid over to GEFCS, and those were the distribution fees."). Defendants further state that at the time of dissolution, GEFCS's only assets were a computer server, a phone switch, a small amount of furniture, and distribution rights for Plug Power's technology. See Defendants' SOF ¶ 26; First Fetouh Decl., Exhibit 3, Scovello Dep., at 49:3-7; id. at 75:12-18; Second Fetouh Decl., Exhibit C, Conway Dep., at 80:4-19.

59. Likewise, GE Fuel Cell did not have any employees. See Ex. 2, Scovello Dep. Tr. at 32:14-33:3; See Ex. 12, Conway Dep. Tr. at 20:23-21:3. Instead, all of the individuals tasked to the GE Fuel Cell project were actually employed by GE. Ex. 2, Scovello Dep. Tr. at 32:22-25; Ex. 12, Conway Dep. Tr. at 6:25-7:3 and 20:23-21:3.

**Defendants' Response to Paragraph 59:**

Defendants admit that GEFCS did not have any employees. Defendants deny that all of the individuals tasked to the GEFCS venture "were actually employed by GE." GE Microgen and Plug Power each provided individuals to support the joint venture. See Defendants' SOF ¶¶ 8-9; First Fetouh Decl., Exhibit 3, Scovello Dep. at 33:1-3. Plug Power devoted over 300 employees toward the effort of developing the Product to specifications, while GE Microgen engaged in efforts to market the product nationwide and around the world through its network of subdistributors. See Defendants' SOF ¶¶ 8-9; First Fetouh Decl., Exhibit 3, Scovello Dep. at 32:19-21; id. at 48:18-20.

60. The Management Committee of GE Fuel Cell was composed entirely of GE and Plug Power representatives. See Ex. 4, Action by Written Consent of Members of GE Fuel Cell Systems, LLC; See also Ex. 2, Scovello Dep. Tr. at 33:1-2.

**Defendants' Response to Paragraph 60:**

Defendants admit the facts set forth in Paragraph 60.

61. On June 6, 2000 GE Fuel Cell entered into the "Distributor Agreement Between GE Fuel Cell Systems, LLC, and Soroof Trading Development Company Ltd." on or about June 6, 2000. See Ex. 6, Agreement. The Agreement established Soroof as the exclusive distributor for Product in the Kingdom of Saudi Arabia. Id. at ¶ 3.1.

**Defendants' Response to Paragraph 61:**

Defendants admit the facts set forth in Paragraph 61.

62. Pursuant to the Agreement, Soroof paid GE a "distributor fee" of $1 million. See Ex. 6, Agreement at ¶ 6.4. Soroof paid this fee on the premise that GE Fuel Cell actually had saleable Product to deliver. See Ex. 7, Jackson Decl. at ¶ 7.

**Defendants' Response to Paragraph 62:**

Defendants clarify that Paragraph 6.4 of the Agreement states that the fee is "a one-time non-refundable distributor fee" of $1 million. Defendants deny that the fee was paid to "GE." The fee was paid to GEFCS. Defendants admit that in exchange for the right to be the sole and exclusive distributor of the PEM Fuel Cell products in Saudi Arabia, Soroof paid a $1,000,000 distributor fee to GEFCS that was specified as "non-refundable" under the terms of the Agreement. Defendants' SOF ¶ 15. Defendants deny that Soroof reasonably believed that GEFCS had saleable product to deliver at the time of the Agreement. See First Fetouh Decl., Exhibit 11, Jackson Decl. at ¶¶ 5, 7 (Distributor Agreement between GEFCS and Soroof was entered into on or about June 6, 2000, and product was not expected until end of the year 2000). Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See Docket No. 46, Memorandum of Law in Support of Defendant GE Microgen, Inc.'s Motion for Judgment on the Pleadings Pursuant to F.R.C.P. 12(c) ("12(c) Memo.") at 14-17; Docket No. 70, Defendant GE Microgen Inc.'s Reply Memorandum of Law in Support of Its Motion for Judgment on the Pleadings Pursuant to F.R.C.P. 12(c) ("12(c) Reply Memo.") at 9-10.

63. The $1 million paid by Soroof was used to pay the salaries of GE Energy employees working at GE Fuel Cell. See Ex. 2, Scovello Dep. Tr. at 121:15-20.

