UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOROOF TRADING DEVELOPMENT COMPANY, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>GE MICROGEN, INC.,<br>PLUG POWER INC., and<br>GENERAL ELECTRIC COMPANY,<br><br>Defendants. | Civil Action No. 1:10-cv-01391-LGS-JCF<br><br>JURY TRIAL DEMANDED |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1
II. SUMMARY OF UNDISPUTED MATERIAL FACTS ..... 3
A. Factual Background ..... 3
B. Procedural Background ..... 9
III. ARGUMENT ..... 10
A. Soroof's Breach of Contract Claims Fail ..... 10
1. Defendants Used Reasonable Efforts to Supply the Product ..... 11
2. Defendants Did Not Fail to Share Relevant Information with Soroof ..... 14
3. The Agreement Bars Soroof's Breach of Contract Claims ..... 17
B. Soroof's Misrepresentation Claim Fails ..... 18
1. Defendants Made No Misrepresentations to Soroof ..... 19
2. Any Reliance by Soroof on Any Alleged Misstatement Was Not Justifiable ..... 21
3. The Agreement's Merger Clause Bars Soroof's Misrepresentation Claim ..... 22
C. All of Soroof's Claims Fail under the Applicable Statutes of Limitations ..... 23
1. The Statute of Limitations Bars Soroof's Breach of Contract Claims ..... 23
2. The Statute of Limitations Bars Soroof's Misrepresentation Claim ..... 26
D. In the Alternative, If Plaintiff Prevails on the Merits of Any Claim, It's Potential Damages Should Be Limited to $1 Million and Claims for Damages Excluded by the Agreement Should Be Dismissed ..... 29
IV. CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abercrombie v. Andrew Coll.*,
438 F. Supp. 2d 243 (S.D.N.Y. 2006)....29

*Bell v. Manhattan Motorcars, Inc.*,
No. 06-CV-4972, 2008 WL 2971804 (S.D.N.Y. Aug. 4, 2008)....27

*Bloor v. Falstaff Brewing Corp.*,
601 F.2d 609 (2d Cir. 1979)....11

*Bright v. Pagan*,
653 N.Y.S.2d 645 (N.Y. App. Div. 1997)....25

*Brown v. E.F. Hutton Grp., Inc.*,
991 F.2d 1020 (2d Cir. 1993)....22

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*,
90 F. Supp. 2d. 401 (S.D.N.Y. 2000)....24

*Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*,
17 N.Y.3d 269 (2011)....22

*CIFG Assurance N. Am., Inc. v. Goldman, Sachs & Co.*,
No. 652286/2011, 2012 WL 1562718 (N.Y. Sup. Ct. May 1, 2012)....22

*Compania Sud-Americana de Vapores v. IBJ Schroder Bank & Trust Co.*,
785 F. Supp. 411 (S.D.N.Y. 1992)....24

*Convenient Med. Care P.C. v. Med. Bus. Assocs., Inc.*,
291 A.D.2d 617 (N.Y. App. Div. 2002)....23

*Danann Realty Corp. v. Harris*,
5 N.Y.2d 317 (1959)....23

*Elmira Teachers' Ass'n ex rel. Martin v. Elmira City Sch. Dist.*,
861 N.Y.S.2d 195 (N.Y. App. Div. 2008)....14

*Ely-Cruikshank Co., Inc. v. Bank of Montreal*,
81 N.Y.2d 399 (1993)....24

*Ferguson v. Hannover Ruckversicherungs-Akteiengesellschaft*,
No. 04 Civ. 9254, 2007 WL 2493692 (S.D.N.Y. Aug. 21, 2007)....17

*In re Chateaugay Corp.*,
198 B.R. 848 (S.D.N.Y. 1996)....................11

*Kalisch-Jarcho v. City of New York*,
58 N.Y.2d 377 (1983)....................18

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)....................19

*Long Island Lighting Co. v. Transamerica Delaval, Inc.*,
646 F. Supp. 1442 (S.D.N.Y. 1986)....................27

*Majka v. Utica City Sch. Dist.*,
668 N.Y.S.2d 831 (N.Y. App. Div. 1998)....................25

*Manshul Constr. Corp. v. Dormitory Auth. of New York*,
79 A.D.2d 383 (N.Y. App. Div. 1981)....................17

*Measom v. Greenwich & Perry Street Housing Corp.*,
643 N.Y.S.2d 56 (N.Y. App. Div. 1996)....................27

*Momentive Performance Materials USA, Inc. v. Astrocosmos Metallurgical, Inc.*,
659 F. Supp. 2d 332 (N.D.N.Y. 2009)....................26

*Mountain Creek Acquisition LLC v. Intrawest U.S. Holdings, Inc.*,
96 A.D.3d 633 (N.Y. App. Div. 2012)....................22

*Mun. High Income Fund, Inc. v. Goldman, Sachs & Co.*,
No. 600012/06, 2008 WL 4938280 (N.Y. Sup. Ct. Oct. 30, 2008)....................27

*Old Country Toyota Corp. v. Toyota Motors Distribs., Inc.*,
966 F. Supp. 167 (E.D.N.Y. 1997)....................24

*Platek v. Town of Hamburg*,
948 N.Y.S.2d 797 (N.Y. App. Div. 2012)....................14

*Primex Int'l Corp. v. Wal-Mart Stores, Inc.*,
89 N.Y.2d 594 (1997)....................23

*Provenzano v. Ioffe*,
784 N.Y.S.2d 138 (N.Y. App. Div. 2004)....................25

*R/S Assocs. v. N.Y. Job Dev. Auth.*,
98 N.Y.2d 29 (2002)....................17

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
765 N.Y.S.2d 575 (N.Y. App. Div. 2003)....................20

*Ryan v. IM Kapco, Inc.*,
930 N.Y.S.2d 627 (N.Y. App. Div. 2011) ....................18

*Salinger v. Projectavision, Inc.*,
972 F. Supp. 222 (S.D.N.Y. 1997)....................28

*Serdarevic v. Centex Homes, LLC*,
No. 08-CV-5563, 2012 WL 4054161 (S.D.N.Y. Sept. 5, 2012)....................11

*Troeller v. Klein*,
918 N.Y.S.2d 436 (N.Y. App. Div. 2011) ....................25

*UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*,
288 A.D.2d 87 (N.Y. App. Div. 2001) ....................22

*Vanderburgh v. Porter Sheet Metal, Inc.*,
446 N.Y.S.2d 523 (N.Y. App. Div. 1982) ....................20

*Varga v. Credit-Suisse*,
5 A.D.2d 289 (N.Y. App. Div. 1958) ....................24

*Waggoner v. Caruso*,
No. 602192-2007, 2008 WL 4274491 (N.Y. Sup. Ct. Sept. 10, 2008)....................28

*Wuhu Imp. & Exp. Corp. v. Capstone Capital, LLC*,
834 N.Y.S.2d 129 (N.Y. App. Div. 2007) ....................24

**STATUTES**

C.P.L.R. 203(g) (McKinney 2013) ....................26, 27

C.P.L.R. 204 (McKinney 2013)....................25

C.P.L.R. 213 (McKinney 2013)....................26, 27

N.Y. Gen. Oblig. Law § 15-301(1) (McKinney 2013) ....................20

N.Y. U.C.C. § 2-102 (McKinney 2013) ....................24, 26

N.Y. U.C.C. § 2-106 (McKinney 2013) ....................24, 26

N.Y. U.C.C. § 2-725 (McKinney 2013) ....................24, 26

Defendants, GE Microgen, Inc. ("GE Microgen"), Plug Power Inc. ("Plug Power"), and General Electric Company ("GE"), appearing in their capacity as former members and/or former affiliates of the dissolved limited liability company GE Fuel Cell Systems LLC ("GEFCS"), respectfully submit this Memorandum in Support of their Motion for Summary Judgment.

## I. <u>INTRODUCTION</u>

Businesses routinely take chances on emerging technologies. Whether through attempts to develop them, invest in them, or do business with them, our economy is driven by businesses taking chances on the development of emerging technologies in order to reap the rewards of potential success. They do so understanding the risk that the technology may not be developed or marketed as hoped. This is the theme that underlies this case. Here, all of the parties—Defendants and Plaintiff—took a chance on an emerging energy technology. In the end, the chance taken did not pay off for any party. But that does not mean that Defendants must now pay for losses claimed by Plaintiff as a consequence of having taken that chance. That is especially true where, as here, the parties allocated the attendant risk in their contract.

