UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SOROOF TRADING DEVELOPMENT COMPANY, LTD.,

Plaintiff,

v.

GE MICROGEN, INC.,
PLUG POWER INC., and
GENERAL ELECTRIC COMPANY

Defendants.

Civil Action No. 1:10-cv-01391-LGS-JCF

**DEFENDANTS GE MICROGEN, INC., PLUG POWER INC., AND GENERAL ELECTRIC COMPANY'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# I. FACTUAL BACKGROUND

A. Formation of GE Fuel Cell Systems, LLC

1. In February 1999, Plug Power Inc. ("Plug Power") and GE Microgen, Inc. ("GE Microgen") entered into an agreement to form a limited liability company, GE Fuel Cell Systems, LLC ("GEFCS"), organized under the laws of the State of Delaware. Ex. 1[1], Deposition of Gerard L. Conway, Jr. on Jan. 27, 2011 ("Conway Dep. 1"), at 17:11-17.

2. Plug Power and GE Microgen formed GEFCS to sell and market fuel cell products that Plug Power was developing to various subdistributors around the world. Ex. 1, Conway Dep. 1, at 17:18-20, 19:20-25, 31:11-19; Ex. 2, Deposition of Frank Scovello on Sept. 2, 2010 ("Scovello Dep. 1"), at 26:11-14, 33:9-13.

3. The product that Plug Power was developing and GEFCS was planning to distribute was a Proton Exchange Membrane ("PEM") fuel cell system (the "Product"). The Product—an interconnection of three components that included a fuel cell stack—was intended to replace the power generation at a residence or small commercial facility and be a continuous power product that would produce power twenty-four hours a day, seven days a week. Ex. 1, Conway Dep. 1, at 87:7-19, 89:19-90:7; Ex. 3, Deposition of Gerard L. Conway, Jr. on Oct. 26, 2012 ("Conway Dep. 2"), at 7:17-8:6; Ex. 2, Scovello Dep. 1, at 38:13-15; Ex. 4, Deposition of Gary Mittleman on Oct. 25, 2012 ("Mittleman Dep."), at 15:20-16:13.

4. GEFCS was the vehicle for distributing the product. GE Microgen's role in GEFCS was primarily to manage sales and marketing, and Plug Power's role was to develop and manufacture the product. Ex. 1, Conway Dep. 1, at 19:25-20:18; Ex. 2, Scovello Dep. 1, at 33:9-33:13; Ex. 5, Deposition of Frank Scovello on Dec. 10, 2012 ("Scovello Dep. 2"), at 86:16-21.

[1] All references to "Ex. __" herein are references to exhibits to the Declaration of Dahlia S. Fetouh filed herewith.

5. During the operation of GEFCS, employees of both GE Microgen and Plug Power supported the activities of GEFCS. Ex. 2, Scovello Dep. 1, at 33:1-33:3; Ex. 3, Conway Dep. 2, at 15:13-22, 16:13-18.

6. Plug Power devoted several hundred employees toward the effort of developing the Product to specifications, while GE Microgen engaged in efforts to market the product nationwide and around the world through its network of subdistributors. Ex. 2, Scovello Dep. 1, at 48:18-48:20 ("[Plug Power] had over 300 people working on the development. They did significant research and development."); Ex. 6, Deposition of John Cerveny on Jan. 31, 2013 ("Cerveny Dep."), at 70:8-12 ("[Plug Power] spent thousands of hours of development with hundreds of employees who scoured the globe for best-available technologies, and spent millions of dollars developing the product."); Ex. 4, Mittleman Dep., at 119:12-15; Ex. 7, Deposition of William Acker on Mar. 22, 2013 ("Acker Dep."), at 83:23-84:3; *see also* Ex. 3, Conway Dep. 2, at 40:4-8.

7. By June 1999, Plug Power had grown from 22 employees at its inception to 250 employees. Ex. 8, Plug Power Form 10-K, for period ending 12/31/99 ("1999 10-K"), at 3.

8. In February 2000, Plug Power completed construction of a 50,000 square foot manufacturing facility. Ex. 8, 1999 10-K, at 5.

9. As of December 31, 2004, Plug Power had a total staff of 330, including 325 full-time employees, of which 215 were engineers, scientists, and other degreed professionals. Ex. 9, Plug Power Form 10-K, for period ending 12/31/04 ("2004 10-K"), at 5.

10. GE Microgen and Plug Power communicated regularly regarding Plug Power's efforts in developing the fuel cell product, and GE Microgen maintained employees onsite at Plug Power's research and development facility to further that collaboration. Ex. 1, Conway

Dep. 1, at 18:21-19:7; Ex. 2, Scovello Dep. 1, at 36:9-16; Ex. 4, Mittleman Dep., at 119:19-24, 153:24-154:9; Ex. 3, Conway Dep. 2, at 34:15-35:3, 36:15-38:4, 111:8-16, 179:15-21.

B. Distributor Agreement Between GEFCS and Soroof

11. Soroof Trading Development Company Ltd. ("Soroof") was formed in 2000 with several business units, including a power division. Ex. 10, Deposition of Bander Abdullah Al-Saud on Dec. 11, 2012 ("Bander Dep."), at 14:18-20, 15:6-16, 21:2-5; Ex. 11, Deposition of Jim Jackson, Soroof's Rule 30(b)(6) corporate representative, on Oct. 18, 2012 ("Soroof 30(b)(6) Dep."), at 26:10-14, 28:12-15, 12:7-21.

12. Soroof initiated contact with GEFCS in the spring of 2000, expressing interest in distributing the Product. Ex. 11, Soroof 30(b)(6) Dep., at 59:9-20; Ex. 5, Scovello Dep. 2, at 204:9-17.

13. In May 2000, Prince Bander Abdullah Al-Saud ("Prince Bander"), Soroof's President and CEO, as well as Jim Jackson, Soroof's Executive Director, met with representatives of GEFCS in New York at the Plug Power and GE Microgen offices to discuss the Product, its stage of development, and its availability. Ex. 11, Soroof 30(b)(6) Dep., at 59:24-60:21, 15:13-16:9, 221:10-22.

14. Later in May 2000, Prince Bander and Mr. Jackson met again with representatives of GEFCS in London, England. Ex. 11, Soroof 30(b)(6) Dep., at 65:11-25; Ex. 12, May 8, 2000 Email from Rajiv Sharma, attaching Email from Jim Jackson.

