**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SOROOF TRADING DEVELOPMENT COMPANY, LTD.,**<br><br>Plaintiff,<br><br>v.<br><br>**GENERAL ELECTRIC COMPANY, GE MICROGEN, INC. and PLUG POWER, INC.**<br><br>Defendant. | No. 10 Civ. 1391 (LGS) (JCF) |

**LOCAL RULE 56.1**
**STATEMENT OF MATERIAL FACTS**

1. In or about May of 2000, Soroof commenced negotiations with GEFCS representatives to become a distributor for the Product, a proton exchange membrane residential fuel cell system that was to generate enough power to provide for the complete energy needs of a home continuously, 24 hours a day, seven days a week. *See* Declaration of Aaron W. Knights ("Knights Decl."), Ex. 1, Deposition of Frank Scovello ("Scovello Dep.") at 38:8-21.

2. GE was notified as early as the first half of 1999 by Dr. Dennis Witmer, who tested Plug Power's fuel cell product, that Plug Power could not develop a fuel cell to meet those specifications. Knights Decl., Ex. 3, Witmer Decl. at ¶¶ 3, 4, 14 and 19.

3. GE understood by no later than April of 2000 that Dr. Witmer's conclusions regarding Plug Power's inability to develop the Product were correct. Knights Decl., Ex. 1, Scovello Dep. at 102:11-103:6.

4. An internal GE report dated April 11, 2000 titled "Fuel Cell Product Overview" shows that the Product failed to meet many GE specifications, including efficiency, size, and quality, and was nowhere close to being developed. Knights Decl., Ex. 4, April 11, 2000 Fuel Cell Product Requirement Overview; Knights Decl., Ex. 5, Supplemental Report of Dennis Witmer at ¶ 5. An internal GE document dated April 7, 2000, reveals GE's frustration that "GEFCS is continuing to sell product "potential", with no hardware, field testing, etc. to back up the story." Knights Decl., Ex. 6, GE Marketing Update.

5. On June 6, 2000, with GE's knowledge and at its direction, GEFCS executed the Distribution Agreement with Soroof ("Agreement"), pursuant to which Soroof paid a $1 million distribution fee, without informing Soroof of the true state of affairs. Knights Decl., Ex. 7, Agreement at ¶ 6.4. The details surrounding the Product's shortfalls and lack of "hardware, field testing, etc. to back up the story" were not shared with Soroof. Knights Decl., Ex. 6, GE Marketing Update.

6. Although the distribution fee was paid to GEFCS, GE siphoned off those funds to pay the salaries of GE employees who were "supporting" the activities of GEFCS. Knights Decl., Ex. 1, Scovello Dep. at 121:15-20.

7. From 2001 through 2005, Soroof expended at least $4.8 million to ready itself and sustain its ability to perform its obligations under the Agreement, which expenditures were contemplated and, in fact, required by GEFCS. *See* Knights Decl., Ex. 8, Expert Report of Clark Lee.

8. Soroof undertook these additional expenditures under the reasonable belief that GEFCS was fully capable of providing saleable Product for delivery to Soroof, as warranted in the Agreement. Specifically, by the Agreement, GEFCS warranted that "[i]t has full authority and capacity to enter into **and perform its obligations** under this Agreement." Knights Decl., Ex. 7, Agreement at ¶ 10.1.2 (emphasis added). GEFCS further warranted that it had "full legal right, power and authority to enter into **and perform** this Agreement." *Id.* at ¶ 10.1.4 (emphasis added). GEFC's warranties were false when made.

9. Under the Agreement, GEFCS had a continuing obligation "to share promptly relevant information, including but not limited to product performance, failure and liability issues...." Knights Decl., Ex. 7, Agreement at ¶ 7.4. This it failed to do.

10. Throughout the duration of the Agreement, although GEFCS periodically informed Soroof of delays and generic technical issues, it failed to reveal how dire and fatal the development shortfalls actually were. In fact, rather than honestly convey the true state of affairs to Soroof, GE decided it would manage its relationship with Soroof by "running out the clock" on the Agreement.

11. For example, GE became gravely concerned with potential brand and reputational damage in light of its association with Plug Power. Knights Decl., Ex. 9, GE "Back Up" Presentation. As a result, rather than provide Soroof and other distributors with an honest assessment of development shortfalls, it adopted a strategy of "Manag[ing] Existing GEFCS Distributor Relationships **to Avoid Issues.**" *Id.* (emphasis added). It also decided it should "Avoid Sales of [Plug Power] Products Through GEFCS" due to "High Risk Associated with Plug." *Id.* GE's conclusions in this regard were never conveyed to Soroof.

