**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SOROOF TRADING DEVELOPMENT COMPANY, LTD.,**<br><br>Plaintiff,<br><br>v.<br><br>**GENERAL ELECTRIC COMPANY, GE MICROGEN, INC. and PLUG POWER, INC.**<br><br>Defendant. | No. 10 Civ. 1391 (LGS) (JCF) |

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE


TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

PROCEDURAL BACKGROUND .......... 2

FACTUAL BACKGROUND .......... 4

ARGUMENT .......... 11

A. Summary Judgment Standards .......... 11

B. Defendants Have Not Met Their Burden to Obtain Summary Judgment on the Breach of Contract Claim .......... 12

1. This Court Has Already Suggested that Soroof's Breach of Contract Claims Are Meritorious. .......... 12

2. Defendants Effectively Abandoned Development of the Product .......... 12

3. Defendants Failed to Promptly Share Relevant Information .......... 14

C. Soroof's Misrepresentation Claims Must Proceed .......... 16

1. Defendants Made Affirmative Misrepresentations and Omitted Material Facts .......... 16

2. Whether Soroof's Reliance on GE's Representations Was Reasonable and Justifiable Are Jury Questions .......... 19

3. The Agreement's Merger Clause Does Not Bar Soroof's Misrepresentation Claim .......... 19

D. All of Soroof's Claims Are Timely .......... 21

1. Soroof Was a Distributor Not a Buyer .......... 21

2. Defendants' Arbitrarily Selected Breach Dates Are Contradicted by the Evidence .......... 23

3. The Statute of Limitations was Tolled .......... 25

4. Soroof Exercised Reasonable Diligence ..... 26

E. Defendants Have Provided No Basis for Summary Judgment on the Basis of Liability Limitations ..... 28

CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
888 F. Supp. 2d 431 (S.D.N.Y. 2012) ..... 19

*Access Northern Security Corp. v. Linear Corp.*,
97 Civ. 2937, 1998 U.S. Dist. LEXIS 13943 (S.D.N.Y. Sept. 4, 1998) ..... 25

*All R's Consulting, Inc. v. Pilgrims Pride Corp.*,
2008 U.S. Dist. LEXIS 30626 (S.D.N.Y. Mar. 28, 2008) ..... 23

*Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*,
850 F. Supp. 1199 (S.D.N.Y. 1994) ..... 14

*Beautiful Jewelers Private, Ltd. v. Tiffany & Co.*,
2007 U.S. Dist. LEXIS 20263 (S.D.N.Y. Mar. 21, 2007) ..... 26

*Bloor v. Falstaff Brewing Corp.*,
601 F.2d 609 (2d Cir. 1979) ..... 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..... 11

*Charter Oak Fire Ins. Co. v. Trio Realty Co.*,
99 CIV. 10827 (LAP), 2002 WL 123506 (S.D.N.Y. Jan 31, 2002) ..... 30

*Convenient Med. Care P.C. v. Medical Bus. Assocs. Inc.*,
737 N.Y.S.2d 403 (N.Y. App. Div. 2002) ..... 21

*Danann Realty Corp. v. Harris*,
5 N.Y.2d 317 (N.Y. 1959) ..... 21

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ..... 25

*Gizzi v. Hall*,
754 N.Y.S.2d 373 (N.Y. App. Div. 2002) ..... 16, 19, 20

*Gotham Boxing, Inc. v. Finkel*,
856 N.Y.S.2d 498 (N.Y. Sup. Ct. 2008) ..... 20

*Graubard Mollen Dannett & Horowitz v. Moskovitz*,
86 N.Y.2d 112 (N.Y. 1995) ..... 20

*Hernandez, Kroone & Assocs., Inc. v. United States*,
2008 WL 4725433 (Fed. Cl. June 16, 2008) ........ 14, 15

*Hobart v. Schuler*,
434 N.E.2d 715 (N.Y. 1982) ........ 20

*Indovino v. Tassinari*,
2006 U.S. Dist. LEXIS 60993 (E.D.N.Y. 2006) ........ 25

*In re Executive Telecard, Ltd. Sec. Litig.*,
913 F. Supp. 280 (S.D.N.Y. 1996) ........ 27

*Ins. Co. of N. Am. v. ABB Power Generation, Inc.*,
925 F. Supp. 1053 (S.D.N.Y. 1996) ........ 22

*iWon, Inc. v. Ourhouse. Inc.*,
744 N.Y.S.2d 791 (N.Y. Sup. Ct. 2001) ........ 29

*Katz v. Goodyear Tire & Rubber Co.*,
737 F.2d 238 (2d Cir. 1984) ........ 28

*Kalisch-Jarcho v. City of New York*,
448 N.E.2d 413 (N.Y. 1983) ........ 28, 29

*Kroboth v. Brent*,
625 N.Y.S.2d 748 (N.Y. App. Div. 1995) ........ 14

*L.B. Foster Co. v. Am. Piles, Inc.*,
138 F.3d 81 (2d Cir. 1998) ........ 11

*MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*,
09 CIV. 10093 RJS, 2011 WL 1197634 (S.D.N.Y. March 25, 2011) ........ 30

*Milman v. Box Hill Sys. Corp.*,
72 F. Supp. 2d 220 (S.D.N.Y. 1999) ........ 27

*Monex Fin. Serv. Ltd. v. Nova Info. Sys. Inc.*,
657 F. Supp. 2d 447 (S.D.N.Y. 2009) ........ 12, 13

*N. Am. Leisure Corp. v. A&B Duplicators, Ltd.*,
468 F.2d 695 (2d Cir. 1972) ........ 22

*NYNEX Corp. v. Shared Resource Exchange, Inc.*,
1990 N.Y. Misc. LEXIS 759 (N.Y. Sup. Ct. 1990) ........ 20, 21

*RKB Enters., Inc. v. Ernst & Young*,
582 N.Y.S.2d 814 (N.Y. App. Div. 1992) .......... 20

*Saphir Int'l, SA v. UBS PaineWebber Inc.*,
807 N.Y.S.2d 58 (N.Y. App. Div. 2006) .......... 28

*Soroof Trading Development Company v. GE Microgen, Inc.*,
283 F.R.D 142 (S.D.N.Y. 2012) .......... 3, 4

*Soroof Trading Development Company v. GE Microgen, Inc.*,
842 F.Supp.2d 502 (S.D.N.Y. 2012) .......... 2, 3, 12, 14, 16, 17, 20, 24, 29, 30

*STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*,
648 F.3d 68 (2d Cir. 2011) .......... 19

*US Airways Grp., Inc. v. British Airways PLC*,
989 F. Supp. 482 (S.D.N.Y. 1997) .......... 14

**RULES**

Rule 56 of the Federal Rules of Civil Procedure .......... 1

**STATUTES**

N.Y. U.C.C. § 2-106 .......... 21, 23

Plaintiff Soroof Trading Development Company, Ltd. ("Soroof"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submits this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. Defendants' Motion should be denied because material issues of fact remain to be addressed by a jury.

**PRELIMINARY STATEMENT**

In their Motion for Summary Judgment, Defendants seek to convince this Court that a contract the parties entered provides license to commit fraud. Unfortunately for Defendants, the law does not countenance such conduct. Not surprisingly, Defendants omit substantial material evidence in their Motion, and instead argue, implausibly, that Plaintiff accepted risks that Defendants fraudulently concealed and misrepresented.

Despite this Court's admonition at the status conference conducted earlier this year, the Defendants have littered their summary judgment motion with issues related to what Soroof knew or should have known and when they should have known it. This is exactly what Your Honor warned the movants not to do.

At its core, Defendants cast this lawsuit as Plaintiff's effort to recover payment for losses resulting from taking a chance on an emerging energy technology. This spin – and it is just that – is an effort to shroud their meritless motion with some semblance of reasonableness. In reality, and as we demonstrate in our papers, nothing could be further from the truth.

