UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOROOF TRADING DEVELOPMENT COMPANY, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>GE MICROGEN, INC.,<br>PLUG POWER INC., and<br>GENERAL ELECTRIC COMPANY<br><br>Defendants. | Civil Action No. 1:10-cv-01391-LGS-JCF |

**PLAINTIFF SOROOF TRADING DEVELOPMENT COMPANY, LTD.'S STATEMENT OF OPPOSING FACTS IN RESPONSE TO DEFENDANTS GE MICROGEN, INC., PLUG POWER INC., AND GENERAL ELECTRIC COMPANY'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# I. FACTUAL BACKGROUND

## A. Formation of GE Fuel Cell Systems, LLC

1. In February 1999, Plug Power Inc. ("Plug Power") and GE Microgen, Inc. ("GE Microgen") entered into an agreement to form a limited liability company, GE Fuel Cell Systems, LLC ("GEFCS"), organized under the laws of the State of Delaware. Ex. 1,[1] Deposition of Gerard L. Conway, Jr. on Jan. 27, 2011 ("Conway Dep. 1"), at 17:11-17.

**Response:** Plug Power and GE Microgen formed the LLC, GEFCS. The deposition testimony cited further reads: "[GE Microgen] had 75 percent interest in the LLC. And Plug Power had a 25 percent interest. They were the managing member, GE Microgen." GE Microgen is a wholly-owned subsidiary of GE. **Ex. 1,** Deposition of Frank Scovello taken September 2, 2010, ("Scovello Phase I Dep.") at 39:5-10; **Ex. 31**, Amended and Restated Limited Liability Agreement.

2. Plug Power and GE Microgen formed GEFCS to sell and market fuel cell products that Plug Power was developing to various subdistributors around the world. Ex. 1, Conway Dep. 1, at 17:18-20, 19:20-25, 31:11-19; Ex. 2, Deposition of Frank Scovello on Sept. 2, 2010 ("Scovello Dep. 1"), at 26:11-14, 33:9-13.

**Response:** Incomplete. GE[2] was to market and distribute residential fuel cell products to various subdistributors. **Ex. 1**, Scovello Phase I Dep. at 33:4-24; **Ex. 2**, Deposition of Gerard L. Conway, Jr. taken January 27, 2011 ("Conway Phase I Dep.") at 19:18-20:18 (Plug Power's role in GEFCS was "passive," and it was "GE's role to market and sell the product.").

---

[1] All references to "Ex. __" herein are references to exhibits to the Declaration of Aaron W. Knights filed herewith.

[2] As set forth in Soroof's Motion for Summary Judgment, it is plain that GE at all times directed the activities of GEFCS and GE Microgen. Dkt. #184-187. Therefore, GEFCS and GE Microgen are referred to herein as "GE."

3. The product that Plug Power was developing and GEFCS was planning to distribute was a Proton Exchange Membrane ("PEM") fuel cell system (the "Product"). The Product—an interconnection of three components that included a fuel cell stack—was intended to replace the power generation at a residence or small commercial facility and be a continuous power product that would produce power twenty-four hours a day, seven days a week. Ex. 1, Conway Dep. 1, at 87:7-19, 89:19-90:7; Ex. 3, Deposition of Gerard L. Conway, Jr. on Oct. 26, 2012 ("Conway Dep. 2"), at 7:17-8:6; Ex. 2, Scovello Dep. 1, at 38:13-15; Ex. 4, Deposition of Gary Mittleman on Oct. 25, 2012 ("Mittleman Dep."), at 15:20-16:13.

**Response:** Disputed. Plug Power was not "developing" the Product at all times. Plug Power shifted its focus to developing products used for backup power at cell towers, not the Product provided for in the Agreement. **Ex. 1**, Scovello Phase I Dep. at 38:8-25; 74:22-75:6, 101:21-25 and 102:11-103:6; **Ex. 3**, Deposition of William Acker taken on March 22, 2013, ("Acker Dep.") at 62:18-21; **Ex. 5 (3)** (Sept. 12, 2003 Due Diligence Memo and Appended GE PowerPoint) **and (4)** (2003 "Back Up Slides").

4. GEFCS was the vehicle for distributing the product. GE Microgen's role in GEFCS was primarily to manage sales and marketing, and Plug Power's role was to develop and manufacture the product. Ex. 1, Conway Dep. 1, at 19:25-20:18; Ex. 2, Scovello Dep. 1, at 33:9-33:13; Ex. 5, Deposition of Frank Scovello on Dec. 10, 2012 ("Scovello Dep. 2"), at 86:16-21.

**Response:** Incomplete. GE provided substantial financial and technical support to Plug Power, and advised Plug Power on its product development. *See* **Ex. 5(3)**, Sept. 12, 2003 Due Diligence Memo; **Ex. 3**, Acker Dep. at 119:19-122:8; **Ex. 6**, Conway Phase II Dep., 39:5-12; **Ex. 7**, Glickman Dep. at 32:13-21; **Ex. 1**, Scovello Phase I Dep. at 45:23-45:12.

5. During the operation of GEFCS, employees of both GE Microgen and Plug Power supported the activities of GEFCS. Ex. 2, Scovello Dep. 1, at 33:1-33:3; Ex. 3, Conway Dep. 2, at 15:13-22, 16:13-18.

**Response:** Misleading, incomplete and disputed. GE provided all necessary support to GEFCS, including GE employees and financial support. **Ex. 1**, Scovello Phase I Depo. at 32:14-33:3 and 44:24-25; **Ex. 2**, Conway Phase I Dep. at 6:27-7:3, 18:24-19:19 (GE leased space identified as belonging to GE Microgen), 19:18-20:18, and 20:23-21:3. **Ex. 18**, Plug Power August 1999 Registration Statement (Plug Power is "heavily dependent on [its] relationship with GE Fuel Cell Systems and General Electric's commitment to develop the residential fuel cell market."); **Ex. 8**, Scovello Phase II Dep. at 13:7-17 and 16:25-17:5. GEFCS's president was employed by GE. **Ex. 1**, Scovello Phase I Dep. at 12:9-20; 24:4-10. The "mark" or "logo" utilized by GEFCS was the General Electric mark. **Ex. 11**, Distributor Agreement Between GEFCS and Soroof dated June 6, 2000 (the "Agreement") at Schedule E; **Ex. 6**, Conway Phase II Dep. at 12:24-13:18 ("the GE logo…validates the product more generally to the community that would be purchasing fuel cell products."). GE's "senior management" – not Plug Power or GE Microgen – made the decision to dissolve and directed the dissolution of GEFCS. **Ex. 1**, Scovello Phase I Dep. at 115:12-116:1, 121:12-20 (GE diverted the $1 million distributor fee Soroof paid GEFCS to fund salaries of GE employees); **Ex. 2**, Conway Phase I Dep. at 27:7-10.

6. Plug Power devoted several hundred employees toward the effort of developing the Product to specifications, while GE Microgen engaged in efforts to market the product nationwide and around the world through its network of subdistributors. Ex. 2, Scovello Dep. 1, at 48:18-48:20 ("[Plug Power] had over 300 people working on the development. They did significant research and development."); Ex. 6, Deposition of John Cerveny on Jan. 31, 2013

("Cerveny Dep."), at 70:8-12 ("[Plug Power] spent thousands of hours of development with hundreds of employees who scoured the globe for best-available technologies, and spent millions of dollars developing the product."); Ex. 4, Mittleman Dep., at 119:12-15; Ex. 7, Deposition of William Acker on Mar. 22, 2013 ("Acker Dep."), at 83:23-84:3; *see also* Ex. 3, Conway Dep. 2, at 40:4-8.

**Response:** Incomplete and misleading. Although Plug Power continued raising funds from GE and other sources, Defendants knew prior to the June 6, 2000 Agreement that the Product could not be developed on schedule or possibly ever. **Ex. 1**, Scovello Phase I Dep. at 102:11-103:6; **Ex. 9**, Oct. 29, 2012 Declaration of Dennis Witmer, Ph.D. ("Witmer Decl.") at ¶ 9; **Ex. 10,** May 30, 2013 Declaration of David J. Edlund, Ph.D. at ¶¶ 1-9; **Ex. 5(1) and 5(2)**, Apr. 11, 2000 GE Fuel Cell Requirement Overview (showing Product Development failed to meet numerous technical milestones) and April 7, 2000 Marketing Update (there was no "hardware, field testing" to back up claims about the Product), respectively. A report from July of 2000 shows that Plug Power continued missing its "goals for performance, reliability and cost…." **Ex. 33,** July 2000 Q2 Dashboard at PPI001653.

The developmental shortcomings were a source of grave concern for GE. **Ex. 7,** Glickman Tr. at 39:9-40:4 ("there were at various times, conversations between myself and GE Fuel Cell employees…where they expressed concern with the pace of development…."). In 2000 and 2001, Plug Power never achieved any of the targets set by GE for commercialization in the key areas of efficiency, reliability and cost. **Ex. 8,** Scovello II at 73:4-75:18. Mr. Glickman considered "treating Plug like a vendor that can't deliver and simply go out and find vendors that can." **Ex. 34,** October 9, 2000 E-mail from B. Glickman to F. Scovello *et. al*. at pg. GE 000554. Mr. Glickman's blunt assessment mirrors Mr. Scovello's that: "it became clearer and clearer to

us the challenges that was involved and that the product would never be developed that would, you know, meet our original specifications." **Ex. 1,** Scovello Phase I Dep. at 102:11-103:6.

By the summer of 2003, GE lost confidence in Plug Power, its business model, and its ability to commercialize the Product, declined to make any further investment in GEFCS venture, and GEFCS went inactive. As a result, Plug Power shifted its focus to the development of other products not subject to the Agreement. **Ex. 1**, Scovello Phase I Dep. at 38:8-25; 74:22-75:6, 101:21-25 and 102:11-103:6; **Ex. 3**, Acker Dep. at 62:18-21; **Ex. 5(3)** (Sept. 12, 2003 Due Diligence Memo and Appended GE PowerPoint by which GE indicates it has lost confidence in Plug Power's ability to commercialize the Product, and, therefore declined to invest any further funds in the project) and **5(4)** (2003 "Back Up Slides" – reveals GE adopted a strategy of "Manag[ing] Existing GEFCS Distributor Relationships to Avoid Issues" and sought to "Avoid Sales of [Plug Power] Products Through GEFCS" due to "High Risk Associated with Plug"); **Ex. 3**, Acker Dep. at 253:2-254:25 (comparing **Ex. 12**, "5/12/04 *GSII* System Fit's," an internal Plug Power document representing PEM fuel cell system efficiencies from 2004, and acknowledging that "the efficiency numbers" from 2004 "are similar to the numbers" from Plug Power's fuel cell system performance in 2000 presented to him in **Ex. 5(1)** at PPI001449, April 11, 2000 GE Overview); **Ex. 13,** Deposition of Elihu Jerabek taken January 31, 2013 ("Jerabek Dep."), a GE employee tasked with relating the status of Plug Power's work to GE, at 12:23-13:17; 75:21-76:2 and 78:6-9 (near the end of 2003 or early 2004, GE Microgen "had a significant reduction of employees" and that "reduction in force had something to do with the product GE Fuel Cell Systems was trying to market."). At or near the summer of 2003, GEFCS went "inactive" because GE determined that there was a "very low probability of our supplier developing a product which GEFCS would have an interest in distributing." **Ex. 5(5)**, Business Condition

Summary (GE 000046) (acknowledging on March 24, 2006 that GEFCS was "inactive for several years" due to "Supplier [Plug Power] Inability to deliver product."). No one from GE or Plug Power ever shared any of the information outlined in this paragraph with Soroof. **Ex. 4**, June 13, 2013 Declaration of James Jackson ("Jackson Decl.") at ¶ 7(c) and (d). In fact, thereafter, GE continued to ensure Soroof that efforts to develop the Product continued. *See* Response 112. *See also* **Ex. 25**, June 21, 2004 E-mail from Mr. Scovello (seeking to convince Soroof to distribute back-up generators "while development of the product, contemplated in our original agreement, continues at Plug Power.").

7. By June 1999, Plug Power had grown from 22 employees at its inception to 250 employees. Ex. 8, Plug Power Form 10-K, for period ending 12/31/99 ("1999 10-K"), at 3.

**<u>Response</u>:** Admitted.

8. In February 2000, Plug Power completed construction of a 50,000 square foot manufacturing facility. Ex. 8, 1999 10-K, at 5.

**<u>Response</u>:** Admitted.

9. As of December 31, 2004, Plug Power had a total staff of 330, including 325 full-time employees, of which 215 were engineers, scientists, and other degreed professionals. Ex. 9, Plug Power Form 10-K, for period ending 12/31/04 ("2004 10-K"), at 5.

**<u>Response</u>:** Admitted, but *see* Paragraph 6.

10. GE Microgen and Plug Power communicated regularly regarding Plug Power's efforts in developing the fuel cell product, and GE Microgen maintained employees onsite at Plug Power's research and development facility to further that collaboration. Ex. 1, Conway Dep. 1, at 18:21-19:7; Ex. 2, Scovello Dep. 1, at 36:9-16; Ex. 4, Mittleman Dep., at 119:19-24, 153:24-154:9; Ex. 3, Conway Dep. 2, at 34:15-35:3, 36:15-38:4, 111:8-16, 179:15-21.

