UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

```
------------------------------------------------------------   X
                                                               :
SOROOF TRADING DEVELOPMENT COMPANY                             :
LTD.,                                                          :
                                    Plaintiff,                 :        10 Civ. 01391
                                                               :           (LGS)
               -against-                                       :
                                                               :        OPINION
GE MICROGEN INC. et al,                                        :        AND ORDER
                                    Defendants.                :
------------------------------------------------------------   X
```

LORNA G. SCHOFIELD, District Judge:

This is an action for breach of contract and misrepresentation by Plaintiff Soroof

Trading Development Company, Ltd. ("Soroof" or "Plaintiff") against Defendants Plug

Power, Inc. ("Plug Power"), GE Microgen, Inc. ("GE Microgen") and General Electric

Company ("GE") (together, "Defendants"). The claims arise from disputes regarding a

distributor agreement that Soroof and GE Fuel Cell Systems LLC ("GEFCS") entered

into on June 6, 2000, providing Soroof, in exchange for a $1 million fee ("Distributor

Fee"), the exclusive right to distribute a fuel cell meeting certain contractual

specifications that was to provide continuous residential power (the "Product") in Saudi

Arabia ("Distributor Agreement").

Plaintiff brings two claims against Defendants, and each claim is predicated on

two theories of liability. First, Plaintiff brings its claim for breach of contract by alleging

(1) a breach of section 5.2 of the Distributor Agreement, requiring GEFCS to "use

reasonable efforts to supply" the Product and (2) a breach of section 7.4 of the Distributor

Agreement, requiring the parties to "share promptly relevant information" with each

other.  Second, Plaintiff brings its claim for misrepresentation by alleging (1) misrepresentation consisting of fraudulent inducement to enter into the Distributor Agreement and (2) misrepresentation during the course of the Distributor Agreement.

Defendants move for summary judgment dismissing all claims.  Plaintiff moves for summary judgment on the issue of piercing GE Microgen's corporate veil in order to hold GE liable.  For the reasons discussed below, both motions are denied.

## I.     Background

### A.  Facts

The facts are taken from the record provided by the parties in connection with their motions for summary judgment and are viewed in the light most favorable to the non-moving party.

### 1.  The Parties and the Product

GEFCS is a now-dissolved Delaware limited liability company that was formed in 1999 by members Plug Power and GE Microgen, a wholly-owned subsidiary of GE, for the purpose of developing and marketing fuel cell products.  GE Microgen's role was to manage sales and marketing, while Plug Power's role was to develop and manufacture the products.

In March 1999, Sandia National Laboratories finished tests on a Plug Power fuel cell product that Dr. Dennis Witmer, one of their scientists, testified was "the same technology" as the Product, but differed because it "did not contain a hydrocarbon reformer, and operated on pure hydrogen."  Dr. Witmer testified that he found the fuel cell's "performance and capabilities" to be "far below that which Plug Power had represented" and that "at no time was it able to perform at the efficiency levels outlined

in the [Distributor Agreement]." Dr. Witmer testified further that he informed Plug Power and GEFCS in the Spring and Summer of 1999 that he had "considerable doubt that they could commercialize the Product" within the timeframe predicted or possibly at all. Plug Power testified, through its agent Gerald Conway, that it believed, both before and after this testing, that the Product could in fact be successfully developed and marketed.

A Plug Power public SEC filing, Form 10-K, from March 2000 states, "We do not know when or whether we will successfully complete research and development of a commercially viable residential fuel cell system." An internal GE Energy Services "Fuel Cell Product Requirement Overview" from April 2000 shows the Product was failing to meet developmental milestones. An internal GECFS "Marketing Update" from April 2000 states, "GEFCS is continuing to sell product 'potential,' with no hardware, field testing, etc. to back up the story." Plug Power testified, through its agent Manmohan Dhar, that Plug Power "didn't have a lot of data" on the Product in early to mid-2000.

## 2. Negotiations and the Distributor Agreement

In May 2000, Soroof, a newly-formed Saudi Arabian company, began negotiating with GEFCS to become a distributor of the Product. At this time, the Product was still in development, which Soroof knew. Soroof's Executive Director, James Jackson, testified that GEFCS' President, Barry Glickman, told him during negotiations that the Product "was nearly ready for availability for production." Soroof's President and CEO, Prince Bander bin Abdullah Al-Saud, testified that Mr. Glickman, as well as GE Energy employee Frank Scovello, who later served as President of GEFCS, told him that the

Product was in "the last stage," "coming soon" and "going to be finished in last quarter 2000."