**Defendants' Response to Paragraph 63:**

Defendants deny paragraph 63 and state that GEFCS utilized Soroof's nonrefundable distributor fee to support the activities of GEFCS. Second Fetouh Decl., Exhibit A, Scovello Dep., at 121:15-20 ("Q. And that $1 million had gone to GE Fuel Cell? A. That $1 million went to offset the cost, my salary, the salaries of Barry Glickman and all the other people that were involved in supporting the activities of GEFCS, yes.").

64. In conjunction with the Agreement, Defendants required Soroof to ready itself for distributing the Product, including, *inter alia*, by hiring staff and outfitting offices. See Ex. 7, Jackson Decl. at ¶ 6. Specifically, to undertake its obligations under the Agreement, Soroof expended in excess of $1 million, which expenditures were contemplated and, in fact, required by GE Fuel Cell. Id. Soroof undertook all of these expenses under the belief that GE Fuel Cell actually had saleable Product to deliver. See Ex. 7, Jackson Decl. at ¶ 7.

**Defendants' Response to Paragraph 64:**

Defendants lack knowledge as to the facts as set forth regarding Soroof's conduct in Paragraph 64 and therefore deny them. Defendants deny that the actions were required by GE. Defendants deny that Soroof reasonably believed that GEFCS had saleable product to deliver at the time of the Agreement. See First Fetouh Decl., Exhibit 11, Jackson Decl. at ¶¶ 5, 7 (Distributor Agreement between GEFCS and Soroof was entered into on or about June 6, 2000, and product was not expected until end of the year 2000). Defendants further state that the facts set forth in Paragraph 64 are outside the scope of the dissolution issue and Phase I discovery, and

thus are immaterial to Defendants' Motion for Summary Judgment. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 9-10.

65. Specifically, GE warranted in the Agreement that "[i]t has full authority and capability to enter into and perform its obligations under this Agreement." See Ex. 6, Agreement at ¶ 10.1.2. GE further warranted that it had "full legal right, power and authority to enter into and perform this Agreement." See Ex. G, Agreement at ¶ 10.1.4.

**Defendants' Response to Paragraph 66:**

Defendants clarify that Paragraph 10.1.2 of the Agreement states that "[GEFCS] has full authority and capability to enter into and perform its obligations under this Agreement (having obtained all requisite third party, corporate and governmental approvals)." Defendants admit that Paragraph 66 accurately states a portion of Paragraph 10.1.4 of the Agreement between GEFCS and Soroof. The Agreement speaks for itself. Defendants further state that these provisions of the Agreement are outside the scope of the dissolution issue and Phase I discovery and thus are immaterial to Defendants' Motion for Summary Judgment.

66. In the event that there was any change in the ability to deliver Product, GE Fuel Cell had a continuing obligation "to share promptly relevant information, including but not limited to product performance, failure and liability issues...." See Ex. G, Agreement at ¶ 7.4.

**Defendants' Response to Paragraph 66:**

Defendants deny Soroof's interpretation of GEFCS's obligations under the Agreement. The Agreement speaks for itself. Defendants further state that the facts set forth in Paragraph 66 are outside the scope of the dissolution issue and Phase I discovery and thus are immaterial to Defendants' Motion for Summary Judgment.

67. In or around November of 2000, Defendants notified Soroof that the Product would not be ready for distribution as promised. See Jackson Decl. at ¶ 8. According to Defendants, the Product was functional, but it did not yet meet quality standards. Id. Although, Defendants claimed quality standards prevented delivery of the product, in actuality there was no product to be delivered at all.

**Defendants' Response to Paragraph 67:**

Defendants deny the facts in Paragraph 67. There were no "promises" nor any obligation under the Agreement that a Product be delivered absent an accepted purchase order. See First Fetouh Decl., Exhibit 5, Agreement at ¶ 5.1; p. 25 at § 7.3; 12(c) Memo. at 10-11. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 9-10. Defendants further state that the facts set forth in Paragraph 67 are outside the scope of the dissolution issue and Phase I discovery and thus are immaterial to Defendants' Motion for Summary Judgment.