This case involves a dispute between sophisticated companies over a distributor agreement. In June 2000, Soroof Trading Development Company, Ltd. ("Soroof"), a Saudi Arabian company, entered into a contract with GEFCS in which GEFCS granted Soroof the right to be the exclusive distributor in Saudi Arabia for a fuel cell product that was in development (the "Product") in exchange for a non-refundable distribution fee (the "Agreement"). Soroof, a sophisticated party, had ample opportunity to conduct due diligence before entering into the Agreement and willingly entered into the Agreement with GEFCS understanding the risks and potential rewards of the contract. Soroof ultimately elected to take the risk of entering into a contract for a product that was still in development, in exchange for what it hoped would be a valuable reward. Indeed, if the development of the Product had been successful, all parties had

the potential to reap substantial rewards. But all parties also accepted certain risks of loss if the development was not successful. Those risks were addressed and allocated in the Agreement by including terms for payment of a "non-refundable" distribution fee, limitations of liability, damage exclusions, and reciprocal waivers of potential claims for losses, prospective profits, or expenditures incurred in connection with the Agreement.

In the end, the venture did not turn out as any of the parties hoped. Despite a tremendous investment of time and money by GEFCS and its members, development of the Product specified under the Agreement was not successful, and the Agreement expired by its terms at the end of 2005. Soroof now alleges that Defendants should be required to return the non-refundable distributor fee that Soroof paid under the Agreement as well as amounts that Soroof allegedly incurred as a consequence of the Agreement.

In January 2012, this Court dismissed the entirety of Soroof's initial Complaint against the Defendants in this action and gave Soroof leave to re-plead just two claims: breach of contract limited to two contract provisions, and misrepresentation. Soroof's current Complaint alleges that Defendants breached the Agreement by failing to make reasonable efforts to supply the Product and by failing to share promptly relevant information regarding the Product's status, and that Defendants misrepresented the status of the Product's development. Extensive and undisputed discovery has shown that Soroof's claims are meritless. To the contrary, there is no genuine dispute that (1) GEFCS made reasonable efforts to supply the Product; (2) GEFCS shared relevant information about the Product's status with Soroof throughout the term of the Agreement; and (3) Defendants did not make any knowingly false statement or omission to Soroof, let alone one on which Soroof justifiably relied. Even if a genuine issue of material fact existed, which Defendants deny, the claims should be dismissed in any case because they are all

barred by the applicable statutes of limitations.

This litigation is little more than Soroof's attempt to avoid the clear terms of the Agreement because it is unhappy with how it fared in the parties' business venture. Like all parties involved, Soroof stood to gain considerably if the Product was successfully developed. The evidence suggests that Soroof's distribution rights alone could have been worth over $10 million if the Product was produced.[1] Unfortunately for all parties involved, the Product was not successfully developed. Soroof's disappointment that its calculated risk did not pay off does not, however, give rise to meritorious claims. To the contrary, allowing parties like Soroof to engage in post hoc re-allocations of risk could have a chilling effect on commercial transactions aimed at fostering the development of emerging technologies. For all of the reasons described below, the Court should grant summary judgment for Defendants on all claims.

## II. <u>SUMMARY OF UNDISPUTED MATERIAL FACTS</u>

### A. <u>Factual Background</u>

***Parties' Roles***

Soroof formed in early 2000 with several business units, including a power division. SUF at ¶ 11. In June 2000, Soroof entered into the Agreement with GEFCS. *Id.* at ¶ 15. Plug Power and GE Microgen formed GEFCS in 1999 to sell and market fuel cell products that Plug Power was developing. *Id.* at ¶¶ 1-2. The product that Plug Power was developing, and GEFCS was planning to distribute, was a Proton Exchange Membrane ("PEM") fuel cell system. *Id.* at ¶ 3. That system was intended to replace the power generation at a residence or small commercial facility and produce continuous power (the "Product"). *Id.*[2]

[1] Defendants' Rule 56.1 Statement of Undisputed Material Facts filed herewith ("SUF") at ¶ 34.

[2] As used herein, the capitalized term "Product" refers to a fuel cell system meeting the definition and specifications for the Product as that term is defined in the Agreement and its schedules. *See* Ex. 13, Agreement, at § 2.1.

GE Microgen's role in GEFCS was primarily to manage sales and marketing, and Plug Power's role was primarily to develop and manufacture the product. *Id.* at ¶ 4. During the operation of GEFCS, employees of both GE Microgen and Plug Power supported the activities of GEFCS. *Id.* at ¶ 5. Plug Power's hundreds of employees—consisting primarily of scientists and engineers—were dedicated to the effort of developing the product to specifications, while GE Microgen engaged in efforts to market the product through its network of subdistributors. *Id.* at ¶¶ 6, 9. GE Microgen and Plug Power communicated regularly regarding Plug Power's development efforts, and GE Microgen maintained employees onsite at Plug Power's research and development facility to further that collaboration. *Id.* at ¶ 10.

***Agreement***

Soroof initiated contact with GEFCS in the spring of 2000 expressing interest in distributing the Product. *Id.* at ¶ 12. In May 2000, Soroof arranged for a meeting with GEFCS to discuss a possible distributorship contract. *Id.* at ¶¶ 13-14. After negotiations, on June 6, 2000, GEFCS and Soroof entered into the Agreement. *Id.* at ¶ 15. Soroof's President and Chief Executive Officer, Prince Bander Abdullah Al-Saud, as well as Soroof's Executive Director, Jim Jackson, reviewed the Agreement prior to signing it. *Id.* at ¶ 16. Under the Agreement, Soroof paid a $1,000,000 distributor fee that was specified as "non-refundable" in exchange for the right to be the exclusive distributor of the Product in Saudi Arabia. *Id.* at ¶ 30. Soroof understood that the $1,000,000 distributor fee was not going to be returned. *Id.* at ¶ 31. The Agreement further limited GEFCS's liability to Soroof, providing *inter alia* that "[t]he total liability of GEFCS . . . arising out of or related to this Agreement . . . shall not exceed the amount that has been paid to GEFCS by [Soroof] under this Agreement" and that "[i]n no event, whether as a result of breach of contract, indemnity, warranty, tort (including negligence), strict liability or

otherwise, shall GEFCS or its officers, directors or employees be liable to [Soroof] . . . for loss of profit or revenues, downtime costs, cost of capital, cost of facilities or services, or any other costs or damage which may be categorized as indirect, incidental, exemplary or consequential damages . . . ." *Id.* at ¶ 32; *see also* Ex. 13, Agreement at §15.4.

At the time the Agreement was negotiated and executed, there is no dispute that the Product was still in development, SUF at ¶ 20, and that Soroof was so informed, *id.* at ¶ 21. Further, Plug Power, a public company as of 1999, made clear in its public filings with the Securities and Exchange Commission ("SEC") that the Product was still in development. *Id.* at ¶ 22. In fact, in the Form 10-K that Plug Power publicly filed on March 30, 2000—shortly before Soroof entered into the Agreement—Plug Power specified in the "Risk Factors" that "[w]e may never complete the research and development of a commercially viable residential fuel cell system. We do not know when or whether we will successfully complete research and development of a commercially viable residential fuel cell system." *Id.* The "Risk Factors" continued for several pages and detailed numerous additional risks including the fact that Plug Power was a new company with a limited basis for evaluation; that Plug Power had no experience manufacturing residential fuel cell systems on a commercial basis; and that Plug Power may not meet its product development and commercialization milestones. Ex. 8, Plug Power 10-K, for period ending 12/31/99, at 6-12. Prior to entering the Agreement, however, Soroof chose not to review any of Plug Power's available public filings, do any due diligence into GEFCS or Plug Power, or speak directly to Plug Power scientists. SUF at ¶¶ 23-27.

***Product Development***

At the time that the parties executed the Agreement, Plug Power and GE Microgen believed that the Product could be commercialized. *Id.* at ¶ 61. Plug Power's effort to develop

the fuel cell product was the largest in the industry. *Id.* at ¶ 42. From the time Plug Power went public in 1999 through the present, it has spent over half a billion dollars trying to bring fuel cell products to the marketplace. *Id.* at ¶ 38. This effort involved the work of over 300 employees in research and development. *Id.* at ¶¶ 6, 9. Further, GE Microgen and other General Electric Company affiliates contributed to Plug Power's investment in the PEM fuel cell systems through a $43.5 million cash investment. *Id.* at ¶ 40. Plug Power also received millions of dollars of funding from other third parties and government sources. *Id.* at ¶ 41.