15. After negotiations, on June 6, 2000, GEFCS and Soroof entered into a Distributor Agreement (the "Agreement") that would allow Soroof to be the exclusive distributor for the Product within the Kingdom of Saudi Arabia. Ex. 11, Soroof 30(b)(6) Dep., at 63:14-23; Ex. 10,

Bander Dep., at 42:13-43:2; Ex. 13, Agreement[2].

16. Prince Bander and Mr. Jackson reviewed the Agreement prior to its execution. Ex. 11, Soroof 30(b)(6) Dep., at 64:15-65:1; Ex. 10, Bander Dep., at 59:14-17; Ex. 14, Deposition of Barry Glickman on Oct. 2, 2012 ("Glickman Dep."), at 88:21-89:8.

17. Prince Bander signed the Agreement on behalf of Soroof; GEFCS's President, Barry Glickman, signed the Agreement on behalf of GEFCS. Ex. 13, Agreement, at 18.

18. The Agreement specifies that it is governed by New York Law. Ex. 13, Agreement § 13.4.

19. The Agreement states that the relationship between Soroof and GEFCS is intended to be that of buyer and seller. Ex. 13, Agreement § 13.2.

20. At the time the Agreement was negotiated and executed, the PEM fuel cell products were still in development. Ex. 14, Glickman Dep., at 94:2-6; Ex. 15, Deposition of Manmohan Dhar on Mar. 6, 2013 ("Dhar Dep."), at 63:4-12; Ex. 2, Scovello Dep. 1, at 27:20-25.

21. Soroof was informed that the Product was still in development at the time the Agreement was negotiated and executed. Ex. 14, Glickman Dep., at 94:16-21; Ex. 10, Bander Dep., at 39:5-8, 147:16-25.

22. As early as March 2000 when it filed its first 10-K after it went public, Plug Power stated in its public filings that the Product was still in development and no commercial product had been made yet. Ex. 8, 1999 10-K, filed on March 30, 2000, at 7 ("We may never complete the research and development of a commercially viable residential fuel cell system. We do not know when or whether we will successfully complete research and development of a

[2] Due to space constraints, the version of the Agreement included as Exhibit 13 contains only the excerpts relied upon for this Motion. A complete copy of the Agreement can be found as Exhibit 1 to the Second Amended Complaint, filed May 14, 2012 (Docket No. 141). If the Court would like full copies of any other excerpted exhibit, Defendants will be happy to provide them.

commercially viable residential fuel cell system.”). The 10-K listed over five pages of additional risk factors, including, among other things, that: “[Plug Power has] only been in business for a short time and your basis for evaluating us is limited;” “[a] mass market for residential fuel cell systems may never develop;” “[Plug Power has] no experience manufacturing residential fuel cell systems on a commercial basis;” and “[Plug Power] may not meet [its] product development and commercialization milestones.” *Id.* at 7-8.

23. Soroof’s President and CEO testified that Soroof did not do any due diligence into GEFCS prior to entering the Agreement. Ex. 10, Bander Dep., at 47:8-11, 209:12-17 (“Q. Do you know if anyone at – within Soroof assisted Jim Jackson with his due diligence with respect to this business arrangement between GEFCS and Soroof? A. Due diligence, we didn’t do due diligence, as far as my recollection.”).

24. Soroof’s 30(b)(6) corporate representative testified that besides meetings and telephone calls with GEFCS personnel, Soroof did not do any due diligence prior to entering into the Agreement. Ex. 11, Soroof 30(b)(6) Dep., at 74:9-16.

25. Prior to entering the Agreement, Soroof did not review any of Plug Power’s public filings. Ex. 10, Bander Dep., at 47:12-22, 50:4-10; Ex. 11, Soroof 30(b)(6) Dep., at 75:9-24.

26. Soroof’s corporate representative testified that he believes Plug Power’s SEC filings were publicly available. Ex. 11, Soroof 30(b)(6) Dep., at 80:13-81:6.

27. Prior to entering the Agreement, Soroof did not speak directly to Plug Power researchers or engineers. Ex. 10, Bander Dep., at 40:2-7; Ex. 11, Soroof 30(b)(6) Dep., at 63:10-13, 74:17-20.

28. Soroof reviewed certain Plug Power press releases regarding the Product through

an internet search prior to entering the Agreement, but did not ask anyone at GE, GEFCS, or Plug Power any questions after reading those press releases. Ex. 11, Soroof 30(b)(6) Dep., at 75:6-15, 78:6-21.

29. Soroof's President and CEO testified that he would not have entered into the Agreement had he known certain information contained in Plug Power's publicly available Form 10-K, such as Plug Power's disclosure that the commercialization schedule could be delayed and that it did not know when or whether it would be able to develop a product of the standards required for commercialization; that Plug Power did not have experience manufacturing residential fuel cell systems on a commercial basis; that Plug Power may not meet its product development and commercialization milestones; or that GE was no longer contractually obligated to purchase units from Plug Power. Ex. 10, Bander Dep., at 53:4-55:24, 56:6-12 ("Q. If you had known this information before entering into the contract, what if anything, would you have done differently? . . . A. We would not sign the contract. We would not go into an agreement."), 57:2-58:15.

30. In exchange for the right to be the sole and exclusive distributor of the Product in Saudi Arabia, Soroof paid a $1,000,000 distributor fee that was specified as "non-refundable" under the terms of the Agreement. Ex. 13, Agreement § 6.4; Ex. 11, Soroof 30(b)(6) Dep., at 10:25-11:4.

31. Soroof understood that the $1,000,000 distributor fee was not going to be returned. Ex. 10, Bander Dep., at 46:2-17.

32. The Agreement limited GEFCS's liability to Soroof. Ex. 13, Agreement §§ 12.1, 12.2, 15.4.

33. Soroof understood that there was a risk entering into the Agreement. Ex. 10,

Bander Dep., at 58:20-59:3.

34. If the Product as outlined had been produced, Soroof's distribution rights would have been valued at greater than ten million dollars. Ex. 5, Scovello Dep. 2, at 228:5-229:1.