12. GE had originally made its investment in Plug Power because it believed that Plug Power could actually deliver a commercial residential fuel cell. Knights Decl., Ex. 2.a,

Scovello Dep. at 18:20-19:13, 54:18-55:7 (Mr. Scovello explaining that GE invested in Plug Power because it believed that Plug Power could commercialize the residential fuel cell.) Another internal GE document reveals that by August 19, 2003, GE concluded that it had "Little Confidence in Residential Fuel Segment Development," that "Plug R&D Resources Should be More Focused on Commercially Viable Products," and that fuel cell technology's development would be driven not by residential fuel cells but by the "Automotive Industry." Knights Decl., Ex. 10, Sept. 12, 2003 Memo Regarding "Due Diligence" and Appended Aug. 19, 2003 Plug Power Update. Consequently, despite its earlier investments, GE demonstrated its lack of confidence by declining to make any further equity investment in Plug Power. *Id.* at 1. Again, GE's conclusions regarding Plug Power and its decision to decline making a further investment were <u>never</u> shared with Soroof.

13. Despite knowing of Soroof's potential claims against GEFCS, GE successfully executed its "run out the clock" strategy. That is, GE waited until GEFCS's relationship with Soroof formally expired to direct GEFCS's formal dissolution. Instead, unbeknownst to Soroof, as revealed by an internal GE document, GE *de facto* shut down GEFCS "several years" prior to the expiration of GEFCS's relationship with Soroof. Knights Decl., Ex. 11, Business Condition Summary Dated March 24, 2006 (revealing that as of March 24, 2006, the same day GEFCS's Certificate of Cancellation was filed with Delaware (Knights Decl., Ex. 12, Certificate of Cancellation), GEFCS "been inactive for several years" due to "Supplier [Plug Power] Inability to deliver product.").

14. Upon the expiration of the Agreement (Knights Decl., Ex. 7, Agreement at ¶4.1), GE directed GE Microgen (and Plug Power) to formally dissolve GEFCS, which had conducted no business for several years. Defendants failed to inform Soroof of GEFCS's dissolution or make any provisions for Soroof's claims. Knights Decl., Ex. 13, January 5, 2006 E-mail from A. Bucknam, Plug Power's Vice President of Business Development, to

Mark Sperry, Plug Power's former Chief Marketing Officer ("GE took a $1MM payment from [Soroof], and now is concerned about legal problems given that the distributors feel that they didn't get value for their $'s.") (emphasis added), and January 26, 2006 E-mail from R. Menon, a Plug Power employee charged with sales and development, to Frank Scovello ("During our conversation this morning, [Soroof] did bring up the financial issues surrounding the expired GE agreement...[m]y fear is that...they may circle back to the investment they made to secure the [GEFCS] distributorship and somehow hold Plug Power accountable."). Knights Decl., Ex. 14, Conway Dep. at 13:23-25; 27:7-10; 34:14-19 and 45:11-13; Knights Decl., Ex. 1, Scovello Dep. at 115:12-116:1.

15. Unknown to Soroof at the time it signed the Agreement, GE was a major shareholder of Plug Power and occupied a seat on the Plug Power Board of Directors. GE employees occupied a seat on Plug Power's board from 1999 through 2005 or 2006. Knights Decl., Ex. 2.b, Scovello Dep. at 275:16-277:3. For example, Richard Stewart, a GE employee, served as director of GE Microgen, on the Management Committee of GEFCS, and on the Board of Plug Power. Knights Decl., Ex. 15, Action by Written Consent at GE 000099; Knights Decl, Ex. 16, Plug Power 8-K at PPI000151.

16. GE Microgen is likely no longer a going concern, as, at his deposition on September of 2010, Mr. Scovello testified that he did not "believe it's in existence" and believed "it was folded," although admitting he was not sure as to this fact. Knights Decl., Ex. 1, Scovello Dep. at 12:9-15. Mr. Scovello still did not know whether GE Microgen was still in existence in December of 2012. Knights Decl., Ex 2.a, Scovello Dep. at 12:14-19. Mr. Scovello admitted that, although he was President of GEFCS, he "was never employed

by" GEFCS *or* GE Microgen but instead was employed by "*GE Energy, GE Company*."[1] Knights Decl., Ex. 1, Scovello Dep. at 12:9-20; 24:4-10 (emphasis added).