Soroof seeks recovery for its large losses as a consequence of having been blatantly deceived. When commercial actors negotiate and enter contracts, they do so in an atmosphere of transparency and full disclosure of material relevant facts. If and when subterfuge and gamesmanship are employed in duping one side to take the chance, then the risk taken is not the "calculated risk" that the defense want this Court to believe.

This case is not suitable for disposition through summary judgment—which is an extreme remedy. The record in this case is replete with genuine material facts that are in dispute that only a trier of fact can weigh and decide.

**PROCEDURAL BACKGROUND**

Soroof initiated this litigation on July 1, 2008, when it commenced an arbitration proceeding before the American Arbitration Association ("AAA") against GEFCS. Soroof's Statement of Opposing Facts ("SSOF") ¶ 127. GEFCS moved to dismiss the arbitration, arguing as it has in this litigation, *inter alia*, that (1) Soroof's claims are barred by the contract at issue and (2) Soroof's claims are time-barred. The AAA panel, chaired by the Hon. Kathleen Roberts, a retired federal magistrate judge from this Honorable Court, denied GEFCS's motion to dismiss. SSOF ¶ 128.

Thereafter, Soroof notified GEFCS of its intention to move to compel GE Microgen and Plug Power to join the arbitration, and the parties stipulated to dismiss the arbitration proceedings and move the dispute to this Court. The Defendants agreed that Soroof's dismissal of the Arbitration would not be used in any way as a basis to support an argument in support of the Defendants' claimed statute of limitations defense. *See* Dkt. # 13-2 at ¶ D. On February 22, 2010, Soroof filed its complaint in this Court against GEFCS and its two members, GE Microgen and Plug Power.[1] SSOF ¶ 129.

On October 20, 2010, Defendants filed a Motion for Judgment on the Pleadings Pursuant to F.R.C.P. 12(c). Dkt. # 46. Defendants again argued that (1) the contract terms bar Soroof's claims and (2) Soroof's claims are time-barred. On January 24, 2012, the Court entered an order

[1] The parties disputed the circumstances and propriety of the dissolution of GEFCS and therefore agreed to conduct discovery in two phases: Phase I discovery was limited to circumstances surrounding the dissolution and/or winding up of GEFCS. Phase II discovery would address Soroof's substantive claims. The parties submitted their proposed case management plan with the Joint Preliminary Pretrial Statement to the Court. *See* Dkt. #13.

(the "January Order") by which it disposed of various pending motions, including Defendants' Motion for Judgment. *See Soroof Trading Development Company v. GE Microgen, Inc.*, 842 F.Supp.2d 502 (S.D.N.Y. 2012) (Dkt. # 110) ("*Soroof I*"). The Court granted, in part, Defendants' Motion for Judgment, but granted Soroof leave to replead its lead claims for breach of contract and misrepresentation against GE Microgen and Plug Power. The Court specifically noted that Soroof "proffered evidence…that suggests [its breach of contract and misrepresentation claims] might be meritorious." *Soroof I*, 842 F.Supp.2d at 513, 514.

> In its moving papers, Soroof proffers the deposition of one Frank Scovello, the former president of GEFCS, during which he testified that Defendants began to realize as early as 'the 2001 time frame' that 'they could not build a product even close to what [they] had originally contemplated.' (Dep. of Frank Scovello 12-13, 102.) Soroof, however, did not learn until 2005 that the product could not be built according to the contractual specifications. These facts suggest that Soroof may have a meritorious claim that Defendants breached the provision of the contract that required them to 'share promptly relevant information, including but not limited to product performance' and breached the best efforts covenant by failing to work in good faith to bring the fuel cells to market during the life of the Contract.

*Id.* at 513. The Court further held that this same evidence "suggests Soroof may have a meritorious [fraud] claim." *Id.* at 514. The Court also granted Soroof's Motion for Partial Summary Judgment and pierced the corporate veil of GEFCS so that its members, Defendants Plug Power and GE Microgen, will be liable for any wrongdoing committed by GEFCS. *See id.* at 521-22.

On February 10, 2012, Soroof filed its First Amended Complaint ("FAC") against GE Microgen and Plug Power for breach of contract and misrepresentation. *See* Dkt. # 113. On May 11, 2012, the Court granted Soroof's Renewed Motion for Leave to File Amended Complaint, by which GE was added as a party to the litigation based on the same facts adduced

in the course of Phase I discovery supporting Soroof's motion for partial summary judgment. *See Soroof Trading Development Company v. GE Microgen, Inc.*, 283 F.R.D 142, 151 (S.D.N.Y. 2012) (Dkt. # 140).

**FACTUAL BACKGROUND**

This case arises out of a contract Soroof entered into with GE, acting through GE Fuel Cell Systems, LLC ("GEFCS"), under which Soroof agreed to serve as the exclusive distributor of a fuel cell that GE represented it was nearly ready to put into production. SSOF ¶¶ 15, 16, 20, 21. The fuel cell was actually in its earliest stage of development and ultimately, GE and its joint venture partners effectively abandoned the intended project in violation of their agreement with Soroof. SSOF ¶¶ 3, 6, 20, 21, 33, 36, 38, 59, 71 and 76.

In or around February of 1999, GE, acting through GE Microgen, formed GEFCS as a joint venture with Plug Power, through which GE employees would market and distribute a Proton Exchange Membrane Residential Fuel Cell (the "Product") then under development by Plug Power. SSOF ¶¶ 1-3. Although GEFCS was ostensibly to be the worldwide distributor of the Product, in reality, it was wholly dependent on its members and, in particular, GE. SSOF ¶ 5. For example, GEFCS did not have a single employee of its own. *Id.* Instead, all of the individuals tasked to the GEFCS venture were actually employed by GE. *Id.* Frank Scovello, purportedly the president of GE Microgen and GEFC, was at all times actually employed by GE. *Id.*

GE's history is the stuff of legends in American business lore. Founded in 1892, it traces its beginnings to Thomas A. Edison. SSOF ¶ 23. GE, which employs 305,000 people in more than 100 countries, is known worldwide as an innovating company in many fields, including power generation. *Id.* Consequently, it is not surprising that Plug Power, a relatively new

company formed in 1997, was heavily dependent on GE to "validate" its technology. In its Form 10-K dated December 31, 1999, Plug Power stated follows:

> We are heavily dependent on our relationship with GE Fuel Cell Systems and General Electric's commitment to develop the residential fuel cell market. Substantially all of our revenue for the foreseeable future will be derived from sales of our products to GE Fuel Cell Systems. We have granted to GE Fuel Cell Systems exclusive worldwide rights to market, distribute, install and service Plug Power fuel cell systems…. Under our distribution agreement, we will sell our systems directly to GE Fuel Cell Systems, which, in turn, will seek to sell them to selected resellers.

SSOF ¶ 22 (Defs' Ex. 8). Plug Power also noted that "[o]ur ability to sell our systems to the mass market is heavily dependent upon General Electric's worldwide sales and distribution network and service capabilities." *Id.*

Notwithstanding Plug Power's predictions that it would fully commercialize the Product by 2001 (SSOF ¶¶ 22, 28, 58, and 80), it became apparent to GE and certainly to Plug Power by no later than early 2000 that Plug Power could not maintain its aggressive commercialization schedule (*Id.* ¶¶ 6, 20, and 21). Dr. Dennis Witmer, the Principal Investigator on the Artic Fuel Cell Demonstration project sponsored by the Department of Energy's Sandia National Laboratories which conducted testing of a Plug Power fuel cell system, notified GE and Plug Power in the first half of 1999 that Plug Power could not successfully commercialize its fuel cell in the timeframe predicted or possibly ever. SSOF ¶¶ 6, 20, 58, 59, 60, and 68. Even earlier, after having been interviewed by Beno Sternlicht of GE, briefed on the status of development by Bill Pledger of Plug Power, and having viewed Plug Power's facilities, Dr. David Edlund, an industry expert in fuel cell technology recruited by Plug Power, informed Gary Mittleman, Bill Ernst, and George McNamee of Plug Power that their commercialization schedule was not even "remotely realistic." SSOF ¶¶ 6, 20, and 60.