**Response:** Incomplete. Plaintiff GE Microgen did not maintain its own employees and was staffed by GE employees. Otherwise, admitted. **Ex. 1**, Scovello Dep. at 32:14-33:3.

**B. Distributor Agreement Between GEFCS and Soroof**

11. Soroof Trading Development Company Ltd. ("Soroof") was formed in 2000 with several business units, including a power division. Ex. 10, Deposition of Bander Abdullah Al-Saud on Dec. 11, 2012 ("Bander Dep."), at 14:18-20, 15:6-16, 21:2-5; Ex. 11, Deposition of Jim Jackson, Soroof's Rule 30(b)(6) corporate representative, on Oct. 18, 2012 ("Soroof 30(b)(6) Dep."), at 26:10-14, 28:12-15, 12:7-21.

**Response:** Admitted.

12. Soroof initiated contact with GEFCS in the spring of 2000, expressing interest in distributing the Product. Ex. 11, Soroof 30(b)(6) Dep., at 59:9-20; Ex. 5, Scovello Dep. 2, at 204:9-17.

**Response:** Admitted.

13. In May 2000, Prince Bander Abdullah Al-Saud ("Prince Bander"), Soroof's President and CEO, as well as Jim Jackson, Soroof's Executive Director, met with representatives of GEFCS in New York at the Plug Power and GE Microgen offices to discuss the Product, its stage of development, and its availability. Ex. 11, Soroof 30(b)(6) Dep., at 59:24-60:21, 15:13-16:9, 221:10-22.

**Response:** Admitted. All "representatives of GEFCS" were actually GE employees. **Ex. 1**, Scovello Dep. at 32:14-33:3.

14. Later in May 2000, Prince Bander and Mr. Jackson met again with representatives of GEFCS in London, England. Ex. 11, Soroof 30(b)(6) Dep., at 65:11-25; Ex. 12, May 8, 2000 Email from Rajiv Sharma, attaching Email from Jim Jackson.

**<u>Response</u>:** Admitted.

15. After negotiations, on June 6, 2000, GEFCS and Soroof entered into a Distributor Agreement (the "Agreement") that would allow Soroof to be the exclusive distributor for the Product within the Kingdom of Saudi Arabia. Ex. 11, Soroof 30(b)(6) Dep., at 63:14-23; Ex. 10, Bander Dep., at 42:13-43:2; Ex. 13, Agreement.

**<u>Response</u>:** Admitted. The Agreement was drafted by GE representatives. *See* **Ex. 29**, May 25, 2009 Declaration of James Jackson ("Jackson Decl. I) at ¶ 5. Soroof would not have entered the Agreement had Defendants honestly conveyed the Product development status. **Ex. 4**, Jackson Decl. at ¶¶ 7 and 8. Under the Agreement, GEFCS had a continuing obligation "to share promptly relevant information, including but not limited to product performance, failure and liability issues…." **Ex. 11,** Agreement at § 7.4. GEFCS further maintained an obligation throughout the duration of the Agreement to "[u]se reasonable efforts to supply Pre-Commercial and Commercial Products to meet performance specifications…." *Id.*, at § 5.2. Under § 6.4 of the Agreement, Soroof paid GEFCS a distributor fee of $1 million. *Id*. at § 6.4.

16. Prince Bander and Mr. Jackson reviewed the Agreement prior to its execution. Ex. 11, Soroof 30(b)(6) Dep. at 64:15-65:1; Ex. 10, Bander Dep., at 59:14-17; Ex. 14, Deposition of Barry Glickman on Oct. 2, 2012 ("Glickman Dep."), at 88:21-89:8.

**<u>Response</u>:** Admitted. *See* Response 15.

17. Prince Bander signed the Agreement on behalf of Soroof; GEFCS's President, Barry Glickman, signed the Agreement on behalf of GEFCS. Ex. 13, Agreement, at 18.

**<u>Response</u>:** Soroof admits that Prince Bander and Mr. Glickman signed the Agreement. *See* Paragraph 5.

18. The Agreement specifies that it is governed by New York Law. Ex. 13, Agreement § 13.4.

**<u>Response</u>:** Admitted.

19. The Agreement states that the relationship between Soroof and GEFCS is intended to be that of buyer and seller. Ex. 13, Agreement § 13.2.

**<u>Response</u>:** Soroof objects to this Paragraph to the extent Defendants seek to establish legal conclusions as "material facts," which they are not. Soroof disputes that the Agreement was intended to be that of buyer and seller. The Agreement's provisions refer to Soroof as a "distributor." **Ex. 11**, Agreement at Preamble and §§ 1, 3 and 22.4. As part of the distributor relationship, the Agreement also required Soroof to exclusively distribute Defendants' Product by not selling and/or leasing "products that compete" with the Product. *Id*. at §§ 6.2, 14.3.3. Further, the Agreement required Soroof to provide its proprietary customer and sales information to Defendants. *Id*. at § 8.1. Defendants admit that Soroof was a distributor, not a buyer. *See, e.g.*, Paragraphs 2, 6 and 15, above; **Ex. 11** at §§ 6.9, 6.10, 6.11.

20. At the time the Agreement was negotiated and executed, the PEM fuel cell products were still in development. Ex. 14, Glickman Dep., at 94:2-6; Ex. 15, Deposition of Manmohan Dhar on Mar. 6, 2013 ("Dhar Dep."), at 63:4-12; Ex. 2, Scovello Dep. 1, at 27:20-25.

**<u>Response</u>:** Soroof admits that PEM fuel cell products were still in development. However, at the time the Agreement was negotiated and executed, the PEM fuel cell products were still in *the very earliest stages* of development. **Ex. 9**, Witmer Decl. at ¶ 9 (informing GE and Plug Power representatives of his considerable doubt that the Product could be commercialized in the spring and summer of 1999); **Ex. 10**, Edlund Decl. at ¶¶ 8 and 9 (informing Plug Power senior management prior to 2000 that their projected commercialization

schedule was not "remotely realistic"); **Ex. 5(1)**, Apr. 11, 2000 Fuel Cell Overview (internal GE document revealing "Technical Summary" showing that the Product was failing to meet numerous scheduled developmental milestones, including fuel cell system efficiency, size, weight, the Product's ability to run independently of the electrical grid, the Product's ability to run continuously without failing (known as MTBF, or mean time between failure), noise, water consumption and emissions; **Ex. 5(2)**, April 7, 2000 Marketing Update (internal GE document for "Review with Plug Power Board of Directors April 2000" revealing GE's frustration with how undeveloped the Product was noting that GE was trying to sell fuel cell product 'potential', with no hardware, field testing, etc. to back up the story."); **Ex. 15**, Dhar Dep. at 66:23-67:4, 134:14-16 (the head engineer leading Plug Power's efforts to develop the Product through November or December of 2000, admitted that, "[i]n 2000, early-middle 2000…we didn't have a lot of data [relating to testing of fuel cells] at that point."); Jerabek Dep. at 9:6-11, 10:13-16 (prior to October of 2006, "there wasn't a body of data in General Electric to analyze about Plug power, the product.").

21. Soroof was informed that the Product was still in development at the time the Agreement was negotiated and executed. Ex. 14, Glickman Dep., at 94:16-21; Ex. 10, Bander Dep., at 39:5-8, 147:16-25.

**Response:** Soroof disputes Paragraph 21 as incomplete and misleading. Soroof was not informed of how premature the efforts to develop the Product were at that time. During the first week of May of 2000, Soroof engaged in discussions with GE representatives at GE's and Plug Power's facility in Latham, New York, regarding becoming a distributor of the Product. **Ex. 14**, Deposition of Jim Jackson taken October 18, 2012 ("Jackson Dep.") at 59:11-60:21. GE employee Barry Glickman, then acting as President of GEFCS, and Frank Scovello told James

Jackson, Executive Director of Soroof's Power Division, and Prince Bander that the Product "was nearly ready for availability for production." *Id.* at 61:21-24; *see also* **Ex. 16,** Deposition of Prince Bander Abdullah Al-Saud taken December 11, 2012, ("Al-Saud Dep.") at 39:5-19 (regarding status of development in 2000, Messrs. Scovello and Glickman gave "the impression [that] it's [in] the last stage and its (sic) coming soon."). Mr. Glickman further represented to Mr. Jackson and Prince Bander that the unit "had an estimated 10-year service life and units, they were hoping to make units available to [Soroof] at an estimated $5,000 per unit," and the Product was "grid independent" capable of providing "prime power" as a "standalone." **Ex. 14**, Jackson Dep. at 61:15-62:7. Although Plug Power employees and engineers were present, they never corrected Messrs. Glickman's and Scovello's statements. *Id.* at 62:19-23 and 64:24-65:4. These statements were false when made, were intended to induce Plaintiff to sign an agreement, and Defendants failed to relay the true state of development as described in Paragraph 20. **Ex. 4**, Jackson Decl. at ¶¶ 7(a) and (b), 8 and 9. Had Soroof known the facts relating to the development of the Product, it would not have executed the Agreement. *Id.*

22. As early as March 2000 when it filed its first 10-K after it went public, Plug Power stated in its public filings that the Product was still in development and no commercial product had been made yet. Ex. 8, 1999 10-K, filed on March 30, 2000, at 7 ("We may never complete the research and development of a commercially viable residential fuel cell system. We do not know when or whether we will successfully complete research and development of a commercially viable residential fuel cell system."). The 10-K listed over five pages of additional risk factors, including, among other things, that: "[Plug Power has] only been in business for a short time and your basis for evaluating us is limited;" "[a] mass market for residential fuel cell systems may never develop;" "[Plug Power has] no experience manufacturing residential fuel

cell systems on a commercial basis;" and "[Plug Power] may not meet [its] product development and commercialization milestones." *Id.* at 7-8.

**Response:** Soroof disputes that Plug Power's March 2000 10-K (or any other) is relevant to Soroof's negotiations with GE in May and the first week of June 2000, or the Agreement with GEFCS that followed those negotiations, and further dispute that it somehow absolves Defendants from their misrepresentations and material omissions. Plaintiff admits that Plug Power, which was not a party to the Agreement (**Ex. 11**), published boilerplate cautionary language intended for the investing public regarding the development of the Product in SEC filings. The 1999 10-K pre-dates Soroof's negotiations with GE, which commenced in early May of 2000. **Ex. 14**, Jackson Dep. at 59:11-60:21. At no time was Soroof ever an "investor" in Plug Power, nor did Soroof ever enter into any agreement with Plug Power. Neither GE nor Plug Power presented Soroof with literature during negotiations, and Soroof viewed its agreement (correctly) as with GE, not Plug Power. *Id.* at 74:21-75:10. Mr. Jackson searched for information relating to the Product to the extent Soroof could, but noted "that information was controlled by GE, and I would imagine Plug Power." *Id.* at 78:22-79:2; **Ex. 9**, Witmer Decl. at ¶ 6 (was forced to sign a non-disclosure and given a stern warning by Plug Power legal counsel about adhering to it). Mr. Jackson also testified that the "very limited" number of Plug Power press releases he was able to locate on the Internet "were all positive, seemed upbeat." *Id.* at 75:1-10 and 79:9-11. With regard to researching Plug Power's public filings, Mr. Jackson testified that Soroof "didn't have any reason to believe we should, our agreement was with GE, not Plug Power." *Id.* at 81:17-23; *see also* **Ex. 4,** Jackson Decl. at ¶ 10. Further, Plug Power would not communicate a sub-distributor such as Soroof because Plug Power's commercial

relationship was with GE, and the relationship with a subdistributor was GEFCS's. **Ex. 6**, Conway Phase II at 115:8-18.

Further, Plug Power's 10-Ks, while listing "risk factors" for the investing public at the end of the document and noting its heavy reliance on GE's support, contain page after page of positive statements regarding the company, its business plan, and its very successful efforts to commercialize the Product—all of which corroborated Messrs. Scovello's and Glickman's misrepresentations. *See, e.g.*, Defendants' Ex. 8 (announcing the achievement of "major milestones" along the "product development and commercialization schedule," predicting the production of "pre-commercial systems" in 2000, "large scale commercial production" in 2001, and noting the joint venture entered with GE Microgen in February 1999). The statements made by Messrs. Glickman and Scovello regarding the near-commercial status of development (Paragraph 21), and other public statements by Plug Power (**Ex. 14,** Jackson Dep., 79:9-11) very directly indicated GE's full confidence in Plug Power's ability to deliver a product that would meet GE specifications, echo the positive content of the 10-K, and is so starkly different in content and tone to the fine-print language of 10-K investor risk statements rendering these risk statements essentially meaningless. That Plug Power's positive public statements were effective and minimized import of the risk factors commonly found in 10-Ks was reflected in the market. For example, in 2000, Plug Power executives sold their Plug Power stock holdings reaping millions of dollars in profit. *See, e.g.*, **Ex. 15**, Dhar Dep. at 238:2-239:1 (profited "more than 1 million" when he sold some of his holdings on May 5, 2000, and "an additional $2 million after tax" from sales of his Plug Power stock holdings after he left Plug in November or December of 2000); **Ex. 17**, Deposition of Gary Mittleman taken October 25, 2012 ("Mittleman Dep.") at 147:8-22; 148:17-24 (profited $175,000 when selling only 3,437 of his 400,000-700,000 shares

of Plug Power stock); **Ex. 3**, Acker Dep. at 103: (sold approximately 20% of his Plug Power holdings in May of 2000 for a profit of $701,662 after a "lock-up" period expired, and the rest of his holdings thereafter for an additional $3 million profit).