Defendants did not inform Soroof of the outside experts' testing or conclusions. Plug Power testified, through its agent John Cerveny, that the tested fuel cell was not similar enough to the Product for the tests to be relevant to the Distributor Agreement. Mr. Jackson testified that the documents concerning the Product's progress from April 2000, as well as the information they contain, were also never shared with Soroof. Soroof did not consult Plug Power's SEC filings. Soroof also did not speak directly with Plug Power's researchers. Mr. Jackson testified that the only due diligence Soroof performed prior to entering into the Distributor Agreement consisted of in-person meetings and telephone conversations with GEFCS and GE personnel.

On June 6, 2000, Soroof and GEFCS entered into the Distributor Agreement, which provided Soroof the exclusive right to distribute the Product in Saudi Arabia. Soroof paid GEFCS a $1 million Distributor Fee, which the Distributor Agreement provided was "non-refundable." The Distributor Agreement required GEFCS to "[u]se reasonable efforts to supply" the Product to Soroof. The Distributor Agreement also required the parties to "share promptly relevant information, including but not limited to product performance" and contained limited liability provisions and a merger clause.

### 3.  Delays in Development of the Product

"At the signing of the contract," GEFCS informed Soroof that the Product would be ready in the last quarter of 2001 instead of 2000. Then, in August 2000, GEFCS informed Soroof that the Product's delivery had further "shifted to the right by six months." The Product continued to experience delays in production throughout the

course of the Distributor Agreement.  Through emails, phone calls and in-person

meetings, GEFCS periodically informed Soroof of these delays.  In April 2001, Soroof

understood the delivery schedule for the Product had "slipped indefinitely," which it

characterized as "a problem," but interpreted to mean that GEFCS could not provide a

definite delivery date, not that the Product would never be delivered.

The Product also continued to fall short of developmental milestones, which Mr.

Glickman testified was a concern to GE.  Mr. Scovello testified that Defendants had "a

gradual realization that they could not build [a] product even close to what [they] had

originally contemplated."  Plug Power's Form 10-K filings from 2000 to 2006 included

information concerning development of the Product, as well as risk factors.

Plug Power testified, through its agent Gerald Conway, that it "work[ed] in good

faith" and "used extraordinary efforts" to develop the Product during the course of the

Distributor Agreement.  Plug Power also testified, through its agent John Cerveny, that it

used "thousands of hours," "hundreds of employees" and "millions of dollars"

developing the Product.  Mr. Scovello testified that Plug Power made good faith efforts to

bring the Product to market, spending "north of half a billion dollars" and employing

over 300 people.

During the course of the Distributor Agreement, Plug Power was working on

other products as well, such as backup generators.  A September 12, 2003 Plug Power

memo states that Plug Power "recently realigned [its] resources to bring more focus to the

GenCore," which was a "backup power product."  A document titled "Plug Power

Review" states that Plug Power is "[c]urrently focusing on products with near-term

revenue potential," which includes the backup generator.  Mr. Jackson testified that these documents, as well as the information they contain, were never shared with Soroof.

Mr. Conway testified that Plug Power "turned [its] focus to the GenCore product" because Plug Power was losing money in connection with its efforts to produce the Product.  Mr. Scovello testified that "[t]owards the end" of GE's relationship with Plug Power, Plug Power was not building the Product but was building something else, a backup power generator.  Mr. Scovello also testified that GE and GEFCS believed in 2003 that development of the Product was continuing.  Additionally, Mr. Scovello, as well as Plug Power, through its agent Gerald Conway, testified that Defendants never abandoned development of the Product during the course of the Distributor Agreement.