68. Frank Scovello admitted in his deposition: "Basically, that Plug was unable to produce the product to our specifications. They were producing technology, but it was considered

pre-commercial by GE. So there was no commercial product that we could provide Soroof." See Ex. 2, Scovello Dep. Tr. at 101:21-25.

**Defendants' Response to Paragraph 68:**

Defendants admit that Plug Power was unable to produce the product as originally envisioned due to technical challenges. See Defendants' SOF ¶ 19; First Fetouh Decl., Exhibit 3, Scovello Dep., at 47:21-48:1.

69. The fuel cell contracted for was supposed to produce power continuously, twenty-four hours a day, seven days a week. See Ex. 2, Scovello Dep. Tr. at 38:8-21. Throughout the term of the Agreement, Plug Power, which was overseeing the development of the Product could never produce a fuel cell to meet the specifications or the design functions required. Id. at 101:21-25. The best Plug Power could develop was a backup generator. Id. at 74:22-75:6.

**Defendants' Response to Paragraph 69:**

Defendants admit that the Product specified by the GEFCS distributor agreements was intended to be a continuous power product that would produce power twenty-four hours a day, seven days a week. Defendants admit that Plug Power was unable to produce the product as originally envisioned due to technical challenges. See Defendants' SOF ¶ 19; First Fetouh Decl., Exhibit 3, Scovello Dep., at 47:21-48:1. Defendants deny Plaintiff's characterization that the "best Plug Power could develop was a backup generator." Plug Power had a product similar to the Product envisioned by GEFCS called GenCore. The GenCore product was also a PEM fuel cell, but the GenCore product had been successfully developed for application as a back-up power source. See Defendants' SOF ¶ 35; First Fetouh Decl., Exhibit 3, Scovello Dep., at 38:13-21; First Fetouh Decl., Exhibit 1, Conway Dep., at 43:6-44:11.

70. Defendants knew as early as 2001 that Plug Power was unlikely to ever successfully develop commercially marketable Product. See Exhibit C, Scovello Dep. Tr. at 102:11-19. Mr. Scovello explained that "it became clearer and clearer to us the challenge that was involved and that the product would never be developed." Id. at 103:1-3

**Defendants' Response to Paragraph 70:**

Defendants deny Soroof's characterization of the facts set forth in Paragraph 70. Defendants further state that around 2001, Defendants realized there would be a delay in production of the Product. Nevertheless, GEFCS continued to work on the development of the Product. See First Fetouh Decl., Exhibit 3, Scovello Dep., at 48:4-8 ("Well, it became evident to us – to me, it became evident maybe in the 2003, 2004 time frame where it looked like Plug was having a lot of problems trying to produce the product that we needed."); Second Fetouh Decl., Exhibit A, Scovello Dep., at 102:13-103:4 ("It was really a gradual realization that they could not build product even close to what we had originally contemplated . . . That was the realization that there would be a delay. And then gradually as Plug continued to work on the development of the product, it became clearer and clearer to us the challenge that was involved and that the product would never be developed that would, you know, meet our original specifications.").

71. Despite Soroof having raised concerns regarding the failure to deliver Product from as early as 2002, Defendants never honestly conveyed to Soroof relevant information regarding the Product, including their inability to develop the Product, as required under section 7.4 of the Agreement. See Ex. 2, Scovello Dep. Tr. at 101:1-11.

**Defendants' Response to Paragraph 71:**

Defendants deny the facts in Paragraph 71. Soroof was well aware before 2005 that GEFCS was having difficulty producing the Product. See First Fetouh Decl., Exhibit 11,

Jackson Decl. at ¶ 9 ("Over the course of several years . . . GE repeatedly contacted Soroof and claimed that the Product was not yet ready due to various problems it had developing the Product . . ."). Defendants further state that in 2005, the parties were engaged in ongoing discussions concerning the Product. See First Fetouh Decl., Exhibit 3, Scovello Dep., at 94:5-12 ("A. There was dialogue that went on between various entities at Soroof and there was a lot of different people. They had a lot of change of personnel. But, there was a lot of e-mail exchanged about not having product. So just in general, they were aware. Whether Prince Bander himself was aware, it is possible he wasn't, but his people certainly were."). Defendants further deny Soroof's interpretation of GEFCS's obligations under the Agreement. The Agreement speaks for itself.