Prior to and throughout the term of the Agreement, Plug Power was continuously testing the fuel cell system and its components, and advancing product development based on the results of that testing. *Id.* at ¶ 43. This included testing conducted both in a laboratory setting at Plug Power as well as in the field at a variety of sites. *Id.* at ¶¶ 43-45, 49-50, 54, 81. These fuel cell units were tested on a daily basis in order to put together milestones and further test plans on Plug Power's path toward commercialization. *Id.* at ¶ 50. By the end of 2002, for example, Plug Power had over 150 test stations onsite running a wide variety of tests and had delivered 121 systems for testing in the field. *Id.* at ¶ 65.

Throughout the development process, Plug Power believed that the Product was feasible for a mass market and could be commercially developed. *Id.* at ¶ 62. Even Soroof's President testified that he believed in 2000 that GEFCS was working as hard as it could to supply the Product. *Id.* at ¶ 92. Over time, however, Plug Power experienced technical difficulties with the development of the Product. *Id.* at ¶ 66. Although Plug Power was eventually able to build reliable fuel cell systems, their high cost presented the biggest (and eventually insurmountable) challenge to commercialization. *Id.* at ¶ 69. As Plug Power experienced these setbacks, it updated its product delivery schedule according to new expectations. *Id.* at ¶ 67. The challenges

that Plug Power encountered were similar to those experienced by other companies working on PEM fuel cell systems. *Id.* at ¶ 68.

At no point between June 2000 and December 2005 did Plug Power abandon the development of the Product specified in the Agreement. *Id.* at ¶ 72. In fact, from about 2005 forward, Plug Power sold versions of a product called "GenSys," which met certain, but not all of the technical specification in the Agreement; and Plug Power continues to work on development of that product. *Id.* at ¶ 75. To date, however, Plug Power has not been successful in developing a commercial Product that meets the Agreement's specifications. *Id.* at ¶ 73.

***Soroof's Knowledge of the Product's Development and Struggles***

Throughout the life of the Agreement, Soroof, GEFCS, and its members communicated about the overall status of the Product development. *Id.* at ¶¶ 82-83. Through emails, phone calls, and in-person meetings, Frank Scovello, President of GEFCS, provided updates including the overall status and limitations of product development. *Id.* at ¶¶ 82, 84-85. When there was a material change in the Product's schedule or definitive action on the development of the Product, GEFCS passed that information on to the various distributors, including Soroof. *Id.* at ¶ 86. Indeed, Soroof's President could not recall a single instance when GEFCS did not answer a question posed by someone from Soroof. *Id.* at ¶ 87.

Uncontroverted evidence shows that Soroof was aware of ongoing delays in Product development. *See id.* at ¶¶ 82-118. In early June 2000, immediately before the signing of the Agreement, GEFCS told Soroof that the Product's delivery had been delayed and was expected to be ready in the last quarter of 2001, instead of the last quarter of 2000 as originally communicated. *Id.* at ¶ 89. In August 2000, GEFCS notified Soroof that "the product commercialization date has shifted to the right by six months," which Soroof understood to be a

six month delay. *Id.* at ¶ 90. Soroof has also admitted that it knew as early as April 2001 that the "delivery schedule for fuel cells ha[d] slipped indefinitely." *Id.* at ¶ 98. From 2001 to 2004, GEFCS continued to report to Soroof the relevant status of fuel cell product development and schedule delays. *Id.* at ¶¶ 100-102, 107-08. During that time, Soroof understood that the Product was still under development and that there was not a specific delivery date for the Product. *Id*. at ¶¶ 103, 107-09. As but one example, GEFCS notified Soroof in July 2003 that "an economically viable, prime power fuel-cell product for the Kingdom [was] still not in the schedule" and "tak[ing] much longer then [sic] anyone had originally expected." *Id.* at ¶ 108. Soroof's President testified that Product delivery schedule delays prompted Soroof to pursue other opportunities in the power business unrelated to the Product. *Id.* at ¶ 96.

The status of the Product's development was also available through Plug Power's public filings. *Id.* at ¶¶ 22, 78, 81. For example, from 1999 through 2006, Plug Power's 10-K filings included sections describing its efforts, achievements, and risk factors. *Id.* at ¶ 81. Industry publications also provided information and analysis regarding Plug Power's fuel cell development. *See, e.g.*, *id*. at ¶ 106. In fact, Soroof's President even circulated to Soroof employees an industry newsletter in May 2002 that included a report on Plug Power and the "major hurdles in turning fuel-cell technology into a commercially successful product." *Id.*

In June 2004, after repeated reports from GEFCS on the problems in Product development, Soroof demanded that GEFCS return the $1 million distribution fee paid under the Agreement because GEFCS "fail[ed] to make a product covered by the said agreement available for commercial application." *Id.* at ¶ 113. GEFCS immediately responded that it did not believe it had an obligation to return the distributor fee and did not do so. *Id.* at ¶ 114.

***Expiration of the Agreement and Dissolution of GEFCS***

The Agreement expired by its terms at the end of 2005. *Id.* at ¶ 35. At that time, there was no Product available to Soroof (or any of the other distributors with which GEFCS had contracted) to distribute under the Agreement. *Id.* at ¶ 36. Because Plug Power was unable to produce the Product as envisioned, GEFCS was dissolved in December 2006. *Id.* at ¶ 37.

**B. <u>Procedural Background</u>**

On July 1, 2008, Soroof filed an arbitration demand against GEFCS claiming that GEFCS had improperly failed to deliver products pursuant to the Agreement. *Id.* at ¶ 127; Docket No. 13, at 1-6. The parties later agreed to discontinue the arbitration and litigate Soroof's claims in this Court. SUF at ¶ 128; Docket No. 63-3. On February 22, 2010, Soroof filed a Complaint against GEFCS, GE Microgen, and Plug Power asserting claims originally stated in the arbitration, as well as various additional claims. SUF at ¶ 129; Docket No. 1.

Following limited discovery, Defendants moved for a Rule 12(c) judgment on the pleadings and the parties cross-moved for summary judgment concerning the threshold issue of the ability to bring claims against GEFCS as a dissolved limited liability company. By its Memorandum Opinion and Order dated January 24, 2012 (the "Order"), the Court dismissed with prejudice Soroof's claims of conversion, constructive trust, unjust enrichment, and demand for accounting, and dismissed without prejudice Soroof's claims of breach of contract and misrepresentation. Docket No. 110 at 28. The Court also dismissed all claims against GEFCS, but allowed Soroof to proceed with its claims against GE Microgen and Plug Power, under the theory that GEFCS was the alter ego of GE Microgen and Plug Power, and that the "corporate

veil" of GEFCS should be pierced. *Id.*[3]

Though the Court allowed Soroof to replead its breach of contract and misrepresentation claims against Plug Power and GE Microgen, the Court held that Soroof's original Complaint failed to support these claims. *Id.* at 10. In fact, the Court noted that Soroof's claim that GEFCS breached the Agreement because GEFCS allegedly failed to make reasonable efforts to supply the Product was "unavailing" and premised solely on the "lack of success in manufacturing the fuel cells" which is not "in and of itself . . . a plausible basis" to state a claim. *Id.* The Court likewise found that Soroof's initial Complaint "provide[d] no basis for the inference that GEFCS withheld material information about the ultimate viability of the cells . . . or that the notifications were not made on a timely basis." *Id.* at 11. The Court further found that Soroof failed to adequately plead its claim of misrepresentation because its allegations lacked specific "proffers as to who, when, how or even what was misstated or omitted." *Id.* at 13. Soroof filed its First Amended Complaint on February 10, 2012 and later filed the Second Amended Complaint ("SAC") on May 11, 2012, which included, among other amendments, the addition of General Electric Company as a Defendant.