35. The Agreement expired by its own terms on December 31, 2005. Ex. 13, Agreement § 4.1; Ex. 3, Conway Dep. 2, at 167:23-168:3; Ex. 5, Scovello Dep. 2, at 151:18-21.

36. At the time the Agreement expired, GEFCS had been unable to produce the PEM fuel cell products to commercial specifications and no Product was available for distribution. Ex. 2, Scovello Dep. 1, at 101:21-101:25; Ex. 5, Scovello Dep. 2 at 68:12-17.

37. Because the Product was unable to be produced as originally envisioned, GEFCS was subsequently dissolved. Ex. 2, Scovello Dep. 1, at 47:14-48:1; Ex. 16, Action By Written Consent of the Members of GE Fuel Cell Systems, L.L.C., at PPI000104. A certificate of cancellation for GEFCS was filed on December 29, 2006 and took effect on December 31, 2006. Ex. 16, GEFCS Certificate of Cancellation, at GE000111.

C. Development of the Product

38. Since Plug Power went public in 1999, it spent over a half a billion dollars trying to bring the PEM fuel cell products, including the Product specified in the Agreement, to the marketplace. Ex. 1, Conway Dep. 1, at 101:12-102:3; *see also* Ex. 17, Plug Power Form 10-K, for period ending 12/31/11, at 10 ("As of December 31, 2011, we had an accumulated deficit of $754.8 million. We anticipate that we will continue to incur losses until we can produce and sell our products on a large-scale and cost-effective basis. Substantially all of our losses resulted from costs incurred in connection with our manufacturing operations, research and development expenses and from general and administrative costs associated with our operations.").

39. Plug Power disclosed in its 1999 10-K that "[s]ince inception, we have devoted

substantially all of our resources toward the development of the PEM fuel cell systems . . ." Ex. 8, 1999 10-K, at 16; *see also* Ex. 18, Plug Power Form 10-K, for period ending 12/31/00 ("2000 10-K"), at 19; Ex. 19, Plug Power Form 10-K, for period ending 12/31/01 ("2001 10-K"), at 17.

40. GE Microgen and other General Electric Company affiliates contributed to Plug Power's investment in the PEM fuel cell systems through a $43.5 million cash investment. Ex. 3, Conway Dep. 2, at 35:9-22; Ex. 20, Power Fuel Cell Update, May 2002, at GE003269.

41. Plug Power received millions of dollars of funding from other third parties and government sources. Ex. 7, Acker Dep., at 199:3-19; *see also*, *e.g.*, Ex. 18, 2000 10-K, at 19.

42. Plug Power's efforts to develop the PEM fuel cell systems were the largest in the industry. Ex. 7, Acker Dep., at 151:1-5, 87:1-10 ("People were starting to recognize that residential markets were things that could occur faster than the automotive market. Plug Power was in a leading position in that and Plug Power was applying the most resources of any company by many fold. So, there were competitors that had 30 people working on things whereas we had 300. We were putting vast amounts of effort into this and seeing the rate of growth associated with that vast amount of effort.").

*i. Early Product Testing and Development*

a. Overall Product Testing and Development

43. Plug Power was continuously testing its fuel cell systems and advancing product development based on the results of that testing. Ex. 15, Dhar Dep., at 55:13-21, 59:12-60:10; Ex. 4, Mittleman Dep., at 122:10-123:10; Ex. 21, Deposition of Elihu Jerabek on Jan. 31, 2013 ("Jerabek Dep."), at 94:4-95:7; Ex. 7, Acker Dep., at 80:6-9 ("[F]rom the point Plug Power was formed we adhered very strongly to this fast design[,] build[,] test cycle. And we built numerous testing laboratories."); Ex. 3, Conway Dep. 2, at 41:9-12 ("[T]esting went on daily on the

systems, the subsystems, the components. So, that would have been going on constantly."), 45:10-13 ("Q. Can you tell me whether or not testing took place? . . . A. Yes. It went on every day.") (objection omitted), 80:17-18 ("[W]e were continually making improvements in all aspects of the system . . . .").

44. This testing took place at a variety of sites, including at a model home at Plug Power in 1998. Ex. 15, Dhar Dep., at 74:9-75:3; Ex. 8, 1999 10-K, at 3.

45. Around this same time, a laboratory testing area was also established to complete direct testing of fuel cells and direct testing of the various components. Ex. 7, Acker Dep., at 80:2-19; 81:8-11 ("[The components] are being testing for different reasons. They are being tested for fulfillments. They are being tested for longevity. They are being tested for efficiency, all these different kinds of things."); Ex. 8, 1999 10-K, at 3 (facility "contains over 90 test stations where we conduct design optimization and verification testing, rapid-aging testing, failure mode and effects analysis, multiple technology evaluations, and endurance testing in our effort to accelerate the development and commercialization of our fuel cell systems.").

46. In 1998 and 1999, Plug Power continued development of various fuel cell components. Ex. 7, Acker Dep., at 221:17-222:1; Ex. 3, Conway Dep. 2, at 22:12-23. Specifically, in June 1998, Plug Power powered a three-bedroom home with a hydrogen-fueled residential fuel cell system; in November 1998, Plug Power demonstrated a methanol-fueled residential fuel cell system; and in December 1998, it demonstrated a natural gas-fueled residential fuel cell system. Ex. 8, 1999 10-K, at 3.

47. Plug Power met its 1999 milestone of building 50 fuel cell systems. Ex. 4, Mittleman Dep., at 83:18-84:15; *see also* Ex. 7, Acker Dep., at 91:3-5; Ex. 8, 1999 10-K, at 3.

48. In December 1999, Plug Power completed its 52nd fuel cell system. Ex. 8, 1999

10-K, at 3.

49. Plug Power's corporate representative testified that in 1999, Plug Power's early alpha or beta type fuel cell systems were "demonstrating, operating, fielding to gather information data to continue to improve the system." Ex. 3, Conway Dep. 2, at 17:13-18.

50. Fuel cell units were being tested on a daily basis in order to put together milestones and further test plans. Ex. 3, Conway Dep. 2, at 22:24-23:11.

51. In February 2000, Plug Power acquired intellectual property and assets related to fuel processor development from Gastec, a developer of fuel processor technology located in the Netherlands. Ex. 8, 1999 10-K, at 3, 17.