17. GEFCS never employed anyone, and GE the parent – not GE Microgen – provided people to support the venture. Knights Decl., Ex. 1, Scovello Dep. at 32:14-33:3. Moreover, GEFCS had no physical presence of its own. *Id.* And although space was leased from Plug Power identified as belonging to GE Microgen, it was GE and not GE Microgen that actually leased space, which housed GE employees assigned to GEFCS venture. *Id.*; Knights Decl., Ex. 14, Deposition of Gerard Conway ("Conway Dep.") at 18:24-19:4 and 22:13-22.

18. GE Microgen, ostensibly the parent company of GEFCS, provided no funding to support its own subsidiary. Any funds GE Microgen received came not from revenue-generating business of its own but instead from its parent, GE. Knights Decl., Ex. 2.a, Scovello Dep. at 13:7-17 and 16:25-17:5. Additionally, Mr. Scovello, at deposition, confirmed that "**GE** agreed to fund the expenses of [GEFCS] initially." Knights Decl., Ex. 1, Scovello Dep. at 44:24-25 (emphasis added).

19. GE financed Plug Power's research and development of the Product through an infusion of $35 million of capital paid to Plug Power. Knights Decl., Ex. 1, Scovello Dep. at 45:23-46:12. GE also provided Plug Power with access to substantial funds through the use of "non-recourse promissory notes." According to the Amended and Restated Limited Liability Company Agreement between Defendants GE Microgen and Plug Power dated August 21, 2001 ("LLC Agreement"), GE Microgen was to arrange for its "Affiliate, GE" to provide capital as required to fund GEFCS's operations in an amount "not to exceed $8,000,000." Knights Decl., Ex. 17, Amended and Restated Limited Liability Company

---

[1] Mr. Scovello testified that GE Energy is the energy division of General Electric Company. *See* **Ex. 1**, Scovello Dep. at 10:3-13.

Agreement at ¶5.5(a). This funding was to be a "loan" pursuant to a "non-recourse promissory note." *Id.*

20. GE's "senior management" that made the decision to terminate GEFCS. Knights Decl., Ex. 1, Scovello Dep. at 115:12-116:1; *see* Ex. 14**,** Conway Dep. at 27:7-10. GE's legal team sought to convince Plug Power to "broadly and fully indemnify GE for any possible actions taken at any future date by the distributors," which would include Soroof. Knights Decl., Ex. 18, February 26, 2006, E-mail from Greg Silvestri to Sergay Polikarpov; Ex. 14, Conway Dep. at 27:7-10 and 66:16-20. Plug Power has also acknowledged that GE was the real party in interest in papers that it filed with the SEC. Although its joint venture agreement was with ostensibly with GE Microgen, Plug Power stated in its 8-K that: "[Plug Power] and GE are terminating their joint venture GE Fuel Cell Systems." Knights Decl., Ex. 16, Plug Power 8-K at PPI000149 (emphasis added).

21. GE settled on a $1 million dollar indemnification with regard to potential legal claims by Soroof. Knights Decl., Ex. 19, GE Fuel Cell Systems, L.L.C. Termination Agreement at ¶2(b).

22. GE permitted GEFCS to be dramatically undercapitalized, including at the time of dissolution. In fact, any funds that GEFCS came to possess were diverted for GE's use. As noted above, GE utilized the $1 million distributor fee Soroof paid GEFCS to fund the salaries of GE employees working in support of GEFCS. Knights Decl., Ex. 1**,** Scovello Dep. at 121:12-20. Mr. Scovello testified that GEFCS had "very few" assets at the time of its dissolution. *Id.* at 48:22-24. In fact, according to Mr. Scovello, GEFCS had "[n]o cash on hand" and "was not really a going concern. The only thing we had were things related to our physical presence within the Plug Power building. We had a server that we used for our computer connections, and a telephone switch, a small amount of furniture. And that was it." *Id.* at 48:22-49:1-9.

Dated: May 10, 2013

Respectfully submitted,

KALBIAN HAGERTY LLP

By: /s/ Aaron W. Knights

Haig V. Kalbian (*pro hac vice*)
Aaron W. Knights (*pro hac vice*)
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
T: (202) 223-5600
F. (202) 223-6625
hkalbian@kalbianhagerty.com
aknights@kalbianhagerty.com

James R. Lynch (JL-2778)
Jason Kaufman
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York, New York 10018
T: (212) 302-2400
F: (212) 302-2210
lynch@lawlynch.com
kaufman@lawlynch.com

*Counsel for Plaintiff Soroof Trading Development Company, Ltd.*