Documents from April of 2000 – before Defendants executed any agreement with Soroof – reveal that GE and Plug Power knew that Dr. Edlund's and Dr. Witmer's conclusions regarding Plug Power's inability to develop the Product were correct. For example, an internal GE report dated April 11, 2000 titled "Fuel Cell Product Overview" contains a table titled "Technical Summary," which shows that the Product was failing to meet numerous scheduled developmental milestones. For example, the Product failed to meet GE specifications in fuel cell system efficiency, size, weight, the Product's ability to run independently of the electrical grid, the Product's ability to run continuously without failing (known as MTBF, or mean time between failure), noise, water consumption and emissions. SSOF ¶¶ 6, 20, and 21. An internal GE document dated April 7, 2000, and titled "Marketing Update" for "Review with Plug Power Board of Directors April 2000" reveals GE's frustration in how undeveloped the Product was. The document reads: "Customers are losing interest and GEFCS has lost credibility. GEFCS is continuing to sell product 'potential', *with no hardware, field testing, etc. to back up the story*." *Id.*

During the first week of May of 2000, Soroof engaged in discussions with GE representatives at GE's and Plug Power's facility in Latham, New York, regarding becoming a distributor of the Product. SSOF ¶ 21. Specifically, Soroof's President and CEO, Prince Bander bin Abdullah Al-Saud and James Jackson, Executive Director of Soroof's Power Division, met with GE employee Barry Glickman, then acting as President of GEFCS, who claimed the Product "was nearly ready for availability for production." SSOF ¶¶ 13, 21. Mr. Glickman, then acting as GEFCS's president, further represented to Mr. Jackson and Prince Bander that (i) the unit "had an estimated 10-year service life," (ii) "they were hoping to make units available to [Soroof] at an estimated $5,000 per unit," and (iii) the Product was "grid independent" capable

of providing "prime power" as a "standalone." SSOF ¶¶ 21, 23. The Fuel Cell Status Memo and Marketing Update from only a month earlier evidence that Mr. Glickman knew these statements to be false when he made them.

Neither during negotiations nor afterward did Mr. Glickman or anyone else inform Mr. Jackson or Prince Bander that industry experts had raised substantial concerns about the viability of the Product or the schedule within which Plug Power predicted it would commercialize the Product. SSOF ¶¶ 15, 21. Further, at no time did Mr. Glickman or anyone else provide Mr. Jackson or Prince Bander with the Marketing Update or other documents from April of 2000 or disclose the information they contain; i.e., dramatic developmental shortfalls in the Product and confirmation that there was "no hardware, field testing, etc." to back up the claims about the Product, its capabilities, and its projected availability. *Id.* Had Soroof known the facts revealed in the April 2000 documents, it would not have executed the Agreement. *Id.*

On June 6, 2000, without informing Soroof of the true state of affairs and Defendants' own grave doubts about their ability to develop a viable Product, GE employee Mr. Glickman executed the Distribution Agreement with Soroof ("Agreement") on behalf of GEFCS, pursuant to which Soroof paid a $1 million distribution fee. SSOF ¶¶ 15. As noted, the details surrounding the Product's developmental shortfalls and lack of "hardware, field testing, etc. to back up the story" were not shared with Soroof. SSOF ¶¶ 20, 21. Although the distribution fee was paid to GEFCS, GE siphoned off those funds to pay the salaries of GE employees who were "supporting" the activities of GEFCS. SSOF ¶ 5.

Neither GE nor Plug Power presented Soroof with any literature, and Soroof viewed the Agreement (correctly) as being with GE, not Plug Power. SSOF ¶ 22. Mr. Jackson searched for information relating to the Product to the extent it was available, but noted "that information was

controlled by GE, and I would imagine Plug Power." *Id.* Mr. Jackson did not believe it was incumbent upon him to search Plug Power's public filings, as "our agreement was with GE, not with Plug Power." *Id.* Mr. Jackson did locate and review some press releases regarding the Product, which "were all positive, seemed upbeat." *Id.*

Prior to entering into the Agreement, Soroof conducted "due diligence" by seeking and obtaining relevant information from those with direct information and knowledge about the Product and its development status, the timing of commercialization, and the capabilities of the Product. SSOF ¶ 23. Specifically, Soroof participated in meetings in Albany, London, and Riyadh, and over the telephone, during which Soroof made inquiries of GE employees. *Id.* Soroof understood they were negotiating directly and contracting with one of the most respected suppliers of energy on earth – GE – and reasonably believed that GE had performed rigorous due diligence before engaging and contracting with subdistributors. *Id.*

It is not disputed that Soroof entered the Agreement with GEFCS, not Plug Power. *Id.* It is also not disputed that GEFCS, which was not a public company, had no public SEC filings Soroof could review. *Id.* The Agreement, which protects the intellectual property of GE and GEFCS, not Plug Power, specifies that the famous GE logo is GEFCS's mark. This made it crystal clear that GE is the primary actor. *Id.* As Plug Power's 30(b)(6) designee testified: "the GE logo…validates the product more generally to the community that would be purchasing fuel cell products." *Id.*

Under the Agreement, GEFCS had a continuing obligation "to share promptly relevant information, including but not limited to product performance, failure and liability issues...." and to "[u]se reasonable efforts to supply Pre-Commercial Product and Commercial Product that

meet [the Agreement's] performance specifications. SSOF ¶ 15. It failed to do either. *See, e.g.*, SSOF ¶¶ 3, 6, 20-22, 33, 38, 59, and 71.

Throughout the duration of the Agreement, Frank Scovello periodically informed Jim Jackson of delays and generic technical issues. *See, e.g.*, SSOF ¶ 98. In April of 2001, Soroof understood that the Product was delayed "indefinitely," which it took to mean not "forever," but simply that GEFCS was unable to give a "definite delivery date." *Id*. However, neither Mr. Scovello nor anyone else revealed to Soroof how dire and fatal the development shortfalls actually were. SSOF ¶¶ 3, 6, 20-22, 38, 59, and 71. In fact, at this same time, Mr. Glickman informed Prince Bander and Mr. Jackson that "GE remains optimistic about fuel cells." SSOF ¶ 98.

GE's awareness that the Product was a failure as early as 2001 is more than apparent from GE's internal assessments, which make clear that GE was gravely concerned it would suffer potential brand and reputational damage from its association with Plug Power. *Id.* Rather than honestly convey the true state of affairs to Soroof, internal GE documents never disclosed to Soroof until Phase II discovery in this litigation reveal that GE decided in the summer of 2003 that it would "Manage" its relationship with Soroof to "**Avoid Issues**" by running out the clock on the Agreement. SSOF ¶ 6, 37 (emphasis added). GE further directed GEFCS -- which had a contractual obligation under the Agreement to share relevant information and employ "reasonable efforts" to develop the Product -- to "Avoid Sales of [Plug Power Products] due to the "High Risk Associated with Plug." *Id.*

By August 19, 2003, GE had completely lost confidence in the Project. SSOF ¶ 6, 37, 38 and 71. An internal GE document dated August 19, 2003 confirms that GE had concluded that it had "Little Confidence in Residential Fuel Segment Development," that "Plug R&D Resources

Should be More Focused on Commercially Viable Products," and that fuel cell technology's development would be driven not by residential fuel cells but by the "Automotive Industry." *Id.* Consequently, despite its earlier investments, GE demonstrated its lack of confidence by declining to make any further equity investment in Plug Power. *Id*.