23. Soroof's President and CEO testified that Soroof did not do any due diligence into GEFCS prior to entering the Agreement. Ex. 10, Bander Dep., at 47:8-11, 209:12-17 ("Q. Do you know if anyone at – within Soroof assisted Jim Jackson with his due diligence with respect to this business arrangement between GEFCS and Soroof? A. Due diligence, we didn't do due diligence, as far as my recollection.").

**Response:** Disputed. Plaintiff performed "due diligence" as a prospective subdistributor by seeking and obtaining relevant information from GE, which had direct knowledge about the Product and its development status. **Ex. 14**, Jackson Dep. at 59:9-60:21, 61:15-62:7, 74:21-75:10, and 78:22-79:11; **Ex. 16**, Al-Saud Dep. at 39:5-19. Prior to entering the Agreement, Soroof participated in meetings in Albany, New York, London, England, and Riyadh, Saudi Arabia, and over the telephone, during which Soroof made inquiries of GE employees GE had tasked to GEFCS, the global distributor, which had direct access to the technology that was to the subject of the Agreement, as to the status of development, the timing of commercialization, and capabilities of the Product. **Ex. 16,** Al-Saud Dep. at 48:6-22, 95:10-15; **Ex. 14**, Jackson Dep. at 74:9-75:10; *see* **Ex. 32**, GE Fact Sheet. Public information regarding the Product would have been minimal, as, unknown to Soroof, the Product did not exist. **Ex. 7**, Glickman Dep. at 21:24-22:8 (GE did not test the Product because it did not exist); **Ex. 8**, Scovello Phase II at 19:23-20:5 (GE never tested the Product before or after the Agreement).

Soroof understood that they were negotiating directly and contracting with GE, one of the most respected suppliers of energy on earth, and very reasonably believed that GE had

performed rigorous due diligence before seeking to engage and contract with subdistributors. *See* **Ex. 16**, Al-Saud Dep. at 48:6-22 (Soroof went with "GE Fuel Cell Systems" because "it's GE," "we had experience in Saudi Arabia with GE," and although he heard of Plug Power "GE, that was the Agreement… all our dealing was with GE"); 58:24-59:3 ("[W]e consider our risk is so limited that due to a name of GE and very reputable company, and we thought our risk is very minimal"); 95:10-15 ("We're dealing with a company like GE, that's a company that has a reputation, as I said before, and it is Class A company. So it is – if there is anything wrong, they will tell us directly immediately…").

GE's history is the stuff of legends in American business lore. Founded in 1892, it traces its beginnings to Thomas A. Edison. **Ex. 32**, GE Fact Sheet. It is the only company listed in the Dow Jones Industrial Index that was also included in the original index in 1896. *Id.* GE is known worldwide for its many innovations, including in the fields of aircraft engines, power generation, water processing, household appliances, medical imaging, business and consumer financing and industrial products. *Id.* In 2012, it employed 305,000 people, and its operations spanned more than 100 countries across the globe. *Id.* "Along the way, GE scientists have amassed thousands of patents, and two Nobel Prizes." *Id.* GE claims on its website that it prides itself on working "on things that matter," "finding solutions," and applying its "spirit of innovation and unique set of capabilities to take on tough challenges…." *Id.*

It is not disputed that Soroof entered the Agreement with GEFCS, not Plug Power. *See* **Ex. 11**, Agreement. Jim Jackson noted that Soroof did not feel it necessary to research Plug Power's public filings: Soroof "didn't have any reason to believe we should, our agreement was with GE, not Plug Power." **Ex. 14**, Jackson Dep. at 81:17-23. It is also undisputed that GEFCS was not a publicly traded company and did not issue any SEC filings for review by potential

customers and distributors. *See* **Ex. 11**, Agreement at ¶ 8.3 and Schedule E; **Ex. 6**, Conway Phase II Dep. at 12:24-13:18 ("the GE logo…validates the product more generally to the community that would be purchasing fuel cell products."). Finally, the Agreement does not include any cautionary language or statement of risk.

24. Soroof's 30(b)(6) corporate representative testified that besides meetings and telephone calls with GEFCS personnel, Soroof did not do any due diligence prior to entering into the Agreement. Ex. 11, Soroof 30(b)(6) Dep., at 74:9-16.

**<u>Response</u>:** *See* Response 23.

25. Prior to entering the Agreement, Soroof did not review any of Plug Power's public filings. Ex. 10, Bander Dep., at 47:12-22, 50:4-10; Ex. 11, Soroof 30(b)(6) Dep., at 75:9-24.

**<u>Response</u>:** *See* Responses 22 and 23.

26. Soroof's corporate representative testified that he believes Plug Power's SEC filings were publicly available. Ex. 11, Soroof 30(b)(6) Dep., at 80:13-81:6.

**<u>Response</u>:** *See* Responses 22 and 23.

27. Prior to entering the Agreement, Soroof did not speak directly to Plug Power researchers or engineers. Ex. 10, Bander Dep., at 40:2-7; Ex. 11, Soroof 30(b)(6) Dep., at 63:10-13, 74:17-20.

**<u>Response</u>:** Incomplete and misleading. *See* Responses 20 – 23. Further, Defendants have not put forward any evidence to show what, if anything, would have come from those conversations or that Plug Power representatives would have contradicted the statements of Messrs. Glickman and Scovello. Evidence supports that Plug Power would not have done so. *See, e.g.*, **Ex. 14**, Jackson Dep. 62:19-23 and 64:24-65:4. As Defendants admit in paragraph 10,

GE maintained its own personnel on-site at Plug Power's facilities and Defendants can point to no evidence to suggest that Soroof should have suspected that GE's knowledge of the development of the Product was inadequate or incomplete.

28. Soroof reviewed certain Plug Power press releases regarding the Product through an internet search prior to entering the Agreement, but did not ask anyone at GE, GEFCS, or Plug Power any questions after reading those press releases. Ex. 11, Soroof 30(b)(6) Dep., at 75:6-15, 78:6-21.

**<u>Response</u>:** Incomplete and misleading. *See* Responses 21-23. Further, defendants have not: (1) identified any of the press releases reviewed by Soroof, (2) given any reason why these press releases would serve as cause for Soroof to follow up with Defendants, or (3) shown what, if anything, Defendants' response would have been to the hypothetical inquiry by Soroof. Defendants' Exhibit 22, a May 4, 2000 Press Release, reveals that Plug Power's public statements were positive and corroborated the statements made by Messrs. Glickman and Scovello (Response 21), and as such would not have been cause for follow up ("[t]he data collected will enable us to set our sales and manufacturing forecasts for 2001" and "we remain on track to bring our first commercial product to market in 2001"), and omitted the material facts related the development status of the Product as referenced in Paragraph 20.

29. Soroof's President and CEO testified that he would not have entered into the Agreement had he known certain information contained in Plug Power's publicly available Form 10-K, such as Plug Power's disclosure that the commercialization schedule could be delayed and that it did not know when or whether it would be able to develop a product of the standards required for commercialization; that Plug Power did not have experience manufacturing residential fuel cell systems on a commercial basis; that Plug Power may not meet its product

development and commercialization milestones; or that GE was no longer contractually obligated to purchase units from Plug Power. Ex. 10, Bander Dep., at 53:4-55:24, 56:6-12 ("Q. If you had known this information before entering into the contract, what if anything, would you have done differently? . . . A. We would not sign the contract. We would not go into an agreement."), 57:2-58:15.

**Response:** *See* Response 22.

30. In exchange for the right to be the sole and exclusive distributor of the Product in Saudi Arabia, Soroof paid a $1,000,000 distributor fee that was specified as "non-refundable" under the terms of the Agreement. Ex. 13, Agreement § 6.4; Ex. 11, Soroof 30(b)(6) Dep., at 10:25-11:4.

**Response:** Soroof objects to this Paragraph to the extent Defendants seek to establish legal conclusions as "material facts," which they are not. The referenced Agreement speaks for itself. Subject to this objection, Soroof disputes this Paragraph. Soroof paid this fee for the rights to distribute a Product, which it was misled, in the course of contract negotiations, to believe was very near commercialization. *See* Responses 6, 20, 21 and 23. Had Soroof known that these representations were false, it would not have signed the Agreement or paid the distributor fee. *Id.*

31. Soroof understood that the $1,000,000 distributor fee was not going to be returned. Ex. 10, Bander Dep., at 46:2-17.

**Response:** *See* Responses 6, 20, 21, 23 and 30.

32. The Agreement limited GEFCS's liability to Soroof. Ex. 13, Agreement §§ 12.1, 12.2, 15.4.

**<u>Response</u>:** Soroof objects to this Paragraph to the extent Defendants seek to establish legal conclusions as "material facts," which they are not. The referenced Agreement speaks for itself. Subject to the foregoing objection, as outlined in its Memorandum in Opposition filed here with, Soroof disputes that any provision of the Agreement limits Defendants' liability to Soroof. As reflected in, *inter alia*, Paragraphs 6, 20, 21 23, Defendants' conduct justifies recovery despite the existence of any exculpatory clauses in the Agreement.

33. Soroof understood that there was a risk entering into the Agreement. Ex. 10, Bander Dep., at 58:20-59:3.

**<u>Response</u>:** The facts alleged in this Paragraph are incomplete and disputed. Defendants failed to inform Soroof of material risks relating to Product development, the likelihood the Product would not be developed, and misrepresented those risks, associated with entering the Agreement. *See* Paragraphs 6, 20, 21, and 23. Consequently, Soroof reasonably believed that "[t]he only risk we may have anticipated was whether or not we could find clients, we felt certain we could." **Ex. 14**, Jackson Dep. at 75:25-76:8.

34. If the Product as outlined had been produced, Soroof's distribution rights would have been valued at greater than ten million dollars. Ex. 5, Scovello Dep. 2, at 228:5-229:1.

**<u>Response</u>:** Admitted.

35. The Agreement expired by its own terms on December 31, 2005. Ex. 13, Agreement § 4.1; Ex. 3, Conway Dep. 2, at 167:23-168:3; Ex. 5, Scovello Dep. 2, at 151:18-21.

**<u>Response</u>:** Soroof objects to this Paragraph to the extent Defendants seek to establish legal conclusions as "material facts," which they are not. The referenced Agreement speaks for itself. Rajiv Sharma of GE represented to Jim Jackson that the term of the Agreement would not commence until the Product was available for distribution, which never occurred. **Ex. 14,**

Jackson Dep. at 246:7-20. Moreover, in late-2005, Ravi Menon of Plug Power (**Ex. 1**, Scovello Phase I Dep. at 108:2-9) visited Soroof in Saudi Arabia and told Tahir Rashid, Soroof's Chief Operating Officer, that the Product would come to Soroof in 2007. **Ex. 26**, Deposition of Tahir Rashid taken February 25, 2013 ("Rashid Dep.") at 22:5-9, 73:18-74:18, and 79:11-25.

Further, evidence produced by Defendants in this case show that Defendants deliberately sought to delay Soroof's understanding of the true state of affairs with regard to the Product and the status of its relationship with GEFCS. In an e-mail dated January 5, 2006, Ravi Menon noted that, "from a contractual standpoint, *GEFC and Soroof have some open items to iron out between themselves*…." In a revealing response, Al Bucknam relayed to Mark Sperry (both of Plug Power, **Ex. 1**, Scovello Phase I Dep. at 16:23-27:6 and 84:4-7) that Frank Scovello (*Id.* at 111:17-112:8) was "pushing" for Plug Power to negotiate a distributorship directly with Soroof. **Ex. 28**, Jan. 5, 2006 E-mail from Al Bucknam to Mark Sperry. According to Mr. Bucknam, this was not "objectionable, but the reason to do them is not because [Soroof was] the first choice distributor for [Plug Power's] products, *but because GE took $1MM payment from each, and now is concerned about legal problems given that the distributors feel they didn't get value for their $'s. Id*. (emphasis added). With regard to Soroof, Mr. Bucknam expressed "a desire to slow-pedal." *Id.* He further recommended that he instruct Ravi Menon of Plug Power "to move slowly on the Saroof (sic) discussion, and provide the reason as 'we are considering asking GE for a different royalty agreement, and don't want to act on Saroof (sic) until the picture is clear." **Ex. 28**. This storyline was false, as clearly GE had severed its support of Plug Power and GEFCS had gone "inactive" many years before. *See* Responses 6 and 38.

36. At the time the Agreement expired, GEFCS had been unable to produce the PEM fuel cell products to commercial specifications and no Product was available for distribution. Ex. 2, Scovello Dep. 1, at 101:21-101:25; Ex. 5, Scovello Dep. 2 at 68:12-17.

**<u>Response</u>:** Admitted.

37. Because the Product was unable to be produced as originally envisioned, GEFCS was subsequently dissolved. Ex. 2, Scovello Dep. 1, at 47:14-48:1; Ex. 16, Action By Written Consent of the Members of GE Fuel Cell Systems, L.L.C., at PPI000104. A certificate of cancellation for GEFCS was filed on December 29, 2006 and took effect on December 31, 2006. Ex. 16, GEFCS Certificate of Cancellation, at GE000111.