Internal GE documents show that GE was withdrawing its financial support from Plug Power and the Product in 2003.  An August 19, 2003, GE slide titled "Plug Power Update" says that there will be "[n]o [f]urther GE [i]nvestment" in Plug Power.  A September 12, 2003, Plug Power "Due Diligence" memo cites GE's "decision not to make further equity investments in Plug Power."  Another GE slide from 2003 titled "GEFCS Current Strategy" lists one strategy as "[a]void[ing] sales of PP [Plug Power] [p]roducts [t]hrough GEFCS."  An April 5, 2006, GE "Business Condition Summary" states that GEFCS "has been inactive for several years" due to "[s]upplier [i]nability to deliver product."  Mr. Jackson testified that neither these documents, nor the information they contain, were ever shared with Soroof.

Mr. Jackson testified that, in January 2004, Soroof did not feel it was "always kept up-to-date."  In June 2004, Soroof asked GECFS to return the Distributor Fee, and GEFCS declined.  On June 21, 2004, Mr. Scovello informed Soroof in an email that

"development of the product, contemplated in our original agreement, continues at Plug Power."  Soroof internal emails on June 23 and 24, 2004, show that Soroof considered consulting with an attorney regarding the Distributor Agreement.  Tahir Rashid, COO of Soroof, testified that in late 2005, Plug Power representative Ravi Menon visited Soroof in Saudi Arabia and told him that the Product would be ready in 2007.

The term of the Distributor Agreement expired on December 31, 2005.  On December 31, 2006, GEFCS was formally dissolved.  Soroof was not informed that GEFCS was going to be dissolved.  Mr. Jackson testified that Soroof did not become aware of GEFCS' dissolution until 2007.  To date, Plug Power has not created a commercial product meeting the specifications in the Distributor Agreement, but has sold similar products.

### B. Procedural History

Soroof commenced arbitration against GEFCS on July 1, 2008.  The parties then stipulated to dismiss the arbitration and bring the dispute to this Court.  Plaintiff claims that the Venue Agreement entered into by the parties tolled the statute of limitations, and while Defendants do not necessarily agree, for purposes of the instant motions for summary judgment, Defendants "give Soroof the benefit of the arbitration filing date."

Plaintiff filed its original complaint in this Court against GEFCS, GE Microgen and Plug Power on February 22, 2010, which included claims for breach of contract, misrepresentation, conversion, constructive trust, unjust enrichment and a demand for an accounting.  Defendants moved for judgment on the pleadings; Soroof moved for summary judgment on the issue of piercing GEFCS' corporate veil; and the parties cross-

moved for summary judgment on the issue of bringing claims against GEFCS, a dissolved entity.

On January 24, 2012, Judge Swain granted Defendants' motion for judgment on the pleadings, dismissing Soroof's breach of contract and misrepresentation claims "without prejudice to repleading" and dismissing the other four claims with prejudice. At this time, Judge Swain also (1) granted Defendants' motion for summary judgment dismissing all claims against GEFCS, (2) denied Soroof's motion for summary judgment nullifying GEFCS' certificate of cancellation and (3) granted Soroof's motion for summary judgment piercing GEFCS' corporate veil.

On February 10, 2012, Soroof filed its First Amended Complaint, repleading its breach of contract and misrepresentation claims against GE Microgen and Plug Power. On May 11, 2012, Magistrate Judge Francis granted Soroof's motion to further amend its complaint. Soroof filed its Second Amended Complaint (hereafter, "Complaint," as the operative complaint on this motion) on May 14, 2012, which pleads the same two causes of action and adds GE as a defendant. The instant cross-motions for summary judgment followed.

## II.    Discussion

### A.  Standard of Review

Summary judgment is appropriate only where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008). A motion for summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the nonmoving party. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178–79 (2d Cir. 2008).

### B. Breach of Contract

With respect to Plaintiff's claim for breach of contract, Defendants' motion for summary judgment is denied, as genuine issues of material fact exist for trial.

### 1. Section 5.2

Section 5.2 of the Distributor Agreement required GEFCS to use "reasonable efforts to supply" the Product. A "reasonable efforts" clause, like a "best efforts" clause, "'imposes an obligation to act with good faith in light of one's own capabilities.'" *Monex Fin. Serv. Ltd. V. Nova Info. Sys., Inc.*, 657 F. Supp.2d 447, 454 (S.D.N.Y. 2009) (quoting *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613 n. 7 (2d Cir. 1979); *accord Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124 (2d. Cir. 2013). Whether Defendants acted with good faith in light of their capabilities to supply the Product involves questions of fact.