72. Defendants never informed Soroof about the dissolution of GE Fuel Cell. See Ex. 2, Scovello Dep. Tr. at 92:22-25; Ex. 12, Conway Dep. Tr. at 27:7-10.

**Defendants' Response to Paragraph 72:**

Defendants admit that they are not aware of formal notice directly to Soroof about the dissolution of GEFCS. First Fetouh Decl., Exhibit 3, Scovello Dep., at 93:1-4. Defendants were not required to notify Soroof of the dissolution of GEFCS because the Distributor Agreement between GEFCS and Soroof had already expired at that time. First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1. The dissolution of GEFCS was reported publicly by Plug Power. Defendants' SOF ¶ 43; First Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149.

73. Defendants continued to falsely assure Soroof that the Product would eventually be delivered. See Ex. 7, Jackson Decl. ¶ 9. During this time, Defendants encouraged Soroof to expand its infrastructure in preparation to distribute the Product. See Id. at ¶ 8. The

Defendants fell into a pattern whereby they repeatedly contacted Soroof and claimed that the Product was not yet ready due to various problems, while at the same time assuring Soroof that the Product was forthcoming. Id. at ¶ 9.

**Defendants' Response to Paragraph 73:**

Defendants deny the facts in Paragraph 73. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 9-10. Defendants further state that the facts set forth in Paragraph 73 are outside the scope of the dissolution issue and Phase I discovery, and thus are immaterial to Defendants' Motion for Summary Judgment.

74. To placate Soroof for its patience, GE agreed to expand Soroof's distribution territory to include Lebanon. Id. In light of GE Fuel Cell's repeated assurances, Soroof entered into negotiations with third-parties whereby Soroof would deliver potentially thousands of units of Product throughout Saudi Arabia and Lebanon. Id. at ¶ 11. Defendants' false assurances also had the added consequence of causing Soroof to maintain its offices and workforce at great expense. Id. It was not until the early months of 2005 that Defendants finally informed Soroof that they could not overcome the apparent problems in bringing the Product to market (and to Soroof). Id. at ¶ 12.

**Defendants' Response to Paragraph 74:**

Defendants deny the facts in Paragraph 74. There was no obligation under the Agreement that a Product be delivered absent an accepted purchase order. See First Fetouh Decl., Exhibit 5, Agreement at ¶ 5.1; p. 25 at § 7.3. Defendants further state that the Jackson

Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 7-10. But even that declaration shows that Soroof was well aware before 2005 that GEFCS was having difficulty producing the Product. See First Fetouh Decl., Exhibit 11, Jackson Decl. at ¶ 9 ("Over the course of several years . . . GE repeatedly contacted Soroof and claimed that the Product was not yet ready due to various problems it had developing the Product . . ."). Defendants further state that in 2005, the parties were engaged in ongoing discussions concerning the Product. See First Fetouh Decl., Exhibit 3, Scovello Dep., at 94:5-12 ("A. There was dialogue that went on between various entities at Soroof and there was a lot of different people. They had a lot of change of personnel. But, there was a lot of e-mail exchanged about not having product. So just in general, they were aware. Whether Prince Bander himself was aware, it is possible he wasn't, but his people certainly were."). Defendants also lack knowledge as to the facts set forth regarding the reasons for Soroof's conduct in Paragraph 74 and therefore deny them. Defendants further state that the facts set forth in Paragraph 74 are outside the scope of the dissolution issue and Phase I discovery, and thus are immaterial to Defendants' Motion Summary Judgment.

**Defendants' Response to Paragraph 75:**

75. In late 2005, Soroof expressed its dissatisfaction with Defendants complete lack of performance under the Agreement. See Ex. 7, Jackson Decl. at ¶ 13.

**Defendants' Response to Paragraph 75:**

Defendants state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and

unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 9-10. Without waiving these objections, Defendants admit that Soroof had only expressed "dissatisf[action]" with what Soroof characterized as "GE's total lack of performance of the Agreement." Defendants' SOF ¶ 30; Docket No. 1, Complaint ¶ 21; First Fetouh Decl., Exhibit 11, Declaration of James Jackson ¶ 13 ("I spoke with Frank Scovello of GE and informed him that Soroof was dissatisfied with GE's total lack of performance of the Agreement."). Defendants deny that there was a "total lack of performance of the Agreement" as alleged by Soroof.