## III. <u>ARGUMENT</u>

### A. <u>Soroof's Breach of Contract Claims Fail</u>

Soroof's breach of contract claims are limited to allegations that Defendants breached two provisions of the Agreement: 1) "failing to use 'reasonable efforts to supply' the Product by abandoning development of the originally contracted for Product less than one year from the

[3] In addition to their success on the merits, Defendants believe they should prevail on appeal (if necessary) of the order granting Soroof's request to pierce the veil of GEFCS. The decision to pierce the veil of GEFCS, a dissolved LLC, was flawed because (1) the Court's determination of GEFCS's status as non-existent under Delaware law (and accordingly not subject to suit) should have yielded a corresponding dismissal of the claims against the LLC's former members, and (2) the Court incorrectly applied the elements necessary to pierce a veil in any event. A request to pierce the corporate veil is not an independent cause of action, but merely a method of imposing liability on underlying claims which, in this case, do not exist against GEFCS.

signing of the Agreement," SAC, ¶ 72; and 2) "failing to 'share promptly relevant information, including but not limited to product performance, failure and liability issues' because despite Soroof having raised concerns regarding the failure to deliver Product from as early as 2001, Defendants never honestly conveyed the real reason that the Product could not be delivered to Soroof," *id.* at ¶ 73. To the contrary, and as explained below, the undisputed material facts demonstrate that Defendants used reasonable efforts to supply the Product and shared promptly with Soroof relevant information about the Product. Moreover, the plain terms of the Agreement specifically bar Soroof's breach of contract claims.

**1. Defendants Used Reasonable Efforts to Supply the Product**

Soroof argues that Defendants failed to use "reasonable efforts" to supply the Product pursuant to Agreement § 5.2 (GEFCS responsible to "[u]se reasonable efforts" to supply the Product). SAC ¶ 72. Courts applying New York law may interpret a "reasonable efforts" clause to be a "less stringent" standard than a "best efforts" clause. *In re Chateaugay Corp.*, 198 B.R. 848, 854 (S.D.N.Y. 1996). Under either standard, though, "a party is entitled to give 'reasonable consideration to its own interests.'" *Id.* (quoting *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979)). And even under the more stringent "best efforts" standard, a party is obliged only "to act with good faith in light of one's own capabilities." *Serdarevic v. Centex Homes, LLC*, No. 08-CV-5563, 2012 WL 4054161, at *5 (S.D.N.Y. Sept. 5, 2012) (quoting *Bloor*, 601 F.2d at 613 n.7). Under either standard, "[a] party may thus exercise discretion, within its good faith business judgment, in devising a strategy for achieving its ultimate goal." *Chateaugay*, 198 B.R. at 855. Moreover, Defendants were not obligated to "spend [themselves] into bankruptcy," to meet their contractual obligations. *Bloor*, 601 F.2d at 614.

Soroof has not, and cannot, support its claim that Defendants failed to use "reasonable

efforts" to supply the Product. As a threshold issue, Soroof bases this claim entirely on its unsupported allegation that Defendants "abandoned" development of the Product. SAC ¶¶ 37, 40, 72. The only support to which Soroof points for this claim of "abandonment" is a statement made by Frank Scovello, GE Microgen's corporate representative, during his September 2, 2010 deposition. SAC ¶ 37; SUF at ¶¶ 71, 124-125. Soroof has mischaracterized Mr. Scovello's testimony. Mr. Scovello never testified that GEFCS abandoned the development of the Product. To the contrary, he testified—in a deposition that was limited in scope to topics surrounding the dissolution of GEFCS, not the timeline for the development of the Product—that he was not certain but believed that "in the 2001 time frame" there was "a gradual realization that they could not build [a] product even close to what we had originally contemplated." *Id.* at ¶ 71. Mr. Scovello clarified in a more recent deposition that to the best of his knowledge, Product development was *never* abandoned during the Agreement term, much less abandoned in the 2001 timeframe. *Id.* Soroof's corporate designee admitted that it has *no* facts to support its allegation other than its reading of Mr. Scovello's first deposition. *Id.* at ¶¶ 124-125.

To the contrary, there is undisputed evidence that Defendants used reasonable (if not extraordinary) efforts to supply the Product. Uncontroverted testimony from Plug Power's corporate representative established that at no time between June 6, 2000, when the Agreement was executed, and December 31, 2005, when the Agreement terminated, did Plug Power abandon development of the Product. *Id.* at ¶ 72. Further, he testified that Defendants "work[ed] in good faith to bring the [P]roduct to the market," and "used extraordinary efforts" during the course of the Agreement to try to become a "successful manufacturer, marketer, and distributor of . . . fuel cell systems[.]" *Id*. at¶¶ 76-77. Since Plug Power went public in 1999, it spent "north of half a billion dollars trying to bring these products to the marketplace." *Id*. at ¶ 38.

Testimony from individuals with contemporaneous knowledge of the Product's development during the relevant timeframe confirms these efforts. *See, e.g.*, *id.* at ¶ 6 (Mr. Scovello testified, "[Plug Power] had over 300 people working on the development. They did significant research and development."); *id.* (John Cerveny, former Director of Economic Development and Government Relations of Plug Power, testified, "[Plug Power] spent thousands of hours of development with hundreds of employees who scoured the globe for best-available technologies, and spent millions of dollars developing the product."). Throughout the relevant time, Plug Power believed that it would be able to develop the Product. *Id.* at ¶¶ 61-65. Even Soroof's own President testified that he believed in 2000 that Defendants were "working as hard as they could" to supply the Product. *Id.* at ¶ 92.

The Court and Soroof need not only take Defendants' word for it. The uncontroverted facts establish that during the term of the Agreement, Plug Power (1) grew from 22 employees to over 300 employees, at least two-thirds of whom were engineers, scientists, and other degreed professionals (*id.* at ¶¶ 7, 9); (2) constructed a 50,000 square foot manufacturing facility (*id.* at ¶ 8); (3) had more than 100 issued patents and 85 patents pending relating to its fuel cell technology (*id.* at ¶ 65); (4) acquired intellectual property from component suppliers to resolve technical issues in development (*id.* at ¶ 51); and (5) built over 650 fuel cell systems (*id.* at ¶ 74). These objective steps make no sense if, as Soroof suggests, GEFCS and its members were doing anything other than using reasonable efforts to supply the Product.

To the extent Soroof argues that the "reasonable efforts" provision obligated GEFCS to successfully supply the Product, *see* SAC at ¶¶ 36, 37, this Court has already rejected this argument in the Order, holding that the clause "imposed no obligation to provide <u>any</u> cells." Order at 8 (emphasis in original). The Court held that the "failure to manufacture and supply

cells . . . does not, in and of itself, provide a plausible basis for inferring that GEFCS acted in bad faith or at a level below its capacities, as would be required to state a plausible claim for breach of a reasonable efforts covenant." *Id.* at 10. After extensive discovery, Soroof has *nothing* to support this claim other than the argument that this Court has already rejected—conclusory allegations founded on the sole fact that Defendants were ultimately unable to successfully develop the Product. *See* SAC at ¶¶ 36, 37, 72. Defendants did not fail to use reasonable efforts to supply the Product in breach of § 5.2, and summary judgment should be granted on this claim.

**2. Defendants Did Not Fail to Share Relevant Information with Soroof**

Soroof also alleges that Defendants breached Agreement § 7.4, which provides that "[t]he parties agree to share promptly relevant information, including but not limited to product performance, failure, and liability issues . . . ." SAC at ¶¶ 73-74. Under New York law, "a contract should be interpreted according to its plain and ordinary meaning." *Elmira Teachers' Ass'n ex rel. Martin v. Elmira City Sch. Dist.*, 861 N.Y.S.2d 195, 197 (N.Y. App. Div. 2008); *see also Platek v. Town of Hamburg*, 948 N.Y.S. 2d 797, 799 (N.Y. App. Div. 2012). Here, the Agreement does not define "relevant," so the meaning of the term should be its "plain and ordinary meaning." *Platek*, 948 N.Y.S. 2d at 799 (affording undefined contract term the Webster's dictionary definition). Webster's dictionary defines "relevant" as "having *significant* and *demonstrable* bearing on the matter at hand." *Merriam-Webster's Collegiate Dictionary* 985 (10th ed. 2000) (emphasis added). Further, this Court, in its Order, dismissed Soroof's claim that Defendants had not shared "relevant" information because the Complaint lacked "the inference that GEFCS withheld *material information* about *the ultimate viability* of the cells." Order at 11 (emphasis added).