52. In March 2000, Plug Power filed its 63rd patent relating to fuel cell technology, system designs and manufacturing processes. *Id.*

53. The purpose of the units created in early 2000 was to generate data to make decisions in continued product development. Ex. 15, Dhar Dep., at 196:17-199:11; Ex. 22, Plug Power Press Release, May 4, 2000, at PPI011025.

54. Plug Power's former Chief Engineer testified that as of July 2000, Plug Power was "working on reliability on a continuous basis and doing a lot of testing . . . so there's a lot of work going on. So problems were being identified, problems were being solved and work was going on . . ." Ex. 15, Dhar Dep., at 220:17-21, 141:6-8; *see also* Ex. 6, Cerveny Dep., at 34:24-35:7 ("The fact that we made the progress that we did, the number of systems that were under test for tens of thousands of hours. We had a farm of systems in the back of the building. We had 20-some test beds, test bays, inside the building to run full systems. So we were driving very hard at a target that was clear to all of us."), 63:16-21 ("[T]he entire purpose for the company and the entire effort that had been funded and staffed and given lots of resources was to

improve on all the elements here and in the integration of the elements to create a system that could get to those efficiencies and to the full product requirement.”).

b. Testing at Sandia National Laboratory

55. A Plug Power fuel cell component was delivered to Sandia National Laboratory (“Sandia”) in September 1998, and tested in February and March of 1999. Ex. 23, Deposition of Dennis Witmer on Mar. 21, 2013 (“Witmer Dep.”), at 19:1-6.

56. This testing was completed at Sandia more than one year prior to the date the Agreement was signed. Ex. 23, Witmer Dep., at 153:14-16.

57. The unit Plug Power provided to Sandia was a laboratory device that was not a complete system. Ex. 23, Witmer Dep., at 121:21-123:21.

58. The unit sent to Sandia was different than the Product contemplated by the Agreement; for example, it did not include a hydrogen reformer, did not include the same control system, and was in an earlier stage of development. Ex. 23, Witmer Dep., at 103:1-105:21, 120:14-22, 130:15-17 (“We were very clearly informed that what we were getting was a laboratory unit with a barely operating control system.”); Ex. 7, Acker Dep., at 175:3-7 (“[T]he unit going to Sandia also had a natural gas feed because of the fact that it didn’t have a reformer, so we were having to adapt it to overcome the missing component in order to get the right application.”), 154:13-158:20; Ex. 6, Cerveny Dep., at 82:2-22.

59. The unit Plug Power provided to Sandia was designed solely for testing purposes, not for the purpose of trying to achieve the performance or efficiency levels expected of the eventual Product. Ex. 24, Expert Report of William P. Acker, Ph.D., dated January 31, 2013 (“Acker Report”), at ¶ 16; Ex. 7, Acker Dep., at 156:8-20; Ex. 23, Witmer Dep., at 123:1-21; 130:13-20; 147:7-10.

60. The product provided to Sandia was one of fifty Plug Power units being tested at that time and by the time the results were received from Sandia, the results from Sandia were obsolete. Ex. 7, Acker Dep., at 210:3-5; *see also* Ex. 6, Cerveny Dep., at 62:15-64:22.

*ii. Continuing and Anticipated Product Development*

61. At the time that GEFCS was formed and at the time that the parties executed the Agreement, Plug Power and GE Microgen believed that the proton exchange membrane fuel cell systems would be marketable. Ex. 4, Mittleman Dep., at 152:12-153:1; Ex. 14, Glickman Dep., at 102:19-103:9; Ex. 3, Conway Dep. 2, at 155:7-20; Ex. 5, Scovello Dep. 2, at 118:23-119:13.

62. Throughout the development process, Plug Power believed that the Product's design and configuration were feasible for a mass market and the Product would be developed. Ex. 4, Mittleman Dep., at 66:15-67:7, 125:7-23; Ex. 7, Acker Dep., at 87:1-12; Ex. 3 Conway Dep. 2, at 196:16-19.

63. As of June 1999, Plug Power believed it had the capability to sell 10,000 units in 2001. Ex. 4, Mittleman Dep., at 73:11-76:11; *see* Ex. 7, Acker Dep., at 86:21-87:12, 93:13-22.

64. Plug Power's projected milestones for delivery of its PEM fuel cell products established in October 2000 were believed to be accurate by Plug Power at the time. Ex. 3, Conway Dep. 2, at 194:19-24.

65. In 2003, even after the timeline for delivery of the Product had slipped, GEFCS still believed that the Product would be developed. Ex. 5, Scovello Dep. 2, at 179:4-9, 179:11-18 ("Plug had made huge progress to get where they were. So I think at this point in time we were very concerned that it was slipping and that the targets were – were difficult to hit, but at this time I think we were thinking, if it's going to be done, Plug will be the one to do it. I don't think anyone in the industry at about this time was as far along as Plug."), 225:12-23; Ex. 26, July 9,

2003 Email from Frank Scovello. By the end of 2002, Plug Power's facility had over 150 test stations where it conducted its testing, and had delivered 121 systems into the field. Ex. 30, Plug Power Form 10-K, for period ending 12/31/02 ("2002 10-K"), at 2. By the end of 2003, Plug Power had 102 issued patents and 85 patents pending in the United States related to its fuel cell systems. Ex. 29, Plug Power Form 10-K, for period ending 12/31/03 ("2003 10-K"), at 6.

*iii. Continued Product Development and Struggles in Development*

66. Plug Power experienced technical difficulties with development of the Product. Ex. 21, Jerabek Dep., at 41:9-24; Ex. 2, Scovello Dep. 1, at 48:16-18; Ex. 1, Conway Dep. 1, at 98:13-99:10.

67. As Plug Power experienced these technical difficulties and setbacks, it updated its product delivery schedule according to new expectations. Ex. 4, Mittleman Dep., at 110:3-12; *see also, e.g.*, Ex. 19, 2001 10-K, at 8 ("Our distribution agreement with GE Fuel Cell Systems has been amended on three occasions. The most recent amendment in August 2001, further amended the distribution agreement to extend its term through 2014 and to replace the product specifications, prices and delivery schedule in the current agreement with a high-level, multi-generation product plan with subsequent modifications subject to mutual agreement.").