At around this time, GEFCS went "inactive" and GE employees dedicated to supporting GEFCS in its work relating to commercializing the Product were reassigned. *Id.* (GE internal document titled "Business Condition Summary" reveals that, as of March 24, 2006, GEFCS had been "inactive" for "several years" because the Product could not be developed, and GE employee Elihu Jerabek confirms that in GE Microgen "had a significant reduction of employees" and that "reduction in force had something to do with the product GE Fuel Cell Systems was trying to market.") Moreover, around this same time, deprived of GE capital and having been advised by GE to focus on commercially viable products, not the Product provided for in the Agreement, Plug Power effectively abandoned development of the Product in favor of developing back-up generators. SSOF ¶¶ 6, 37, 38 and 71. None of this critical information – GE's lack of confidence in Plug and the Product, its decision to decline making further equity investments in Plug, its decision to discontinue GEFCS's support of Product development, and Plug's decision to re-focus its development efforts on fuel cell products other than the Product – was ever conveyed to Soroof. *Id.*

GE's decision not to put any more money into the project is especially telling because it reveals GE's true assessment of Plug Power's likelihood of success in developing the Product. GE had originally made its investment in Plug Power because it believed that Plug Power could actually deliver a commercial residential fuel cell. The fact that GE chose in 2003 to forgo a

further investment demonstrates that it had realized by then that Plug Power was not capable of achieving this goal.

Despite knowing of Soroof's potential claims against GEFCS, GE successfully executed its "run out the clock" strategy by waiting until GEFCS's relationship with Soroof formally expired on December 31, 2005, before directing GE Microgen (and Plug Power) to formally dissolve GEFCS despite that it had been "inactive" for "several years" already. SSOF ¶¶ 5 and 37. Even then, Defendants failed to inform Soroof of GEFCS's dissolution or make any provisions for Soroof's claims. SSOF ¶ 37. After GEFCS's formal dissolution and recognizing Soroof may seek a recovery as a result of its wrongdoing, as revealed by an internal e-mail produced by Defendants, Defendants deliberately sought to delay Soroof's understanding of the true state of affairs with regard to the Product and the status of its relationship with GEFCS . SSOF at ¶ 35 (Jan. 5, 2006 E-mail). It was not until at least two years later in 2007 that Soroof discovered the fact of GEFCS's dissolution and, around the same time, GE discontinued responding to Soroof's inquires. SSOF ¶¶ 37 and 115.

## ARGUMENT

### A. Summary Judgment Standards.

Substantial admissible evidence creates genuine issues of material fact that can only be addressed by a jury and, accordingly, Defendants' Motion must be denied in its entirety. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (The party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists); *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) ("[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor.").

### B. Defendants Have Not Met Their Burden to Obtain Summary Judgment on the Breach of Contract Claim.

Defendants contention that the breach of contract claim should be dismissed because Plaintiff cannot prove breach ignores a wealth of evidence that Defendants (i) failed to use "reasonable efforts" to develop the Product, (ii) failed to promptly share relevant information – which led to Defendants spending millions to prepare for distribution of a product at a time when Defendants knew the product would never be delivered, and (iii) violated the covenant of good faith and fair dealing inherent in every contract. Because there are clear issues of disputed fact, summary judgment is not appropriate on this issue.

#### 1. This Court Has Already Suggested that Soroof's Breach of Contract Claims Are Meritorious.

In the January Order, Judge Swain held that testimony of Frank Scovello, a GE employee who served as GEFCS's president, that Defendants knew as early as 2001 that they "could not build a product even close to what [they] had originally contemplated" was compelling enough that Soroof could state a claim for breach of contract through failure to share promptly relevant information and the best efforts covenant "by failing to work in good faith to bring the fuel cell to market during the life of the Contract." *Soroof I*, 842 F.Supp.2d at 513. This conclusion was based only on Phase I discovery, but substantial additional evidence has been adduced since then which validates Mr. Scovello's assessment and this Court's previous finding.

#### 2. Defendants Effectively Abandoned Development of the Product.

Defendants breached the Agreement by failing to use reasonable efforts to supply the Product. When interpreting the meaning of a "reasonable efforts" clause, "New York [C]ourts use the term 'reasonable efforts' interchangeably with 'best efforts'…[and] a 'best efforts' clause imposes an obligation to act with good faith in light of one's own capabilities." *Monex Fin. Serv. Ltd. v. Nova Info. Sys. Inc.*, 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009) (internal citations

omitted). Although a defendant may "give reasonable consideration to its own interests," it cannot "emphasiz[e] profit …without fair consideration of the effect on" the plaintiff. *See Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979). At the very least, a party must "explore whether steps not involving substantial losses could have been taken to [avoid] or at least lessen" the adverse impact on the other party. *Id.* at 613-14. Here, substantial admissible evidence establishes that the Defendants failed to use all reasonable efforts to supply the Product, and summary judgment must be denied.

Defendants' argument that they expended "extraordinary" efforts to develop the Product is a red herring. There is abundant evidence that, while Defendants initially focused on commercializing a residential fuel cell system, by no later than the summer of 2003, Plug Power, with GE's knowledge and approval, effectively abandoned those efforts and shifted them to the development of back-up fuel cell generators. SSOF ¶¶ 6, 37, 38, 71. At this same time, GE withdrew its support of Plug Power (and, consequently, the Product) and GEFCS, contractually obligated to develop the Product, went "inactive." SSOF ¶ 6, 37, 38, 71.

Despite its early focus on residential fuel cell systems, in 2003 Plug Power undertook a dramatic shift in its strategy away from residential fuel cell applications, including the Product. In a 2003 internal memo, Plug Power explained that it was refocusing its "business from mass residential to value added niche opportunities." SSOF ¶ 6. Plug Power shifted its focus to back-up applications because it provided a "value proposition that [Plug Power] can capitalize in the near term." SSOF ¶¶ 6, 38, 71. GE was not only aware of Plug Power's change of direction, it recommended it. *Id.* As Mr. Scovello testified, "GEFCS was formed to be a master distributor of a certain kind of product…[Plug Power was] not building that product. They were building

something else." SSOF ¶ 71. As such, Defendants effectively terminated the Agreement without ever informing Soroof.

Under New York law "'[b]est efforts' requires that a party pursue 'all reasonable means for obtaining' the promised goal, and whether such an obligation has been fulfilled 'will almost invariably …involve a question of fact.'" *See US Airways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997) (*quoting Kroboth v. Brent*, 625 N.Y.S.2d 748, 749-50 (N.Y. App. Div. 1995). Here the facts establish that Defendants did not use "all reasonable means" to develop a residential fuel cell system. By no later than 2003, GE withdrew support of Plug Power and the Product, GEFCS became "inactive," and Plug Power refocused its efforts to support the development of niche fuel cell products that would yield short term revenue gains. That is, Defendants effectively abandoned development of the Product. Thus, Defendants breached the reasonable efforts covenant of the Agreement and summary judgment on the breach of contract claim must be denied.

**3. Defendants Failed to Promptly Share Relevant Information.**

Similarly, there is substantial evidence that Defendants failed to promptly share relevant information regarding development of the Product with Soroof, in direct contravention of the Agreement. In the January Order, this Court indicated that a failure to disclose "material information about the ultimate viability" of the Product would support a claim that Defendants breached its obligation to promptly share relevant information. *Soroof I*, 842 F.Supp.2d at 512. Under New York law, "[m]aterial information is the type that 'go[es] to the essential factual essence of the transaction.'" *Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*, 850 F. Supp. 1199, 1217 (S.D.N.Y. 1994) (internal citations omitted); *see also Hernandez*,

*Kroone & Assocs., Inc. v. United States*, 07-165 C, 2008 WL 4725433 (Fed. Cl. June 16, 2008) ("Information is material if the failure to disclose may prejudice the other party.").