**<u>Response</u>:** Plaintiff disputes the facts asserted in this paragraph as incomplete and misleading. Plaintiff admits that GEFCS was dissolved, and that the certificate of cancellation took effect on December 31, 2006. Soroof was not informed of GEFCS's dissolution (**Ex. 1**, Scovello Phase I Dep. at 92:22-93:4; **Ex 2**, Conway Phase I Dep. at 27:7-10), and GEFCS was left without any assets to satisfy potential claims against it (**Ex. 1**, Scovello Phase I Dep. at 48:22-49:9). Soroof did not learn of GEFCS's dissolution until 2007. **Ex. 29**, Jackson Decl. I at ¶ 14. Plaintiff further notes that GE determined far earlier that "the Product was unable to be produced as originally envisioned." *See* Response 6.

## C. <u>Development of the Product</u>

38. Since Plug Power went public in 1999, it spent over a half a billion dollars trying to bring the PEM fuel cell products, including the Product specified in the Agreement, to the marketplace. Ex. 1, Conway Dep. 1, at 101:12-102:3; *see also* Ex. 17, Plug Power Form 10-K, for period ending 12/31/11, at 10 ("As of December 31, 2011, we had an accumulated deficit of $754.8 million. We anticipate that we will continue to incur losses until we can produce and sell

our products on a large-scale and cost-effective basis. Substantially all of our losses resulted from costs incurred in connection with our manufacturing operations, research and development expenses and from general and administrative costs associated with our operations.”).

**Response:** Defendants’ statement is self-serving and incomplete. This statement does not indicate what resources were devoted to developing the Product versus developing other products, such as back-up generators. It is not disputed that the Product was never actually developed, but instead Plug Power shifted its focus to developing products used for backup power at cell towers—a different product than that which is provided for in the Agreement. **Ex. 1**, Scovello Phase I Dep. at 38:8-25; 74:22-75:6, 101:21-25 and 102:11-103:6; **Ex. 2,** Conway Dep. at 101:10-18 (Plug Power “turned [its] focus to the GenCore product,” i.e., the backup generator, because Plug Power determined that it would lose money in connection with its efforts to develop the Product specified in the Agreement); **Ex. 6**, Conway Phase II Dep., 123:8-124:2; **Ex. 3**, Acker Dep. at 62:18-21; **Ex. 5 (3)** (Sept. 12, 2003 Due Diligence Memo and Appended GE PowerPoint) **and 5(4)** (2003 “Back Up Slides”). GEFCS, with which Soroof contracted, discontinued its Product-related work in or around 2003. *See* Responses 6 and 37. Although Plug Power experienced paper losses, its executives and institutional investors pocketed millions of dollars in profits from their Plug Power investments. *See*, *e.g.*, **Ex. 15**, Dhar Dep. at 238:2-239:1; **Ex. 17**, Mittleman Dep. at 147:8-22; 148:17-24; and **Ex. 3**, Acker Dep. at 103:5-104:13.

39. Plug Power disclosed in its 1999 10-K that “[s]ince inception, we have devoted substantially all of our resources toward the development of the PEM fuel cell systems . . .” Ex. 8, 1999 10-K, at 16; *see also* Ex. 18, Plug Power Form 10-K, for period ending 12/31/00 (“2000 10-K”), at 19; Ex. 19, Plug Power Form 10-K, for period ending 12/31/01 (“2001 10-K”), at 17.

**Response:** *See* Responses 22 and 38.

40. GE Microgen and other General Electric Company affiliates contributed to Plug Power's investment in the PEM fuel cell systems through a $43.5 million cash investment. Ex. 3, Conway Dep. 2, at 35:9-22; Ex. 20, Power Fuel Cell Update, May 2002, at GE003269.

**Response:** *See* Response 38. GE Microgen was reliant on GE for all of its funds. So any funds contributed to Plug Power by a GE affiliate actually came from GE. **Ex. 8**, Scovello Phase II at 13:7-7 and 16:25-17:5.

41. Plug Power received millions of dollars of funding from other third parties and government sources. Ex. 7, Acker Dep., at 199:3-19; *see also*, *e.g.*, Ex. 18, 2000 10-K, at 19.

**Response:** *See* Response 38. Otherwise, admitted.

42. Plug Power's efforts to develop the PEM fuel cell systems were the largest in the industry. Ex. 7, Acker Dep., at 151:1-5, 87:1-10 ("People were starting to recognize that residential markets were things that could occur faster than the automotive market. Plug Power was in a leading position in that and Plug Power was applying the most resources of any company by many fold. So, there were competitors that had 30 people working on things whereas we had 300. We were putting vast amounts of effort into this and seeing the rate of growth associated with that vast amount of effort.").

**Response:** *See* Response 38. Otherwise, admitted.

### *i. Early Product Testing and Development*

#### a. Overall Product Testing and Development

43. Plug Power was continuously testing its fuel cell systems and advancing product development based on the results of that testing. Ex. 15, Dhar Dep., at 55:13-21, 59:12-60:10; Ex. 4, Mittleman Dep., at 122:10-123:10; Ex. 21, Deposition of Elihu Jerabek on Jan. 31, 2013 ("Jerabek Dep."), at 94:4-95:7; Ex. 7, Acker Dep., at 80:6-9 ("[F]rom the point Plug Power was

formed we adhered very strongly to this fast design[,] build[,] test cycle. And we built numerous testing laboratories."); Ex. 3, Conway Dep. 2, at 41:9-12 ("[T]esting went on daily on the systems, the subsystems, the components. So, that would have been going on constantly."), 45:10-13 ("Q. Can you tell me whether or not testing took place? . . . A. Yes. It went on every day.") (objection omitted), 80:17-18 ("[W]e were continually making improvements in all aspects of the system . . . .").

**Response:** *See* Response 38. Plaintiff disputes the nature and extent of Plug Power's "tests" and the data they produced at various stages. *See* Response 6. *See also* **Ex. 13**, Jerabek Dep. at 9:6-11, 10:13-16 (prior to October of 2006, "there wasn't a body of data in General Electric to analyze about Plug power, the product.").

44. This testing took place at a variety of sites, including at a model home at Plug Power in 1998. Ex. 15, Dhar Dep., at 74:9-75:3; Ex. 8, 1999 10-K, at 3.

**Response:** Admitted.

45. Around this same time, a laboratory testing area was also established to complete direct testing of fuel cells and direct testing of the various components. Ex. 7, Acker Dep., at 80:2-19; 81:8-11 ("[The components] are being testing for different reasons. They are being tested for fulfillments. They are being tested for longevity. They are being tested for efficiency, all these different kinds of things."); Ex. 8, 1999 10-K, at 3 (facility "contains over 90 test stations where we conduct design optimization and verification testing, rapid-aging testing, failure mode and effects analysis, multiple technology evaluations, and endurance testing in our effort to accelerate the development and commercialization of our fuel cell systems.").

**Response:** *See* Responses 3, 6, 38 and 43.

46. In 1998 and 1999, Plug Power continued development of various fuel cell components. Ex. 7, Acker Dep., at 221:17-222:1; Ex. 3, Conway Dep. 2, at 22:12-23. Specifically, in June 1998, Plug Power powered a three-bedroom home with a hydrogen-fueled residential fuel cell system; in November 1998, Plug Power demonstrated a methanol-fueled residential fuel cell system; and in December 1998, it demonstrated a natural gas-fueled residential fuel cell system. Ex. 8, 1999 10-K, at 3.

**<u>Response</u>:** *See* Responses 3, 6, 38 and 43.

47. Plug Power met its 1999 milestone of building 50 fuel cell systems. Ex. 4, Mittleman Dep., at 83:18-84:15; *see also* Ex. 7, Acker Dep., at 91:3-5; Ex. 8, 1999 10-K, at 3.

**<u>Response</u>:** *See* Responses 3, 6, 38 and 43.

48. In December 1999, Plug Power completed its 52nd fuel cell system. Ex. 8, 1999 10-K, at 3.

**<u>Response</u>:** *See* Responses 3, 6, 38 and 43.

49. Plug Power's corporate representative testified that in 1999, Plug Power's early alpha or beta type fuel cell systems were "demonstrating, operating, fielding to gather information data to continue to improve the system." Ex. 3, Conway Dep. 2, at 17:13-18.

**<u>Response</u>:** *See* Responses 3, 6, 38 and 43.

50. Fuel cell units were being tested on a daily basis in order to put together milestones and further test plans. Ex. 3, Conway Dep. 2, at 22:24-23:11.

**<u>Response</u>:** *See* Responses 3, 6, 38 and 43.

51. In February 2000, Plug Power acquired intellectual property and assets related to fuel processor development from Gastec, a developer of fuel processor technology located in the Netherlands. Ex. 8, 1999 10-K, at 3, 17.

**Response:** *See* Responses 3, 6, 38 and 43.

52. In March 2000, Plug Power filed its 63rd patent relating to fuel cell technology, system designs and manufacturing processes. *Id.*

**Response:** *See* Response 3, 6, 38 and 43.

53. The purpose of the units created in early 2000 was to generate data to make decisions in continued product development. Ex. 15, Dhar Dep., at 196:17-199:11; Ex. 22, Plug Power Press Release, May 4, 2000, at PPI011025.

**Response:** *See* Responses 3, 6, 38 and 43.

54. Plug Power's former Chief Engineer testified that as of July 2000, Plug Power was "working on reliability on a continuous basis and doing a lot of testing . . . so there's a lot of work going on. So problems were being identified, problems were being solved and work was going on . . ." Ex. 15, Dhar Dep., at 220:17-21, 141:6-8; *see also* Ex. 6, Cerveny Dep., at 34:24-35:7 ("The fact that we made the progress that we did, the number of systems that were under test for tens of thousands of hours. We had a farm of systems in the back of the building. We had 20-some test beds, test bays, inside the building to run full systems. So we were driving very hard at a target that was clear to all of us."), 63:16-21 ("[T]he entire purpose for the company and the entire effort that had been funded and staffed and given lots of resources was to improve on all the elements here and in the integration of the elements to create a system that could get to those efficiencies and to the full product requirement.").

**Response:** *See* Responses 3, 6, 38 and 43.

**b. Testing at Sandia National Laboratory**

55. A Plug Power fuel cell component was delivered to Sandia National Laboratory ("Sandia") in September 1998, and tested in February and March of 1999. Ex. 23, Deposition of Dennis Witmer on Mar. 21, 2013 ("Witmer Dep."), at 19:1-6.

**Response:** Admitted.

56. This testing was completed at Sandia more than one year prior to the date the Agreement was signed. Ex. 23, Witmer Dep., at 153:14-16.

**Response:** Admitted.

57. The unit Plug Power provided to Sandia was a laboratory device that was not a complete system. Ex. 23, Witmer Dep., at 121:21-123:21.

**Response:** This statement is incomplete and disputed. *See* Response 58.

58. The unit sent to Sandia was different than the Product contemplated by the Agreement; for example, it did not include a hydrogen reformer, did not include the same control system, and was in an earlier stage of development. Ex. 23, Witmer Dep., at 103:1-105:21, 120:14-22, 130:15-17 ("We were very clearly informed that what we were getting was a laboratory unit with a barely operating control system."); Ex. 7, Acker Dep., at 175:3-7 ("[T]he unit going to Sandia also had a natural gas feed because of the fact that it didn't have a reformer, so we were having to adapt it to overcome the missing component in order to get the right application."), 154:13-158:20; Ex. 6, Cerveny Dep., at 82:2-22.

**Response:** Incomplete and disputed. Dr. Dennis Witmer, the Principal Investigator on the Artic Fuel Cell Demonstration project which received the unit Plug Power sent to Sandia, stated that "[t]he Product referenced in the Agreement is the same technology that was provided by Plug Power to [Sandia] for testing and evaluation, although the product shipped to [Sandia]

did not include a hydrocarbon reformer, and operated on pure hydrogen." **Ex. 9**, Witmer Decl. at ¶ 5. A press release published by Plug Power dated December 3, 1998 relating to the fuel cell system delivered to Sandia, clearly states that the product delivered to Sandia was, in fact, an early yet incomplete version of the Product. **Ex. 19**, Dec. 3, 1998 Plug Power Press Release ("Plug Power LLC announced the delivery of a *state-of-the-art proton exchange membrane (PEM) fuel cell system to Sandia National Laboratories,*" the Sandia system "is *the same design* as the 7 kW unit demonstrated in Latham since June, which is the world's first PEM fuel cell system to completely power a home"; Gary Mittleman, then Plug Power's President and CEO, is quoted as hailing the system's "successful operation" at Sandia, which "further establishes the technical integrity of Plug Power PEM fuel cells," noted that the delivery "puts [Plug Power] one step closer to bringing [its] residential fuel cell unit to market.").

59. The unit Plug Power provided to Sandia was designed solely for testing purposes, not for the purpose of trying to achieve the performance or efficiency levels expected of the eventual Product. Ex. 24, Expert Report of William P. Acker, Ph.D., dated January 31, 2013 ("Acker Report"), at ¶ 16; Ex. 7, Acker Dep., at 156:8-20; Ex. 23, Witmer Dep., at 123:1-21; 130:13-20; 147:7-10.