Soroof claims that Defendants breached section 5.2 by "abandoning development" of the Product as early as "less than one year from the signing" of the Distributor Agreement and "no later than 2003." Soroof offers sufficient evidence that a reasonable jury could find Defendants breached section 5.2, including evidence that Plug Power shifted its efforts from developing the Product to developing other products, such as backup generators, and evidence that GE withdrew its support of Plug Power and the Product in 2003, causing GEFCS to become inactive.

Therefore, with respect to Plaintiff's claim that Defendants breached section 5.2 of the Distributor Agreement, Defendants' motion for summary judgment is denied as genuine issues of material fact exist for trial, including, among others:

1.      Whether Defendants "abandoned" development of the Product at any time during the course of the Distributor Agreement;

2.      Whether Defendants unfairly prioritized the development of other products over development of the Product;

3.      Whether and how much of Defendants' resources – money, facilities, equipment, intellectual property, and employees – were used for development of the Product versus other products; and

4.      Whether Defendants believed during the entire course of the Distributor Agreement they could develop and commercialize the Product.

### 2.  Section 7.4

Section 7.4 of the Distributor Agreement required both parties to "share promptly relevant information, including but not limited to product performance, failure and liability issues."  The Distributor Agreement does not define the term "relevant."  Under New York law, when interpreting a contract, "words and phrases . . . should be given their plain meaning."  *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (alteration in original) (internal quotations omitted).  The meaning of "relevant" is "having significant and demonstrable bearing on the matter at hand."  *Relevant*, MERRIAM–WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/relevant (last visited October 25, 2013).  Whether Defendants

promptly shared all information having significant and demonstrable bearing on the Product involves questions of fact.

Soroof claims that Defendants breached section 7.4 by "never honestly convey[ing] the real reason the Product could not be delivered," "fail[ing] to inform Soroof of relevant information relating to product performance and failure . . . the substantial and significant Product development problems . . . and the real possibility that the Product could not . . . be commercialized" and "express[ing] optimism" about the Product that was "unfounded" in an attempt to "run[] out the clock on the Agreement."

Soroof offers sufficient evidence that a reasonable jury could find Defendants breached section 7.4, including evidence that Defendants possessed the following information and did not share it with Soroof: (1) independent tests were conducted on the Product, showing it could not be developed on schedule, or possibly ever, (2) the Product fell short of developmental milestones before and after the parties signed the Distributor Agreement, causing Defendants to realize they could not build the Product and (3) GE withdrew its support from Plug Power, which ceased development of the Product, and GEFCS became inactive.

Therefore, with respect to Plaintiff's claim that Defendants breached section 7.4 of the Distributor Agreement, Defendants' motion for summary judgment is denied as genuine issues of material fact exist for trial, including, among others:

1.    Whether and when Defendants knew the Product could not, or likely could not, be developed and/or commercialized;

2.    Whether and when Defendants informed Soroof the Product could not, or likely could not, be developed and/or commercialized; and

3.      Whether the fuel cell independently tested in 1999 was similar enough for the test results to be "relevant information."

### C. Misrepresentation

With respect to Plaintiff's claim for misrepresentation, Defendants' motion for summary judgment is denied as genuine issues of material fact exist regarding Plaintiff's fraudulent inducement theory of liability.  However, Plaintiff's theory of liability that Defendants continued in their misrepresentations during the course of the Distributor Agreement cannot survive as a matter of law, as the allegations underlying this theory are duplicative of the allegations underlying Plaintiff's claim that Defendants breached section 7.4 of the Distributor Agreement.

### 1. Fraudulent Inducement

Soroof claims that Defendants "in order to induce Plaintiff to sign the Agreement and pay the $1 million . . . made material misrepresentations and failed to disclose material facts."  Specifically, Soroof claims that Defendants, in contract negotiations, (1) represented, knowing it to be false, that the Product was almost ready for production and (2) failed to disclose the significant problems with the Product's development, including the fact it may never be produced at all.  Defendants argue not only that they did not make any misrepresentations, but also that Soroof "could not have justifiably relied on any misinformation" it allegedly was provided by Defendants due to Soroof's status as a sophisticated party and its alleged lack of due diligence, specifically its failure to consult Plug Power's publicly-available SEC filings.