76. Based on the concerns raised by Soroof, Defendants were aware that Soroof had potential legal claims against Defendants. See Ex. 8, January 5, 2006 E-mail from A. Bucknam ("GE took a $1MM payment from [Soroof], and now is concerned about **legal problems** given that the distributors feel that they didn't get value for their $'s.") (emphasis added); see also Ex. 9, January 26, 2006 E-mail from R. Menon (During our conversation this morning, [Soroof] did bring up the financial issues surrounding the expired GE agreement...[m]y fear is that...they may circle back to the investment they made to secure the [GE Fuel Cell] distributorship and somehow hold Plug Power accountable.)

**Defendants' Response to Paragraph 76:**

Defendants deny Soroof's characterization of the facts set forth in Paragraph 76. At the time of the termination of the GEFCS LLC Agreement and the dissolution of GEFCS, the Distributor Agreement had already expired. Defendants' SOF ¶ 28; First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1. GEFCS had no ongoing obligations to Soroof under that expired contract. Defendants' SOF ¶ 29; First Fetouh Decl., Exhibit 5, Agreement. Soroof had only expressed

"dissatisf[action] with GE's total lack of performance of the Agreement." Defendants' SOF ¶ 30; Docket No. 1, Complaint ¶ 21; First Fetouh Decl., Exhibit 11, Declaration of James Jackson ¶ 13 ("I spoke with Frank Scovello of GE and informed him that Soroof was dissatisfied with GE's total lack of performance of the Agreement."). Because the Agreement with Soroof had expired by its terms, and because Soroof had articulated no viable claim against GEFCS under the Agreement in any event, GE Microgen and Plug Power viewed the expiration of the Agreement as the end of the contractual relationship between GEFCS and Soroof; and did not believe there was any possible or viable claim by Soroof. Defendants' SOF ¶ 31; First Fetouh Decl., Exhibit 3, Scovello Dep., at 89:15-16 ("We had felt it expired under its own term in December of 2005."); id. at 113:19-24 ("A. We did not have a concern at the time we were terminating that Soroof was asking for the return of their million dollar distribution fee. We wanted to support both Soroof and Flint in setting up an alternative to what they originally started with GE. That was our biggest concern."); First Fetouh Decl., Exhibit 1, Conway Dep., at 48:5-15 ("A. They, as you said, appeared to be unhappy. So perhaps that is what he is referring to. I would also say that none of these people are lawyers. So when they are referring to contractual standpoint, I think that's their opinion. If there was a formal claim that had been made by Soroof to Plug Power, it would have been brought to my attention. And that did not happen."); id. at 49:13-50:4 ("A. To my knowledge, it was clear. The contract terminated on December 31, 2005. In that contract, which we did not have at the time but which we subsequently were provided by GE, it also is clear that there was a nonrefundable distribution fee. As I said before, we were looking to engage with and develop an ongoing relationship with Soroof. So trying to understand were they happy, what were their issues would have been part of

Ravi's job, with the goal of coming to an agreement with Soroof to do a go-forward business relationship related to Plug Power.").

77. As such, when the decision was made to dissolve GE Fuel Cell, GE Microgen sought a very broad indemnity from Plug Power to cover any possible claims raised by Soroof. See Ex. 2, Scovello Dep. Tr. at 125:21-126:9. However, in light of Plug Power's unwillingness to grant such a broad indemnity, the Defendants capped it at $1 million. See Ex. 10, February 28, 2006 G. Silvestri E-mail ("Essentially, GE is looking for Plug Power to broadly and fully indemnify GE for any possible actions taken at any future date by the distributors...Plug Power's position is that we will not sign such a broad and open ended agreement...."); see also Ex. 2, Scovello Dep. Tr. at 125:21-126:9.