Under the "plain and ordinary meaning" of the term "relevant," and as supported by this

Court's reading of the Agreement in the Order, Defendants have not breached this section of the Agreement. There can be no dispute that GEFCS was not obliged to provide *any and all* information possibly related to the development of the Product. GEFCS was not required to share with Soroof every single test result and data point related to the Product learned over an almost six-year period, which included a time when Plug Power employed a staff of hundreds of full-time employees, including engineers, scientists and other professionals, and was spending millions of dollars toward research and development of the Product. Instead, GEFCS was obliged to provide significant, *material* information to Soroof, and the undisputed evidence establishes that it fulfilled that obligation. In particular, Soroof was kept informed about the Product's overall status and "ultimate viability," including notice by April 2001 that that Product delivery had "slipped indefinitely." SUF at ¶ 98.

Even assuming *arguendo* a broader definition of the term "relevant," Soroof's allegation that GEFCS failed to provide relevant information is inaccurate. Soroof was well-aware during the term of the Agreement of the Product's overall development, including its ongoing delays. *Id.* at ¶¶ 82-118. Throughout the relationship with GEFCS, Soroof was kept informed of the Product development, generally through emails and phone calls between Frank Scovello, President of GEFCS and Jim Jackson, an Executive Director at Soroof, but also through several in-person meetings. *Id.* at ¶¶ 82-85.[4] Any time there was a material change in the Product's

[4] Additionally, Soroof could have learned about the development of the Product from publicly-available information, including Plug Power's public filings, which contained detailed updates and described the product development and commercialization plan. *See, e.g.*, Ex. 29, Plug Power Form 10-K, for period ending 12/31/03, at 1 ("We continue to advance the development of our fuel cell systems. Our research and development facility contains over 150 test stations, where we conduct design optimization and verification testing, rapid-aging testing, failure mode and effects analysis, multiple technology evaluations, and endurance testing in order to accelerate the development and commercialization of our products."); Ex. 18, Plug Power Form 10-K, for period ending 12/31/00, at 3-4; Ex. 19, Plug Power Form 10-K, for period ending 12/31/01, at 2-3; Ex. 30, Plug Power Form 10-K, for period ending 12/31/02, at 2; Ex. 9, Plug Power Form 10-K, for period ending 12/31/04, at 2-3; Ex. 27, Plug Power Form 10-K, for period ending 12/31/05, at 1.

schedule or definitive action on the development of the product, GEFCS shared that information with Soroof. *Id.* at ¶ 86. In particular, Soroof was informed on numerous occasions of the delays in the Product schedule because of unanticipated technical problems. *Id.* at ¶ 86; *see also id.* at ¶¶ 84-110, 112, 118.

Indeed, Soroof's corporate deponent testified that he could point to nothing other than his own opinion that Defendants "must have known" by May 2000 that a Product could not be delivered by the end of 2000 to support its allegation that Defendants misinformed Soroof about the status of the Product's development. *Id.* at ¶ 120. This conclusory suspicion is not sufficient to create a material fact issue. Soroof also alleges that Defendants "never honestly conveyed the real reason the Product could not be delivered." SAC ¶ 73. But this bald conclusion is controverted by, among other things, Soroof's own admission that Defendants conveyed to Soroof the real reason that the Product could not be delivered—that a product was not produced which met the specifications of the Agreement. SUF at ¶ 122. The only other "fact" that Soroof may attempt to use to dispute these uncontroverted facts is the opinion of a single researcher from Alaska who tested a very early component from Plug Power in 1998 and reached an opinion that Plug Power was not close to commercializing the Product. *See generally id.* at ¶¶ 55-60. But the opinion of one man who tested one early unit component *a year before the Agreement was signed* does not establish a genuine fact issue against the overwhelming evidence that GEFCS candidly shared relevant information about the Product throughout the time period of the Agreement. And Defendants have explained that they did not consider the results of that single test, which took place *before* the Agreement was negotiated or executed, to be material or significant to the Product development at the time. *Id.* at ¶ 60. Thus, Defendants did not fail to provide Soroof with relevant information in breach of § 7.4, and summary judgment should be

granted on this claim.

**3. The Agreement Bars Soroof's Breach of Contract Claims**

Soroof's contract claims also fail because the express terms of the Agreement preclude them. Plaintiff bears the burden of proving that the contract upon which its claim is based supports the claims and recovery alleged, and Soroof cannot meet this burden. *See, e.g.*, *Manshul Constr. Corp. v. Dormitory Auth. of New York*, 79 A.D.2d 383, 387 (N.Y. App. Div. 1981). First, Soroof claims that it should recover the $1 million distributor fee, notwithstanding that the Agreement specifies that this fee is "non-refundable." Ex. 13, Agreement at § 6.4. The Agreement reflects the parties' reasonable expectation that the non-refundable distributor fee was not a recoverable item even in the event of the Agreement's expiration or termination. Second, the recovery of amounts more than the distributor fee amount and the recovery of the sort of damages claimed by Soroof are also barred by the terms of the contract providing that (1) GEFCS's "total liability" on any claims "shall not exceed the amount that has been paid to GEFCS by [Soroof] under this Agreement;" and that (2) GEFCS would be liable "[i]n no event" for the very same kinds of damages that Soroof is seeking to recover in this action (i.e., "cost of facilities or services," "cost of capital" and all other "indirect, incidental . . . or consequential damages"). Ex. 13, Agreement at §§ 12.1-12.2.[5]

Where, as here, the parties to the Agreement are sophisticated, the unambiguous terms of the Agreement should be given effect. *See Ferguson v. Hannover Ruckversicherungs-Akteiengesellschaft*, No. 04 Civ. 9254, 2007 WL 2493692, at *14 (S.D.N.Y. Aug. 21, 2007); *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32 (2002). The Order holds that contract

[5] In addition to being barred in full by the Agreement's limitations on liability, the grounds on which Soroof seeks $4.8 million in damages are speculative and insufficient to support their recovery. Soroof's corporate representative admitted that the damages claimed include every single expense allegedly incurred by Soroof's power division from 2001 to 2005 without regard to whether the expenses were allegedly related to Agreement. SUF at ¶ 126.

provisions limiting liability are "perfectly common and acceptable" though they may not protect a party from liability in the instance of "willful or grossly negligent acts." Order at 16-17 (quoting *Kalisch-Jarcho v. City of New York*, 58 N.Y.2d 377, 384-85 (1983)). This Court found that the only evidence Soroof pled in its initial Complaint potentially suggesting willful and/or gross negligence was the allegation that GEFCS knew as early as 2001 that it could not build the Product and affirmatively deceived Soroof by indicating otherwise. *Id.* at 17. As discussed above, this allegation is untrue; Defendants worked throughout the term of the Agreement to bring the Product to market. SUF at ¶ 72. Soroof has not and cannot show any general negligence on Defendants' part, much less a showing of conduct that "smack[s] of intentional wrongdoing," "reckless indifference," and the failure "to exercise even slight care" or "slight diligence" that is prerequisite to a finding of the gross negligence or willful misconduct sufficient to void the Agreement's limitations and exclusions and the distributor fee's non-refundable status. *Ryan v. IM Kapco, Inc.*, 930 N.Y.S.2d 627, 629 (N.Y. App. Div. 2011). Thus, the provisions limiting Defendants' liability provide another, independent basis to grant summary judgment on Soroof's contract claims.

### B. <u>Soroof's Misrepresentation Claim Fails</u>

Soroof alleges that Defendants made fraudulent misrepresentations by 1) inducing Soroof to sign the Agreement and pay the distributor fee based on alleged material misrepresentations; and 2) by continuing to make misrepresentations and omissions of material facts regarding the status of the Product's development after the Agreement was executed. SAC ¶¶ 82-85. Neither of these allegations have support in fact or law. Additionally, the Agreement's merger clause prevents Soroof from asserting a misrepresentation claim based on alleged extra-contractual promises by GEFCS.

**1. Defendants Made No Misrepresentations to Soroof**

"Under New York law, for a plaintiff to prevail on a claim of fraud, he must prove five elements by clear and convincing evidence: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 n.8 (2d Cir. 2006) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)). The SAC fails to allege any misrepresentation with the required particularity, and discovery has shown nothing to cure the inadequacies in Soroof's allegations, which are largely the same as those the Court found insufficient in its Order dismissing Soroof's original Complaint.