68. The challenges that Plug Power encountered in bringing the PEM fuel cell product to the market within the timeframe originally envisioned were similar to those experienced by other companies across the world that were working on PEM fuel cell systems. Ex. 3, Conway Dep. 2, at 112:19-113:16.

69. Plug Power was eventually able to build reliable fuel cell systems, but the biggest challenge to commercialization was the high cost of those systems. Ex. 3, Conway Dep. 2, at 125:7-126:6.

70. All parties involved were disappointed that technical challenges prevented the production and distribution of Plug Power's product, as both GE Microgen and Plug Power expended substantial amounts of time and money trying to create and market the product for distribution. Ex. 1, Conway Dep. 1, at 33:3-12, 41:24-42:3; Ex. 2, Scovello Dep. 1, at 48:16-21.

71. GE Microgen's corporate representative, Frank Scovello, testified that he was not certain, but believed that "in the 2001 time frame" there was a "a gradual realization that they could not build [a] product even close to what we had originally contemplated." Ex. 2, Scovello Dep. 1, at 102:11-19. Mr. Scovello clarified that he did not believe the development of the Product was ever abandoned during the term of the Agreement. Ex. 5, Scovello Dep. 2, at 241:16-20 ("Q. To the best of your knowledge, did Plug Power ever abandon the development of the [P]roduct during the term of the agreement between GEFCS and Soroof? A. No, they did not.").

72. Plug Power's corporate representative, as well as several Plug Power former employees, testified that at no point between June 2000 and December 31, 2005 did Plug Power abandon the development of the Product that was contemplated in the Agreement. *See, e.g.*, Ex. 3, Conway Dep. 2, at 168:7-12; Ex. 6, Cerveny Dep., at 76:10-77:12, 78:16-21; Ex. 21, Jerabek Dep., at 99:10-100:13.

73. To date, Plug Power has not successfully developed a commercial product that meets the Agreement's specifications for the Product. Ex. 3, Conway Dep. 2, at 51:23-52:13.

74. However, as of December 31, 2005, Plug Power had delivered 650 PEM fuel cell systems worldwide that met different specifications. Ex. 27, Plug Power 10-K, for period ending 12/31/05 ("2005 10-K"), at 1.

75. Plug Power sold versions of a product called "GenSys" from about 2005 forward

and continues to work on development of that product. GenSys meets certain, but not all, of the technical specifications in the Agreement. In particular, GenSys does not meet the price specifications in the Agreement. Ex. 3, Conway Dep. 2, at 139:4-12; *see also* Ex. 5, Scovello Dep. 2, at 191:12-15; Ex. 28, Deposition of Frank Scovello on Apr. 16, 2013 ("Scovello Dep. 3"), at 338:16-24 ("Q. . . As of February 12, 2004, was Plug Power still developing the GenSys product? . . . A. Yes . . . Yes, they were.") (objection omitted).

76. Both Plug Power's and GE Microgen's corporate representatives testified that they believed GEFCS, through the actions of Plug Power and GE Microgen, used reasonable and good faith efforts to bring the Product contemplated in the Agreement to the market. Ex. 3, Conway Dep. 2, at 170:4-171:17, 171:16-17 ("I believe we did work in good faith to bring the [P]roduct to the market."); Ex. 5, Scovello Dep. 2, at 239:23-240:5; *cf.* Ex. 14, Glickman Dep., at 102:7-11.

77. Plug Power's corporate representative testified that GEFCS "used extraordinary efforts" throughout the course of the Agreement to try to become a "successful manufacturer, marketer, and distributor of . . . fuel cell systems[.]" Ex. 3, Conway Dep. 2, at 175:18-176:3.

*iv. Publication of Product Development Risk, Progress, and Struggles*

78. Plug Power disclosed in its public filings that it "may not meet our product development and commercialization milestones." *See, e.g.*, Ex. 8, 1999 10-K, at 8.

79. The purpose of this disclosure was to make public that Plug Power "had not met and may never meet the product development and commercial milestones that were established both within Plug Power and then with [its] relationship with GE Fuel Cell Systems." Ex. 3, Conway Dep. 2, at 21:16-22:2.

80. In May 4, 2000, Plug Power issued a press release which stated that the units

being developed were not final commercial design, but "enable Plug Power to gather meaningful data that is critical to advance the design of the initial commercial product." Ex. 22, Plug Power Press Release, May 4, 2000, at PPI011025. In the same press release, Plug Power stated, "The pre-commercial units which Plug Power is now developing do not conform to the specifications originally agreed upon with GE in February 1999. As a result, GE is no longer contractually obligated to purchase the 485 units under its take or pay commitment." *Id.*

81. From at least 1999 through 2006, Plug Power's Form 10-K filings included sections describing its efforts and achievements in Product Development and Commercialization, Distribution and Marketing, as well as its Risk Factors. *See, e.g.,* Ex. 29, 2003 10-K, at 1 ("We continue to advance the development of our fuel cell systems. Our research and development facility contains over 150 test stations, where we conduct design optimization and verification testing, rapid-aging testing, failure mode and effects analysis, multiple technology evaluations, and endurance testing in order to accelerate the development and commercialization of our products." ); *see also id.* at 7-16; Ex. 18, 2000 10-K, at 3-4, 7-13; Ex. 19, 2001 10-K, at 2-3, 6-14; Ex. 30, 2002 10-K, at 2, 6-16; Ex. 9, 2004 10-K, at 2-3, 5-13; Ex. 27, 2005 10-K, at 1, 5-14.

D. <u>GEFCS' Communications with Soroof</u>

82. Throughout the relationship with GEFCS, Soroof was kept informed of the Product's development, generally through communications between Frank Scovello, President of GEFCS and Jim Jackson, an Executive Director at Soroof. Ex. 5, Scovello Dep. 2, at 83:2-12, 130:20-131:6, 231:4-19, 246:11-14; Ex. 28, Scovello Dep. 3, at 289:11-24; Ex. 2, Scovello Dep. 1, at 24:3-5; Ex. 25, Soroof's Interrogatory Responses, at Response No. 6.

83. Early in the relationship between GEFCS and Soroof, Barry Glickman from GEFCS also provided Soroof with updates with respect to the progress of the Product's

development. Ex. 14, Glickman Dep., at 48:11-13.