Defendants argue that they disclosed some relevant information. Assuming *arguendo*, that they did, there is nevertheless abundant evidence that Defendants did not share *all* relevant information to which Defendants were entitled. The information Defendants did share, which related generally to Product delays or scheduling changes, does not satisfy even the broadest interpretation of material information. As Jim Jackson explained: "we could have received better information than we received" because Soroof "had only been given delays for the delivery of the Product." SSOF ¶¶ 84 and 96. There is substantial evidence in the record that Defendants failed to share material information, as outlined in Section C below, including, but not limited to: (1) as shown in an internal Fuel Cell Overview, the Product fell short of multiple, fundamental developmental milestones shortly before the Agreement was entered; (2) at the time the Agreement was entered, there was "no hardware, field testing" to back up the Product; (3) a report from July of 2000 shows that Plug Power had again missed multiple Product development milestones toward commercialization, including "goals for system performance, reliability and cost" (SSOF at ¶ 6); (4) throughout the term of the Agreement (6/6/2000-12/31/2005), GE did not have a body of data to analyze about the Product; (5) by the summer of 2003, GE withdrew its support of Plug Power, concluded that the Product could not be developed, and GEFCS went "inactive"; and (6) Plug Power, consonant with GE's recommendation, effectively abandoned development of the Product in favor of niche fuel cell back-up products. SSOF at ¶¶ 3, 6, 20, 21, 37, 38, and 71.

None of this information was ever shared with Soroof. *Id.* Instead, both before the contract was signed and after, GE continued to express optimism and failed to disclose to Soroof

that the Product would, eventually, be developed. *See*, *e.g.*, SOF at ¶¶ 98 and 112. Overwhelming evidence suggests this optimism was unfounded and was fed to Soroof in the hope of running out the clock on the Agreement.

Obviously, these developmental shortcomings were a source of concern for GE. Former GEFCS President Barry Glickman admitted that "there were at various times, conversations between myself and GE Fuel Cell employees…where they expressed concern with the pace of development…." SSOF at ¶ 6. In 2000 and 2001, Plug Power never achieved any of the targets set by GE for commercialization in the key areas of efficiency, reliability and cost. SSOF at ¶ 6 Mr. Glickman considered "treating Plug like a vendor that can't deliver and simply go out and find vendors that can." SSOF at ¶ 6. Mr. Glickman's blunt assessment mirrors Mr. Scovello's that: "it became clearer and clearer to us the challenges that was involved and that the product would never be developed that would, you know, meet our original specifications." SSOF at ¶ 3, 6. GE's critical – and accurate, if not self-fulfilling – determination that commercialization of the Product was unlikely was never shared with Soroof. *Id.*

**C. Soroof's Misrepresentation Claims Must Proceed.**

**1. Defendants Made Affirmative Misrepresentations and Omitted Material Facts.**

Under New York law, the elements of fraud or misrepresentation are: (1) a material misrepresentation or omission of material fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff. *See Gizzi v. Hall*, 754 N.Y.S.2d 373, 376 (N.Y. App. Div. 2002). In the case of claims for material omissions, a plaintiff must show "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through fraud." *Soroof I*,

842 F.Supp.2d at 513. Defendants argue only that they made no misrepresentations or material omissions.

Defendants assert, without citation, that "Soroof has not a single misrepresentation to support any claim of fraudulent inducement." MSJ at 20. However, contrary to Defendants' conclusory assertion, the record is replete with material misstatements and omissions made by Defendants. *See, e.g.*, SSOF ¶¶ 6, 20, 21, 23, 37, 38, 59, 71. As noted, Judge Swain previously held that deposition testimony from GEFCS's former president Frank Scovello that, as early as 2001, Defendants began to realize that 'they could not build a product even close to what [they] had originally contemplated," suggests that Soroof "may have a meritorious [misrepresentation] claim." *Soroof I,* 842 F.Supp.2d at 513-14. Phase II discovery has revealed that this was just the tip of the iceberg, and in fact, GE misrepresented the state of the Product's development during negotiations with Soroof. In meetings in May of 2000, Barry Glickman, a GE employee and president of GEFCS at the time, told Jim Jackson and Prince Bander that the Product was "nearly ready for availability for production. It had an estimated 10-year service life," and that the proposed unit was "grid independent and…a standalone as prime power." SSOF ¶ 21. Similarly, Prince Bander testified he was informed in these meetings that the technology was in its "last stage of development" and was "coming soon." *Id.*

Mr. Glickman made these statements knowing them to be false. In fact, the Product was not at all "nearly ready for availability" and was <u>very</u> early in its developmental process. GE and Plug Power were notified in first half of 1999 by Dr. Dennis Witmer, who tested Plug Power's fuel cell product, that Plug Power could not develop a fuel cell to meet those specifications. SSOF ¶¶ 6, 20 and 21. Documents from April of 2000—prior to executing any agreement with Soroof—show that the Product was failing to meet numerous scheduled developmental

milestones and that there was no "field testing" data to support the claims Plug and GE were making. *Id.* (e.g., April 7, 2000 GE Marketing Update providing "Customers are losing interest and GEFCS has lost credibility. GEFCS is continuing to sell product 'potential', *with no hardware, field testing, etc. to back up the story.*"). *Id.*

As discussed in Section B above, Defendants' misrepresentations and material omissions continued after the execution of the Agreement. For example, Defendants never disclosed to Soroof that GE lost confidence in Plug Power and the Product, decided GEFCS should avoid sales of Plug Power products, declined to put further support into the endeavor, sought to avoid GEFCS sales of Plug Power products because of "High Risk" associated with Plug Power, and caused GEFCS to become "inactive." SSOF ¶¶ 6, 38, 59, 71. Notwithstanding that GE sought to avoid sales of Plug Power products due to "high risk" associated with Plug Power, it nevertheless continued presenting Soroof with alternative Plug Power products in 2004 and beyond (*see* SSOF ¶ 85 (Defendants' Ex. 37)), and stated that the Product was still under development and might be forthcoming (*see* SSOF ¶ 6 (Scovello informing Soroof on June 21, 2004 that "development of the product, contemplated in our original agreement, continues at Plug Power"; *see also* ¶ 112 (Defendants' Ex. 38)).[2] Moreover, in late-2005, Ravi Menon of Plug Power visited Soroof in Saudi Arabia and told Tahir Rashid, Soroof's General Manager, that the Product would come to Soroof in 2007. SSOF ¶ 35.

[2] Defendants assert that "Soroof also alleges [in para. 23 of the SAC] that it was fraudulently induced to enter the Agreement by a statement by a GEFCS representative that the term of the Agreement would not begin to run until the Product was ready for delivery," and then, disingenuously, suggests that Soroof's testimony contradicts this allegation. However, paragraph 23 contains no such allegation. Instead, paragraph 23 alleges as follows: "Also, in the summer of 2000, Mr. Jackson discussed with Rajiv Sharma, GE's Regional Director, in Al-Khobar, Saudi Arabia, Soroof's need for a firm delivery date so that Soroof could place orders in advance. Mr. Sharma informed Mr. Jackson that the initial three years of the Agreement would not begin to run until the Product was ready for delivery and that Soroof should wait until that time to begin to place orders." The summer of 2000 post-dates the execution of the Agreement on June 6, 2000, and the allegation is consistent with the testimony of Jim Jackson, Soroof's 30(b)(6) representative, who testified that Mr. Sharma made this representation after the agreement was executed. Sadly, Defendants apparently find it necessary to misrepresent the record, which creates additional work for the Court and forces the Plaintiff forced to check each and every representation. That is, rather than basing the arguments on facts *as they are*, the Defendants make arguments on the facts *as they wish them to be*.

### 2. Whether Soroof's Reliance on GE's Representations Was Reasonable and Justifiable Are Jury Questions.

Defendants assert that this Court should, as a matter of summary judgment, find that "Soroof could not have justifiably relied on any misinformation it was allegedly told by Defendants." This position borders on frivolous. "[W]hether a party could have ascertained the facts with reasonable diligence is a factual question for resolution by the jury." *Gizzi*, 754 N.Y.S.2d at 377; s*ee Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 445 (S.D.N.Y. 2012) ("[R]easonable reliance is often a question of fact for the jury rather than a question of law for the court" and thus not one subject to summary judgment on an investor's fraud claim) (*quoting STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011)).