**Response:** Disputed. The Plug Power unit delivered to Sandia was designed for evaluating the efficiency of the fuel cell stack alone and was adequate for this purpose. **Ex. 20**, Witmer Dep. at 147:11-24 ("This efficiency, this electrochemical efficiency, the unit that Plug Power sent us was adequate for measuring that kind of efficiency."). This information is critically important to evaluating the fundamental, achievable limits with regard to efficiency levels in PEM fuel cell systems. *Id.* at 148:1-150:6 ("we were measuring something that was a fundamental property of the membrane," and "Plug Power was not ahead or behind any other

competitors."); at 152:20-153:24 ("In all my reviews of the documents provided by Plug Power, I have not seen a single polarization curve that presented that rises above the one that we measured [at Sandia] in 1999."); and at 160:22-162:2 and 164:11-165:16 ("what I am calculating is what I think the upper limit on thermodynamic efficiency is"); *see also* **Ex. 3**, Acker Dep. at 253:2-254:25 (acknowledging no progress in Product efficiency from 2000 to 2004).

60. The product provided to Sandia was one of fifty Plug Power units being tested at that time and by the time the results were received from Sandia, the results from Sandia were obsolete. Ex. 7, Acker Dep., at 210:3-5; *see also* Ex. 6, Cerveny Dep., at 62:15-64:22.

**Response:** Disputed. Dr. Witmer's testing revealed fundamental limits of fuel cell technology, which were and are not obsolete. In light of Plug Power's commercialization projections, Dr. Witmer presented his concerns to Plug Power representatives, including George Earl, Monmohan Dhar, who headed residential PEM fuel cell development, and Dr. William Acker, Dr. Dhar's superior who is serving ostensibly as Defendants' expert witness, and to then-GEFCS employee, John Cerveny. **Ex. 9**, Witmer Decl. at ¶ 19. Dr. Witmer's concerns, like those expressed by Dr. Edlund, were ignored. *See* **Ex. 15,** Dhar Dep. at 118:9-17; **Ex. 3,** Acker Dep. at 156:25-157:7; **Ex. 22,** Deposition of John Cerveny taken January 31, 2013 ("Cerveny Dep.") at 70:17-18 (acknowledging he "probably would have dismissed" Dr. Witmer's concerns.) It is not disputed that Defendants failed to develop the Product. *See* Paragraphs 36 and 73. It is also undisputed that Dr. Witmer's concerns with Plug Power's projected commercialization of the Product have proven true. *See*, *e.g.*, **Ex. 21,** Deposition of Defendants' Expert Matthew Fronk taken March 20, 2013, ("Fronk Dep.") at 209:21-210:10. *See* also Responses 58 and 59.

***ii. Continuing and Anticipated Product Development***

61. At the time that GEFCS was formed and at the time that the parties executed the Agreement, Plug Power and GE Microgen believed that the proton exchange membrane fuel cell systems would be marketable. Ex. 4, Mittleman Dep., at 152:12-153:1; Ex. 14, Glickman Dep., at 102:19-103:9; Ex. 3, Conway Dep. 2, at 155:7-20; Ex. 5, Scovello Dep. 2, at 118:23-119:13.

**Response:** Disputed. *See* Responses 6, 20, 21, 23 and 33.

62. Throughout the development process, Plug Power believed that the Product's design and configuration were feasible for a mass market and the Product would be developed. Ex. 4, Mittleman Dep., at 66:15-67:7, 125:7-23; Ex. 7, Acker Dep., at 87:1-12; Ex. 3 Conway Dep. 2, at 196:16-19.

**Response:** Disputed. *See* Responses 3, 6, 20, 21, 23, 33, 38, 59 and 60.

63. As of June 1999, Plug Power believed it had the capability to sell 10,000 units in 2001. Ex. 4, Mittleman Dep., at 73:11-76:11; *see* Ex. 7, Acker Dep., at 86:21-87:12, 93:13-22.

**Response:** Disputed. *See* Responses 3, 6, 20, 21, 23, 33, and 60.

64. Plug Power's projected milestones for delivery of its PEM fuel cell products established in October 2000 were believed to be accurate by Plug Power at the time. Ex. 3, Conway Dep. 2, at 194:19-24.

**Response:** Disputed. *See* Responses 3, 6, 20, 21, 23, 33, and 60.

65. In 2003, even after the timeline for delivery of the Product had slipped, GEFCS still believed that the Product would be developed. Ex. 5, Scovello Dep. 2, at 179:4-9, 179:11-18 ("Plug had made huge progress to get where they were. So I think at this point in time we were very concerned that it was slipping and that the targets were – were difficult to hit, but at this time I think we were thinking, if it's going to be done, Plug will be the one to do it. I don't think

anyone in the industry at about this time was as far along as Plug."), 225:12-23; Ex. 26, July 9, 2003 Email from Frank Scovello. By the end of 2002, Plug Power's facility had over 150 test stations where it conducted its testing, and had delivered 121 systems into the field. Ex. 30, Plug Power Form 10-K, for period ending 12/31/02 ("2002 10-K"), at 2. By the end of 2003, Plug Power had 102 issued patents and 85 patents pending in the United States related to its fuel cell systems. Ex. 29, Plug Power Form 10-K, for period ending 12/31/03 ("2003 10-K"), at 6.

**Response:** Disputed. *See* Responses 3, 6, 20-23, 38, 43, 59 and 71.

***iii. Continued Product Development and Struggles in Development***

66. Plug Power experienced technical difficulties with development of the Product. Ex. 21, Jerabek Dep., at 41:9-24; Ex. 2, Scovello Dep. 1, at 48:16-18; Ex. 1, Conway Dep. 1, at 98:13-99:10.

**Response:** Admitted.

67. As Plug Power experienced these technical difficulties and setbacks, it updated its product delivery schedule according to new expectations. Ex. 4, Mittleman Dep., at 110:3-12; *see also, e.g.*, Ex. 19, 2001 10-K, at 8 ("Our distribution agreement with GE Fuel Cell Systems has been amended on three occasions. The most recent amendment in August 2001, further amended the distribution agreement to extend its term through 2014 and to replace the product specifications, prices and delivery schedule in the current agreement with a high-level, multi-generation product plan with subsequent modifications subject to mutual agreement.").

**Response:** Plaintiff disputes that the product delivery schedule was accurately updated to reflect the reality that the Product could not be developed and that Plug Power had effectively abandoned its development in favor of developing back-up rather than primary power fuel cells. *See* Paragraphs 3, 6, 20-23, 38 and 43.

68. The challenges that Plug Power encountered in bringing the PEM fuel cell product to the market within the timeframe originally envisioned were similar to those experienced by other companies across the world that were working on PEM fuel cell systems. Ex. 3, Conway Dep. 2, at 112:19-113:16.

**Response:** Irrelevant. No other companies were making aggressive projections regarding the commercialization of PEM fuel cells. **Ex. 20**, Witmer Dep. at 92:6-93:6; 173:7-13.

69. Plug Power was eventually able to build reliable fuel cell systems, but the biggest challenge to commercialization was the high cost of those systems. Ex. 3, Conway Dep. 2, at 125:7-126:6.

**Response:** Disputed and misleading. Defendants misrepresent the evidence cited for the proposition, which merely notes challenges involved with commercializing "reliable fuel cell systems." Today Plug Power manufactures fuel cell products to power warehouse material-moving equipment (forklifts), not fuel cells having a residential application. *See* **Ex. 30,** Plug Power Products Print-out.

70. All parties involved were disappointed that technical challenges prevented the production and distribution of Plug Power's product, as both GE Microgen and Plug Power expended substantial amounts of time and money trying to create and market the product for distribution. Ex. 1, Conway Dep. 1, at 33:3-12, 41:24-42:3; Ex. 2, Scovello Dep. 1, at 48:16-21.

**Response:** The parties' "disappointment" is not relevant, and the nature and extent of Defendants Product-related efforts is disputed. *See* Responses 3, 6, 20-23, 33, 38.

71. GE Microgen's corporate representative, Frank Scovello, testified that he was not certain, but believed that "in the 2001 time frame" there was a "a gradual realization that they could not build [a] product even close to what we had originally contemplated." Ex. 2, Scovello

Dep. 1, at 102:11-19. Mr. Scovello clarified that he did not believe the development of the Product was ever abandoned during the term of the Agreement. Ex. 5, Scovello Dep. 2, at 241:16-20 ("Q. To the best of your knowledge, did Plug Power ever abandon the development of the [P]roduct during the term of the agreement between GEFCS and Soroof? A. No, they did not.").

**Response:** Defendants effectively abandoned development of the Product no later than the summer of 2003 after shifting their focus to developing back-up generators. *See* Paragraphs 3, 6, 38, 43, and 67; **Ex.5(3),** Sept. 12, 2003 Plug Power Strategy Council Memo at PPI002652 (stating that Plug Power was refocusing its "business from mass residential to value added niche opportunities."); **Ex. 23**, Bob Powers Research Memo pg. PPI000565-566 (stating that while "mass-market residential product remains a promising long-term market, we are engaging markets today…for back-up power applications which carries an end-user value proposition that we can capitalize on in the near term."); see also **Ex. 1**, Scovello Phase I Dep. at 72:25-73:10 ("GEFCS was formed to be a master distributor of a certain kind of product…[Plug Power was] not building that product. They were building something else."); 38:8-21 ("GE's interest was in a Fuel Cell product that would produce power 24/7," but Plug Power was building different "products used for backup power, specifically for telecommunication application."), 74:22-75:6; 118:18-119:10. Further, evidence supports a finding that Defendants knew *before* they entered into the Agreement that they could not build a product even close to what they had originally contemplated. *See* **Exs. 5(1) and 5(2)**, Apr. 11, 2000 Fuel Cell Overview and Apr. 7, 2000 Marketing Update, respectively.

72. Plug Power's corporate representative, as well as several Plug Power former employees, testified that at no point between June 2000 and December 31, 2005 did Plug Power

abandon the development of the Product that was contemplated in the Agreement. *See, e.g.*, Ex. 3, Conway Dep. 2, at 168:7-12; Ex. 6, Cerveny Dep., at 76:10-77:12, 78:16-21; Ex. 21, Jerabek Dep., at 99:10-100:13.

**Response:** Disputed. *See* Responses 3, 6, 38, 43, and 71.

73. To date, Plug Power has not successfully developed a commercial product that meets the Agreement's specifications for the Product. Ex. 3, Conway Dep. 2, at 51:23-52:13.

**Response:** Admitted.

74. However, as of December 31, 2005, Plug Power had delivered 650 PEM fuel cell systems worldwide that met different specifications. Ex. 27, Plug Power 10-K, for period ending 12/31/05 ("2005 10-K"), at 1.

**Response:** Whether Plug Power delivered fuel cell systems that do not meet the specifications required by the Agreement is not relevant, and Plaintiff objects on that basis.

75. Plug Power sold versions of a product called "GenSys" from about 2005 forward and continues to work on development of that product. GenSys meets certain, but not all, of the technical specifications in the Agreement. In particular, GenSys does not meet the price specifications in the Agreement. Ex. 3, Conway Dep. 2, at 139:4-12; *see also* Ex. 5, Scovello Dep. 2, at 191:12-15; Ex. 28, Deposition of Frank Scovello on Apr. 16, 2013 ("Scovello Dep. 3"), at 338:16-24 ("Q. . . As of February 12, 2004, was Plug Power still developing the GenSys product? . . . A. Yes . . . Yes, they were.") (objection omitted).

**Response:** Whether Plug Power sold a product called "GenSys" from 2005 forward is not relevant, and Plaintiff objects on that basis. **Ex. 6**, Conway Phase II Dep. at 124:6-18 (GenSys is "a different product targeted for a different market.")

76. Both Plug Power's and GE Microgen's corporate representatives testified that they believed GEFCS, through the actions of Plug Power and GE Microgen, used reasonable and good faith efforts to bring the Product contemplated in the Agreement to the market. Ex. 3, Conway Dep. 2, at 170:4-171:17, 171:16-17 ("I believe we did work in good faith to bring the [P]roduct to the market."); Ex. 5, Scovello Dep. 2, at 239:23-240:5; *cf.* Ex. 14, Glickman Dep., at 102:7-11.

**<u>Response</u>:** Disputed. *See* Responses 3, 6, 20-23, 38, 43, 59, 67, 71, 77.

77. Plug Power's corporate representative testified that GEFCS "used extraordinary efforts" throughout the course of the Agreement to try to become a "successful manufacturer, marketer, and distributor of . . . fuel cell systems[.]" Ex. 3, Conway Dep. 2, at 175:18-176:3.

**<u>Response</u>:** Disputed. GEFCS went inactive by the summer of 2003 as a result of GE's conclusion that Plug Power could not commercialize the Product, and Plug Power effectively abandoned development of the Product in favor of developing different products. It is impossible to employ "extraordinary" or even good faith efforts when not conducting any business. *See* Responses 3, 6, 20-23, 38, 43, 59, 67 and 71.

***iv. Publication of Product Development Risk, Progress, and Struggles***

78. Plug Power disclosed in its public filings that it "may not meet our product development and commercialization milestones." *See, e.g.*, Ex. 8, 1999 10-K, at 8.

**<u>Response</u>:** *See* Response 22.

79. The purpose of this disclosure was to make public that Plug Power "had not met and may never meet the product development and commercial milestones that were established both within Plug Power and then with [its] relationship with GE Fuel Cell Systems." Ex. 3, Conway Dep. 2, at 21:16-22:2.