Whether Soroof's reliance on Defendants' alleged misrepresentations was reasonable involves questions of fact, including whether Plug Power's SEC filings

provided Soroof with inquiry notice that the Product might never be developed, when GE allegedly was contradicting this information with verbal representations.  Whether a party was put on inquiry notice may be decided as a matter of law; however, "courts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements."  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp.2d 220, 229 (S.D.N.Y. 1999); *see In re Ames Dep't Stores, Inc. Note Litig.*, 991 F.2d 968, 981 (2d Cir. 1993).  Here, positive statements not only appeared in the filings themselves, but also allegedly were communicated directly to Soroof by Defendants.

Moreover, "reasonable reliance is often a question of fact for the jury rather than a question of law for the court."  *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011).  While "a sophisticated plaintiff cannot establish . . . justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it," this rule does not alter the general rule that "the inquiry [into the reasonableness of reliance] is fact-specific" and "the entire context of the transaction" is to be considered.  *Universe Antiques, Inc. v. Vareika*, 826 F. Supp.2d 595, 609 (S.D.N.Y. 2011).  A party's failure to show perfect due diligence does not "remove any question of fact with respect to the reasonableness of their reliance."  *In re Lavender*, 399 Fed. Appx. 649, 652 (2d Cir. 2010).

Soroof offers sufficient evidence that a reasonable jury could find that Defendants fraudulently induced Soroof to enter into the Distributor Agreement, including evidence that Defendants represented to Soroof in contract negotiations that the Product was close to commercialization while knowing it was actually very early in its development, as well as evidence that Defendants withheld material information from Soroof during

negotiations, such as the Product's failure to meet technical milestones and the results of the independent testing.

Defendants' argument that the merger clause in the Distributor Agreement would bar this evidence is incorrect. The Distributor Agreement states that "[a]ny representations or terms and conditions relating to transactions within the scope of this Agreement which are not incorporated or referenced herein shall not be binding upon either party." New York law, however, "permits the use of parol evidence to prove a claim of fraud in the inducement, even where the written contract contains an integration, or merger, clause." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006).

Moreover, "a general merger clause is generally insufficient to bar parol evidence of a fraudulent misrepresentation." *Hobart v. Schuler*, 434 N.E.2d 715, 716 (N.Y. 1982). Parol evidence may be considered to prove fraudulent representations that are not "specifically contradicted by any of the detailed representations or warranties contained in the agreement." *Id.* Here, the Distributor Agreement does not address the Product's development progress or its likelihood of successful commercialization.

Defendant's argument that this claim must be dismissed because it is duplicative of Plaintiff's claim for breach of contract also is incorrect. Under New York law, "a claim based on fraudulent inducement of a contract is separate and distinct from a breach of contract claim." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007). New York law "distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." *Id.* Here, Soroof claims that Defendants made

misrepresentations and failed to disclose material facts regarding the Product's stage of development at the time the Distributor Agreement was signed.

Therefore, with respect to Plaintiff's claim that Defendants fraudulently induced Soroof to enter into the Distributor Agreement, Defendants' motion for summary judgment is denied as genuine issues of material fact exist for trial, including, among others:

1.      What Defendants knew and believed regarding the Product's development and viability while negotiating the Distributor Agreement;

2.      What Defendants told Soroof about the Product's development and viability while negotiating the Distributor Agreement; and

3.      Whether Soroof performed satisfactory due diligence before entering into the Distributor Agreement.

## 2.  Misrepresentation During the Course of the Distributor Agreement

Soroof claims that Defendants "continued in their misrepresentations and omissions" throughout the term of the Distributor Agreement.  Specifically, Soroof claims that Defendants (1) never disclosed to Soroof that GE lost confidence in Plug Power, pulled its financial support and caused GEFCS to become inactive and (2) misrepresented to Soroof that the Product was forthcoming when they knew it was not.