**Defendants' Response to Paragraph 77:**

Defendants deny Soroof's characterization of the facts set forth in Paragraph 77. Defendants deny that the reason for the indemnity was because of concerns about legal claims by Soroof. In connection with the negotiations between Soroof and Plug Power for the GenCore product, GE Microgen asked Plug Power to obtain a release from Soroof for any liability under the Agreement. GE Microgen's president, Frank Scovello, testified that GE Microgen sought that release because, following execution of the Termination Agreement, GE Microgen would have no role in any future communications with Soroof. Defendants' SOF ¶ 39; First Fetouh Decl., Exhibit 3, Scovello Dep., at 100:19-22. In the Termination Agreement, GE Microgen asked Plug Power to agree to indemnify GEFCS and GE Microgen up to $1,000,000 if Plug Power did not obtain a release from Soroof releasing GEFCS from all liability relating to Soroof's payment of the $1,000,000 nonrefundable distributor fee under the Agreement. Defendants' SOF ¶ 40; First Fetouh Decl., Exhibit 9, Termination Agreement ¶ 2(b). GE

Microgen requested the indemnification provision because it did not produce fuel cell products and therefore had no means of addressing any issue Soroof might have in the future. Defendants' SOF ¶ 42; First Fetouh Decl., Exhibit 3, Scovello Dep., at 123:18-124:2 ("[O]nce we had dissolved our agreement with Plug Power, we had no way of resolving any kind of issues with any distributors that could come up after that time . . . There were no claims that were made at the time, but we just had no means to address them going forward.").

The final indemnity agreement was the product of a month of negotiations between Plug Power and GE Microgen. See Second Fetouh Decl., Exhibit C, Conway Dep., at 72:4-10. Plug Power and GE Microgen negotiated over the indemnity provisions in the Termination Agreement because Plug Power had not been a party to GEFCS's distributor agreements and Plug Power needed time to obtain, review, and assess each agreement. See Second Fetouh Decl., Exhibit C, Conway Dep., at 73:5-15 ("The reason why it took a month was we had not been party to those agreements. So we initially wanted to see -- before we would agree to this blanket indemnification, which we ultimately did not agree to, we wanted to [see] the agreements. So they gave us all of the agreements. We reviewed the agreements and did an assessment of what we thought the liability or exposures would be under each of them."). Ultimately, Plug Power agreed to the indemnification provision because it saw minimal to no risk to Plug Power by agreeing to it, as the Agreement had already expired on its own terms at the time of the dissolution of GEFCS and no viable claims existed under the Agreement. Defendants' SOF ¶ 41; First Fetouh Decl., Exhibit 1, Conway Dep., at 85:8-12 ("I felt that there was no claim, that the risk was minimal, and that because GE had asked for it and I saw no risk to Plug Power that we could agree to that request.").

78. In 2006, Soroof again raised the issue of the Agreement's termination and possible financial implications resulting therefrom. See Ex. 2, Scovello Tr. at 90:19-91:21; see also Ex. 9, January 26, 2006 E-mail from R. Menon

**Defendants' Response to Paragraph 78:**

Defendants deny Soroof's characterization of the facts in Paragraph 78. At the time of the termination of the GEFCS LLC Agreement and the dissolution of GEFCS, the Distributor Agreement had already expired. Defendants' SOF ¶ 28; First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1. GEFCS had no ongoing obligations to Soroof under that expired contract. Defendants' SOF ¶ 29; First Fetouh Decl., Exhibit 5, Agreement. Soroof had only expressed "dissatisf[action] with GE's total lack of performance of the Agreement." Defendants' SOF ¶ 30; Docket No. 1, Complaint ¶ 21; First Fetouh Decl., Exhibit 11, Declaration of James Jackson ¶ 13 ("I spoke with Frank Scovello of GE and informed him that Soroof was dissatisfied with GE's total lack of performance of the Agreement."). Because the Agreement with Soroof had expired by its terms, and because Soroof had articulated no viable claim against GEFCS under the Agreement in any event, GE Microgen and Plug Power viewed the expiration of the Agreement as the end of the contractual relationship between GEFCS and Soroof; and did not believe there was any possible or viable claim by Soroof. Defendants' SOF ¶ 31; First Fetouh Decl., Exhibit 3, Scovello Dep., at 89:15-16 ("We had felt it expired under its own term in December of 2005."); id. at 113:19-24 ("A. We did not have a concern at the time we were terminating that Soroof was asking for the return of their million dollar distribution fee. We wanted to support both Soroof and Flint in setting up an alternative to what they originally started with GE. That was our biggest concern."); First Fetouh Decl., Exhibit 1, Conway Dep., at 48:5-15 ("A. They, as you said, appeared to be unhappy. So perhaps that is what he is