First, Soroof claims that it was falsely told on May 5, 2000 that the Product would be ready by the last quarter 2000 and that Defendants never corrected this statement, thereby creating a false impression with regard to the development of the Product to induce Soroof to execute the distribution Agreement. SAC at ¶¶ 21-22. This is untrue. Soroof's own President admitted that before signing the Agreement, GEFCS told Soroof that the Product's delivery had been delayed for a year. SUF at ¶ 89.

Second, Soroof also alleges that it was fraudulently induced to enter the Agreement by a statement by a GEFCS representative that the term of the Agreement would not begin to run until the Product was ready for delivery. SAC at ¶ 23. This too is groundless. The Agreement specified a clear term that expired in 2005 and provided that any amendment to the Agreement must be written and executed by the parties. Ex. 13, Agreement at §§ 4.1, 22.3. By Soroof's own admission, this alleged statement (if even made) was never reduced to writing and was made months *after* the Agreement was executed (in September or October 2000). Ex. 11,

Deposition of Jim Jackson, Soroof's Rule 30(b)(6) corporate representative, on Oct. 18, 2012 ("Soroof 30(b)(6) Dep."), at 246:7-249:5. Soroof cannot rely on any alleged promise to extend or amend the Agreement which fails to meet the Agreement's requirements to be effective.[6] Additionally, the alleged statement could not have created any false impression that Soroof relied on *before* Soroof executed the Agreement since it was allegedly made months later. Thus, Soroof has not a single misrepresentation to support any claim of fraudulent inducement. Instead, Soroof was informed that the Product was still in development at the time the Agreement was negotiated and executed, and Defendants were truthful in their communications.

In addition to its fraudulent inducement claim, Soroof alleges that Defendants made "misrepresentations and omissions of material facts regarding the status of the Product's development and prospective availability for sale despite their knowledge shortly after the [GEFCS] venture commenced in 1999 that they faced substantial problems with the Product." SAC ¶ 84. As an initial matter, this claim fails because it is nothing more than Soroof repleading its breach of contract claim as a misrepresentation claim. A claim for misrepresentation cannot exist where the misrepresentation "is based on the same facts underlying the contract claim and merely duplicate[s] it." *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S. 2d 575, 589 (N.Y. App. Div. 2003); *Vanderburgh v. Porter Sheet Metal, Inc.*, 446 N.Y.S.2d 523, 523 (N.Y. App. Div. 1982) ("Since plaintiffs' allegations of fraudulent misrepresentation related to performance of the . . . agreement, their theory of recovery is restricted to an action for breach of contract."). Here, Soroof's claim that Defendants made misrepresentations or omissions regarding the status of the Product's development is entirely duplicative of its claim that

[6] *See generally* N.Y. Gen. Oblig. Law § 15-301(1) (McKinney 2013) ("[a] written agreement . . . which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent").

Defendants breached the Agreement by failing to share promptly relevant information regarding the status of the Product's development, and fails for this reason alone.

In addition, the underlying allegations of Soroof's misrepresentation claim are insufficient. Soroof relies exclusively on its own opinion that Defendants "must have known" by May 2000 that a Product could not be delivered by the end of 2000 to support its allegation that Defendants misinformed Soroof about the status of the Product's development. SUF at ¶ 120. This conclusory allegation does not give rise to a claim for misrepresentation. As explained above, Defendants communicated the status of the Product development to Soroof, including its delays in production. *Id.* at ¶¶ 82-118. And the status of the Product's development was also knowable at all times through Plug Power's SEC filings, which Soroof admitted were publicly available. *Id.* at ¶¶ 81, 26. In addition, Soroof has admitted that it could have asked questions of GEFCS and that it did not know of a time that GEFCS did not answer Soroof's questions. *Id.* at ¶ 88. Finally, there is no evidence to show that Defendants believed that any statement made to Soroof was false. To the contrary, Defendants were running their businesses and investing hundreds of millions of dollars in the belief that the statements were true. *Id.* at ¶¶ 38-42. It strains credulity (and creates no genuine fact issue) to suggest that Defendants would continue to invest such substantial sums if they did not believe they would be successful.

**2. Any Reliance by Soroof on Any Alleged Misstatement Was Not Justifiable**

Moreover, even if Defendants had provided Soroof with misinformation regarding the status of the Product (which they did not), Soroof could not have justifiably relied on any misinformation it was allegedly told by Defendants. "As a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that

were available to it . . . ." *UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*, 288 A.D.2d 87, 88 (N.Y. App. Div. 2001); *see also Mountain Creek Acquisition LLC v. Intrawest U.S. Holdings, Inc.*, 96 A.D.3d 633, 634 (N.Y. App. Div. 2012); *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 278-79 (2011) (plaintiff "will not be heard to complain that he was induced to enter into the transaction by misrepresentation" where he does not make use of means available to him to know the facts); *CIFG Assurance N. Am., Inc. v. Goldman, Sachs & Co.*, No. 652286/2011, 2012 WL 1562718, at 11 (N.Y. Sup. Ct. May 1, 2012) ("As a sophisticated party involved in an arms length transaction, [Plaintiff] had a duty to undertake an independent due diligence review of the risks associated with the [transaction] . . . ."); *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) (holding even unsophisticated investor "may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth"). Here, the status of the Product was at all times available and Soroof could have verified it through due diligence, including 1) reviewing Plug Power's public filings, 2) interviewing scientists, suppliers, and/or industry experts, or 3) studying industry-wide information regarding fuel cell development. SUF at ¶¶ 25-28, 81. Instead, Soroof chose to do no due diligence. *Id.* at ¶¶ 23-24. It must live with the consequences of that choice.

**3. The Agreement's Merger Clause Bars Soroof's Misrepresentation Claim**

Finally, this Court has found that the Agreement "is clear, unambiguous, complete on its face and . . . contains an explicit integration clause," and therefore "[p]arol evidence is properly excluded." Order at 9-10. Specifically, the Agreement provides that it "contains the entire and only agreement between [Soroof] and GEFCS . . . . Any representations or terms and conditions relating to transactions within the scope of this Agreement which are not incorporated or

referenced herein shall not be binding upon either Party." Ex. 13, Agreement at § 22.1; *see also id.* at § 22.2. Because the Agreement's merger clause mandates the application of the parol evidence rule, Soroof is prevented from asserting a misrepresentation claim based on alleged extra-contractual promises by GEFCS.[7]

As detailed above, Defendants deny that they made any false representation or omission to Soroof. Notwithstanding, Soroof may not raise a disputed issue of material fact to defeat this Motion by alleging inadmissible parol evidence. Where a merger clause is specific in providing that the parties were not relying on any representation, term, or condition not contained in the contract itself, the parol evidence rule applies even against a claim that the contract was induced by misrepresentation. *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21 (1959); *see also Convenient Med. Care P.C. v. Med. Bus. Assocs., Inc.*, 291 A.D.2d 617, 618 (N.Y. App. Div. 2002) (unambiguous terms of contract and its merger clause precluded introduction of extrinsic evidence to establish that defendant induced corporation to enter into contract by oral promise). Accordingly, Soroof may not rely on any allegations of statements Defendants made prior to the execution of the Agreement and therefore cannot raise any issue of disputed material fact to support its claim of fraudulent inducement.

## C. All of Soroof's Claims Fail under the Applicable Statutes of Limitations

Summary judgment in Defendants' favor on all counts is also appropriate for the independent reason that all of Soroof's claims are barred by the applicable statutes of limitations.

### 1. The Statute of Limitations Bars Soroof's Breach of Contract Claims

Because the Agreement provides that the parties' relationship was "intended to be that of

---

[7] *See Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599 (1997) ("Courts and commentators addressing the substantive and procedural aspects of New York commercial litigation agree that the purpose of a general merger provision . . . is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.") (citing treatise and cases).

buyer and seller," SUF ¶ 19, it is a contract for the sale of goods, which is governed by the New York Uniform Commercial Code ("N.Y. U.C.C."). *See* N.Y. U.C.C. §§ 2-106(1)-(2), 2-102 (McKinney 2013); *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d. 401, 407 (S.D.N.Y. 2000); *Wuhu Imp. & Exp. Corp. v. Capstone Capital, LLC*, 834 N.Y.S.2d 129, 130 (N.Y. App. Div. 2007).[8] Thus, the N.Y. U.C.C. applies and imposes a four year statute of limitations on Soroof's breach of contract claims. N.Y. U.C.C. § 2-725(1); *Cary Oil*, 90 F. Supp. 2d. at 407; *Wuhu*, 834 N.Y.S.2d at 130.