84. Mr. Scovello provided fuel cell updates, including the overall status of Product development and limitations in the Product, to Mr. Jackson through emails and phone calls. Ex. 10, Bander Dep., at 88:21-25, 89:15-20, 90:21-23, 96:5-8; *see also id.* at 104:15-25, 148:5-9; *see also, e.g.*, Ex. 26, July 9, 2003 Email from Frank Scovello; Ex. 34, Jan. 2, 2002 Email from Frank Scovello; Jan. 17, 2002 Email from Frank Scovello Attaching Status Report; Apr. 25, 2002 Email from Frank Scovello.

85. There were also several in person meetings between Soroof and GEFCS representatives between 2000 and 2004. Ex. 5, Scovello Dep. 2, at 115:21-116:16; Ex. 12, May 8, 2000 Email from Rajiv Sharma, attaching Email from Jim Jackson; Ex. 31, Aug. 21, 2000 Email from Rajiv Sharma; Ex. 32, Apr. 17-19, 2001 Email String, at Apr. 17, 2001 Email from Prince Bander; Ex. 37, Jan. 21, 2004 Email from Frank Scovello; Ex. 38, Feb. 23, 2004 Email from Frank Scovello.

86. When there was a material change in the Product's schedule or definitive action on the development of the Product, GEFCS passed that information on to the various distributors, including Soroof. Ex. 5, Scovello Dep. 2, at 220:3-9; *see also* Ex. 11, Soroof 30(b)(6) Dep., at 21:19-22:2 ("Q. Can you describe the topics of communication that you had with Plug and the different GE entities when you were the point of contact. A. It was primarily requesting schedules, delivery schedules for the precommercial units and the commercialized units of fuel cells that we had contracted for."); Ex. 28, Scovello Dep. 3, at 329:14-25 ("Q . . . Did GE Fuel Cell Systems relay information relating to product development such as struggles with mean time, improving mean time between failures to Soroof? A. Yes. But not in that – we may not have used those words, we may have said that the [P]roduct was in early development

and that this is not currently performing, you know, at a level that we're ready to sell as a commercially viable product.").

87. There was never a time that Soroof asked Plug Power for information that Plug Power did not provide the requested information. Ex. 11, Soroof 30(b)(6) Dep., at 155:17-21.

88. Soroof's President and CEO is unable to recall any instance when GEFCS did not answer a question posed by someone from Soroof. Ex. 10, Bander Dep., at 73:3-7.

89. In early June 2000, immediately before the signing of the Agreement, GEFCS told Soroof that the Product's delivery had been delayed and was expected to be ready in the last quarter of 2001 instead of the last quarter of 2000, as originally communicated. Ex. 10, Bander Dep., at 51:12-25, 147:22-25.

90. In August 2000, GEFCS informed Soroof that "[t]he [P]roduct commercialization date has shifted to the right by six months," which Soroof understood was a further six-month delay. Ex. 11, Soroof 30(b)(6) Dep., at 90:5-92:12; Ex. 10, Bander Dep., at 64:24-65:11; Ex. 14, Glickman Dep., at 99:19-100:5; Ex. 31, Aug. 21, 2000 Email from Rajiv Sharma.

91. Prince Bander testified that he did not believe that Mr. Glickman misrepresented the truth at the time that he stated the Product's expected delivery schedule. Ex. 10, Bander Dep., at 193:20-195:10.

92. Prince Bander testified that it was his belief that as of August 2000, GEFCS was working as hard as they could to supply the pre-commercial and commercial p that met the performance specifications of the Agreement. Ex. 10, Bander Dep., at 218:22-219:9.

93. In August and September 2000, Mr. Jackson and members of GEFCS met to discuss aspects of the fuel cell systems, as well as the relationship with Plug Power and GEFCS. Ex. 5, Scovello Dep. 2, at 117:6-12; Ex. 11, Soroof 30(b)(6) Dep., at 85:24-87:11.

94. At the time of this meeting, the initial delivery schedule and product price had already changed, and those changes were communicated to Soroof. Ex. 5, Scovello Dep. 2, at 117:13-20; Ex. 11, Soroof 30(b)(6) Dep., at 87:4-7, 91:15-19; Ex. 31, Aug. 21, 2000 Email from Rajiv Sharma.

95. At the time of these meetings, GEFCS believed and communicated that a product could still be delivered. Ex. 5, Scovello Dep. 2, at 118:1-119:13.

96. As a result of the delay in the Product delivery schedule, Soroof pursued other opportunities in the power business unrelated to the Product. Ex. 10, Bander Dep., at 66:10-19; Ex. 11, Soroof 30(b)(6) Dep., at 187:9-24.

97. By the end of 2000, Soroof had been informed twice that there were delays in the delivery of the Product. Ex. 10, Bander Dep., at 160:20-24.

98. By April 17, 2001, Soroof was informed that the "delivery schedule for fuel cells ha[d] slipped indefinitely." Ex. 32, Apr. 17-19, 2001 Email String, at "Discussion Agenda with GE" Attachment; Ex. 33, Apr. 17-26, 2001 Email String, at "Soroof – Discussion Guide" Attachment; Ex. 14, Glickman Dep., at 117:8-13, 121:9-14; Ex. 11, Soroof 30(b)(6) Dep., at 98:10-99:10 ("Q. So at this time on April 17th, 2001, it was Soroof's understanding that the delivery schedule for the product had slipped indefinitely? A. We had first been told it would be last quarter 2000 by August only weeks after signing the agreement, we were told now it would slip perhaps six months, now we are getting into early '01. This is now we are talking about April of '01, by that time it was obvious we were not receiving product. . . .Where the first six-month delay of the product would not have been a problem, now we are looking at now they can't give us a delivery date. Q. Why was it - - A. That's a problem."); Ex. 10, Bander Dep., at 79:11-80:4, 84:6-10 ("Q. But at least as of this point in April of 2001, GE Fuel Cell Systems is

notifying you about uncertainties in the fuel cell product? . . . A. It looks like it, yeah.") (objection omitted); Ex. 5, Scovello Dep. 2, at 133:14-134:2, 134:6-11 ("At this time, and this would have been after the first delay, we were explaining to them that product was not being produced that met our specifications, that cost was high, reliability wasn't where we needed it to be in order to resell the product to Soroof."), 213:20-214:8.