Further, Defendants' claims that Soroof did "no due diligence" are belied by the record. Extensive evidence demonstrates that Soroof did conduct due diligence – it was briefed on multiple occasions by representatives of GE, one of the most reputable companies on earth. *See, e.g.*, SSOF ¶¶ 22, 23 and 33. Soroof was entitled to rely on the representations of GE's representatives. Moreover, contrary to Defendants' claims, GE's representatives were Soroof's best and only means for verifying the information represented about the Product's development because GE had direct access to the technology at issue. SSOF ¶ 22. Meanwhile, Plug Power went to great lengths to shield information regarding the development of the Product that it did not want made public. *Id.*

### 3. The Agreement's Merger Clause Does Not Bar Soroof's Misrepresentation Claim.

Defendants, implausibly, assert that the existence of an agreement gave them license to lie. Although a separate cause of action for fraud "cannot stand when the only fraud alleged

relates to the breach of contract," allegations of intentional fraud can stand even though they may be "parallel in many respects to the breach of contract claim." *Gizzi*, 754 N.Y.S.2d at 376. Where, as here, defendants make fraudulent misrepresentations that induce them to enter into a contract, such misrepresentations "are not 'merely redundant' of the breach of contract claim." *Id.* (citing *RKB Enters., Inc. v. Ernst & Young*, 582 N.Y.S.2d 814, 816 (N.Y. App. Div. 1992) ("[a] party fraudulently induced to enter into a contract may join a cause of action for fraud with one [of] breach of ... contract.")). Moreover, "[a] false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122 (N.Y. 1995); *see also Gotham Boxing, Inc. v. Finkel*, 856 N.Y.S.2d 498, *9 (N.Y. Sup. Ct. 2008) (noting the First Department "has repeatedly confirmed and applied the principle that a fraud claim can be maintained, even where it is based on conduct or assurances that have some relation to the facts of a breach of contract claim").

Moreover, admissible evidence of Defendants' misrepresentation made prior to the Agreement is not barred by the parol evidence rule. Defendants' assertion that the Court previously ruled on this (MSJ at 22) is false and misleading. The Court actually ruled, as to the contract claim only, that parol evidence could not be admitted to alter the terms of the contract, and on this basis, held that "Soroof's breach of contract claim [in its original complaint] that is premised on a contractual obligation to supply fuel cells to Soroof in sufficient quantity for distribution is unavailing." *Soroof I*, 842 F.Supp.2d at 512. "[A] general merger clause is generally *insufficient* to bar parol evidence of a fraudulent misrepresentation." *Hobart v. Schuler*, 434 N.E.2d 715, 716 (N.Y. 1982) (emphasis added). Instead, evidence of oral misrepresentations is barred where a contract governs the parties' relations only "when the

alleged oral misrepresentations are directly contradicted by a specific provision in a written contract." *NYNEX Corp. v. Shared Resource Exchange, Inc.*, 1990 N.Y. Misc. LEXIS 759, *3 (N.Y. Sup. Ct. 1990). Defendants' reliance on *Danann Realty* is therefore misplaced because it falls squarely into the exception drawn in *NYNEX*, i.e., the alleged misrepresentation was explicitly disclaimed by an extremely detailed merger clause and thus contradicted the contract terms. *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317 (N.Y. 1959) (parol evidence inadmissible to establish that seller misrepresented income and expenses where contract stated that seller "has not made and does not make any representations as to . . . rents, leases, expenses . . . except as herein specifically set forth"). Defendants' second case is inapposite because it did not involve a fraud claim but simply application of the parol evidence rule to a contract claim. *See Convenient Med. Care P.C. v. Medical Bus. Assocs. Inc.*, 737 N.Y.S.2d 403 (N.Y. App. Div. 2002).

**D. All of Soroof's Claims Are Timely.**

Soroof timely filed its claims against Defendants when it initiated AAA arbitration proceedings against GEFCS on July 1, 2008. Defendants deny the timeliness of Soroof's claims by conveniently (and incorrectly) characterizing the nature of the parties' relationship as that of a "buyer" and "seller" and arbitrarily picking breach dates, which they claim triggered the running of the statute of limitations. Defendant's arguments are unavailing in two key respects: (1) Soroof was a distributor of GEFCS not a "buyer," and therefore the U.C.C. provisions for sale of goods do not apply; and (2) the earliest that Soroof could possibly have learned of any potential action against Defendants was in 2007.

**1. Soroof Was a Distributor Not a Buyer.**

Defendants claim that the breach of contract and misrepresentation claims are governed by the U.C.C.'s four-year statute of limitations period, because the relationship between Soroof

and GEFCS was that of a "buyer" and "seller." While the Agreement does permit Soroof to purchase the Product, the majority of the Agreement's provisions refer to Soroof as a "distributor." SSOF ¶ 19 at, *e.g.*, Preamble and §§ 1, 3 and 22.4. Perhaps most telling as to how Defendants envisaged the relationship is the Agreement's description of the $1 million Soroof was obligated to pay. The Agreement refers to this payment as a "distributor fee" not a "purchase fee." Finally, Defendants admit that Soroof was a distributor, not a buyer, in their own Statement of Material Facts in Support of their Motion for Summary Judgment at Paragraph 15 when they allege as follows: GEFCS and Soroof entered into a Distributor Agreement (the "Agreement") that would allow Soroof to be the exclusive **distributor** for the Product within the Kingdom of Saudi Arabia." (Emphasis added.)

Where, as here, "a contract involves the sale of both services and goods, the Court looks to the main purpose of the contract in order to determine the applicable statute of limitations." *See Ins. Co. of N. Am. v. ABB Power Generation, Inc*., 925 F. Supp. 1053, 1061 (S.D.N.Y. 1996). Further, "[w]hen service[s] predominate, the incidental sale of items of personal property, does not alter the basic transaction." *See N. Am. Leisure Corp. v. A&B Duplicators, Ltd*., 468 F.2d 695, 697 (2d Cir. 1972). Here, the agreement specifically tied Soroof's purchase commitments to services, to: "sell, advertise and promote the sale and use of Product." *See* SSOF at ¶ 19. Further, Soroof was also obligated to provide "Product Services," "Perform tests on" pre-commercial Product and submit the results of those tests to GEFCS, and provide information relating to "sales and services." *Id.* Accordingly, any purchase requirement Soroof had under the Agreement was ancillary to its service obligations to sell, promote and service the Product.

Further, for a sale to come under the ambit of the U.C.C., title must be transferred between a buyer and seller. N.Y. U.C.C. § 2-106. However, as noted above, the majority of Soroof's obligations was services or tied to services. In these situations title would not pass to Soroof. Therefore, Soroof could not be deemed a buyer for the purposes of the U.C.C. *See All R's Consulting, Inc. v. Pilgrims Pride Corp.*, 06 Civ. 3601, 2008 U.S. Dist. LEXIS 30626, *21 (S.D.N.Y. Mar. 28, 2008) (where title to goods did not pass, there was no buyer or seller relationship under the U.C.C. between the parties). Thus, given that the sale of property was incidental to Soroof's primary obligations to provide services, the U.C.C. is inapplicable to determine the statute of limitations.

Given that Soroof was a distributor rather than a buyer of goods, the U.C.C. does not apply. Thus, the six year statute of limitations for both breach of contract and misrepresentation should apply. N.Y. C.P.L.R. 213(2) and (8). However, assuming, *arguendo*, that the four-year statute of limitations applied, Soroof's claims would still be timely given that, as demonstrated below, the likeliest date that Soroof could have learned of its claims was in 2007.