**Response:** *See* Response 22.

80. In May 4, 2000, Plug Power issued a press release which stated that the units being developed were not final commercial design, but "enable Plug Power to gather meaningful data that is critical to advance the design of the initial commercial product." Ex. 22, Plug Power Press Release, May 4, 2000, at PPI011025. In the same press release, Plug Power stated, "The pre-commercial units which Plug Power is now developing do not conform to the specifications originally agreed upon with GE in February 1999. As a result, GE is no longer contractually obligated to purchase the 485 units under its take or pay commitment." *Id.*

**Response:** Misleading and incomplete. *See* Responses 3, 6, 20-23, 28, and 33. The May 4, 2000 Press Release pre-dates the Agreement and negotiations GE had with Soroof. Further, the language cited from the May 4, 2000 Press release are without full context. That Press Release, which did not reference GEFCS, contains many positive statements that corroborate Messrs. Glickman's and Scovello's statements: Plug Power projected producing and distributing 500 pre-commercial by the end of 2000, setting "sales and manufacturing forecasts for 2001," noted that it remained "on track to bring our first commercial product to market in 2001," and projected commercializing grid-independent fuel cell systems sometime late in 2001 or early 2002. It also failed to disclose just how serious its developmental shortcomings were referenced in Paragraph 20, and stated that its "relationship with GE remains intact," that, GE continues to support product development, sales and distribution directed at bringing the GE MicroGen/Plug Power commercial product to market, and that "GE will be purchasing a large number" of fuel cells in 2000 and 2002.

81. From at least 1999 through 2006, Plug Power's Form 10-K filings included sections describing its efforts and achievements in Product Development and Commercialization,

Distribution and Marketing, as well as its Risk Factors. *See, e.g.*, Ex. 29, 2003 10-K, at 1 ("We continue to advance the development of our fuel cell systems. Our research and development facility contains over 150 test stations, where we conduct design optimization and verification testing, rapid-aging testing, failure mode and effects analysis, multiple technology evaluations, and endurance testing in order to accelerate the development and commercialization of our products." ); *see also id.* at 7-16; Ex. 18, 2000 10-K, at 3-4, 7-13; Ex. 19, 2001 10-K, at 2-3, 6-14; Ex. 30, 2002 10-K, at 2, 6-16; Ex. 9, 2004 10-K, at 2-3, 5-13; Ex. 27, 2005 10-K, at 1, 5-14.

**Response:** Plaintiff disputes that Plug Power's 10-K filings are relevant. *See* Responses 22.

**D. GEFCS' Communications with Soroof**

82. Throughout the relationship with GEFCS, Soroof was kept informed of the Product's development, generally through communications between Frank Scovello, President of GEFCS and Jim Jackson, an Executive Director at Soroof. Ex. 5, Scovello Dep. 2, at 83:2-12, 130:20-131:6, 231:4-19, 246:11-14; Ex. 28, Scovello Dep. 3, at 289:11-24; Ex. 2, Scovello Dep. 1, at 24:3-5; Ex. 25, Soroof's Interrogatory Responses, at Response No. 6.

**Response:** Soroof admits that communications between Soroof and Defendants occurred between Jim Jackson and Frank Scovello. Otherwise, disputed. *See* Responses 6, 15, 16, 20, 21, 37, 59, 38 and 71.

83. Early in the relationship between GEFCS and Soroof, Barry Glickman from GEFCS also provided Soroof with updates with respect to the progress of the Product's development. Ex. 14, Glickman Dep., at 48:11-13.

**Response:** Soroof admits that Barry Glickman communicated with Soroof. Otherwise, disputed. *See* Responses 6, 15, 16, 20, 21, 37, 59, 38 and 71.

84. Mr. Scovello provided fuel cell updates, including the overall status of Product development and limitations in the Product, to Mr. Jackson through emails and phone calls. Ex. 10, Bander Dep., at 88:21-25, 89:15-20, 90:21-23, 96:5-8; *see also id.* at 104:15-25, 148:5-9; *see also, e.g.*, Ex. 26, July 9, 2003 Email from Frank Scovello; Ex. 34, Jan. 2, 2002 Email from Frank Scovello; Jan. 17, 2002 Email from Frank Scovello Attaching Status Report; Apr. 25, 2002 Email from Frank Scovello.

**Response:** Soroof admits that Mr. Jackson communicated with Mr. Scovello, but Soroof was not provided with material information relating to the development of the Product. **Ex. 14**, Jackson Dep. at 256:15-13. *See* Responses 82 and 83.

85. There were also several in person meetings between Soroof and GEFCS representatives between 2000 and 2004. Ex. 5, Scovello Dep. 2, at 115:21-116:16; Ex. 12, May 8, 2000 Email from Rajiv Sharma, attaching Email from Jim Jackson; Ex. 31, Aug. 21, 2000 Email from Rajiv Sharma; Ex. 32, Apr. 17-19, 2001 Email String, at Apr. 17, 2001 Email from Prince Bander; Ex. 37, Jan. 21, 2004 Email from Frank Scovello; Ex. 38, Feb. 23, 2004 Email from Frank Scovello.

**Response:** Admitted that there were in person meetings.

86. When there was a material change in the Product's schedule or definitive action on the development of the Product, GEFCS passed that information on to the various distributors, including Soroof. Ex. 5, Scovello Dep. 2, at 220:3-9; *see also* Ex. 11, Soroof 30(b)(6) Dep., at 21:19-22:2 ("Q. Can you describe the topics of communication that you had with Plug and the different GE entities when you were the point of contact. A. It was primarily requesting schedules, delivery schedules for the precommercial units and the commercialized units of fuel cells that we had contracted for."); Ex. 28, Scovello Dep. 3, at 329:14-25 ("Q . . .

Did GE Fuel Cell Systems relay information relating to product development such as struggles with mean time, improving mean time between failures to Soroof? A. Yes. But not in that – we may not have used those words, we may have said that the [P]roduct was in early development and that this is not currently performing, you know, at a level that we're ready to sell as a commercially viable product.").

**Response:** Disputed. Defendants misrepresented the status of Product development and failed to disclose material, relevant information to Soroof as referenced in, *inter alia*, Paragraphs 3, 6, 15, 16, 20, 21, 23, 33, 37, 38, 59, 71, 82, and 83.

87. There was never a time that Soroof asked Plug Power for information that Plug Power did not provide the requested information. Ex. 11, Soroof 30(b)(6) Dep., at 155:17-21.

**Response:** Misleading and disputed. Soroof's communications with regarding the status of the Product were with GE. **Ex. 4**, Jackson Dep. at 82:12-15 ("Very early on Frank Scovello was identified as our point of contact and I respected that and maintained contact only with Frank, direct contact with Frank."). Information provided to Soroof was inaccurate and incomplete. *See* Paragraphs 3, 6, 15, 16, 20, 21, 23, 33, 37, 38, 59, 71, 82, and 83.

88. Soroof's President and CEO is unable to recall any instance when GEFCS did not answer a question posed by someone from Soroof. Ex. 10, Bander Dep., at 73:3-7.

**Response:** *See* Response 87.

89. In early June 2000, immediately before the signing of the Agreement, GEFCS told Soroof that the Product's delivery had been delayed and was expected to be ready in the last quarter of 2001 instead of the last quarter of 2000, as originally communicated. Ex. 10, Bander Dep., at 51:12-25, 147:22-25.

**<u>Response</u>:** Defendants misstate Prince Bander's testimony. Prince Bander learned about a delay "at the signing of the contract," which delay was not related to fundamental issues with developing the Product, but rather was required to perfect the Product. **Ex. 16,** Al-Saud Dep., 51:12-25. At the time Soroof entered the Agreement, Mr. Glickman informed him the Product was "almost developed…." *Id.* at 147:22-25. *See* Responses 20 and 21.

90. In August 2000, GEFCS informed Soroof that "[t]he [P]roduct commercialization date has shifted to the right by six months," which Soroof understood was a further six-month delay. Ex. 11, Soroof 30(b)(6) Dep., at 90:5-92:12; Ex. 10, Bander Dep., at 64:24-65:11; Ex. 14, Glickman Dep., at 99:19-100:5; Ex. 31, Aug. 21, 2000 Email from Rajiv Sharma.

**<u>Response</u>:** Admitted.

91. Prince Bander testified that he did not believe that Mr. Glickman misrepresented the truth at the time that he stated the Product's expected delivery schedule. Ex. 10, Bander Dep., at 193:20-195:10.

**<u>Response</u>:** Objection. The facts alleged are irrelevant and inadmissible as they seek to admit evidence of Defendants' mental state by a third-party. FRE 404(a). Prince Bander was in no position to assess the truth of Mr. Glickman's statements and did not know of the substantial material information Mr. Glickman withheld. *See* Responses 20-22.

92. Prince Bander testified that it was his belief that as of August 2000, GEFCS was working as hard as they could to supply the pre-commercial and commercial p that met the performance specifications of the Agreement. Ex. 10, Bander Dep., at 218:22-219:9.

**<u>Response</u>:** Disputed. *See* Responses 6, 15, 16, 20, 21, 33, 37, 38, 59, 71, 82, 83, and 91. Prince Bander was in no position to assess GEFCS's efforts as of August of 2000 or at any time thereafter.

93. In August and September 2000, Mr. Jackson and members of GEFCS met to discuss aspects of the fuel cell systems, as well as the relationship with Plug Power and GEFCS. Ex. 5, Scovello Dep. 2, at 117:6-12; Ex. 11, Soroof 30(b)(6) Dep., at 85:24-87:11.

**Response:** Admitted.

94. At the time of this meeting, the initial delivery schedule and product price had already changed, and those changes were communicated to Soroof. Ex. 5, Scovello Dep. 2, at 117:13-20; Ex. 11, Soroof 30(b)(6) Dep., at 87:4-7, 91:15-19; Ex. 31, Aug. 21, 2000 Email from Rajiv Sharma.

**Response:** This statement paints the misleading picture that Defendants shared all relevant, material information with Soroof. This was not so. *See* Responses 6, 15, 16, 20, 21, 33, 37, 38, 59, 71, 82, 83, and 91.

95. At the time of these meetings, GEFCS believed and communicated that a product could still be delivered. Ex. 5, Scovello Dep. 2, at 118:1-119:13.

**Response:** Plaintiff admits that, at the time of these meetings and at all times, GEFCS communicated that the Product could still be delivered. That GEFCS believed that a Product could still be delivered is a disputed fact. *See* Responses 6, 15, 16, 20, 21, 33, 37, 38, 59, 71, 82, 83, and 91.

96. As a result of the delay in the Product delivery schedule, Soroof pursued other opportunities in the power business unrelated to the Product. Ex. 10, Bander Dep., at 66:10-19; Ex. 11, Soroof 30(b)(6) Dep., at 187:9-24.

**Response:** Soroof admits it attempted to mitigate its damages by attempting to secure business it would otherwise have not sought but for delays in the Product development schedule. **Ex. 16**, Al-Saud Dep. at 67:4-11; **Ex. 14**, Jackson Dep. at 267:5-22, 272:3-11, and 268:3-15

("We had only been given delays for delivery of the product," and "[o]nce product would be available to us you couldn't possibly then start from scratch again, create this company structure and receive that product within 90 to 120 days lead time that was discussed in making the product available.").

97. By the end of 2000, Soroof had been informed twice that there were delays in the delivery of the Product. Ex. 10, Bander Dep., at 160:20-24.

**Response:** Incomplete. Defendants withheld information material to the state of development of the Product. *See* Responses 3, 6, 20 and 21.

98. By April 17, 2001, Soroof was informed that the "delivery schedule for fuel cells ha[d] slipped indefinitely." Ex. 32, Apr. 17-19, 2001 Email String, at "Discussion Agenda with GE" Attachment; Ex. 33, Apr. 17-26, 2001 Email String, at "Soroof – Discussion Guide" Attachment; Ex. 14, Glickman Dep., at 117:8-13, 121:9-14; Ex. 11, Soroof 30(b)(6) Dep., at 98:10-99:10 ("Q. So at this time on April 17th, 2001, it was Soroof's understanding that the delivery schedule for the product had slipped indefinitely? A. We had first been told it would be last quarter 2000 by August only weeks after signing the agreement, we were told now it would slip perhaps six months, now we are getting into early '01. This is now we are talking about April of '01, by that time it was obvious we were not receiving product. . . .Where the first six-month delay of the product would not have been a problem, now we are looking at now they can't give us a delivery date. Q. Why was it - - A. That's a problem."); Ex. 10, Bander Dep., at 79:11-80:4, 84:6-10 ("Q. But at least as of this point in April of 2001, GE Fuel Cell Systems is notifying you about uncertainties in the fuel cell product? . . . A. It looks like it, yeah.") (objection omitted); Ex. 5, Scovello Dep. 2, at 133:14-134:2, 134:6-11 ("At this time, and this would have been after the first delay, we were explaining to them that product was not being

produced that met our specifications, that cost was high, reliability wasn't where we needed it to be in order to resell the product to Soroof."), 213:20-214:8.

**Response:** Out of context and misleading. Soroof did not understand "indefinite delay" to mean that the Product was never coming or faced insurmountable issues with its development. "Indefinitely to me is not forever. It just doesn't have a date with it." **Ex. 16**, Al-Saud Dep. at 79:20-24, 83:20-84:5. Mr. Scovello told Jim Jackson that "they had reliability issues with the [P]roduct," and that "[w]hile Plug Power thought they had a product that they could provide to GE, it did not meet the specifications, GE specifications for reliability." **Ex. 14**, Jackson Dep. at 98:9-99:3. Further, the e-mail Defendants cite as their Ex. 33 explicitly stated that "GE remains optimistic about fuel cells."