Under New York law, where a claim for misrepresentation "arises out of the same facts as plaintiff's breach of contract claim," the misrepresentation claim "is redundant and plaintiff's sole remedy is for breach of contract."  *Telecom Intern. America, Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (internal quotations omitted); *accord Guilbert v. Gardner*, 480 F.3d 140, 148 (2d. Cir. 2007).  A separate claim for

misrepresentation cannot survive where it "arises out of the identical facts and circumstances, and even contains the same allegations, as the cause of action alleging breach of contract." *34-35th Corp. v. 1-10 Indus. Assoc. LLC*, 768 N.Y.S.2d 644, 644 (2d Dep't. 2003).

Here, the theory that Defendants continued in their misrepresentations during the course of the Distributor Agreement and the theory that Defendants breached section 7.4 of the Distributor Agreement are the same, and they are based on the same facts. Both allege, in essence, that Defendants did not disclose the whole truth to Soroof about the Product's development, or lack thereof, and that Defendants strung Soroof along, saying the Product would be delivered when they knew it would not.

The allegations use very similar language. In support of its breach of contract claim, the Complaint states, "Defendants never honestly conveyed the real reason that the Product could not be delivered . . . Defendants never informed Soroof that it was not quality but a complete inability to commercialize the Product and Plug Power's abandonment of the Product's development altogether in 2001 that prevented delivery." In support of its misrepresentation claim, the Complaint states, "Defendants deliberately and continually failed to disclose the truth regarding the Product: that it did not exist and was unlikely to ever exist given Plug Power's complete abandonment of the Product's development in 2001."

The theory of liability that Defendants continued in their misrepresentations during the course of the Distributor Agreement is "not sufficiently distinct from the breach of contract cause of action to constitute a separate cause of action . . . and the alleged misrepresentations did not result in any loss independent of the damages

allegedly incurred for breach of contract." *Church of S. India Malayalam Congregation of Greater N.Y. v. Bryant Installations, Inc.*, 925 N.Y.S.2d 131, 132 (2d Dep't. 2011) (citation omitted). Therefore, while Plaintiff's claim for misrepresentation survives under a fraudulent inducement theory, recovery under Plaintiff's theory that Defendants continued their misrepresentations throughout the term of the Distributor Agreement is barred, as this theory is duplicative of Plaintiff's claim for breach of contract.

### D.  Statute of Limitations

Plaintiff initiated arbitration proceedings in this matter on July 1, 2008, which is the operative date for the statute of limitations on this motion. For the reasons discussed below, the Court has determined that the statute of limitations applicable to Plaintiff's breach of contract claim is four years, and the statute of limitations applicable to Plaintiff's misrepresentation claim is the longer of six years from the misrepresentations or two years from the time Plaintiff discovered or should have discovered the misrepresentations. Whether the statute of limitations has run is a question of law; however, here the fact-finder must answer questions of fact detailed below before the Court can make this determination.

### 1.  Breach of Contract

The statute of limitations period applicable to Soroof's breach of contract claim is four years under the New York Uniform Commercial Code ("UCC"). N.Y. U.C.C. § 2-725(1). The UCC applies to these claims pursuant to the plain language of the Distributor Agreement, which states, "The relationship between [Soroof] and GEFCS under this Agreement is intended to be that of buyer and seller." The UCC applies to all contracts for the sale of goods in which title transfers from seller to buyer. N.Y. U.C.C.

§§ 2-102, 2-106(1).  The Distributor Agreement states that GEFCS shall "[s]ell" the Product to Soroof and that "[t]itle to the Product shall pass to the Buyer."

Soroof alleges that Defendants breached section 7.4 immediately upon entering the Distributor Agreement in June 2000 and breached section 5.2 "less than one year from the signing of the Agreement."  Under the UCC, a claim for breach of contract accrues when the breach occurs, regardless of whether the aggrieved party is aware of the breach.  N.Y. U.C.C. § 2-725(2).  The UCC, however, "does not alter the law on tolling of the statute of limitations."  N.Y. U.C.C. § 2-725(4).

Under New York law, a limitation period is tolled when a plaintiff fails to bring suit as a result of "blameless ignorance" or "culpable action by the defendant."  *Johnson v. Nyack Hosp.*, 891 F. Supp. 155, 165 (S.D.N.Y. 1995); *accord Access Northern Sec. Corp. v. Linear Corp.*, 97 Civ. 2937, 1998 WL 566815, *5 (S.D.N.Y. Sept. 4, 1998).  For example, a statute would be tolled during a "defendant's fraudulent concealment of facts that would alert the plaintiff to [its] claim."  *Johnson*, 891 F. Supp. at 165; *see Cerbone v. International Ladies Garment Workers Union*, 768 F.2d 45, 48 (2d Cir. 1985).