referring to. I would also say that none of these people are lawyers. So when they are referring to contractual standpoint, I think that's their opinion. If there was a formal claim that had been made by Soroof to Plug Power, it would have been brought to my attention. And that did not happen."); id. at 49:13-50:4 ("A. To my knowledge, it was clear. The contract terminated on December 31, 2005. In that contract, which we did not have at the time but which we subsequently were provided by GE, it also is clear that there was a nonrefundable distribution fee. As I said before, we were looking to engage with and develop an ongoing relationship with Soroof. So trying to understand were they happy, what were their issues would have been part of Ravi's job, with the goal of coming to an agreement with Soroof to do a go-forward business relationship related to Plug Power.").

79. However, neither during these conversations nor after did Defendants ever tell Soroof of the impending dissolution of GE Fuel Cell. See Ex. 2, Scovello Tr. at 92:22-93:4; see also Jackson Decl. at ¶ 14.

**Defendants' Response to Paragraph 79:**

Defendants admit that they are not aware of formal notice directly to Soroof about the dissolution of GEFCS. First Fetouh Decl., Exhibit 3, Scovello Dep., at 93:1-4. Defendants were not required to notify Soroof of the dissolution of GEFCS because the Distributor Agreement between GEFCS and Soroof had already expired at that time. First Fetouh Decl., Exhibit 5, Agreement ¶ 4.1. The dissolution of GEFCS was reported publicly by Plug Power. Defendants' SOF ¶ 43; First Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest

that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 7-10.

80. GE Fuel Cell's dissolution became effective on December 31, 2006, although a decision was reached to dissolve GE Fuel Cell early in 2006. See Ex. 11, Executed Certificate of Cancellation of GE Fuel Cell.

**Defendants' Response to Paragraph 80:**

Defendants clarify that the Certificate of Cancellation was executed on December 29, 2006, but became effective on December 31, 2006. Defendants further state that the Termination Agreement was effective as of March 24, 2006. See First Fetouh Decl., Exhibit 9, Termination Agreement.

81. Soroof had expressed its concerns about the failure to deliver Product as early as 2002, in late 2005 and again in early 2006. See Ex. 2, Scovello Dep. Tr. at 90:19-91:13, 101:1-11; see also Ex. 7, Jackson Decl. at ¶ 13.

**Defendants' Response to Paragraph 81:**

Defendants deny Soroof's characterization of the facts in Paragraph 81. There was no obligation under the Agreement that a Product be delivered absent an accepted purchase order. See First Fetouh Decl., Exhibit 5, Agreement at ¶ 5.1; p. 25 at § 7.3. Defendants further state that the Jackson Declaration is incompetent summary judgment evidence that should not be considered by the Court in any event because it is an unsworn and unverified statement purporting to alter the contract's terms and to suggest that the contract was modified by alleged "misrepresentations" made by GEFCS. See 12(c) Memo. at 14-17; 12(c) Reply Memo. at 7-10. Defendants further state that Soroof had only expressed "dissatisf[action] with GE's [alleged] total lack of performance of the Agreement." Defendants' SOF ¶ 30; Docket No. 1, Complaint ¶

21; First Fetouh Decl., Exhibit 11, Declaration of James Jackson ¶ 13 ("I spoke with Frank Scovello of GE and informed him that Soroof was dissatisfied with GE's total lack of performance of the Agreement.").

82. Mr. Scovello admitted under oath that the new generator developed by Plug Power "was **totally different** than what GE had totally envisioned when we entered into the agreement with Plug" and that "[i]t was a backup power rather than a 24/7 continuous power." See Ex. 2, Scovello Dep. Tr. at 74:22-75:6 (emphasis added). In fact, that Plug Power failed to develop the Product is, according to Mr. Scovello, precisely why the decision to dissolve GE Fuel Cell was made. See Ex. 2, Scovello Dep. Tr. at 47:17-48:1. That is, Defendants were offering to replace an agreement for a fuel cell that generated power continuously twenty-four hours, seven days a week for a backup generator akin to a battery pack.