Here, the evidence, including testimony of Soroof's corporate representative and its President and CEO, leaves no genuine issue of material fact to dispute that Soroof had notice or knowledge by at least 2001 of its alleged breach of contract.[9] Soroof admits it knew 1) in June 2000 that the Product's delivery was delayed by one year (SUF at ¶ 89); 2) in August 2000 that the Product's delivery was delayed by another six months (SUF at ¶ 90); and 3) in April 2001 that the Product's delivery schedule had "slipped indefinitely" (SUF at ¶ 98). What is more, Soroof's corporate representative admitted that Soroof viewed the April 2001 indefinite delay as "a problem." *Id.* at ¶ 98.[10] Moreover, Plug Power disclosed in its 1999 10-K, in March 2000,

[8] In determining whether a contract is for the sale of goods and covered by the U.C.C., courts look to the "essence" or main objective of the agreement. *Compania Sud-Americana de Vapores v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 431 n.19 (S.D.N.Y. 1992). If the sale of goods is the predominant purpose of the contract, then the contract is subject to U.C.C. Article 2. *Id.* Here, the parties' contract specified a "buyer and seller" relationship including the pricing and sale of certain products to Soroof for later resale in a designated area of distribution. SUF ¶ 19. Thus, the Agreement is a contract for the sale of goods. *See Old Country Toyota Corp. v. Toyota Motors Distribs., Inc.*, 966 F. Supp. 167, 168-69 (E.D.N.Y. 1997) (where distributor agreement prominently used the word "sales," and specified pricing, warranties, and related sales terms, the "heart of the agreement" was product sales and UCC applied). Here, the "essence" of the Agreement was the sale of goods, and the U.C.C. applies.

[9] Even if Soroof was not aware of the breach, a cause of action for breach of contract accrues and the statute of limitations begins to run when the contract is breached, regardless of whether the aggrieved party is aware of the breach. N.Y. U.C.C. § 2-725(2); *Ely-Cruikshank Co., Inc. v. Bank of Montreal*, 81 N.Y.2d 399, 403 (1993); *Varga v. Credit-Suisse*, 5 A.D.2d 289, 292, 171 N.Y.S.2d 674 (N.Y. App. Div. 1958), *aff'd*, 182 N.Y.S.2d 17 (1958).

[10] "Q. So at this time on April 17th, 2001, it was Soroof's understanding that the delivery schedule for the product had slipped indefinitely? A. We had first been told it would be last quarter 2000 by August only weeks after signing the agreement, we were told now it would slip perhaps six months, now we are getting into early '01. This is now

that it "may never complete the research and development of a commercially viable residential fuel cell system." *Id.* at ¶ 22. If there was a breach of contract, either by Defendants failing to use reasonable efforts to supply the Product or by any failure to provide relevant information, it had to have occurred by April 2001 at the latest, when the Product's delivery was not only not imminent, but delayed indefinitely. Thus, Soroof's breach of contract claim was barred by April 2005, over three years before Soroof filed its arbitration demand against GEFCS on July 1, 2008.[11]

Moreover, Soroof's own documents and testimony show that Soroof knew more than four years in advance of filing this action that it had a dispute with GEFCS arising out of the Agreement. Soroof's representative has testified that at least as early as January 2004, and notwithstanding Soroof's statements of appreciation for GEFCS's updates, Soroof did not believe that it was always kept updated with the latest developments concerning the fuel cell technology. *Id.* at ¶¶ 110-111. Further, as early as June 2004, Soroof requested a refund of the $1 million distributor fee, and considered having a lawyer review the Agreement after GEFCS refused to provide any refund. *Id*. at ¶¶ 113, 115. These facts indisputably triggered the statute of limitations. Accordingly, Soroof's breach of contract claim is barred by the statute of

---

we are talking about *April of '01, by that time it was obvious we were not receiving product*. Where the first six-month delay of the product would not have been a problem, now we are looking at now they can't give us a delivery date. Q. Why was it - - A. *That's a problem*." Ex. 11, Soroof 30(b)(6) Dep., at 98:10-99:10 (emphasis added).

[11] Soroof has argued that the parties' Venue Agreement (Docket No. 63-3) tolled its claims against Defendants. Defendants believe there is an argument that the arbitration filing did not toll the statute of limitations where under New York law, an arbitration claim tolls limitations on a later filed action only if the later action is an "action upon such [a] claim" that was earlier advanced in the arbitration, *see* N.Y. C.P.L.R. 204 (McKinney 2013), and an arbitration filing does not toll the statute on a later filed action that involves different parties or issues, *see Troeller v. Klein*, 918 N.Y.S.2d 436, 437-38 (N.Y. App. Div. 2011); *Provenzano v. Ioffe*, 784 N.Y.S.2d 138, 140 (N.Y. App. Div. 2004); *Majka v. Utica City Sch. Dist.*, 668 N.Y.S.2d 831, 832 (N.Y. App. Div. 1998); *Bright v. Pagan*, 653 N.Y.S.2d 645, 646 (N.Y. App. Div. 1997). Without waiving that argument, for purpose of this Motion, Defendants give Soroof the benefit of the arbitration filing date.

limitations and summary judgment should enter on that ground.[12]

**2. The Statute of Limitations Bars Soroof's Misrepresentation Claim**

Whether Soroof's misrepresentation claim is subject to the four-year statute of limitations in the N.Y. U.C.C. or the six-year statute of limitations in New York's Civil Practice Law and Rules depends on whether the alleged misrepresentation negatively affected performance of the Agreement or fraudulently induced Soroof to enter into the Agreement in the first place. *See Momentive Performance Materials USA, Inc. v. Astrocosmos Metallurgical, Inc.*, 659 F. Supp. 2d 332, 344 (N.D.N.Y. 2009) (applying N.Y. U.C.C. statute of limitations to negligent misrepresentation claim affecting performance of contract for sale of goods and C.P.L.R. statute of limitations to fraudulent inducement claim arising under same contract). Soroof's single count of misrepresentation appears to allege both categories. Regardless of how that single claim is categorized, however, Soroof's misrepresentation claim is time barred.

Because the Agreement provides that the parties' relationship was "intended to be that of buyer and seller," SUF ¶ 19, N.Y. U.C.C. provisions apply to Soroof's misrepresentation claim at least inasmuch as it relates to performance of the contract. *See supra* Section III(C)(1) (discussing application of U.C.C. to contracts for sale of goods between buyer and seller); N.Y. U.C.C. §§ 2-102, 2-106, 2-725(1); C.P.L.R. 203(g) (claims covered by U.C.C. exempted from the statute of limitations' discovery rule); *Momentive*, 659 F. Supp. 2d at 345-46 & n.7 ("If the allegedly negligent misrepresentations related to the performance of the contract, the four-year statute of limitations of New York's UCC would apply . . . ."). As a result, the four-year statute of limitations applies to both the contract and misrepresentation claims.

[12] Presuming that the alleged breach occurred by 2001, when the Product was delayed indefinitely, Soroof's breach of contract claims would still be barred even if New York's more general six-year statute of limitations for breach of contract applied. *See* C.P.L.R. 213(2) (six year statute of limitations for breach of contract).

Alternatively, even if this Court determines that the N.Y. U.C.C. provisions do not apply, the six-year statute of limitations for fraud (including fraudulent inducement) under the Civil Practice Law and Rules still bars Soroof's claims. C.P.L.R. 213(8) (applying six year statute of limitations to fraud claims); *Bell v. Manhattan Motorcars, Inc.*, No. 06-CV-4972, 2008 WL 2971804, at *2 (S.D.N.Y. Aug. 4, 2008) (applying six-year C.P.L.R. 213 statute of limitations to fraudulent inducement claim).[13] The statute of limitations on a claim for fraud, including fraudulent inducement, runs for six years after the cause of action accrued (in the instance of fraudulent inducement, when the contract is executed), or two years from when the plaintiff discovered or with reasonable due diligence could have discovered the alleged fraud, whichever is longer. C.P.L.R. 213(8); *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F. Supp. 1442, 1449 (S.D.N.Y. 1986); *Bell*, 2008 WL 2971804, at *2.