99. Despite being told that the delivery schedule had slipped indefinitely, in April 2001, Soroof desired to expand its distributorship to include Lebanon and other Middle Eastern countries. Ex. 5, Scovello Dep. 2, at 214:9-14; Ex. 14, Glickman Dep., at 117:14-20; Ex. 11, Soroof 30(b)(6) Dep., at 100:18-101:1.

100. GEFCS informed Soroof that it was concerned about expanding Soroof's distribution territory given the uncertainties of the Product's schedule. Ex. 14, Glickman Dep., at 121:15-122:10; Ex. 5, Scovello Dep. 2, at 214:15-215:2; Ex. 11, Soroof 30(b)(6) Dep., at 101:11-22; Ex. 33, Apr. 17-26, 2001 Email String, at "Soroof – Discussion Guide" Attachment.

101. As of November 2001, Soroof understood that there was not a Product available at that time and there was not a specific date for delivery of the Product. Ex. 11, Soroof 30(b)(6) Dep., at 109:2-8.

102. In 2002, GEFCS continued to provide fuel cell updates and to report delays in the Product commercialization schedule to Soroof. Ex. 10, Bander Dep., at 95:20-23; Ex. 34, Dec. 29, 2001-Jan. 2, 2002 Email String, at Jan. 2, 2002 Email from Frank Scovello; Jan. 17, 2002 Email from Frank Scovello Attaching Status Report; Apr. 25, 2002 Email from Frank Scovello.

103. Soroof understood that Product development was continuing but that there was no schedule for release of the Product. Ex. 11, Soroof 30(b)(6) Dep., at 114:3-116:22.

104. Soroof did not do additional research into the reasons for the delay into the release

of the Product. Ex. 10, Bander Dep., at 95:24-96:4.

105. Besides communications with personnel at GEFCS, the only step Soroof's corporate representative testified that it took to investigate the status of the Product from 2000 to 2006 was reading an industry publication at one point in late 2000 or early 2001, but that publication did not identify Plug Power or GE. Ex. 11, Soroof 30(b)(6) Dep., at 82:5-83:9.

106. In May 2002, Prince Bander circulated a "Fuel Cell Catalyst" industry newsletter to some members of the Soroof staff, which included a report regarding Plug Power and the "major hurdles in turning fuel-cell technology into a commercially successful product." Ex. 35, May 3-4, 2002 Email String, at Fuel Cell Catalyst Attachment.

107. In April 2003, Mr. Scovello informed various members of Soroof that the products were still in the early commercialization phase. Ex. 10, Bander Dep., at 105:25-106:7, 106:8-13 ("Q. Was it your understanding then in April of 2003 that the product was still considered in early commercialization and that the price was still very high? A. Yes, I'm aware of that, and they are working on it, yes."); Ex. 11, Soroof 30(b)(6) Dep., at 120:12-20 ("Q. So at this time in April 2003 what was Soroof's understanding as to the status of development of the product? A. Only that it was not yet available for production, and it would remain that way because it never went into production . . . We had hoped for different news, but it never changed."); Ex. 36, Apr. 19-25, 2003 Email String, at Apr. 22, 2003 Email from Frank Scovello.

108. As of July 2003, Soroof understood that "an economically viable, prime power fuel cell product for the Kingdom [was] still not in the schedule" and "tak[ing] much longer then [sic] anyone had originally expected." Ex. 26, July 9, 2003 Email; Ex. 10, Bander Dep., at 99:24-100:4; Ex. 11, Soroof 30(b)(6) Dep., at 122:2-123:4. Prince Bander testified that the statements conveyed by Mr. Scovello related to the challenges in developing the Product in July 2003 were

accurate. Ex. 10, Bander Dep., at 228:7-229:12; Ex. 28, Scovello Dep. 3, at 300:9-19 ("Q. Was GE's belief that the mass residential [PEM] fuel cell may not be viable, was that ever communicated to Soroof? A. Yes. Q. And how was that information communicated to Soroof? A. In an e-mail to Soroof. I believe that the exact wording was that a product, an economically viable product, was not in the schedule.").

109. As of December 2003, Soroof understood that the Product under the Agreement was still under development. Ex. 11, Soroof 30(b)(6) Dep., at 132:7-13, 133:15-22.

110. In January 2004, Ibrahim Akar from Soroof sent an email to Mr. Scovello stating, "I wish to thank you for taking the initiative always and keeping us (S[oroof]) up-dated with the latest developments and discussions concerning fuel cell technology . . . ." Ex. 37, Jan. 24, 2004 Email from Ibrahim Akar.

111. When Soroof's corporate representative was asked if it was "Soroof's opinion [in January 2004] that it was always kept up-to-date with fuel cell development information from GEFCS," he answered "No." He also admitted that he did not recall asking GEFCS for any additional information at that time. Ex. 11, Soroof 30(b)(6) Dep., at 136:6-137:17.

112. In February 2004, GEFCS again informed Soroof that Plug Power did not have an economically viable version of the Product at that time. Ex. 10, Bander Dep., at 117:7-11; Ex. 38, Feb. 23, 2004 Email String, at Feb. 23, 2004 Email from Frank Scovello.

113. In June 2004, Soroof requested that the $1 million nonrefundable distributor fee paid under the Agreement be returned because GEFCS "fail[ed] to make the product covered by the said agreement available for commercial application." Ex. 39, June 22, 2004 Email String, at June 22, 2004 Email from Ayman Nabhan; Ex. 10, Bander Dep., at 125:9-25; *see also* Ex. 39, June 21, 2004 Email String.

114. GEFCS responded to Soroof's demand for a return of the distributor fee by email, stating, "I am not sure you are aware of the fact that there is no contractual basis for return of the distributor fee to Soroof. This fee was not intended to guarantee delivery of product, but to secure Soroof distribution rights in the Kingdom." Ex. 39, June 24, 2004 Email String, at June 23, 2004 Email from Frank Scovello.

115. The day after Soroof received GEFCS's response, Soroof considered having a lawyer review the Agreement. Ex. 39, June 24, 2004 Email String, at June 24, 2003 Email from Prince Bander.

116. Through 2005, Soroof understood there had been delays in the Product due to technical problems. Ex. 40, Deposition of Tahir Rashid on Feb. 25, 2013 ("Rashid Dep."), at 74:19-75:3, 77:8-13.