### 2. Defendants' Arbitrarily Selected Accrual Dates Are Contradicted by the Evidence.

Summary judgment also cannot be granted because issues of fact exist as to the date the statute of limitations accrued. Defendants arbitrarily select two dates for accrual of the statute of limitations. The first they claim occurred in April 2001, when Soroof noted in meeting discussion points that the schedule had "slipped indefinitely." SSOF at ¶ 98 (Defendants' Ex. 32) The second date proffered is in 2004, when a Soroof employee requested the "temporary" return of the $1 million distributor fee and Soroof's President said the Agreement should be referred to an attorney. The facts underpinning these dates belie Defendants' contention that the statute of limitations commenced running on either date.

First, and most importantly, both of these proffered dates misconstrue the nature of the Agreement and Soroof's claims that it was breached. As this Court previously held, a failure to deliver the product by a particular date is not a term of the contract and therefore cannot be the basis of Soroof's breach of contract claim. *Soroof I*, 842 F.Supp.2d at 511. As argued in Section B, Soroof's contract claim is based on Defendants' abandonment of the development project and their failure to share that fact and other material information with Soroof.

The 2001 date cannot trigger accrual because failing to deliver the Product by a definite date was not an obligation under the Agreement and therefore Defendants' failure to do it was not a breach. Moreover, Soroof did not understand the schedule slipping "indefinitely" to mean that it would never receive the Product, only that there was no longer a definite delivery date. SSOF at ¶ 98. As Soroof's President explained: "[i]ndefinitely to me is not forever. It just doesn't have a date with it." *Id.*

As to the 2004 date, Soroof's request for the return of the money was viewed as a temporary measure, as is clear from the request, and it did not mean that Soroof believed that the Agreement had ended, or that the Product would never arrive. SSOF ¶ 113. The reference to having an attorney review the Agreement is irrelevant and certainly cannot support a finding as a matter of law that Soroof had reason to believe Defendants had breached the Agreement. In fact, it was simply a strategy to take the matter out of Soroof's then-CEO's hands; telling him to "hold your horses" because he was not in a position to assess the situation as well as Soroof's executive director, Jim Jackson. SSOF ¶ 115.

In actuality, Soroof had no reason to consult an attorney in 2001 or 2004 regarding any delays by Defendants because it always believed that delivery would occur. SSOF at ¶ 115. It was only in 2007, when Jim Jackson learned that GEFCS had been dissolved and Frank Scovello

stopped responding to his inquiries, that Soroof first had reason to suspect the facts on which its breach of contract claims are based. SSOF 35, 37, 115. Indeed, most of the facts underpinning Soroof's claim based on failure to share material information was never known to Soroof until crucial documents were obtained in this litigation. SSOF ¶ 6, 20, 21, 35, 38.

**3. The Statute of Limitations Was Tolled.**

Assuming, *arguendo*, that the statute of limitations did begin to run on the two dates claimed by Defendants, the time period would have been tolled. Under New York law, the statute of limitations for breach of contract claims is equitably tolled, "while the plaintiff fails to bring suit as a result of blameless ignorance, culpable action by the defendant, or the continued existence of a close and important relationship that reasonably may be regarded as making the commencement of litigation in appropriate or unduly costly . . ." *Access Northern Security Corp. v. Linear Corp.*, 97 Civ. 2937, 1998 U.S. Dist. LEXIS 13943, *14 (S.D.N.Y. Sept. 4, 1998) (internal citation omitted). In such circumstances, a cause of action does not accrue at the time of the breach; rather, it accrues when "the plaintiff either acquires actual knowledge of the facts that comprise his action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." *Indovino v. Tassinari*, CV-05-4167 (JS) (AK.T), 2006 U.S. Dist. LEXIS 60993, at *12 (E.D.N.Y. 2006) (*citing Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974)).

As noted above in Section C, Defendants concealment of the true status of the Product's development and repeated assurances that the Product would be delivered, precluded Soroof from ever taking action against Defendants for breach of contract and misrepresentation. SSOF ¶¶ 6, 35, 37, 101, 115, 122. Here, Defendants disclosed delays but never disclosed that they had abandoned the product and continued throughout the life of the Agreement to assure Soroof that

they were continuing development of the Product and as late as 2005, assured Soroof that delivery would be forthcoming in 2007. *Id.* Thus, from 2000 to 2007, Soroof believed that the Product would be delivered and had no reason to suspect otherwise. *Id.* It was only in 2007 when Jim Jackson learned of the dissolution of GEFCS and Frank Scovello ceased responding to Soroof's inquiries that Soroof of facts that may give rise to its claims here. SSOF at ¶¶ 35, 115. Thus, the statute of limitations for breach of contract and misrepresentation could not have been triggered prior to 2007.[3] Prior to that date, Defendants failure to provide material information precluded Soroof from discovering facts that would have alerted it to possible breaches by its business partner, with which it had a close fiduciary relationship.[4]

**4. Soroof Exercised Reasonable Diligence.**

Defendants' argument that equitable tolling should not apply because Soroof failed to show reasonable diligence by consulting Plug Power's public statements is groundless. This essentially amounts to a contention that Soroof would have learned Plug Power was lying if it had reviewed Plug Power's disclosures to its investors. First, while Plug Power included boilerplate disclaimer language on its disclosures, these were tempered by positive statements aimed at inflating the stock price for Plug Power. The statements made by Messrs. Glickman

---

[3] Defendants may argue that the statute commenced in early 2005, when GE informed Soroof that it could not resolve the problems relating to the development of the Product. However, at this time, neither party thought the Agreement had expired and GEFCS still had not been formally dissolved (although it was, unbeknownst to Soroof, "inactive"), and Defendants did not categorically deny that the Product would not be forthcoming. On the contrary, Soroof was expressly informed in late 2005 that Product would be available in 2007. SSOF at ¶¶ 35, 101 and 115. Thus, Defendants' continued representations again would have tolled the statute of limitations until 2007 when Soroof learned of GEFCS' dissolution.

[4] A fiduciary relationship exists between a distributor and a manufacturer where "the manufacturer has a 'position of dominance' over the distributor, the distributor invests time and money into the manufacturer's business, and ... the distributor reveal[s] proprietary information to the manufacturer." *Beautiful Jewelers Private, Ltd. v. Tiffany & Co.*, 06 Civ. 3085 KMW, 2007 U.S. Dist. LEXIS 20263 (S.D.N.Y. Mar. 21, 2007). All of these elements have been satisfied. First, the contract required that Soroof be an exclusive supplier of Defendants' Product. SSOF at ¶ 19, Agreement at §14.3.3. Second, it is not disputed the Soroof contributed $1 million to Defendants' business. SSOF ¶ 30. Third, the Agreement required that Soroof share its proprietary customer information with Defendants. SSOF at ¶ 19 Agreement at § 8.1 – add "first" and "third" to SSOF.

and Scovello regarding the near-commercial status of development, and other public statements by Plug Power, were different in content and tone to the fine-print language of 10K investor risk statements, and very directly indicated Plug Power's full confidence in its ability to deliver a product that would meet GE specifications. SSOF ¶ 22. These positive statements increased Plug Power's stock prices, which permitted Plug Power executives to sell company stock they held for millions of dollars in profit. SSOF at ¶¶ 22, 38. Courts "have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements." *Milman v. Box Hill Sys. Corp*., 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999). Moreover, any contention that such disclosures would have put a reasonable person on inquiry notice is not properly addressed on summary judgment. *In re Executive Telecard, Ltd. Sec. Litig*., 913 F. Supp. 280, 285 (S.D.N.Y. 1996) ("Whether information contained in corporation's [SEC 10–K] put investors on inquiry notice of existence of fraud … [is for the] trier of fact.").

Furthermore, Soroof had no cause to consult Plug Power's public filings. It entered into a contract with a GE entity, GEFCS, of which GE Microgen owned 75 percent, which in turn wholly-owned subsidiary of GE. Moreover, the Product was to bear the GE logo not Plug Power's. SSOF ¶ 5, 23.