99. Despite being told that the delivery schedule had slipped indefinitely, in April 2001, Soroof desired to expand its distributorship to include Lebanon and other Middle Eastern countries. Ex. 5, Scovello Dep. 2, at 214:9-14; Ex. 14, Glickman Dep., at 117:14-20; Ex. 11, Soroof 30(b)(6) Dep., at 100:18-101:1.

**Response:** Misleading, incomplete, and disputed. Soroof had been pursuing the addition of Lebanon (and other territories) since before the execution of the Agreement. *See* **Ex. 24**, May 8, 2000 E-mail from R. Sharma to B. Glickman, et. al. at GE 000330-331. That Soroof continued to seek expansion of distribution territories in 2001 underscores that Soroof believed that the Product was forthcoming upon resolution of GE's demands regarding Product reliability. Rather than inform Soroof that the Product's challenges could not be overcome as revealed Frank Scovello's admission that, very early on in the 2001 timeframe, it became clear to GE that Plug Power could not develop anything close to the Product, Mr. Glickman told Soroof that "GE

remains optimistic about fuel cells." **Ex. 1,** Scovello Phase I Dep. at 102:11-103:3; **Ex. 4**, Jackson Decl. at ¶¶ 7-9; Defendants' Ex. 33.

100. GEFCS informed Soroof that it was concerned about expanding Soroof's distribution territory given the uncertainties of the Product's schedule. Ex. 14, Glickman Dep., at 121:15-122:10; Ex. 5, Scovello Dep. 2, at 214:15-215:2; Ex. 11, Soroof 30(b)(6) Dep., at 101:11-22; Ex. 33, Apr. 17-26, 2001 Email String, at "Soroof – Discussion Guide" Attachment.

**Response:** Misleading. Material "uncertainties" known to Defendants were not conveyed to Soroof, including the severity of developmental issues underlying them. *See* **Ex. 14,** Jackson Dep. at 101:11-17 (GE failed to specify technical problems resulting in delay). *See also* Responses 6, 20-22, 38, 59, 71, 98, and 99.

101. As of November 2001, Soroof understood that there was not a Product available at that time and there was not a specific date for delivery of the Product. Ex. 11, Soroof 30(b)(6) Dep., at 109:2-8.

**Response:** Admitted, but Soroof's understanding then and after was not that there was some fundamental problem with developing the Product, but rather that the delay was attributable to the Product "still being perfected." **Ex. 14**, Jackson Dep., 109:9-20. Further, from 2000 to 2007 Soroof believed that it would receive the Product. See **Ex. 14**, Jackson Dep. at 132:7-133:22, 138:8-13, 200:3-19, 273:18-274:2; **Ex. 26**, Rashid Dep. at 73:18-74:7, 255:21-256:15.

102. In 2002, GEFCS continued to provide fuel cell updates and to report delays in the Product commercialization schedule to Soroof. Ex. 10, Bander Dep., at 95:20-23; Ex. 34, Dec. 29, 2001-Jan. 2, 2002 Email String, at Jan. 2, 2002 Email from Frank Scovello; Jan. 17, 2002 Email from Frank Scovello Attaching Status Report; Apr. 25, 2002 Email from Frank Scovello.

**<u>Response</u>:** *See* Responses 82 and 97. Further, the cited exhibits, including a press release titled "Plug Power Announces Year-End, 4th Quarter Milestones Achieved" for 2001 and announcing an "[e]xpanded distribution agreement[] with GE Fuel Cell Systems," demonstrate that Defendants failed to inform Soroof as to just how dire the developmental status was at that time (*see* Paragraphs 20-21), but instead shared only very positive information to paint a misleading picture that the Product development efforts will succeed. An internal GE document from that time period reflects multiple developmental problems encountered in 2001, including with regard to the integral reformer development ("Unable to Effectively Load Follow"), reliability, fuel cell stack degradation, and costs. **Ex. 27**, Fuel Cells Business Overview at GE 002527.

103. Soroof understood that Product development was continuing but that there was no schedule for release of the Product. Ex. 11, Soroof 30(b)(6) Dep., at 114:3-116:22.

**<u>Response</u>:** Admitted. Further, from 2000 to 2007 due to Defendants representations, Soroof believed that the Product would be delivered. See **Ex. 14**, Jackson Dep. at 200:3-19; **Ex. 26,** Rashid Dep. at 22:5-9, 73:18-74:18, 79:11-15. *See also* Responses 82 and 101.

104. Soroof did not do additional research into the reasons for the delay into the release of the Product. Ex. 10, Bander Dep., at 95:24-96:4.

**<u>Response</u>:** This statement is inaccurate. Mr. Jackson monitored the development of the Product online and regularly corresponded via telephone and e-mail with Frank Scovello to obtain information regarding the Product. See **Ex. 14**, Jackson Dep. at 78:22-79:11 (Soroof investigated the Product to the extent it could although "that information was controlled by GE, and I would imagine Plug Power" because there was not public information concerning "delays in production, delays in the development of the product itself," and the press releases Mr.

Jackson had read were all positive, seemed upbeat.); 82:5-15 (from 2000 to 2006, Soroof relied on "conversations and e-mails that we had with personnel at GE", including Barry Glickman, Frank Scovello—Soroof's direct point of contact, and Rajiv Sharma).

105. Besides communications with personnel at GEFCS, the only step Soroof's corporate representative testified that it took to investigate the status of the Product from 2000 to 2006 was reading an industry publication at one point in late 2000 or early 2001, but that publication did not identify Plug Power or GE. Ex. 11, Soroof 30(b)(6) Dep., at 82:5-83:9.

**Response:** This statement is inaccurate. *See* Response 104.

106. In May 2002, Prince Bander circulated a "Fuel Cell Catalyst" industry newsletter to some members of the Soroof staff, which included a report regarding Plug Power and the "major hurdles in turning fuel-cell technology into a commercially successful product." Ex. 35, May 3-4, 2002 Email String, at Fuel Cell Catalyst Attachment.

**Response:** Disputed as to the import Defendants assign to this e-mail and the newsletter attached to it. Further, Defendants create a false impression of the article. The article embedded within that newsletter cited by Defendants, authored by Plug Power's Director of Supply Chain Management, provides that "[l]owering the cost of ownership is one of the major hurdles in turning fuel cell technology into a commercially successful product." The author then proceeds to explain Plug Power's strategy for tackling this hurdle and tout why it is well-equipped to do so, noting that Plug Power had reduced "unit material cost by 37% through a combination of internal design changes, supply chain initiatives and increased volume" in 2001 and "has a similar goal for 2002.

107. In April 2003, Mr. Scovello informed various members of Soroof that the products were still in the early commercialization phase. Ex. 10, Bander Dep., at 105:25-106:7,

106:8-13 ("Q. Was it your understanding then in April of 2003 that the product was still considered in early commercialization and that the price was still very high? A. Yes, I'm aware of that, and they are working on it, yes."); Ex. 11, Soroof 30(b)(6) Dep., at 120:12-20 ("Q. So at this time in April 2003 what was Soroof's understanding as to the status of development of the product? A. Only that it was not yet available for production, and it would remain that way because it never went into production . . . We had hoped for different news, but it never changed."); Ex. 36, Apr. 19-25, 2003 Email String, at Apr. 22, 2003 Email from Frank Scovello.

**Response:** Admitted that, in April of 2003, Mr. Scovello misrepresented that the Product had been commercialized in its early stages notwithstanding that the Product was actually far from being, and actually never was, commercially developed. *See* Responses to 20-22 and 82.

108. As of July 2003, Soroof understood that "an economically viable, prime power fuel cell product for the Kingdom [was] still not in the schedule" and "tak[ing] much longer then [sic] anyone had originally expected." Ex. 26, July 9, 2003 Email; Ex. 10, Bander Dep., at 99:24-100:4; Ex. 11, Soroof 30(b)(6) Dep., at 122:2-123:4. Prince Bander testified that the statements conveyed by Mr. Scovello related to the challenges in developing the Product in July 2003 were accurate. Ex. 10, Bander Dep., at 228:7-229:12; Ex. 28, Scovello Dep. 3, at 300:9-19 ("Q. Was GE's belief that the mass residential [PEM] fuel cell may not be viable, was that ever communicated to Soroof? A. Yes. Q. And how was that information communicated to Soroof? A. In an e-mail to Soroof. I believe that the exact wording was that a product, an economically viable product, was not in the schedule.").

**Response:** Incomplete and misleading. Prince Bander did not indicate whether Mr. Scovello's statements were "accurate," nor was he in any position to make that assessment. Further, this statement is a misrepresentation: the referenced e-mail stated that the Product is

"still" not in the schedule, implying that it will be added to the schedule at a future date. By 2003, Defendants had effectively ceased development of the Product. *See* Responses 3, 6, 20-22, 38, 43, 67, and 71.

109. As of December 2003, Soroof understood that the Product under the Agreement was still under development. Ex. 11, Soroof 30(b)(6) Dep., at 132:7-13, 133:15-22.

**Response:** Although this was Soroof's understanding, admissible evidence shows that the Product was not the focus of Plug Power's product development efforts by December 2003, and GEFCS was "inactive" as a result. *See* Responses 3, 6, 38, 43, 67, 71 and 108.

110. In January 2004, Ibrahim Akar from Soroof sent an email to Mr. Scovello stating, "I wish to thank you for taking the initiative always and keeping us (S[oroof]) up-dated with the latest developments and discussions concerning fuel cell technology . . . ." Ex. 37, Jan. 24, 2004 Email from Ibrahim Akar.

**Response:** Misleading. The "fuel cell technology" referenced in the exhibit—GenCore and GenSite – relates to fuel cell systems other than the Product. *See* Responses 38 and 71. Mr. Akar could not have assessed the veracity and completeness of the information provided by Mr. Scovello.

111. When Soroof's corporate representative was asked if it was "Soroof's opinion [in January 2004] that it was always kept up-to-date with fuel cell development information from GEFCS," he answered "No." He also admitted that he did not recall asking GEFCS for any additional information at that time. Ex. 11, Soroof 30(b)(6) Dep., at 136:6-137:17.

**Response.** Misleading and misstates testimony. It is not clear whether Mr. Jackson testified about his current belief about whether Soroof was being kept up-to-date: "I don't

believe so, no, I don't believe we were." Further, Mr. Jackson did regularly seek information through internet searches and communication with Frank Scovello. *See* Response 104.

112. In February 2004, GEFCS again informed Soroof that Plug Power did not have an economically viable version of the Product at that time. Ex. 10, Bander Dep., at 117:7-11; Ex. 38, Feb. 23, 2004 Email String, at Feb. 23, 2004 Email from Frank Scovello.

**Response:** Misleading and incomplete. Mr. Scovello stated that: "fuel cell products that can be used for continuous power…Plug Power does not ***yet*** have an economically viable version of that product to offer." (Emphasis added.) Despite that Defendants had effectively abandoned the Product six months earlier, they implied that the Product might "yet" be offered, however, that was unlikely as they were no longer focused on developing the Product. Further, four months later, despite that GE withdrew its support for the Product, concluded it had little confidence in its commercialization, and knew Plug Power had shifted its focus to back-up generators (*see* Responses 6, 38, 43, 67 and 71), Mr. Scovello told Mr. Nabhan, then Soroof's CEO, "development of the product, contemplated in our original agreement, continues at Plug Power." **Ex. 25,** June 21, 2004 E-mail from Frank Scovello to Ayman Nabhan.

113. In June 2004, Soroof requested that the $1 million nonrefundable distributor fee paid under the Agreement be returned because GEFCS "fail[ed] to make the product covered by the said agreement available for commercial application." Ex. 39, June 22, 2004 Email String, at June 22, 2004 Email from Ayman Nabhan; Ex. 10, Bander Dep., at 125:9-25; *see also* Ex. 39, June 21, 2004 Email String.

**Response:** Misleading and misrepresents the evidence cited. Soroof requested a return of the distributor fee "temporarily" until "they could give a delivery date and give us a date we could receive product," and Soroof would "resubmit the fee to them when they could provide

product." *See* **Ex.14,** Jackson Dep. at 175:20-176:6. Soroof was informed on June 21, 2004 by Mr. Scovello that the development of the Product "continues." **Ex. 25**, June 21, 2004 E-mail from Frank Scovello to Ayman Nabhan.

114. GEFCS responded to Soroof's demand for a return of the distributor fee by email, stating, "I am not sure you are aware of the fact that there is no contractual basis for return of the distributor fee to Soroof. This fee was not intended to guarantee delivery of product, but to secure Soroof distribution rights in the Kingdom." Ex. 39, June 24, 2004 Email String, at June 23, 2004 Email from Frank Scovello.

**Response:** Misleading. It is not clear that Mr. Scovello (or GE) believed that the distributor fee would not have to be returned. *See* **Ex. 1,** Scovello Phase I Dep. at 99:19-100:25 (GE sought an indemnification to provide for a "scenario where the resolution had to be the return of nonrefundable distribution fees."); **Ex. 28,** Jan. 5, 2006 E-mail from A. Bucknam, Plug Power's Vice President of Business Development, to Mark Sperry, Plug Power's former Chief Marketing Officer ("GE took a $1MM payment from [Soroof], and now is concerned about legal problems given that the distributors feel that they didn't get value for their $'s.").