The doctrine of equitable tolling delays the start of a statute of limitations when a defendant's "misleading conduct is responsible for the [plaintiff's] unawareness of his cause of action" until "the time the plaintiff should have discovered" it.  *Dillman v. Combustion Engineering, Inc.*, 784 F.2d 57, 60 (2d Cir. 1985).  Alternatively, the doctrine of equitable estoppel tolls a statute of limitations where the plaintiff knew of the existence of the claim, but "the defendant's conduct caused him to delay bringing his lawsuit."  *Id.*; *accord Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995).

Here, Soroof claims it was not aware of the alleged breaches until 2007 when it learned of the dissolution of GEFCS and Defendants allegedly stopped responding to its inquiries.  Defendants, however, claim Soroof was aware much earlier, such as in 2001, when it viewed the Product's indefinite delay as a problem, and in 2004, when it did not feel it was always kept up to date with information about the Product, asked for the Distributor Fee to be returned and mentioned having a lawyer review the Distributor Agreement.

What Soroof knew and when are questions of fact.  Soroof has presented sufficient evidence that a reasonable jury could find that Soroof was blamelessly ignorant of the alleged breaches and/or that Defendants' misconduct caused Plaintiff to delay bringing suit, including evidence that Defendants repeatedly assured Soroof the Product would be delivered when they knew it would not be, and evidence that Defendants concealed the Product's true development status.  Therefore, questions of fact exist regarding whether the statute of limitations should be tolled, and for how long, including:

1.      When Soroof knew Defendants were in breach of the Distributor Agreement, including Soroof's knowledge when asking for GEFCS to return the Distributor Fee in 2004;

2.      Whether and for how long Defendants continued to promise Soroof that the product was forthcoming when they knew it was not; and

3.      Whether Soroof performed satisfactory due diligence.

## 2.  Misrepresentation

The statute of limitations period applicable to Soroof's fraudulent inducement claim is, under New York law, the greater of six years from the misrepresentations or two

years from the time Soroof discovered or should have discovered them.  N.Y. C.P.L.R. §

213(8).  Soroof claims that it did not become aware of the alleged misrepresentations

until 2007.  Defendants, however, argue that Soroof should have known of any alleged

misrepresentations as early as 2000, considering the statements in Plug Power's Form 10-

K from March 2000, but failed to do adequate due diligence.  Determining when Soorof

knew, or should have known, of the alleged misrepresentations involves questions of fact,

including whether Soroof performed adequate due diligence.

### E.  Limited Liability Contract Provisions

#### 1.  Section 12.1-2

The Distributor Agreement states that GEFCS' "total liability . . . shall not exceed

the amount that has been paid to GEFCS by [Soroof] under this Agreement," which was

$1 million.  The Distributor Agreement also states that "[i]n no event . . . shall GEFCS . .

. be liable to [Soroof] . . . for loss of profit or revenues, downtime costs, cost of capital,

cost of facilities or services, or any other costs or damages which may be categorized as

indirect, incidental, exemplary, or consequential damages."

Clauses limiting liability are "perfectly common and acceptable."  *Kalisch-
Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983).  But under public

policy, these provisions will not apply to "exonerate a party from . . . willful or grossly

negligent acts."  *Id.*  "Willful or grossly negligent acts" may be "explicit" - "fraudulent,

malicious, or prompted by . . . sinister intention" or "implicit" - "reckless[ly] indifferen[t]

to the rights of others."  *Id.* at 416-17.

If Defendants engaged in "willful or grossly negligent acts," the limited liability

provisions in the Distributor Agreement will be disregarded.  In the absence of such a

finding, damages in this action will be capped at $1 million and will exclude any damages of the types expressly prohibited by the Distributor Agreement.

Whether Defendants engaged in "willful or grossly negligent acts" involves genuine questions of material fact, including:

1.      Whether and when Defendants knew commercialization of the Product was not possible or at least unlikely, especially prior to entering the Distributor Agreement and accepting the Distributor Fee;

2.      Whether and when Defendants abandoned development of the Product during the term of the Distributor Agreement;

3.      Whether Defendants intentionally withheld material information from Plaintiff concerning the viability of the Product; and

4.      Whether Defendants deceived Plaintiff by indicating the Product would be ready for distribution, knowing this to be untrue.