**Defendants' Response to Paragraph 82:**

Defendants admit that the Product was intended to be a continuous power product that would produce power twenty-four hours a day, seven days a week. Defendants admit that Plug Power was unable to produce the Product as originally envisioned due to technical challenges. See Defendants' SOF ¶ 19; First Fetouh Decl., Exhibit 3, Scovello Dep., at 47:21-48:1. Defendants further state that the LLC was subsequently dissolved for this reason. First Fetouh Decl., Exhibit 3, Scovello Dep., at 47:21-48:1 ("GE's original intention was to distribute a certain kind of product that became very clear to us after an amount of time that Plug could not produce that product. When that became evident, that's when we started talking about terminating that agreement because basically we had nothing to sell."); First Fetouh Decl., Exhibit 6, PPI000104, Action by Written Consent of the Members of GE Fuel Cell Systems,

L.L.C., at PPI000104 ("WHEREAS, the Company has experienced little financial activity over the past several years and is not likely to experience an increase in financial activity before the term of the Agreement expires."); First Fetouh Decl., Exhibit 7, PPI000147, Plug Power Inc. Form 8-K filed March 27, 2006, at PPI000149 (explaining that decision to dissolve GEFCS). Defendants deny Plaintiff's characterization that Plug Power developed a "backup generator." Plug Power had a product similar to the Product envisioned by GEFCS called GenCore. The GenCore product was also a PEM fuel cell, but the GenCore product had been successfully developed for application as a back-up power source. See Defendants' SOF ¶ 35; First Fetouh Decl., Exhibit 3, Scovello Dep., at 38:13-21; First Fetouh Decl., Exhibit 1, Conway Dep., at 43:6-44:11.

Dated: April 15, 2011

Respectfully submitted,

/s/ Dahlia S. Fetouh
Dahlia S. Fetouh (*pro hac vice*)
Natalie F. Langlois (*pro hac vice*)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.: 617.570.1000
Fax: 617.523.1231
E-Mail: dfetouh@goodwinprocter.com
E-Mail: nlanglois@goodwinprocter.com

Abigail K. Hemani (AH 2071)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 813-8800
ahemani@goodwinprocter.com

Attorneys for Defendant PLUG POWER INC.

/s/ Michael D. Fisse
Michael D. Fisse, Esq.
Jan Van Steenis, Esq.
DAIGLE FISSE & KESSENICH, PLC
P.O. Box 5350
Covington, LA 70434-5350
(985) 871-0800
Fax: (985) 871-0899
Email: mfisse@daiglefisse.com
Email: jbradford@daiglefisse.com

Thomas Edward Healy, Esq.
PINO & ASSOCIATES, LLP
50 Main Street
White Plains, NY 10606
(914) 946-0600
Fax: (914) 946-0650
Email: thealy@pinolaw.com

Attorneys for Defendant GE MICROGEN, INC.

**CERTIFICATE OF SERVICE**

I, Dahlia S. Fetouh, hereby certify that true copies of the foregoing DEFENDANTS PLUG POWER INC. AND GE MICROGEN, INC.'S RESPONSE TO PLAINTIFF'S ADDITIONAL MATERIAL FACTS IN PLAINTIFF'S COUNTERSTATEMENT OF FACTS were caused to be served by ECF on this 15th day of April, 2011 on the following counsel:

James R. Lynch, Esq.
Jason Kaufman, Esq.
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York , NY 10018
(212) 302-2400
Fax: (212) 302-2210
Email: lynch@lawlynch.com
Attorneys for Plaintiff SOROOF TRADING DEVELOPMENT COMPANY, LTD.

Haig V. Kalbian, Esq.
Mary M. Baker, Esq.
Aaron W. Knights, Esq.
KALBIAN HAGERTY LLP
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Email: hkalbian@kalbianhagerty.com
Attorneys for Plaintiff SOROOF TRADING DEVELOPMENT COMPANY, LTD.

Dated: April 15, 2011 /s/ Dahlia S. Fetouh