When considering reasonable diligence, courts have found that sophisticated investors are required to "protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the business they are acquiring." *Mun. High Income Fund, Inc. v. Goldman, Sachs & Co.*, No. 600012/06, 2008 WL 4938280, at *5 (N.Y. Sup. Ct. Oct. 30, 2008). Courts have dismissed fraud claims on statute of limitations grounds where plaintiffs could have reviewed publicly available information that would have exposed the alleged fraud but failed to do so. *Id.* ("[T]he record suggests that public information would have exposed the poor state of the market [and defendants' other allegedly fraudulent acts]," and as such, "the facts of the fraud claim against defendants, to the extent that they were not already known, could have been discovered with the exercise of due diligence more than two years

[13] *Cf. Meason v. Greenwich & Perry Street Housing Corp.*, 643 N.Y.S. 2d 56, 57 (N.Y. App. Div. 1996) (noting that C.P.L.R. 203(g) does not apply to U.C.C. contracts and applying U.C.C.'s four-year statute of limitations to fraudulent inducement claim).

before the action was commenced."); *Waggoner v. Caruso*, No. 602192-2007, 2008 WL 4274491, at *19 n.13, 23 (N.Y. Sup. Ct. Sept. 10, 2008) (dismissing fraud claim where plaintiffs could have discovered alleged fraud more than two years before action was commenced "by inspecting public records"). In particular, investors are charged with knowledge of information contained in SEC filings, and the statute of limitations on an alleged misrepresentation claim is triggered by such knowledge.[14]

Here, whichever statute of limitations period is applied, Soroof cannot overcome it. Soroof's President and CEO's admission that he would not have entered into the Agreement had he known of public disclosures Plug Power made in March 2000, before Soroof ever signed the Agreement, stands as a bar to Soroof's claim in its own right. Significantly, when asked what he would have done differently had he known of this and other public disclosures, he confessed, "[w]e would not sign the contract. We would not go into an agreement." SUF at ¶ 29.

Additionally, even if this Court were to disregard Soroof's imputed knowledge of Plug Power's public filings, Soroof had actual knowledge of the circumstances of any alleged misrepresentation. Even using a generously late date of Soroof's knowledge – April 21, 2001, when Soroof knew the Product delivery had "slipped indefinitely" – any such claim would have been barred by the statute of limitations long before Soroof filed the arbitration demand whether the four year statute of limitations is applied (barring misrepresentation claims after April 2005) or the six year statute of limitations is applied (barring misrepresentation claims after April 2007).

Any argument by Soroof that the statute of limitations was somehow tolled by allegedly fraudulent statements that concealed the underlying misrepresentation is groundless. An

[14] *Cf. Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 226, 229-30 (S.D.N.Y. 1997).

equitable tolling claim requires the plaintiff to show "reasonable diligence" to detect the fraudulent concealment. *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 266-67 (S.D.N.Y. 2006) (holding that equitable estoppel should be "invoked sparingly," "does not apply where the misrepresentation . . . is the same act which forms the basis of plaintiff's underlying cause of action," and "[a] party seeking to avoid the bar of the statute [of limitations] on account of fraud must aver and show that he used due diligence to detect it. . . .") (internal quotations omitted). As described above, Soroof admits that it failed to do *any* due diligence. *See supra* Section III(B)(2). Soroof cannot hide behind its own failure to investigate the facts of which it now complains. In particular, Soroof cannot be rewarded for failing to conduct due diligence where by its own testimony it had a reason for investigating further the Product's status.[15] Where Soroof chose not to perform reasonable due diligence that would have exposed any alleged misrepresentation, the statute of limitations should not be tolled. *Abercrombie*, 438 F. Supp. 2d at 267 (refusing to apply equitable estoppel to toll the statute of limitations because plaintiffs failed to use due diligence "and a party cannot plead ignorance of a public record to which he has access") (internal citation and quotation omitted). Accordingly, Soroof's misrepresentation claim is barred by the statute of limitations.

### D. In the Alternative, If Plaintiff Prevails on the Merits of Any Claim, It's Potential Damages Should Be Limited to $1 Million and Claims for Damages Excluded by the Agreement Should Be Dismissed

In the alternative, if this Court finds that any claim remains for trial and Plaintiff prevails on any such claim, any recovery by Soroof should be restricted according to the Agreement's

[15] Specifically, in the August 2000 meeting between the parties after the Agreement was executed, Soroof alleges having been advised that "Plug Power had misrepresented the advancement of the development of the fuel cell" and that the president of Plug Power was being fired "because he had overstated . . . the progress of development." Ex. 11, Soroof 30(b)(6) Dep., at 86:3-88:10. Although Defendants deny Soroof's characterization of this meeting, Soroof's admission that its principals left that meeting with feelings of "surprise" and "shock" at the delayed Product delivery further supports that Soroof had notice or knowledge of circumstances sufficient to trigger the statute of limitations. *Id.* at 88:15-89:12; *see also id.* at 258:22-260:6.

express limitations of liability, which provide (1) that GEFCS's "total liability" on any claims "shall not exceed the amount that has been paid to GEFCS by [Soroof] under this Agreement"; and (2) that GEFCS would be liable "[i]n no event" for "cost of facilities or services," "cost of capital" and all other "indirect, incidental . . . or consequential damages." Ex. 13, Agreement at §§ 12.1-12.2. These are the very same kinds of damages that Soroof seeks to recover in this action.

As discussed above, this Court has stated that a contract provision limiting liability should be disregarded only in the instance of "willful or grossly negligent acts," Order at 17, and the undisputed facts prove that no such willful or gross negligence is present here. Accordingly, if this Court declines to enter summary judgment dismissing Soroof's claims in their entirety, then, at a minimum, partial summary judgment should issue which (1) dismisses Soroof's claims for costs of facilities or services, costs of capital and all other indirect, incidental or consequential damages claimed; and (2) limits any recovery by Soroof (if any)[16] to no more than $1 million per the contract terms.

## IV. CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court grant this Motion and enter judgment on all counts in favor of Defendants. In the alternative, Defendants respectfully request, based on the Agreement's limitation of liability, that the Court dismiss Soroof's claims for damages barred by contract and order that any damages Plaintiff recovers in this action be limited to $1 million.

[16] A partial summary judgment limiting Soroof's recoverable damages to $1 million will not, however, assume recovery in that amount. To the contrary, there will still remain issues of damage recoverability including causation and set off of contractual amounts that would be otherwise owed by Soroof on its alleged claims. *See* Ex. 13, Agreement at § 6.6 (take or pay contract requirements required Soroof to pay GEFCS at least $800,000 for Product purchases).

Dated: May 10, 2013

Respectfully submitted,

/s/ Dahlia S. Fetouh

Dahlia S. Fetouh (*pro hac vice*)
Abigail K. Hemani (AH 2071)
Lisa M. LoGerfo (*pro hac vice*)
Lauren S. Kupersmith (*pro hac vice*)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.: 617.570.1000
Fax: 617.523.1231
E-Mail: dfetouh@goodwinprocter.com
E-Mail: ahemani@goodwinprocter.com
E-Mail: llogerfo@goodwinprocter.com
E-Mail: lkupersmith@goodwinprocter.com

Attorneys for Defendant PLUG POWER INC.

/s/ Michael D. Fisse

Michael D. Fisse
John Dubreuil
Jon A. Van Steenis
DAIGLE FISSE & KESSENICH, PLC
P.O. Box 5350
Covington, LA 70434-5350
(985) 871-0800
Fax: (985) 871-0899
Email: mfisse@daiglefisse.com
Email: jdubreuil@daiglefisse.com
Email: jvansteenis@daiglefisse.com

Thomas Edward Healy
PINO & ASSOCIATES, LLP
50 Main Street
White Plains, NY 10606
(914) 946-0600
Fax: (914) 946-0650
Email: thealy@pinolaw.com

Attorneys for Defendant GENERAL ELECTRIC COMPANY and GE MICROGEN, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT has been served on all parties by electronically uploading the same to this Court's CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established by this Court on this 10th day of May, 2013.

/s/ Dahlia S. Fetouh
Dahlia S. Fetouh