117. In November 2005, Plug Power and Soroof met to discuss available products other than the ones contemplated under the Agreement. Ex. 40, Rashid Dep., at 92:25-93:19.

118. On multiple occasions, Soroof was informed by GEFCS that the product development schedule was unknown. Ex. 11, Soroof 30(b)(6) Dep., at 290:3-9 ("In fact, you have testified multiple times today that what GEFCS told you was, we don't know when the product is going to be developed, right, as soon as we do we will let you know. Isn't that correct? A. Yes."); *see also* Ex. 32, Apr. 17-19, 2001 Email String, at "Discussion Agenda with GE" Attachment; Ex. 33, Apr. 17-26, 2001 Email String, at "Soroof – Discussion Guide" Attachment; Ex. 34, at Apr. 25, 2002 Email from Frank Scovello; Ex. 26, July 9, 2003 Email from Frank Scovello.

E. <u>Soroof's Admissions concerning its Allegations</u>

119. Tahir Rashid, Soroof's current vice-president of planning, and Soroof's corporate

representative as to damages, testified that he believes the purpose of this case is to seek recovery "because the product was never delivered." Ex. 40, Rashid Dep., at 21:9-10, 66:7-11, 146:19-24. Further, he testified that the only alleged misrepresentation in this case is that the Product never arrived. *Id*. at 255:21-256:25, 257:10-16.

120. Soroof admits that it cannot point to any fact on which it relies to say that Defendants misinformed Soroof regarding the status of the development of the Product. Ex. 11, Soroof 30(b)(6) Dep., at 289:21-290:2 ("Q. Other than your allegation, your statement just now they must have known, your opinion that they must have known, is there any other fact on which you rely to say that defendants misinformed Soroof regarding the status of the development of the product? A. No").

121. Prince Bander, Soroof's President and CEO, testified that he does not believe that GEFCS ever knowingly gave Soroof false information regarding the development of the Product between 2000 and 2005. Ex. 10, Bander Dep., at 246:8-247:7.

122. Soroof's corporate representative, Jim Jackson, testified that he believes that the real reason that the Product could not be delivered to Soroof under the Agreement—that a Product was not developed that would satisfy the terms of the Agreement—was honestly conveyed to Soroof. Ex. 11, Soroof 30(b)(6) Dep., at 291:11-293:5.

123. Soroof is unable to point to any specific relevant information that Defendants failed to share promptly with Soroof. Ex. 11, Soroof 30(b)(6) Dep., at 291:7-10.

124. Soroof is unable to identify any facts to support its allegation that the Defendants did not make good faith efforts to bring the product to market other than its characterization of statements in Mr. Scovello's first deposition. Ex. 11, Soroof 30(b)(6) Dep., at 282:19-283:16, 304:5-21, 283:17-284:25.

125. Soroof admits it is unable to identify anything to support its allegation that the development of the product was abandoned in 2001 other than Mr. Scovello's first deposition. Ex. 11, Soroof 30(b)(6) Dep., at 150:25-151:5, 285:20-287:5, 302:7-17, 295:4-8 ("Q. So do you have any facts to support that defendants knew at any time during the term of the agreement that the product was unlikely to ever exist? A. No."); Ex. 10, Bander Dep., at 243:18-20; Ex. 25, Soroof's Interrogatory Responses, at No. 9.

126. Tahir Rashid, Soroof's corporate representative as to damages, admitted that the damages claimed include every single expense allegedly incurred by Soroof's power division from 2001 to 2005 without regard to whether the expenses were allegedly related to the Agreement. Ex. 40, Rashid Dep., at 156:7-23; *cf.* Ex. 11, Soroof 30(b)(6) Dep., at 183:22-184:6.

## II. SIGNIFICANT PROCEDURAL BACKGROUND

127. On July 1, 2008, Soroof filed an arbitration demand against GEFCS seeking to recover damages under the theory that GEFCS had improperly failed to deliver products pursuant to the Agreement. Docket No. 13, Preliminary Pre-Trial Statement, at 1-6.

128. On January 22, 2010, the parties entered into a Venue Agreement, whereby the parties agreed to discontinue the arbitration and litigate Soroof's claims in this Court. Docket No. 63-3, Venue Agreement.

129. On February 22, 2010, Soroof filed a Complaint against GEFCS, GE Microgen, and Plug Power asserting claims originally stated in the arbitration as well as various other claims allegedly arising out of the Agreement, including claims for breach of contract, misrepresentation, conversion, and unjust enrichment. Docket No. 1, Complaint, at 7-14.

Dated: May 10, 2013

Respectfully submitted,

/s/ Dahlia S. Fetouh

Dahlia S. Fetouh (*pro hac vice*)
Abigail K. Hemani (AH 2071)
Lisa M. LoGerfo (*pro hac vice*)
Lauren S. Kupersmith (*pro hac vice*)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.: 617.570.1000
Fax: 617.523.1231
E-Mail: dfetouh@goodwinprocter.com
E-Mail: ahemani@goodwinprocter.com
E-Mail: llogerfo@goodwinprocter.com
E-Mail: lkupersmith@goodwinprocter.com

Attorneys for Defendant PLUG POWER INC.

/s/ Michael D. Fisse

Michael D. Fisse
John Dubreuil
Jon A. Van Steenis
DAIGLE FISSE & KESSENICH, PLC
P.O. Box 5350
Covington, LA 70434-5350
(985) 871-0800
Fax: (985) 871-0899
Email: mfisse@daiglefisse.com
Email: jdubreuil@daiglefisse.com
Email: jvansteenis@daiglefisse.com

Thomas Edward Healy
PINO & ASSOCIATES, LLP
50 Main Street
White Plains, NY 10606
(914) 946-0600
Fax: (914) 946-0650
Email: thealy@pinolaw.com

Attorneys for Defendant GENERAL ELECTRIC COMPANY and GE MICROGEN, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing DEFENDANTS GE MICROGEN, INC., PLUG POWER INC., AND GENERAL ELECTRIC COMPANY'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT has been served on all parties by electronically uploading the same to this Court's CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established by this Court on this 10th day of May, 2013.

/s/ Dahlia S. Fetouh
Dahlia S. Fetouh