Nor is there anything in the course of dealing between Soroof and Defendants to put Soroof on notice that it should consult Plug Power's public statements rather than GE's direct representations. SSOF ¶¶ 22, 23. During negotiations, Soroof's representatives spoke only with GE employees *Id.* Indeed, under the terms of its contract with GE, Plug Power was not permitted to communicate with a sub-distributor unless was authorized to do so by GE (SSOF ¶ 22) which effectively minimized their role in Soroof's eyes. Jim Jackson may have summed it up best: "we didn't have any reason to believe we should [review Plug Power's public statements], our

agreement was with GE, not Plug Power." *Id.* Moreover, Defendants' assertion that because Soroof did not review Plug Power's public disclosures it did not conduct any due diligence is intellectually dishonest. Evidence exists that Soroof attempted to research fuel cells but was unable to find much. *Id.* ¶ 23. This is to be expected given that the Product never existed before and considering the extreme secrecy maintained around R&D for potentially highly lucrative technologies. *Id.*

As demonstrated, there are numerous issues of material fact which are relevant to a determination of when the claims accrued and for how long Soroof's claims should be equitably tolled as a result of Defendants' concealment of their breaches. These issues are not appropriate for disposition on summary judgment. Where, as here, "the statute of limitations operates as an affirmative defense . . . issues of fact as to the application of that defense must be submitted to the jury." *See Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 242 n. 2 (2d Cir. 1984); *see also Saphir Int'l, SA v. UBS PaineWebber Inc.*, 807 N.Y.S.2d 58, 59 (N.Y. App. Div. 2006) (where there is no conclusive evidence that plaintiff "had knowledge of facts from which the alleged fraud might be reasonably inferred," the question is one for the jury). Thus, this Court should deny summary judgment on Defendants' statute of limitations defense.

**D. Defendants Have Provided No Basis for Summary Judgment on the Basis of Liability Limitations.**

The Motion argues that Soroof's contract claims fail as a matter of law because the distributor fee is characterized in the Agreement as "non-refundable" and because that contract contains liability limitations. MSJ at 17. It later contends that liability limitations apply to limit damages as to all claims. MSJ at 29. Both contentions fail for several reasons.

Defendants acknowledge, as they must, the January Order in which this Court adopted case law holding that, while contractual liability limitations are "perfectly common and

acceptable . . . an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances." *Kalisch-Jarcho v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983). The New York Court of Appeals in Kalisch-Jarcho clarified the meaning of "willful or grossly negligent acts" as follows:

> an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or, when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.

*Id.* at 416-17 (internal citations omitted; emphasis added). Accordingly, under New York law, Soroof is entitled to judgment in excess of the limits of liability as to any damages it can prove at trial that arose from Defendants' (i) fraudulent or malicious acts, (ii) intentional acts indicating bad faith, or ("conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Id.* The January Order also applied the same analysis to the "non-refundable" terminology on which Defendants seek to rely. *Soroof I*, 842 F.Supp.2d at 516; citing *iWon, Inc. v. Ourhouse, Inc.*, 744 N.Y.S.2d 791, 794 (N.Y. Sup. Ct. 2001) ("the word non-refundable cannot be construed as a license to provide little or no consideration and to still retain an advance payment").

Despite acknowledging the January Order, Defendants ignore the Court's finding there that, even based only on the evidence available at the time the motion for judgment on the pleadings was briefed (after Phase-I discovery was complete but prior to any Phase-II discovery), there was sufficient evidence to "suggest[] that GEFCS knew as early as 2001 that it could not build a product that would meet the contractual specifications and that GEFCS withheld this information from Soroof until 2005 and that GEFCS affirmatively deceived Plaintiff by

indicating repeatedly that a contractually adequate product would soon be ready for distribution." *Soroof I*, 842 F.Supp.2d at 516. Since that time, substantial additional evidence has been adduced that is more than sufficient to send the issue of willful or grossly negligent acts to a jury. As discussed in more detail in Sections A and B above, there is more than sufficient support that Defendants knew before signing the contract that they would be unable to commercialize the product and that Defendants not only entered into the contract in bad faith but also, in an effort to avoid liability, continued to cover up and misrepresent to Soroof the lack of progress they had made toward that goal.

While Defendants are entitled to dispute this evidence at trial, factual findings related to gross negligence, malice and intent are not amenable to determination on summary judgment but are properly left to a jury. *Charter Oak Fire Ins. Co. v. Trio Realty Co.*, 99 CIV. 10827 (LAP), 2002 WL 123506, *5 (S.D.N.Y. Jan 31, 2002) ("issue of gross negligence is ordinarily a question of fact for a jury to determine"); *MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, 09 CIV. 10093 RJS, 2011 WL 1197634, *15 (S.D.N.Y., March 25, 2011) ("As a general matter, determinations as to bad faith, recklessness, and intent are factual inquiries that are more appropriately resolved by the fact-finder").

**CONCLUSION**

Genuine issues of material fact exist as to all issues raised by Defendants in their Motion for Summary Judgment. For all the reasons set forth herein, Plaintiff respectfully requests that the motion be denied in its entirety.

Dated: June 25, 2013

Respectfully submitted,

KALBIAN HAGERTY LLP

By: /s/ Haig V. Kalbian

Haig V. Kalbian (*pro hac vice*)
Aaron W. Knights (*pro hac vice*)
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
T: (202) 223-5600
F. (202) 223-6625
hkalbian@kalbianhagerty.com
mmb@kalbianhagerty.com
aknights@kalbianhagerty.com

James R. Lynch (JL-2778)
Jason Kaufman
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York, New York 10018
T: (212) 302-2400
F: (212) 302-2210
lynch@lawlynch.com
kaufman@lawlynch.com

*Counsel for Plaintiff Soroof Trading Development Company, Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was served this 25th day of June 2013, via electronic and overnight mail on the following:

Dahlia S. Fetouh, Esq.
Abigail K. Hemani, Esq.
Lisa M. LoGerfo, Esq.
Lauren S. Kupersmith, Esq.
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
E-mail: dfetouh@goodwinprocter.com
E-mail: ahemani@goodwinprocter.com
E-mail: llogerfo@ goodwinprocter.com
E-mail: lkupersmith@ goodwinprocter.com

*Counsel for PLUG POWER, INC.*

Michael D. Fisse, Esq.
John Dubreuil, Esq.
Jon A. Van Steenis, Esq.
DAIGLE FISSE & KESSENICH
PO Box 5350
Covington, LA 70434-5350
E-mail: mfisse@daiglefisse.com
E-mail: jdubreuil@daiglefisse.com
E-mail: jvansteenis@daiglefisse.com

*Counsel for Defendants GENERAL ELECTRIC COMPANY and GE MICROGEN, INC.*

/s/ Aaron W. Knights
Aaron W. Knights

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Statement of Opposing Facts, Declaration of Aaron Knights and exhibits, was served this 28th day of June 2013, via notice of electronic filing on the following:

Dahlia S. Fetouh, Esq.
Abigail K. Hemani, Esq.
Lisa M. LoGerfo, Esq.
Lauren S. Kupersmith, Esq.
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
E-mail: dfetouh@goodwinprocter.com
E-mail: ahemani@goodwinprocter.com
E-mail: llogerfo@ goodwinprocter.com
E-mail: lkupersmith@ goodwinprocter.com

*Counsel for PLUG POWER, INC.*

Michael D. Fisse, Esq.
John Dubreuil, Esq.
Jon A. Van Steenis, Esq.
DAIGLE FISSE & KESSENICH
PO Box 5350
Covington, LA 70434-5350
E-mail: mfisse@daiglefisse.com
E-mail: jdubreuil@daiglefisse.com
E-mail: jvansteenis@daiglefisse.com

*Counsel for Defendants GENERAL ELECTRIC COMPANY and GE MICROGEN, INC.*

/s/ Aaron W. Knights
Aaron W. Knights