115. The day after Soroof received GEFCS's response, Soroof considered having a lawyer review the Agreement. Ex. 39, June 24, 2004 Email String, at June 24, 2003 Email from Prince Bander.

**Response:** Misleading and irrelevant. Soroof was unhappy but had no reason to know of the misrepresentations and material omissions of Defendants. *See* Paragraphs 20-22, 38, 43, 59, 67 and 71. Prince Bander considered consulting an attorney in order to take the matter out of the hands of Soroof's then CEO, but ultimately did not do so as he believed that Product development efforts continued and that the Product would be delivered. See **Ex. 16,** Al-Saud

Dep. at 135:15-136:9 ("in 2004...we are hoping that the machine is going to be there."). *See* **Ex. 25**, June 21, 2004 E-mail from Mr. Scovello (asserting to Soroof that "development of the product, contemplated in our original agreement, continues at Plug Power."). Soroof would not consult an attorney until 2007 when it learned that GEFCS had been dissolved (**Ex. 26**, Rashid Dep at 83:20-84:14) and after Frank Scovello stopped communicating with Jim Jackson. **Ex. 16**, Al-Saud Dep.. at 121:3-25; *see* **Ex. 26**, Rashid Dep. at 79:4-15 (believed the Product was coming until they learned of GEFCS's liquidation in 2007). .

116. Through 2005, Soroof understood there had been delays in the Product due to technical problems. Ex. 40, Deposition of Tahir Rashid on Feb. 25, 2013 ("Rashid Dep."), at 74:19-75:3, 77:8-13.

**Response:** Disputed. In the referenced deposition testimony, Mr. Rashid testified that Soroof believed that the "product was under development, it would be delivered" and that it was undergoing "fine-tunings [sic]." *See* Reponses to Paragraphs 3, 6, 38, 43, 59, 67, and 71.

117. In November 2005, Plug Power and Soroof met to discuss available products other than the ones contemplated under the Agreement. Ex. 40, Rashid Dep., at 92:25-93:19.

**Response:** Admitted that, to mitigate, alternative products were explored while Soroof waited for the Product to arrive. **Ex. 14,** Jackson Dep. at 187:9-19, 267:5-22, 272:3-11.

118. On multiple occasions, Soroof was informed by GEFCS that the product development schedule was unknown. Ex. 11, Soroof 30(b)(6) Dep., at 290:3-9 ("In fact, you have testified multiple times today that what GEFCS told you was, we don't know when the product is going to be developed, right, as soon as we do we will let you know. Isn't that correct? A. Yes."); *see also* Ex. 32, Apr. 17-19, 2001 Email String, at "Discussion Agenda with GE" Attachment; Ex. 33, Apr. 17-26, 2001 Email String, at "Soroof – Discussion Guide"

Attachment; Ex. 34, at Apr. 25, 2002 Email from Frank Scovello; Ex. 26, July 9, 2003 Email from Frank Scovello.

**<u>Response</u>:** *See* Response 3, 6, 20-22, 38, 43, 67, 71, 98, 99 and 116.

**E. <u>Soroof's Admissions concerning its Allegations</u>**

119. Tahir Rashid, Soroof's current vice-president of planning, and Soroof's corporate representative as to damages, testified that he believes the purpose of this case is to seek recovery "because the product was never delivered." Ex. 40, Rashid Dep., at 21:9-10, 66:7-11, 146:19-24. Further, he testified that the only alleged misrepresentation in this case is that the Product never arrived. *Id*. at 255:21-256:25, 257:10-16.

**<u>Response</u>:** This statement is immaterial and disingenuous. Tahir Rashid, who served as Soroof's 30(b)(6) designee on the issue of damages, had no reason to know what Defendants knew and when. Defendants produced more than 20,000 pages of documents in discovery in this case, most of which Mr. Rashid had never seen. **Ex. 26**, Rashid Dep. at 11:21-12:16 (testifying that he had only reviewed "[m]ajor documents with regards to the financial numbers"). *See* Paragraphs 3, 6, 20-22, 33, 38, 43, 59, 67 and 71. **Ex. 4**, Jackson Decl. at ¶¶ 7-9.

120. Soroof admits that it cannot point to any fact on which it relies to say that Defendants misinformed Soroof regarding the status of the development of the Product. Ex. 11, Soroof 30(b)(6) Dep., at 289:21-290:2 ("Q. Other than your allegation, your statement just now they must have known, your opinion that they must have known, is there any other fact on which you rely to say that defendants misinformed Soroof regarding the status of the development of the product? A. No").

**<u>Response</u>:** This statement is immaterial and disingenuous. Jim Jackson, who served a Soroof 30(b)(6) designee, had no reason to know what Defendants knew and when. Defendants

produced more than 20,000 pages of documents in discovery in this case, most of which Mr. Jackson had never seen. **Ex. 14,** Jackson Dep. at 9:18-24. *See* Responses 3, 6, 20-22, 33, 38, 43, 67 and 71. **Ex. 4**, Jackson Decl. at ¶¶ 7-9.

121. Prince Bander, Soroof's President and CEO, testified that he does not believe that GEFCS ever knowingly gave Soroof false information regarding the development of the Product between 2000 and 2005. Ex. 10, Bander Dep., at 246:8-247:7.

**Response:** Misleading and irrelevant. What Prince Bander *believed* with regard to Defendants' representations is not relevant to whether they were truthful. Prince Bander had no reason to believe at the time that anyone at GE was dishonest. Defendants have produced more than 20,000 pages of documents in this case, most of which Prince Bander has never seen. *See* **Ex. 16**, Al-Saud Dep. at 8:20-23. *See* Responses 3, 6, 20-22, 38, 43, 67 and 71. **Ex. 4**, Jackson Decl. at ¶¶ 7-9.

122. Soroof's corporate representative, Jim Jackson, testified that he believes that the real reason that the Product could not be delivered to Soroof under the Agreement—that a Product was not developed that would satisfy the terms of the Agreement—was honestly conveyed to Soroof. Ex. 11, Soroof 30(b)(6) Dep., at 291:11-293:5.

**Response:** Incomplete and misleading. In or around early 2005, Defendants conceded that the technical developmental problems encountered in the course of attempting to develop the Product could not be overcome. *See* **Ex. 29**, Jackson Decl. I at ¶ 12. However, Tahir Rashid was informed by Ravi Menon of Plug Power in late 2005 that the Product would be delivered in 2007. *See* Response 35. Either way, Defendants knew that the Product could not be developed (and certainly not before December 31, 2005, the date the Agreement was to expire on its terms)

long before 2005 and failed to share this material information with Soroof. *See* Paragraphs 3, 6, 20-22, 38, 43, 67 and 71. **Ex. 4**, Jackson Decl. at ¶¶ 7-9.

123. Soroof is unable to point to any specific relevant information that Defendants failed to share promptly with Soroof. Ex. 11, Soroof 30(b)(6) Dep., at 291:7-10.

**Response:** Disputed. *See* Responses 3, 6, 20-22, 38, 43, 67 and 71.

124. Soroof is unable to identify any facts to support its allegation that the Defendants did not make good faith efforts to bring the product to market other than its characterization of statements in Mr. Scovello's first deposition. Ex. 11, Soroof 30(b)(6) Dep., at 282:19-283:16, 304:5-21, 283:17-284:25.

**Response:** Disputed. *See* Responses 3, 6, 20-22, 38, 43, 67 and 71. GEFCS – the party with which Soroof contracted – had been inactive for several years prior to March 24, 2006 because Plug Power was unable to deliver any Product and could exercise no efforts, much less good faith efforts, relating to product development.

125. Soroof admits it is unable to identify anything to support its allegation that the development of the product was abandoned in 2001 other than Mr. Scovello's first deposition. Ex. 11, Soroof 30(b)(6) Dep., at 150:25-151:5, 285:20-287:5, 302:7-17, 295:4-8 ("Q. So do you have any facts to support that defendants knew at any time during the term of the agreement that the product was unlikely to ever exist? A. No."); Ex. 10, Bander Dep., at 243:18-20; Ex. 25, Soroof's Interrogatory Responses, at No. 9.

**Response:** Disputed. Soroof's witnesses have no reason to know internal decisions made by Plug Power and/or GE regarding the development of the Product. Plug Power, at GE's recommendation, refocused development efforts from the Product to "back-up generators." *See, e.g.*, Paragraphs 3, 6, 38, 59 and 71.

126. Tahir Rashid, Soroof's corporate representative as to damages, admitted that the damages claimed include every single expense allegedly incurred by Soroof's power division from 2001 to 2005 without regard to whether the expenses were allegedly related to the Agreement. Ex. 40, Rashid Dep., at 156:7-23; *cf.* Ex. 11, Soroof 30(b)(6) Dep., at 183:22-184:6.

**Response:** Defendants' statement is a gross misrepresentation of the testimony cited. "The basis is that Soroof signed this contract with GE Fuel Cell and the whole of the division was primarily set up for the marketing of this new innovative product. As such, **all of these expenses were incurred as a result of that contract and the product never arrived….**" Rashid Dep. at 156:15-23 (emphasis added).

## II. SIGNIFICANT PROCEDURAL BACKGROUND

127. On July 1, 2008, Soroof filed an arbitration demand against GEFCS seeking to recover damages under the theory that GEFCS had improperly failed to deliver products pursuant to the Agreement. Docket No. 13, Preliminary Pre-Trial Statement, at 1-6.

**Response:** Admitted. Plaintiff sought recovery for both breach of contract and fraud.

128. On January 22, 2010, the parties entered into a Venue Agreement, whereby the parties agreed to discontinue the arbitration and litigate Soroof's claims in this Court. Docket No. 63-3, Venue Agreement.

**Response:** After the Arbitration Panel denied GEFCS's Motion to Dismiss, admitted.

129. On February 22, 2010, Soroof filed a Complaint against GEFCS, GE Microgen, and Plug Power asserting claims originally stated in the arbitration as well as various other claims allegedly arising out of the Agreement, including claims for breach of contract, misrepresentation, conversion, and unjust enrichment. Docket No. 1, Complaint, at 7-14.

**Response:** Admitted.

Dated: June 25, 2013

Respectfully submitted,

KALBIAN HAGERTY LLP

By: /s/ Haig V. Kalbian

Haig V. Kalbian (*pro hac vice*)
Aaron W. Knights (*pro hac vice*)
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
T: (202) 223-5600
F. (202) 223-6625
hkalbian@kalbianhagerty.com
mmb@kalbianhagerty.com
aknights@kalbianhagerty.com

James R. Lynch (JL-2778)
Jason Kaufman
LYNCH DASKAL EMERY LLP
264 West 40th Street
New York, New York 10018
T: (212) 302-2400
F: (212) 302-2210
lynch@lawlynch.com
kaufman@lawlynch.com

*Counsel for Plaintiff Soroof Trading Development Company, Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Plaintiff's Statement of Opposing Facts in Response to Defendants GE Microgen, Inc., Plug Power Inc., and General Electric Company's Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment, was served this 25th day of June 2013, via electronic and overnight mail on the following:

Dahlia S. Fetouh, Esq.
Abigail K. Hemani, Esq.
Lisa M. LoGerfo, Esq.
Lauren S. Kupersmith, Esq.
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
E-mail: dfetouh@goodwinprocter.com
E-mail: ahemani@goodwinprocter.com
E-mail: llogerfo@ goodwinprocter.com
E-mail: lkupersmith@ goodwinprocter.com

*Counsel for PLUG POWER, INC.*

Michael D. Fisse, Esq.
John Dubreuil, Esq.
Jon A. Van Steenis, Esq.
DAIGLE FISSE & KESSENICH
PO Box 5350
Covington, LA 70434-5350
E-mail: mfisse@daiglefisse.com
E-mail: jdubreuil@daiglefisse.com
E-mail: jvansteenis@daiglefisse.com

*Counsel for Defendants GENERAL ELECTRIC COMPANY and GE MICROGEN, INC.*

/s/ Aaron W. Knights
Aaron W. Knights

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Plaintiff's Statement of Opposing Facts in Response to Defendants GE Microgen, Inc., Plug Power Inc., and General Electric Company's Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment, was served this 28th day of June 2013, via notice of electronic filing on the following:

Dahlia S. Fetouh, Esq.
Abigail K. Hemani, Esq.
Lisa M. LoGerfo, Esq.
Lauren S. Kupersmith, Esq.
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
E-mail: dfetouh@goodwinprocter.com
E-mail: ahemani@goodwinprocter.com
E-mail: llogerfo@ goodwinprocter.com
E-mail: lkupersmith@ goodwinprocter.com

*Counsel for PLUG POWER, INC.*

Michael D. Fisse, Esq.
John Dubreuil, Esq.
Jon A. Van Steenis, Esq.
DAIGLE FISSE & KESSENICH
PO Box 5350
Covington, LA 70434-5350
E-mail: mfisse@daiglefisse.com
E-mail: jdubreuil@daiglefisse.com
E-mail: jvansteenis@daiglefisse.com

*Counsel for Defendants GENERAL ELECTRIC COMPANY and GE MICROGEN, INC.*

/s/ Aaron W. Knights
Aaron W. Knights