### 2.   Section 6.4

The Distributor Agreement characterizes the Distributor Fee as "non-refundable." This provision is also subject to the public policy considerations discussed above. Furthermore, "the word non-refundable cannot be construed as a license to . . .  provide little or no consideration and to still retain an advance payment." *Iwon, Inc. v. Ourhouse, Inc.*, 744 N.Y.S.2d 791, 794 (N.Y. Sup. Ct. 2001).  Thus, if there is a finding of "willful or grossly negligent acts" by Defendants, the Distributor Fee's description as "non-refundable" will be disregarded.

### F.  Piercing GE Microgen's Corporate Veil

Soroof moves for summary judgment to pierce GE Microgen's corporate veil in order to hold GE liable.  Defendants, in turn, request in their Opposition that the veil piercing claim be dismissed.  Both requests are denied, as there are genuine questions of material fact to be answered before this claim can be decided.

Under Delaware law, a court may pierce a corporate veil "where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner." *NetJets Aviation*, 537 F.3d at 176 (alteration in original) (internal quotations omitted).  To prevail under the alter ego theory, fraud is not necessary, but an element of injustice is. *Id.*  The same facts used to show the entities operated as a single enterprise may be used to show the necessary element of injustice.  *Id.* at 183.

Soroof alleges that GE Microgen was the alter ego of GE and that its "only discernable purpose . . . was to serve as an extra layer of corporate protection between GEFCS . . . and GE."  Soroof provides evidence that GE, bypassing GE Microgen, orchestrated the actions of GEFCS.  Specifically, Soroof provides evidence that GE diverted funds, including the Distributor Fee, directly from GEFCS to fund the salaries of GE employees, that GE's senior management directed the dissolution of GEFCS, that the President of GEFCS was not employed by GEFCS or GE Microgen but by GE and that GE was a major shareholder of Plug Power and occupied a seat on its Board.

Additionally, Soroof provides evidence that GE Microgen lacked the funding to finance its own operations or those of GEFCS, that any funds GE Microgen received came not from its own revenue generating business, but from GE and that all necessary

funding for GEFCS was provided by GE, including $35 million of initial capital and additional non-recourse promissory notes.

Soroof also provides evidence that GE Microgen had no employees of its own, but was provided employees selected, tasked and paid by GE and that GE leased space with a GE Microgen sign that actually housed GE employees assigned to GEFCS. Finally, Soroof provides evidence that GE Microgen is no longer an active corporation.

A reasonable jury could conclude, if it accepted these facts as true, that the operations of GE and GE Microgen were sufficiently intermingled that they were alter egos. Specifically, the allegation concerning GE's siphoning of funds from GEFCS and the allegation concerning GE's decision to dissolve GEFCS knowing of Soroof's potential claims, if found to be true, could demonstrate that GE Microgen's corporate form was used for a fraudulent purpose and that GE Microgen's corporate veil should be pierced.

Defendants, however, offer contradictory evidence creating genuine issues of material fact. Defendants provide evidence showing that GE Microgen was a corporation distinct from GE that was managed separately. Defendants also provide evidence that the Distributor Fee was not siphoned to pay the salaries of GE employees, but used to offset the cost of salaries of those GE employees supporting GEFCS, as well as on marketing support for the Product, and that GE Microgen and Plug Power mutually agreed to dissolve GEFCS. Additionally, Defendants provide evidence that GE did not provide all of the funding necessary to make the Product commercially available and that the money invested by GE in GEFCS was actually a loan to GE Microgen. Finally, Defendants provide evidence that GE Microgen is still an active corporation.

Therefore, there are fact issues that must be resolved by the fact-finder before the Court can rule on the veil piercing claim.

**III.     Conclusion**

For the reasons stated above, Defendants' motion is DENIED, and Plaintiff's motion is DENIED.

The Clerk of the Court is directed to close the motions at Docket Numbers 178 and 184.

SO ORDERED.

New York, New York
October  30, 2013

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE